# EXHIBIT A

# THE OFAC LIST

*How a Treasury Department Terrorist Watchlist Ensnares Everyday Consumers*

MARCH 2007



Lawyers' Committee for
**CIVIL RIGHTS**
of the San Francisco Bay Area

The Lawyers' Committee for Civil Rights of the San Francisco Bay Area (LCCR) is a civil rights and legal services organization devoted to advancing the rights of people of color, poor people, and immigrants and refugees. LCCR is affiliated with the Lawyers' Committee for Civil Rights Under Law in Washington, D.C., which was created at the behest of President John F. Kennedy in 1963. Since September 11, 2001, LCCR has advocated on behalf of individuals who have faced discrimination and racial profiling from private companies and government entities.

Written by Shirin Sinnar
Consultant to the Lawyers' Committee for Civil Rights
Staff Attorney at the Asian Law Caucus

Cover illustration:    Alexandra Gross

Contacts:              Shirin Sinnar, 415-896-1701
                       Philip Hwang, 415-543-9444
                       Robert Rubin, 415-543-9444
                       Alexandra Gross, 415-543-9444 (media inquiries)

LAWYERS' COMMITTEE FOR CIVIL RIGHTS
131 STEUART STREET, SUITE 400
SAN FRANCISCO, CA 94105
(415) 543-9444 (TEL)
(415) 543-0296 (FAX)
WWW.LCCR.COM

 Printed on recycled paper

# THE OFAC LIST

## *How a Treasury Department Terrorist Watchlist Ensnares Everyday Consumers*

MARCH 2007



BY SHIRIN SINNAR

# TABLE OF CONTENTS

Executive Summary ........................................................... 1

Introduction ..................................................................... 3

Stories from Everyday Life ................................................. 5

The Law Behind the List .................................................... 9

Enlisting Businesses in Watchlist Screening ....................... 11

Encouraging Discrimination .............................................. 13

Lack of Safeguards .......................................................... 15

Recommendations ........................................................... 16

Conclusion ..................................................................... 17

End Notes ....................................................................... 18

Appendix: First Page of OFAC Watchlist ............................ 20

# EXECUTIVE SUMMARY

An increasing number of private businesses, such as banks, mortgage companies, car dealerships, health insurers, landlords, and employers, now check the names of customers or applicants against a U.S. Treasury Department terrorist list. The Office of Foreign Assets Control (OFAC) list of suspected terrorists, drug traffickers, and other "specially designated nationals" runs over 250 pages long and includes more than 6,000 names. Many Americans who are not on the list face stigma as well as delayed or denied consumer transactions solely because their names are similar to others who are designated. The government has encouraged a wide range of private businesses to screen against the list, resulting in difficulties for ordinary people even where there is no discernible relationship to national security. Moreover, there are few safeguards – such as training requirements for businesses, complaint mechanisms for individuals, or other avenues for redress – to protect against such arbitrary screening. The government should take immediate measures to curb OFAC screening abuses and prevent the practice from becoming an even greater menace to civil rights.

# INTRODUCTION

*Even a shared first or middle name, including some of the most common names in the world, can lead to consumer transactions being denied or delayed.*

Tom and Nanci Kubbany were looking forward to buying their first home together in the city of Arcata on California's redwood coast. They had paid off old debts and were optimistic they could soon move to a new place for themselves and their three children. But when the local mortgage broker stopped returning their phone calls, they decided to investigate. That is when they discovered something shocking: the credit report in their loan file contained an alert stating that "Hassan," Tom's middle name, was an alias for Saddam Hussein's son, who was on a government watchlist of suspected terrorists.

Nothing else in Tom's background matched any of the information provided on his credit report for "Ali Saddam Hussein Al-Tikriti": Tom was born in Michigan, had never been to Iraq, and was thirty years older than the son of Saddam. Nevertheless, his credit report linked him to one of the most notorious regimes in the world. The Kubbanys were emotionally devastated by the association

with the terrorist list and distraught that their dream of home ownership seemed to be slipping away.[1]

In recent years, a growing number of Americans have endured stigma and lost opportunities in ordinary consumer settings because their names are mistakenly flagged as being on a terrorist list. This list of suspected terrorists, narcotics traffickers, and other "specially designated nationals" is maintained by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC), and now includes over 6,000 names. Financial institutions, credit bureaus, charities, car dealerships, health insurers, landlords, and employers are now checking names against the list before they open an account, close a sale, rent an apartment, or offer a job.

Few people in the United States are actually on the list. But because many names on the OFAC list are common Muslim or Latino names – such as "Mohammed Ali" or "Carlos Sanchez" – people in this country with similar names are increasingly getting snagged. Even a shared first or

middle name, including some of the most common names in the world, can lead to consumer transactions being denied or delayed. Moreover, at a time when Muslims, Arabs, and immigrants in the United States are already subject to prejudice and suspicion, it is hardly surprising that individuals from these vulnerable communities encounter problems from OFAC list misidentification.

Consumers discover the watchlist when they are told that they cannot make a purchase, open an account, or do business because their name appears on a terrorist list. The revelation is shocking and upsetting for the individuals involved, who usually have no idea what the list means or how they can clear their names.[2] It is also stigmatizing: customers may be told about the apparent name match in the presence of other customers, business associates, or others who react with suspicion or hostility.

Customers whose names trigger a potential match to the list are required to supply additional identifying documents, such as a driver's license, passport, or even copies of utility bills, to distinguish themselves from the persons on the list. Some names on the OFAC list include a

date of birth, birthplace, nationality, or other identifying information for the listed person, enabling companies to distinguish their customer by comparing the information. Others on the list are identified only by their names, and the only way for companies to "clear" a customer with a similar name is by calling the Treasury Department to verify that the customer is not on the list. In either case, the process often takes several days and makes even routine purchases an ordeal.

Worse still, some businesses may be denying opportunities altogether to individuals whose names appear to match the OFAC list. As the practice of watchlist-screening spreads across the economy, there is an increasing risk that some employers, landlords, or salespeople may simply be cutting short transactions or discontinuing relationships rather than make the effort to determine that an individual is not actually on the list. In such a case, a person denied an opportunity – perhaps a job, apartment, or a business contract – might never come to know the true reason for the loss.

Despite the frequency of "false positive" matches to the list, there is no procedure to permanently distinguish oneself from the person on the list. While individuals who are actually on the list can contest their designation, no procedure for redress exists for those who are repeatedly but mistakenly linked to the list. Therefore, the same individual may find herself repeatedly stopped at banks, car dealerships, mortgage companies, and other venues, forced to prove on each occasion that she is not a terrorist.

### IS YOUR NAME ON THE LIST?

The OFAC list appears to include few Americans. But because computerized programs used by businesses to screen individuals may flag even partial name matches, you could still be identified as a potential terrorist, based on a common first, middle, or last name. Consider these political leaders, celebrities, and prominent figures who share part of their name with a person on the OFAC list:

- Barack **Hussein** Obama
- Nancy **Patricia** D'Alesandro Pelosi
- Alberto **Gonzales**
- Jennifer **Lopez**
- Paula **Abdul**
- **Muhammad Ali**
- George **Lucas**
- Cameron **Diaz**
- Charlie **Gibson**

You can check whether your name appears on the list by going to the website www.treasury.gov/ofac and selecting the link for the "Specially Designated Nationals" list. Once you access the list, you can search for your full name or part of your name by using the "Search" or "Find" feature.

Since OFAC alerts may appear on credit reports, you should also obtain a free copy of your credit report from each of the three national credit reporting agencies. See www.annualcreditreport.com for more information. Even if you do not see any OFAC information on your credit report, you should still be aware that an OFAC alert may appear on copies of your credit report that are sent to businesses. Despite the fact that the Fair Credit Reporting Act gives consumers the right to see all the information in their credit files, at least one major credit reporting agency reportedly includes OFAC alerts only on credit reports that are sent to businesses from which you have applied for credit, and not on copies that you request yourself.

# STORIES FROM EVERYDAY LIFE

It is impossible to know just how many ordinary Americans have endured stigma, delay, or lost opportunities because of mistaken name matches to the OFAC list. The Treasury Department does not keep count of complaints received from individuals mistakenly flagged by OFAC screening, nor does it maintain any procedure by which people can file complaints against private companies that improperly refuse to do business with them.[3] Nevertheless, the following examples describe how more and more businesses are screening names against the OFAC list – and how Americans' ability to make purchases and conduct business is compromised as a result.

## FINDING A HOME:

Like the Kubbanys, more families are finding their dream of buying a home jeopardized by the OFAC list. Before extending financing, mortgage companies now check applicants directly against the OFAC list or review OFAC information from loan applicants' credit reports. Similarly, title companies screen homebuyers against the OFAC list before closing a sale. Families may be denied loans when they are wrongfully identified as potential terrorists.

Even individuals or families seeking to rent, rather than buy, a home may find themselves screened against the list. Many apartment associations and attorneys advise landlords to screen potential tenants before signing a lease or require tenants to sign a statement in the rental application confirming that they are not on the OFAC list.[4] Services used by landlords to examine the credit reports, bankruptcy and eviction records, and criminal histories of potential tenants now include a terrorist screening feature.[5] Examples of people caught up in this process include the following:

*A couple in Phoenix, Arizona appeared for their closing appointment with a title company to sign the paperwork for their first home. They were stunned to hear that the sale could not be closed because the husband's first and last name (both common Latino names) matched an entry on the terrorist list. The OFAC list did not include additional information, such as a date of birth or place of birth, which could be used to distinguish the two individuals. The title company refused to complete the home sale, but did not know how to resolve the name match and asked the homebuy-ers themselves for guidance. The couple contacted numerous federal and state officials and agencies for help, but received no answers. Only after LCCR and a local attorney became involved were they able to persuade the title company that the husband was not the same person on the OFAC list. (Source: LCCR files)*

## APPLYING FOR A JOB:

Some employers are screening job applicants and existing employees against the OFAC list, often through commercially available services that perform employee background checks. More and more employers across the country are relying on background screening services to investigate job applicants. These screening services traditionally focused on criminal records, credit histories, drug tests, and other such records, and were frequently blamed for making mistakes that deprived qualified individuals of job opportunities. Now, the inclusion of an OFAC name check has only increased the prospect of lost jobs.

*A California company that facilitates the auctioning of salvage vehicles required all employees to submit to an extensive background*

check, including an OFAC name check. Employees were told they could be terminated if they refused consent. The OFAC name check was to be performed by Sterling Testing Systems, a company that bills itself as a preeminent provider of employment screening services with over 6,000 clients. (Source: LCCR files)

*Employees of the private companies that performed the OFAC screening appeared to have very little understanding of what the list represented or how they should resolve potential name matches.*

### GETTING HEALTH INSURANCE:

Health insurers are checking the records of millions of Americans against the OFAC list. In 2003, Aetna acknowledged that it had combed through the records of the 13 million people it covers.[6] Blue Cross Blue Shield of Michigan searched records of its employees, patients, and health care providers, and vaunted its screening efforts in a company newsletter article entitled, "Blues Do Part for National Homeland Security." The company found no actual matches, only 6,000 "false positives."[7]

### BUYING A CAR:

Car dealerships are now checking customer names against the OFAC list, either directly or through reviewing OFAC information that appears on credit reports.[8] Trade associations such as the National Association of Independent Automobile Dealers and industry lawyers advise dealerships to screen customers against the list before making a sale.[9]

Saad Ali Muhammad, an African American resident of Chicago, Illinois, sought to buy a used car from a local Chevrolet dealership. When the salesperson ran his TransUnion credit report, he observed at the very beginning a reference to an "OFAC search," followed by the names of terrorists, including Osama bin Laden. The only apparent connection between the customer and the individuals on the list was the name "Muhammad," one of the most common names in the world; the entries from the OFAC list included the name "Muhammad" as middle names. The credit report did not explain what OFAC was, why the information was included, or what the user of the credit report should do with the information. Muhammad wrote to the credit reporting company and filed a complaint with a state human rights agency, but the alert remains on his credit report. (Source: LCCR files)[10]

### SENDING MONEY:

Businesses that provide wire transfers or online payments, from large companies like Western Union to small corner stores, are screening customers against the OFAC list.

A Sacramento-area resident contacted his local Western Union agent to collect $50 in funds that was wired to him by a business associate. For three days, he was repeatedly told that the record could not be located. Finally, a Western Union employee informed him that the money was being withheld because he "had a Muslim name." He was required to provide additional information, including a copy of his ID, Social Security number, and place of birth, before the funds were released. In the meantime, his business associate was informed that the transfer could not go through because the California man was on a government watchlist, giving the impression that he was a terrorist. The customer's full name was not on any list, but his first and middle name "Mohammed Ali" apparently led to Western Union's actions. (Source: LCCR files)

Muslim Advocates, a national civil rights advocacy organization, was informed that PayPal, a service that facilitates online payments, had blocked its account because of a potential name match to a government watchlist. The notice from PayPal stated that copies of the account holder's driver's license, a current utility bill, and other documentation verifying date and place of birth would be required to reopen the account. The full name of the organization's treasurer, M. Yusuf Mohamed, in whose name the account had been opened, does not appear on the OFAC list. While its account was blocked, Muslim Advocates was unable to receive donations online. No advance

*notice had been provided by PayPal, despite the fact that Muslim Advocates had maintained an account with the company for over a year. PayPal unblocked the account only when the treasurer provided the documentation requested. (Source: LCCR files)[11]*

BUYING EXERCISE EQUIPMENT:

Even the most mundane of consumer transactions may result in screening against the terrorist list, sometimes where customers make purchases on credit.

*the transaction until they were "cleared." In addition to the delay, they had to endure the stigma of being informed – in the presence of other customers -- that the husband's Middle Eastern name was the reason they could not make the purchase. (Source: LCCR files).*

These stories likely represent only a small fraction of the incidents facing average people in the United States whose only fault is having the "wrong" name. All of these incidents created confusion, anxiety, and stigma for the individuals involved,

government's creation of a system that conscripts a vast number of private businesses into the "war on terrorism" with few safeguards to protect civil liberties. Although the need to curtail terrorist financing is beyond question, the sweeping scope of the government's OFAC program and the absence of procedural protections needlessly subjects innocent people to humiliation, delay, and denied opportunities.

*At root these problems stem from the government's creation of a system that conscripts a vast number of private businesses into the "war on terrorism" with few safeguards to protect civil liberties.*

*A couple in Roseville, California attempted to buy a treadmill from a home fitness store on a financing plan. A representative from Wells Fargo, the bank that provided financing to the fitness store's customers, informed the salesperson that because the husband's first name was "Hussein," the couple would have to wait 72 hours while they were investigated. She further explained that the additional scrutiny was required "because of Saddam Hussein." The customer's full name did not match any name on the OFAC list, and his first name is an exceedingly common name among people of Middle Eastern origin or Islamic faith. Nevertheless, the couple could not complete*

several of whom were publicly humiliated as being possibly linked with terrorism. In each case, employees of the private companies that performed the OFAC screening appeared to have very little understanding of what the list represented or how they should resolve potential name matches. Moreover, many of these incidents stemmed from the match of only a portion of the customer's name, despite the fact that those names were common Muslim or Middle Eastern names.

In many of these incidents, private companies bear responsibility for their use of improper and overbroad screening practices. At root, however, these problems stem from the

## THE "NO-BUY" LIST VS. THE "NO-FLY" LISTS

The OFAC list is separate from the "no-fly" lists that have led to the questioning, search, and detention of innocent airline passengers. Under government orders, commercial airlines have been screening passengers against two lists maintained by the Transportation Security Administration: one list that prohibits individuals from flying altogether, and another list that subjects passengers to additional searches prior to boarding.[12] Unlike the OFAC list, the names on the no-fly lists are secret.

Despite some differences between the watchlists, the OFAC list and the no-fly lists share a fundamental flaw: both unnecessarily expose innocent people to stigma, delays, and other hurdles simply because their names are similar to names on the list. Faced with thousands of complaints from Americans misidentified as being on the no-fly lists, the Transportation Security Administration created a process by which passengers who have experienced repeated problems can submit personal information and identifying documents to the government, and in return get added to a "cleared list" to expedite screening.[13] Still, many people who have used that procedure continue to face difficulties at the airport, and the problems with the no-fly lists are far from resolved.[14]

In the case of the OFAC list, the government is even further behind: it has yet to create any redress mechanism for individuals who are mistakenly flagged – or even to acknowledge that the problem exists. Meanwhile, the OFAC list threatens to become an even wider problem than the no-fly lists: while the no-fly lists are screened at the airport by a limited number of private companies (commercial airlines), the OFAC list is potentially checked by hundreds of thousands of private businesses across many sectors of the economy, with no standards for training or for compliance with civil rights.[15]

# THE LAW BEHIND THE LIST

There is no single law that provides for the creation or use of the OFAC list. Rather, the list is based upon a range of national security and foreign policy laws, and the names of individuals and entities designated under each of these laws are combined into one comprehensive list. The list pre-dated September 11, 2001, but the terrorist attacks led to the adoption of new counterterrorism laws, a sharp rise in designations, and more aggressive enforcement of the law by the Treasury Department and other federal agencies. Most names on the list are designated by the U.S. government as being linked to terrorism, narcotics trafficking, foreign governments subject to U.S. sanctions, or the proliferation of weapons of mass destruction. While the specific requirements of the laws giving rise to these designations vary, in general, no one in the United States may do business with anyone on the list.

According to a count by the Lawyers' Committee for Civil Rights, as of August 15, 2006, the OFAC list included approximately 6,420 names associated with designated individuals and entities. The number of distinct individuals and entities on the list is significantly lower, but the inclusion of aliases and alternate spellings accounts for the 6,420 names. Of these, the largest numbers of names are associated with "specially designated global terrorists" (2,134); "specially designated narcotics traffickers" (1,615); "foreign terrorist organizations" (391); "specially designated narcotics trafficker kingpins" (700); U.S. sanctions against Cuba (549); sanctions against the former Iraqi régime (383); and "specially designated terrorists" identified as threatening to disrupt the Middle East peace process (211).[16] Smaller numbers of OFAC entries are associated with the Balkans, Belarus, Burma, Cote d'Ivoire, Iran, the proliferation of weapons of mass destruction, Liberia, North Korea, Sudan, Syria, and Zimbabwe.

The largest category of names – "specially designated global terrorists" – stems from an executive order issued by President George W. Bush soon after the September 11 attacks. Executive Order 13224 noted the expansive financial reach of foreign terrorists and declared a national emergency to deal with the terrorist threat.[17] The order froze the assets of, and forbade transactions with, persons determined to have committed, threatened to commit, or supported terrorism, or to be "other-wise associated" with such persons. The president directly designated 27 individuals and groups, including Al Qaida and Osama bin Laden, but delegated authority to the Secretary of State and the Secretary of the Treasury to add additional names. Since the Executive Order, several hundred additional people and organizations have been deemed "specially designated global terrorists" and added to the OFAC list.[18]

In addition to freezing assets of suspected terrorists and their supporters, the Executive Order forbade anyone in the United States from engaging in "any transaction or dealing" with designated persons. Thus, the law covered not just financial institutions or other businesses particularly susceptible to terrorist financing, but extended responsibility to all U.S. citizens, permanent residents, entities organized under U.S. law, and anyone present in the United States.[19] In addition, the order made no exception for minimal transactions, so even a sale worth pennies could be penalized under the law. Furthermore, regulations issued by the Treasury Department in 2003 made clear that while "willful" violations of the law could result in criminal penalties, even transactions

without any "willful" intent to violate the law could trigger civil penalties.[20] Therefore, by its terms, the Executive Order extended liability to hair stylists, flower peddlers, hot dog vendors, or any Jane Doe who unwittingly sold a product or provided a service to a designated person.

The broad scope of Executive Order 13224 has already led courts to invalidate some of its provisions. In late 2006, a district court struck down the president's "unfettered discretion" to designate individuals and groups under the order, noting that the Executive Order provided no standards for the president's direct designations and no process for challenging these designations.[21]

*By its terms, the Executive Order extended liability to hair stylists, flower peddlers, hot dog vendors, or any Jane Doe who unwittingly sold a product or provided a service to a designated person.*

The same court invalidated the ban on being "otherwise associated with" a specially designated global terrorist as "vague" and "overbroad."[22] The Executive Order has also been criticized for designating persons, including U.S. citizens, without due process. As noted in an extensive 9/11 Commission staff report on terrorist financing, administrative designations can be based on classified evidence withheld from the targeted person and are subject to only limited judicial review.[23] The 9/11 Commission staff report expressed particular concern about the use of administrative blocking orders against U.S. citizens

and also noted the weak evidentiary foundation for some designations made under the Executive Order.[24]

Although Executive Order 13224 played a particularly significant role in the expansion of the OFAC list, the federal government also used earlier counterterrorism laws to freeze assets and add new names to the list after 9/11. The OFAC list now includes 391 names associated with "foreign terrorist organizations," which are groups designated under the 1996 Antiterrorism and Effective Death Penalty Act. That law made it a crime for any U.S. person to provide "material support and resources" to such organizations.[25] The same law criminalized financial transactions with the governments of countries listed as supporters of international terrorism.[26] These governments, and their agents, are included in the OFAC list, and currently include Cuba, Iran, Libya, North Korea, Sudan, and Syria.[27]

The OFAC list also includes 211 names of people identified as "specially designated terrorists" under two executive orders issued by President Bill Clinton. These orders, issued in 1995 and 1998, banned transactions with terrorists who committed or supported acts of

violence that threatened to disrupt the Middle East peace process.[28] The executive orders named 16 individuals and entities, including Hamas, Hezbollah, and Osama bin Laden, and delegated authority to the Secretary of State and the Secretary of the Treasury to add additional persons.

Beyond the terrorism sanctions, U.S. sanctions against drug traffickers and sanctioned countries, especially Cuba, supply the legal framework for the inclusion of hundreds of names on the OFAC list. A presidential executive order in 1995 blocked the property of, and forbade transactions with, individuals and groups involved in Colombian narcotics trafficking.[29] The Foreign Narcotics Kingpin Designation Act, passed in 1999, expanded sanctions against other significant foreign drug traffickers and added hundreds of names to the OFAC list.[30] In addition, a broad trade embargo against Cuba has existed for more than forty years, prohibiting the exchange of most goods and services with Cuba and with Cuban nationals.[31] The OFAC list includes the names of many Cuban nationals and Cuban companies, including pages of Cuban websites that appear to promote Cuban tourism and culture; an OFAC brochure warns that this is only a partial list.[32] Although sanctions against narcotics traffickers and Cuba existed long before September 11, the federal government's post-9/11 focus on curtailing terrorist financing increased attention to OFAC sanctions across the board.

# ENLISTING BUSINESSES IN WATCHLIST SCREENING

The steep penalties for businesses that engage in transactions with designated persons, coupled with the government's failure to limit watchlist screening to particular industries or high-risk transactions, has led to the expansion of OFAC screening in many circumstances with little nexus to terrorist financing. As a result, ordinary Americans endure increasing difficulties in consumer transactions, and growing threats to their civil liberties and civil rights, even where there is little benefit to national security.

Businesses have a powerful incentive to screen customers against the OFAC list: under the law, businesses face hefty fines for engaging in transactions with designated persons or sanctioned countries. For example, corporate criminal penalties for violations of the Foreign Narcotics Kingpin Designation Act range up to $10 million.[33] Violations of the Cuba sanctions can result in $1 million in corporate fines.[34] Transactions with specially designated global terrorists, where proven to be willful, can result in $500,000 fines for organizations.[35] Although criminal sanctions can only be imposed for "willful" violations, even non-"willful" violations can result in civil penalties, motivating businesses to take measures to prevent even inadvertent violations.

The implementation of OFAC compliance programs can be costly. Financial institutions have already borne millions of dollars in expenses from designing compliance programs, purchasing screening software, and instructing staff on watchlist screening procedures. First Data Corporation, the parent company of Western Union, has more than 150 employees working specifically on compliance measures, while hundreds of thousands of Western Union agents screen wire transfers on location.[36] Major banks spend millions of dollars annually on checking the OFAC list and following other post-9/11 regulations.[37] For smaller businesses, such as mini-marts that offer check cashing services, the burdens of implementation are even more formidable.[38] The purchase of screening software alone can cost businesses thousands of dollars.

The Treasury Department appears to scrutinize financial institutions particularly strictly. The agency specifically advises certain types of financial institutions, such as banks, insurance companies, securities firms, and money service businesses (companies offering wire transfers, check-cashing, money orders, and similar services), to check transactions against the OFAC list and warns these industries about penalties for non-compliance.[39] Federal regulators routinely examine banks for compliance with the Bank Secrecy Act and other laws, including OFAC requirements.[40] Regulators review whether banks have established policies to compare new customer accounts to OFAC lists, to distinguish between valid and false "hits," and to update their OFAC lists.[41] According to one recent analysis of 400 Treasury Department penalties disclosed from March 2003 to September 2006, financial institutions accounted for 90 percent of all fines levied by the agency for non-compliance with antiterrorism measures.[42]

Nevertheless, in contrast to other laws targeting terrorist financing, Executive Order 13224 and other OFAC-administered rules are not applicable only to financial institutions. Rather, every individual and group in the United States is barred from transacting with designated persons, even if they do not know that a person is designated.

and could be liable even for unwitting violations. Theoretically, before a grocer sells a pint of milk, a deli serves a sandwich, or a doctor treats a patient, they should all be checking the OFAC list to make sure they are not assisting a person on the list. Although such a proposition sounds absurd, the sweeping scope of the law and the government's failure to limit OFAC screening to relevant industries or transactions encourages watchlist checking in the most mundane of business encounters.

*The government's indiscriminate OFAC policies end up drafting large swathes of American society into domestic surveillance.*

The Treasury Department has not released formal regulations mandating that certain industries screen customers against the list or exempting others from enforcement. Although it has published brochures for certain industries recommending OFAC compliance measures, primarily within the financial sector, it has not issued any specific guidance for most other sectors of the economy. Nevertheless, the agency makes no promise that industries not specifically warned about OFAC responsibilities will be immune from penalties for violations.

As a result, businesses are adopting OFAC screening across industries and transactions where the risks of exploitation by terrorist financiers, narcotics traffickers, or other sanctioned parties may be incredibly remote. Even within the financial industry, some transactions – such as financing the purchase of a treadmill through a home fitness store – seem to present little risk of exploitation. Similarly, health insurance policies seem to present an unlikely avenue for terrorist financing. Outside the financial industry, the nexus to national security is frequently even more tenuous. For instance, no one has suggested that terrorist supporters have sought to raise funds for terrorist activities through applying for jobs or renting apartments. Nevertheless, it appears that some Treasury Department officials have gone so far as to encourage employers to check the OFAC list during their hiring process.[43]

Executive Order 13224 was presented by the White House as a means of disrupting the financial infrastructure of terrorism. According to press statements issued by the administration, the President's intent was to "punish those financial institutions at home and abroad that continue to provide resources and/or services to terrorist organizations."[44] By locating and freezing terrorist assets within the United States and pressuring foreign banks to do the same, the Executive Order was "part of a broader strategy…for suppressing terrorist financing."[45] The stated purpose was never to conscript all Americans into searching for terrorists in every sphere of economic life. Yet today, the government's indiscriminate OFAC policies end up drafting large swathes of American society into domestic surveillance.

This failure to limit watchlist screening to appropriate circumstances in which it is necessary for national security has its costs. Businesses large and small assume financial burdens from having to design compliance programs, purchase screening software, and instruct staff on screening procedures. Meanwhile, the more businesses that screen customers, the greater the threat to customers: more individuals face stigma, delay, and lost opportunities, not least because the delegation of national security functions to private citizens fosters profiling and discrimination.

# ENCOURAGING DISCRIMINATION

The proliferation of watchlist screening not only subjects innocent consumers to stigma and delays in transacting business; it also increases the likelihood that some individuals will be denied opportunities altogether because businesses do not distinguish false positives from actual OFAC matches. Some companies may simply refuse to do business with a person whose name is similar to a name on the OFAC list, without actually resolving the apparent name match or even informing the person why their business was refused. Such a refusal might be based on any number of reasons: a lack of understanding of procedures for distinguishing false matches, laziness in dealing with what seems to be a complicated bureaucratic procedure, fear of government penalties, misdirected patriotism, or simple prejudice against people from certain ethnic or religious backgrounds.

The extension of OFAC screening to employment and housing is particularly worrisome because of the historic prevalence of race and national origin discrimination in these areas and because of the ease by which decisions based on the list can be masked as something else.

For example, a failure to hire an individual or offer an available apartment based on a false name match can be easily covered by the classic pretext: "someone else was more qualified" or "the apartment was already taken." In that case, the person affected would have no notice of the real reason for the decision, and no opportunity to contest the denial.

The likelihood of discrimination against people whose names seem similar to a name on the OFAC list is magnified because most names on the list are, or appear to be, Muslim, Middle Eastern, or Latino. These communities are already vulnerable

*A failure to hire an individual or offer an available apartment based on a false name match can be easily covered by the classic pretext: "someone else was more qualified" or "the apartment was already taken."*

to discrimination in the post-9/11 period because some Americans associate them with terrorism or violence in the Middle East, and because of rising anti-immigrant sentiment. Recent studies have confirmed that "Muslim-sounding" names trigger discrimination in

employment and other contexts. For instance, a 2003 "testing" study by the Discrimination Research Center found that temporary employment agencies throughout California responded least often to resumes they received with identifiable Arab-American or South Asian names ("Mohammed Ahmed" or "Abdul-Aziz Mansour"), despite the fact that these resumes showed equal qualifications as resumes with other names.[46]

Even a salesperson who knows that most names triggered by the OFAC list are false matches may, because of underlying stereotypes, view with suspicion any Muslim, Middle Eastern, or Latino customers flagged by watchlist screening. While she may presume that a white person whose name matches the OFAC list is a mistaken match, she may not give the same benefit of the doubt to the olive-skinned Arab man with an accent. In today's climate, it is not difficult to imagine a nervous land-

lord concluding that she will "take no risks" in renting to a Middle Eastern man whose name appears to be on a terrorist list, without bothering to distinguish him from the person actually on the list.

The delegation of national security functions to private citizens has, in other contexts, already spurred racial profiling. After September 11, dozens of passengers were arbitrarily removed from flights by airline crews based on their perceived Arab, Muslim, Middle Eastern, or South Asian background, leading the Department of Transportation to order major airlines to conduct annual civil rights trainings for their employees.[47] Truck drivers participating in a "Highway Watch" program to spot security threats on the nation's highways told a reporter – after being trained – that they looked out for "Islamics" on the road based on their turbans, accents, and lack of cleanliness. Banks and credit card companies have closed accounts of Middle Eastern and South Asian customers, without providing an explanation, for reasons that may have been discriminatory.[49] Now, the proliferation of OFAC screening makes individuals of Muslim, Middle Eastern, and Latino background even more vulnerable to discrimination in employment, housing, retail establishments, and other public accommodations.

## MARKETING TERRORIST SCREENING

Private companies have taken advantage of widespread confusion among businesses surrounding post-9/11 private sector requirements by aggressively marketing new products designed to screen consumers against government watchlists, particularly the OFAC list. Appealing to both profit and patriotism, vendors market these often costly screening products as a way to protect the country, one's reputation, and one's business from fraud. The companies advertise specialized watchlist screening products for a variety of users, including financial institutions, title companies, landlords, employers, non-profits, and car businesses.[50]

Companies that specialize in amassing personal data on Americans readily moved into the watchlist screening business after September 11. The data giant ChoicePoint produces one popular program, "Bridger Insight," which searches more than 24 separate watch lists.[51] TransUnion, one of the top three U.S. credit reporting agencies, promotes an "OFAC Advisor" feature that screens credit applicants against the OFAC list and prints the results on credit reports. The company touts this product as offering "the most comprehensive international list of known terrorists and criminals" and minimizing "false positives" through "unique" matching technology.[52] Consumers, however, have discovered the names of Osama bin Laden and Saddam Hussein's son on their TransUnion credit reports, merely because their names were "Muhammad" or "Hassan," some of the most common names in the world.

# LACK OF SAFEGUARDS

The expansive reach of many OFAC prohibitions – applicable to all U.S. persons and all U.S. transactions, regardless of risk, industry, or willful intent – encourages unrestrained watchlist screening across a vast range of businesses and transactions. Compounding this problem, the Treasury Department has put in place few safeguards to protect the rights of individuals who are mistakenly flagged by OFAC screening.

First, the government has failed to warn companies against obstructing or denying opportunities to individuals with names similar to those of designated persons. Currently, the Treasury Department's advisories to businesses seem remarkably oblivious to any threat to civil rights. They provide no warnings against discrimination based on race, national origin, or "ethnic" names. They set no standards for the period of time in which companies should resolve name matches to prevent excessive delays. They do not require that companies train their employees responsible for OFAC screening to properly distinguish names and to protect their customers' civil rights. This lack of guidance stands in stark contrast to the agency's many stern warnings against carrying out transactions with listed persons. The one-sided message encourages companies to err on the side of overzealous OFAC compliance at the expense of individual rights.

Furthermore, the Treasury Department publishes scant explanation,

and no means of redress, to individuals whose names are mistakenly flagged by OFAC screening. Currently, only one document on the OFAC website addresses consumers, namely a two-page guidance for consumers who discover the names of terrorists printed on their credit reports.[52] Apart from that document, there is no information for individuals on what it means for their name to trigger the OFAC list or how they can resolve problems created by the false match. Consumers experience significant anxiety, frustration, confusion, and even panic when they are told that they cannot perform a transaction because they are on a government terrorist list, but find no guidance from the government on resolving the problem. Several individuals listed in this report spent days searching unsuccessfully for anyone in the federal government who could tell them what the potential OFAC match signified.

The Treasury Department has established no mechanism by which to track and address complaints from consumers regarding OFAC screening. Asked about the existence of a complaint mechanism, an OFAC senior compliance officer told LCCR in August 2006 that private companies, not the government, bore responsibility for any problems facing consumers. By contrast, many other federal agencies charged with national security functions have established complaint mechanisms for Americans who believe their civil rights have been violated, whether by

the government or by private companies undertaking a security function. For example, the Department of Homeland Security has created an Office for Civil Rights and Civil Liberties empowered to investigate and address abuses of civil rights and racial profiling by agency officials.[54] The Department of Transportation investigates complaints of race and national origin discrimination by airlines, including denials of boarding based on purported security rationales, and imposes civil penalties on airlines for violations.[55] As noted earlier, the Transportation Security Administration has established a "traveler identity verification program" for airline passengers who are frequently misidentified as being on the no-fly lists. Although these complaint mechanisms rarely eliminate the underlying problems with government policies, they at least provide a means for the government to review such problems and an opportunity for some individuals to obtain relief.

The Treasury Department's failure to establish any such process leaves Americans experiencing trouble with OFAC screening with no official mechanism for redress. People who are mistakenly flagged by OFAC screening have no means to prevent the same problem from happening again. As OFAC screening continues to spread across industries, Americans may find themselves having to prove they are not terrorists at every business they frequent, with no way of permanently clearing their name.

# RECOMMENDATIONS

The federal government has a responsibility to ensure that its counterterrorism policies respect civil liberties and civil rights. In light of the continued spread of OFAC screening, and rising reports of abuses, the government should take the following measures:

1. Conduct an independent investigation into the impact of OFAC screening on civil rights and civil liberties and exercise congressional oversight over the program

2. Restore due process protections to the designation of individuals and groups under Executive Order 13224 and other laws

3. Prohibit OFAC screening across transactions and industries where there is no demonstrated compelling national security need for such screening

4. Prevent businesses from improperly denying services based on OFAC screening by issuing clear warnings against unwarranted denials, mandating training of any employees conducting OFAC screening, and penalizing businesses for violations

5. Clarify under the Fair Credit Reporting Act the rights of consumers who are erroneously flagged as potential terrorists on their credit reports

6. Hold private vendors of OFAC screening software accountable for product errors that victimize consumers

7. Provide guidance to consumers on OFAC screening

8. Establish a mechanism for individuals to obtain redress from the government and/or private businesses for OFAC abuses

# CONCLUSION

In a U.S. Supreme Court case concerning government loyalty lists of the McCarthy era, Justice Black noted, "Our basic law…wisely withheld authority for resort to executive investigations, condemnations and blacklists as a substitute for…trial and conviction in accordance with procedural safeguards of the Bill of Rights."[56] Despite this notion, terrorist lists compiled by executive agencies, without judicial determinations, are proliferating in post-9/11 America. Using various government lists, airlines screen passengers; federal officials screen truck drivers[57]; immigration officials screen visa applicants; public universities screen professors[58]; border agents screen returning travelers; local and state police officers screen motorists; and banks, landlords, charities, employers, health insurers, and other businesses screen millions of American consumers. Some of this screening may be legitimate and necessary. But much of it is overbroad and unnecessary, and increasingly denies Americans services, livelihoods, and their good name based on opaque determinations and administrative fiat.

Watchlist screening penalizes not just those who are actually on the lists, but many other people whose only "offense" is to share a name with a listed individual. On that basis, many Americans, particularly those with a Latino, Middle Eastern, or Muslim name, have suffered stigma, delays in service, and lost opportunities due to the OFAC list. The breadth of OFAC-administered laws, which are directed not at particular industries or transactions but that apply across the economy, lead to OFAC screening where there is little risk to national security but ample threat to civil rights. The lack of government safeguards for civil rights exposes ordinary Americans to delayed or denied transactions, and discrimination, without any means of redress. As more companies adopt watchlist screening, the government must intervene to regulate and restrain a practice that threatens to become an even greater menace.

# END NOTES

[1] For more information on this case, see *Feds' Terror Watch List Can Ruin Credit Report* (CBS-5 television broadcast, Oct. 17, 2006), *available at* http://cbs5.com/investigates/local_story_291012007.html; Nanette Kelley, *Routine Credit Check Unnerves "Son of Saddam Hussein" in Arcata*, ARCATA EYE, Sept. 5, 2006.

[2] The few U.S. individuals or groups who are actually on the list would presumably learn of their designation prior to attempting an ordinary consumer transaction. New designations are publicly announced and often receive widespread press attention, especially when they involve U.S. persons. The complete OFAC list is available on the Treasury Department's website. (It can be found at www.treasury.gov/ofac under a link for the "Specially Designated Nationals" list). In addition, all assets of a designated person are frozen at financial institutions throughout the United States, putting organizations out of business and forcing individuals to obtain a government license to access their personal bank accounts.

[3] In August 2005, the Lawyers' Committee for Civil Rights requested from the Treasury Department, under the Freedom of Information Act, any records pertaining to the number of complaints the department received from individuals mistakenly flagged by OFAC screening, the agency's policies and procedures for protecting the civil rights of individuals mistakenly flagged, and other records related to the OFAC list. The Treasury Department still has not furnished the requested records. However, on August 2, 2006, a senior OFAC compliance officer told LCCR that the agency did not separately track complaints from individuals and maintained no complaint mechanism for consumers mistakenly flagged by the watchlist.

[4] *See, e.g.*, Sara Gebhardt, *Three Might Be a Crowd – Check the Occupancy Limits*, WASH. POST, Aug. 21, 2004, at T9; see also Nat'l Apartment Ass'n, *Specially Designated Nationals List Deserves Close Attention*, UNITS, Feb. 1, 2006, *available at* 2006 WLNR 3059580 (advising apartment owners to screen applicants); CHICAGOLAND APARTMENT ASSOCIATION, RESIDENT SCREENING: INFORMATION FOR OWNERS AND OPERATORS OF MULTI-FAMILY HOUSING, *available at* http://www.caapts.org/ (same); *Screening out Terrorists*, LEGAL SURVIVAL NEWSL. (Legal Survivor, Akron, N.Y.) Winter 2006, *available at* www.legalsurvival.com/legal_newsletters/Winter_2006.html.

[5] *See, e.g.*, Dennis Hevesi, *When the Credit Check Is Only the Start*, N.Y. TIMES, Oct. 12, 2003, § 11; Douglas Hanks III, *Credit Risk, Terror Risk*, MIAMI HERALD, July 6, 2003, at 1E.

[6] Shaun Waterman, *Insurance Firms Scan Client Files For Terrorism Suspects*, WASH. TIMES, Nov. 22, 2003.

[7] Amy Lee, *Blues, Aetna Help Hunt Terrorists*, DETROIT NEWS, Nov. 16, 2003, at 1A.

[8] *See, e.g.*, Don Oldenburg, *Hit-and-Miss List: If You're in This Directory, Forget Shopping*, WASH. POST, Apr. 9, 2006, at F5; Kelly Hannon, *Identities Are Checked for Major Purchases*, FREDERICKSBURG.COM, July 16, 2006; Jim Stickford, *Watchlist Still Confuses Many*, USED CAR NEWS, Aug. 7, 2006.

[9] *See* Stickford, *supra*, and THOMAS HUDSON, CARLAW: A SOUTHERN ATTORNEY DELIVERS HUMOROUS PRACTICAL LEGAL ADVICE ON CAR SALES AND FINANCING (2006).

[10] LCCR thanks Kamran Memon, a Chicago, Illinois civil rights attorney who represented Muhaimmad, for supplying this example. See also Muslim Civil Rights Center newsletter, May 2004, at http://www.mcrcnet.org/Reports/2004/052004/civilrights052004.htm (describing an incident in which another Illinois resident, whose last name was "Hussein," was told that he could not buy a car because of the OFAC alert on his credit report).

[11] *See also* Chris Williams, *PayPal Freezes out British User in 'Terror' List Snafu*, THE REGISTER (United Kingdom), Aug. 18, 2006, *available at* http://www.theregister.co.uk/2006/08/18/paypal_terror_ban/.

[12] *See* GOV'T ACCOUNTABILITY OFFICE, TERRORIST WATCH LIST SCREENING: EFFORTS TO HELP REDUCE ADVERSE EFFECTS ON THE PUBLIC 1 (2006). These lists contain records drawn from a database operated by the Terrorist Screening Center (TSC), established in 2003 under the aegis of the Federal Bureau of Investigation. The TSC database is also used by U.S. Customs and Border Protection to screen travelers at U.S. ports of entry, by the State Department to screen visa applicants, and by state and local police in the course of routine traffic stops. *Id.* at 7-9, 14.

[13] *See* TSA – Our Traveler Identity Verification Program, www.tsa.gov/travelers/redress/index.shtm (last visited Jan. 8, 2006); GOV'T ACCOUNTABILITY OFFICE, *supra* note 3, at 22.

[14] *See, e.g.*, GOV'T ACCOUNTABILITY OFFICE, *supra* note 3, at 34, 43; Complaint at 32-34, Green v. Transp. Sec. Admin., 351 F. Supp. 2d 1119 (W.D. Wash. 2005) (No. C04-763Z).

[15] Even with the relatively small number of commercial airlines responsible for checking the no-fly lists, the Transportation Security Administration admits that air carriers are using the lists inconsistently; the agency now plans to take over passenger screening from private airlines. GOV'T ACCOUNTABILITY OFFICE, *supra* note 3, at 34-35.

[16] Again, these figures represent the number of *names* associated with particular categories, rather than the number of distinct individuals or entities in each category. In addition, many entries are designated under two or more categories. For example, a foreign terrorist organization may also be listed as a specially designated terrorist and a specially designated global terrorist.

[17] Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) (listing International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., the National Emergencies Act, 50 U.S.C. § 1601 et seq., among other authorities as sources for order); *see also* 31 C.F.R. §§ 595.101-901 (implementing Exec. Order No. 13,224).

[18] *See Humanitarian Law Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1069 (C.D. Cal. 2006) (citing statement by Barbara Hammerle, acting director of OFAC, that 375 individuals and entities were deemed specially designated global terrorists).

[19] Exec. Order No. 13,224 §§ 2, 3(c), 66 Fed. Reg. 49,079 (Sept. 23, 2001); 31 C.F.R. 594.315.

[20] 31 C.F.R. § 594.701(a) (2006).

[21] *Humanitarian Law Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1066-67 (C.D. Cal. 2006). The Court contrasted the broad authority granted to the president in making designations with the greater constraints on the Secretary of the Treasury, and upheld the latter category of designations. *Id.* at 1065-66.

[22] *Id.* at 1070-71.

[23] JOHN ROTH, ET. AL., NAT'L COMM'N ON TERRORIST ATTACKS UPON THE UNITED STATES: MONOGRAPH ON TERRORIST FINANCING: STAFF REPORT TO THE COMMISSION (2004) at 8, 50, 79.

[24] *Id*. See also Jack Tapper, *A Post-9/11 American Nightmare*, SALON.COM, Sept. 4, 2002, http://dir.salon.com/story/news/feature/2002/09/04/jama/index.html?pn=1 (describing ordeal of Saudi American Garad Jama, who was designated under Executive Order 13224 for nine months before being removed from the list for lack of evidence).

[25] 18 U.S.C. § 2339B (2004); *see also* 8 U.S.C. § 1189 (2004) (setting forth procedures for designating entities as foreign terrorist organizations) and 31 C.F.R. pt. 597 (2006) (implementing regulations).

[26] 18 U.S.C. § 2332d (2002). *See also* Terrorism List Government Sanctions Regulations, 31 C.F.R. pt. 596 (implementing regulations).

[27] OFFICE OF FOREIGN ASSETS CONTROL, TERRORISM: WHAT YOU NEED TO KNOW ABOUT U.S. SANCTIONS 103 (2006).

[28] Exec. Order No. 12,947, 60 Fed. Reg. 5,079 (Jan. 23, 1995) and Exec. Order No. 13,099, 63 Fed. Reg. 45,167 (Aug. 20, 1998). *See also* 31 C.F.R. pt. 595 (2006) (implementing Exec. Order No. 12,947).

[29] Exec. Order No. 12,978, 60 Fed. Reg. 54,579 (Oct. 21, 1995); 31 C.F.R. pt. 536.

[30] Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901-1908 (1999), 8 U.S.C. § 1182; 31 C.F.R. pt. 598 (implementing regulations).

[31] OFAC, CUBA: WHAT YOU NEED TO KNOW ABOUT THE U.S. EMBARGO 1 (2004), http://www.treas.gov/offices/enforcement/ofac/programs/cuba/cuba.pdf.

[32] *Id.* at 2.

[33] 21 U.S.C. § 1906(a)(1) (1999).

[34] 31 C.F.R. § 501.701(a)(1).

[35] 31 C.F.R. § 594.701(a)(2) and (b); 18 U.S.C. § 3571(c).

[36] Glenn Simpson, *Expanding in an Age of Terror, Western Union Faces Scrutiny*, WALL ST. J., Oct. 20, 2004, at A1.

[37] Paul Adams, *Customers Face Banks' Scrutiny*, CHI. TRIB., Sept. 16, 2003, at 5; Richard Newman, *Bankers Share Feelings on Patriot Act*, THE RECORD, Apr. 28, 2004, at B3.

[38] *See, e.g.*, Steve Johnson, *Mini-marts Required to Fight War on Terror*, SAN JOSE MERCURY NEWS, Dec. 26, 2004, at 1F; Tom Locy, *Anti-Terror Law Puts New Demands on Businesses*, USA TODAY, Feb. 26, 2004, at 5A.

[39] *See, e.g.*, OFFICE OF FOREIGN ASSETS CONTROL, FOREIGN ASSETS CONTROL REGULATIONS FOR THE SECURITIES INDUSTRY (2004), *available at* http://www.treas.gov/offices/enforcement/ofac/regulations/t11facse.pdf; OFFICE OF FOREIGN ASSETS CONTROL, FOREIGN ASSETS CONTROL REGULATIONS AND THE INSURANCE INDUSTRY (2004), *available at* http://www.treas.gov/offices/enforcement/ofac/regulations/t11main.pdf; OFFICE OF FOREIGN ASSETS CONTROL, PROTECTING OUR NATIONAL SECURITY: THE CRITICAL NATURE OF OFAC COMPLIANCE FOR MONEY SERVICE BUSINESSES (2004), *available at* http://www.treas.gov/offices/enforcement/ofac/regulations/msb_reg.pdf.

[40] *See* FEDERAL FINANCIAL INSTITUTIONS EXAMINATION COUNCIL, BANK SECRECY ACT/ANTI-MONEY LAUNDERING EXAMINATION MANUAL (2006). *See also* Memorandum of Understanding between OFAC and the Federal Reserve, Federal Deposit Insurance Corporation, National Credit Union Administration, Office of the Comptroller of the Currency, and the Office of Thrift Supervision (Apr. 12, 2006), http://www.ustreas.gov/offices/enforcement/ofac/ricpen/mou_final.pdf.

[41] FEDERAL FINANCIAL INSTITUTIONS EXAMINATION COUNCIL, BANK SECRECY ACT/ANTI-MONEY LAUNDERING EXAMINATION MANUAL 140-41 (2006).

[42] Rick Rothacker, *Banks' Skirting of U.S. Sanctions Under Scrutiny*, CHARLOTTE OBSERVER, Sept. 22, 2006. In addition, new requirements imposed on financial institutions by the USA Patriot Act, enacted in October 2001, have led financial institutions to pay greater attention to OFAC rules, even though nothing in the Patriot Act mandates OFAC watchlist screening. Section 352(a) of the Patriot Act requires a wide range of financial institutions to establish anti-money laundering programs that include written internal policies and procedures, a designated compliance officer, an ongoing employee training program, and independent auditing measures. 31 U.S.C. § 5318(h). Section 326 of the Patriot Act requires financial institutions to verify the identity of customers opening new accounts and to determine whether any new customer appears on certain government terrorist lists. 31 U.S.C. § 5318(l); *see also* 31 C.F.R. § 103.121 (implementing regulation). Interestingly, this provision does not require companies to check the OFAC list. FEDERAL FINANCIAL INSTITUTIONS EXAMINATION COUNCIL, BANK SECRECY ACT/ANTI-MONEY LAUNDERING EXAMINATION MANUAL 137 (2006). Nevertheless, these and other new laws have encouraged financial institutions to adopt OFAC screening as part of their overall "compliance" programs.

[43] BNA, *Verifying Worker Eligibility, Identity Can Be Complicated, Speakers Say*, PRIVACY LAW WATCH, Mar. 29, 2006, http://subscript.bna.com/SAMPLES/pra.nsf/125731a8816a84d3852562970053336a/a8af615919 08525714000652fa0?OpenDocument.

[44] Press Release, Fact Sheet on Terrorist Financing Executive Order (Sept. 24, 2001), http://www.whitehouse.gov/news/releases/2001/09/20010924-2.html.

[45] *Id.*

[46] Discrimination Research Center, NAMES MAKE A DIFFERENCE: THE SCREENING OF RESUMES BY TEMPORARY EMPLOYMENT AGENCIES IN CALIFORNIA (2004). Researchers sent 6,000 fictitious resumes to California temp agencies of equally qualified applicants with identifiable Arab-American/South Asian, Latino, African-American, Asian-American, and white names, and measured response rates for each category.

[47] *See, e.g.*, United Air Lines, Inc., Order No. 2003-11-13 (Dep't Transp. Nov. 19, 2003) (consent order directing United Air Lines to cease and desist from violations of civil rights laws). Removals of passengers for reasons that appear to be discriminatory are continuing to the present. *See, e.g.*, Bob Van Sternberg & Pamela Miller, *Uproar Follows Imams' Detention*, STAR TRIBUNE, Nov. 21, 2006; Cicero A. Estrella, *Muslim Men Kicked Off Plane Accuse Airlines of Racism*, S.F. CHRON., Mar. 23, 2006, at B2.

[48] Amanda Ripley, *Eyes and Ears of the Nation*, TIME, Jun. 27, 2004. For more on the government's recruitment of private businesses in counterterrorism, see AMERICAN CIVIL LIBERTIES UNION, THE SURVEILLANCE-INDUSTRIAL COMPLEX: HOW THE AMERICAN GOVERNMENT IS CONSCRIPTING BUSINESSES AND INDIVIDUALS IN THE CONSTRUCTION OF A SURVEILLANCE SOCIETY (2004).

[49] *See, e.g.*, Hilary Russ, *Leave Home Without It: Credit Card Companies Cancel on Muslin New Yorkers*, CITY LIMITS, May 2003; Kathy Hanrahan, *OFAC Customers Seek Answers after Bank Accounts Closed*, DETROIT NEWS, Dec. 18, 2004; Mark Jewell, *Bank of America Resolves Complaints of Anti-Muslim Bias By Former Fleet Bank*, BOSTON.COM, Apr. 12, 2006.

[50] A "google" search for "OFAC and landlord," "OFAC and employer," or similar searches by industry generates results for many screening products on the market.

[51] *See* Bridger Insight website, at http://www.bridgerinsight.choicepoint.com/.

[52] Press Release, TransUnion, TransUnion and TFP Align to Offer New Product for USA Patriot Act Compliance (Sept. 18, 2002), http://newsroom.transunion.com/index.php?s=press_releases&item=311.

[53] *See* OFFICE OF FOREIGN ASSETS CONTROL, OFAC UPDATE FOR CONSUMERS, *at* http://www.treas.gov/offices/enforcement/ofac/regulations/t11cons.pdf. This document advises consumers with an OFAC alert on their credit reports to ask the credit reporting agencies, not OFAC, to remove an improper alert; some credit reporting agencies, however, tell consumers they cannot remove the alert because of OFAC rules.

[54] *See* 6 U.S.C. § 345 (2004) (establishing Officer for Civil Rights and Civil Liberties).

[55] *See* AVIATION CONSUMER PROTECTION DIVISION, AIR TRAVEL CIVIL RIGHTS PROBLEMS (2002), *at* http://airconsumer.ost.dot.gov/DiscrimComplaintsContacts.htm (advising airline passengers how to file civil rights complaints with various federal agencies).

[56] Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 144-45 (1951) (Black, J., concurring).

[57] *See* Shaun Waterman, *Trucker Case Shows Vetting Redress Problem*, WASH. TIMES, Mar. 6, 2005 (stating that Transportation Security Administration ran a name check on 2.7 million truckers licensed to carry hazardous materials).

[58] Scott Jaschik, *Are You Now or Have You Ever...*, INSIDE HIGHER ED, Aug. 15, 2006, http://www.insidehighered.com/news/2006/08/15/oath (describing Ohio public universities' new job requirement that employees fill out a form disclaiming any involvement with any organization on the U.S. State Department "Terrorist Exclusion List").

A P P E N D I X



# OFFICE OF FOREIGN ASSETS CONTROL

## SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS

February 27, 2007

17 NOVEMBER (a.k.a. EPANASTATIKI ORGANOSI 17 NOEMVRI; a.k.a. REVOLUTIONARY ORGANIZATION 17 NOVEMBER) [FTO] [SDGT]

32 COUNTY SOVEREIGNTY COMMITTEE (a.k.a. 32 COUNTY SOVEREIGNTY MOVEMENT; a.k.a. IRISH REPUBLICAN PRISONERS WELFARE ASSOCIATION; a.k.a. REAL IRA; a.k.a. REAL IRISH REPUBLICAN ARMY; a.k.a. REAL OGLAIGH NA HEIREANN; a.k.a. RIRA) [FTO] [SDGT]

32 COUNTY SOVEREIGNTY MOVEMENT (a.k.a. 32 COUNTY SOVEREIGNTY COMMITTEE; a.k.a. IRISH REPUBLICAN PRISONERS WELFARE ASSOCIATION; a.k.a. REAL IRA; a.k.a. REAL IRISH REPUBLICAN ARMY; a.k.a. RIRA) [FTO] [SDGT]

2000 DOSE E.U. (a.k.a. DOMA E M). Calle 31 No. 1-34, Cali, Colombia; NIT # 805015749-3 (Colombia) [SDNT]

2000-DODGE S.L., Calle Gran Via 80, Madrid, Madrid, Spain; C.I.F. B83149955 (Spain) [SDNT]

2904977 CANADA, INC. (a.k.a. CARIBE SOL; a.k.a. HAVANTUR CANADA INC.), 818 rue Sherbrooke East, Montreal, Quebec H2L 1K3, Canada [CUBA]

A G REPRESENTACIONES LTDA., Calle 22 Norte No. 9-43, Cali, Colombia; Calle 20N No. 5N-26 Of. 102, Cali, Colombia; NIT # 800132578-3 (Colombia) [SDNT]

A RAHMAN, Mohamad Iqbal (a.k.a. ABDURRAHMAN, Abu Jibril; a.k.a. ABDURRAHMAN, Mohamad Iqbal; a.k.a. ABU JIBRIL; a.k.a. MUQTI, Fihiruddin; a.k.a. MUQTI, Fikiruddin; a.k.a. RAHMAN, Mohamad Iqbal); DOB 17 Aug 1958; POB Tirpas-Selong Village, East Lombok, Indonesia; nationality Indonesia (individual) [SDGT]

A.I.C. COMPREHENSIVE RESEARCH INSTITUTE (a.k.a. A.I.C. SOGO KENKYUSHO; a.k.a. ALEPH; a.k.a. AUM SHINRIKYO; a.k.a. AUM SUPREME TRUTH) [FTO] [SDGT]

A.I.C. SOGO KENKYUSHO (a.k.a. A.I.C. COMPREHENSIVE RESEARCH INSTITUTE; a.k.a. ALEPH; a.k.a. AUM SHINRIKYO; a.k.a. AUM SUPREME TRUTH) [FTO] [SDGT]

A.T.E. INTERNATIONAL LTD. (a.k.a. RWR INTERNATIONAL COMMODITIES), 3 Mandeville Place, London, United Kingdom [IRAQ2]

A.W.A. ENGINEERING LIMITED, 3 Mandeville Place, London, United Kingdom [IRAQ2]

ABADIA BASTIDAS, Carmen Alicia (a.k.a. ABADIA DE RAMIREZ, Carmen Alicia), c/o DISDROGAS LTDA., Yumbo, Valle, Colombia; c/o RAMIREZ ABADIA Y CIA. S.C.S., Cali, Colombia; Calle 9 No. 39-65, Cali, Colombia; DOB 15 Jul 1934; POB Palmira, Valle, Colombia; Cedula No. 29021074 (Colombia) (individual) [SDNT]

ABADIA DE RAMIREZ, Carmen Alicia (a.k.a. ABADIA BASTIDAS, Carmen Alicia), c/o DISDROGAS LTDA., Yumbo, Valle, Colombia; c/o RAMIREZ ABADIA Y CIA. S.C.S., Cali, Colombia; Calle 9 No. 39-65, Cali, Colombia; DOB 15 Jul 1934; POB Palmira, Valle, Colombia; Cedula No. 29021074 (Colombia) (individual) [SDNT]

ABAS, Mohamad Nasir (a.k.a. ABAS, Nasir; a.k.a. BIN ABAS, Mohammed Nasir; a.k.a. BIN ABAS, Sulaiman; a.k.a. "KHAIRUDDIN";

"SOLIMAN"); DOB 6 May 1969; nationality Malaysia (individual) [SDGT]

ABAS, Nasir (a.k.a. ABAS, Mohamad Nasir; a.k.a. BIN ABAS, Mohammed Nasir; a.k.a. BIN ABAS, Sulaiman; a.k.a. "KHAIRUDDIN"; a.k.a. "SOLIMAN"); DOB 6 May 1969; nationality Malaysia (individual) [SDGT]

ABASTECEDORA NAVAL Y INDUSTRIAL, S.A. (a.k.a. ANAINSA), Panama [CUBA]

ABAUNZA MARTINEZ, Javier; DOB 1 Jan 1965; POB Guernica, Vizcaya Province, Spain; D.N.I. 78.865.882 (Spain): Member ETA (individual) [SDGT]

ABBAKAR MUHAMAD, Abdul Aziz; DOB 1961; POB Sudan; Passport 562605 (Sudan) issued 28 Oct 1998; IARA Peshwar, Pakistan Director (individual) [SDGT]

ABBAS, Abdul Hussein, Italy (individual) [IRAQ2]

ABBAS, Abu (a.k.a. ZAYDAN, Muhammad); DOB 10 Dec 1948; Director of PALESTINE LIBERATION FRONT - ABU ABBAS FACTION (individual) [SDGT]

ABBAS, Kassim, Lerchesbergring 23A, D-60598, Frankfurt, Germany; DOB 7 Aug 1956; POB Baghdad, Iraq (individual) [IRAQ2]

ABBES, Moustafa, Via Padova. 82, Milan, Italy; DOB 5 Feb 1962; POB Osniers, Algeria (individual) [SDGT]

ABBES, Youcef (a.k.a. "GIUSEPPE"), Via Padova 82, Milan, Italy; Via Manzoni, 33. Cinisello Balsamo, Milan, Italy; DOB 5 Jan 1965; POB Bab El Aoued, Algeria (individual) [SDGT]

ABD AL HADI (a.k.a. BENDEBKA, L'Hadi; a.k.a. HADI; Via Garibaldi. 70, San Zenone al Po, Pavia, Italy; Via Manzoni, 33. Cinisello Balsamo, Milan, Italy; DOB 17 Nov 1963; POB Algiers Algeria (individual) [SDGT]

ABD AL HAFIZ, Abd Al Wahab (a.k.a. FERDJANI, Mouloud; a.k.a. "MOURAD"; a.k.a. "RABAH DI ROMA"), Via Lungotevere Dante, Rome, Italy; DOB 7 Sep 1967; POB Algiers, Algeria (individual) [SDGT]

ABD AL RAZEQ, Abu Sufian (a.k.a. 'ABD AL-RAZZIQ, Abu Sufian al-Salamabi Muhammed Ahmed; a.k.a. ABDELRAZEK, Abousofian; a.k.a. ABDELRAZIK, Abousfian Salman; a.k.a. ABDELRAZIK, Abousfian; a.k.a. ABDELRAZIK, Abousofiane; a.k.a. ABDELRAZIK, Sofian; a.k.a. "ABOU EL LAYTH"; a.k.a. "ABOULAIL"; a.k.a. "ABU JUIRIAH"; a.k.a. "ABU SUFIAN"; a.k.a. "ABULAIL"; a.k.a. "DJOLAIBA THE SUDANESE"; a.k.a. "JOLAIBA"; a.k.a. "OULD EL SAYEIGH"); DOB 6 Aug 1962; POB Al-Bawgah, Sudan; alt. POB Albaouga, Sudan; nationality Canada; alt. nationality Sudan; Passport BC166787 (Canada) (individual) [SDGT]

ABD AL-GHAFAR, Sundus, Iraq; DOB c. 1967; POB Kirkuk, Iraq; nationality Iraq; wife of Izzat Ibrahim Al-Durl (individual) [IRAQ2]

ABD AL-GHAFUR, Humam Abd al-Khaliq (a.k.a. 'ABD AL-RAHMAN, Humam 'abd al-Khaliq; a.k.a. 'ABD AL-GHAFUR, Humam abd-al-Khaliq; a.k.a. GHAFUR, Humam Abdel Khaleq Abdel; a.k.a. RASHID, Humam 'abd al-Khaliq); DOB 1945; POB ar-Ramadi, Iraq; nationality Iraq; Former Minister of Higher Education and Research; M00180611/104.issued 12 September 1993 (individual) [IRAQ2]

'ABD AL-KARIM (a.k.a. ABU AL-MU'TAZ; a.k.a. AL-HABIB; a.k.a. AL-KHALAYLAH. Ahmad

Fadil Nazzal; a.k.a. AL-MUHAJIR; a.k.a. AL-ZARQAWI, Abu Mus'Ab, a.k.a. GHARIB; a.k.a. KHALAILAH, Ahmad Fadeel; a.k.a. KHALAYLEH, Fedel Nazzel; a.k.a. "MOUHANAD"; a.k.a. "MOUHANNAD"; a.k.a. "MUHANNAD"; a.k.a. "RASHID"); DOB 20 Oct 1966; POB Zarqa, Jordan; citizen Jordan; National ID No. 9661031030 (Jordan); Passport Z264968 (Jordan) (individual) [SDGT]

'ABD ALLAH, 'Issam 'Ali Muhammad (a.k.a. 'ABD-AL-'IZ; a.k.a. ABD-AL-WAHAB, Abd-al-Hai Ahmad; a.k.a. ABU YASIR; a.k.a. AL-KAMEL, Salah 'Ali; a.k.a. MUSA, Rita'i Ahmad Taha; a.k.a. TAHA MUSA, Rifa'i Ahmad; a.k.a. THABIT 'IZ); DOB 24 Jun 54; POB Egypt; Passport 83860 (Sudan); alt. Passport 30455 (Egypt); alt. Passport 1046403 (Egypt) (individual) [SDT]

ABD AL-RAHMAN, Abdullah Muhammad Rajab (a.k.a. ABU AL-KHAYR, Ahmad Hasan); DOB 3 Nov 1957; POB Kafr al-Shaykh; nationality Egypt (individual) [SDGT]

'ABD AL-RAHMAN, Humam 'abd al-Khaliq (a.k.a. ABD AL-GHAFUR, Humam Abd al-Khaliq; a.k.a. ABD-AL-GHAFUR, Humam abd-al-Khaliq; a.k.a. GHAFUR, Humam Abdel Khaleq Abdel; a.k.a. RASHID, Humam 'abd al-Khaliq); DOB 1945; POB ar-Ramadi, Iraq; nationality Iraq; Former Minister of Higher Education and Research; M00180611/104.issued 12 September 1993 (individual) [IRAQ2]

'ABD AL-RAZZIQ, Abu Sufian al-Salamabi Muhammed Ahmed (a.k.a. ABD AL RAZEQ, Abu Sufian; a.k.a. ABDELRAZEK, Abousofian; a.k.a. ABDELRAZIK, Abousfian Salman; a.k.a ABDELRAZIK, Abousofian; a.k.a. ABDELRAZIK, Abousofiane; a.k.a. ABDELRAZIK, Sofian; a.k.a. "ABOU EL LAYTH"; a.k.a. "ABOULAIL"; a.k.a. "ABU JUIRIAH"; a.k.a. "ABU SUFIAN"; a.k.a. "ABULAIL"; a.k.a. "DJOLAIBA THE SUDANESE"; a.k.a. "JOLAIBA"; a.k.a. "OULD EL SAYEIGH"); DOB 6 Aug 1962; POB Al-Bawgah, Sudan; alt. POB Albaouga, Sudan; nationality Canada; alt. nationality Sudan; Passport BC166787 (Canada) (individual) [SDGT]

ABD AL-GHAFUR, Humam abd-al-Khaliq (a.k.a. ABD AL-GHAFUR, Humam Abd al-Khaliq; a.k.a. 'ABD AL-RAHMAN, Humam 'abd al-Khaliq; a.k.a. GHAFUR, Humam Abdel Khaleq Abdel; a.k.a. RASHID, Humam 'abd al-Khaliq); DOB 1945; POB ar-Ramadi, Iraq; nationality Iraq; Former Minister of Higher Education and Research; M00180611/104.issued 12 September 1993 (individual) [IRAQ2]

'ABD-AL-'IZ (a.k.a. 'ABD ALLAH, 'Issam 'Ali Muhammad; a.k.a. ABD-AL-WAHAB, Abd-al-Hai Ahmad; a.k.a. ABU YASIR; a.k.a. AL-KAMEL, Salah 'Ali; a.k.a. MUSA, Rifa'i Ahmad Taha; a.k.a. TAHA MUSA, Rifa'i Ahmad; a.k.a. THABIT 'IZ); DOB 24 Jun 54; POB Egypt; Passport 83860 (Sudan); alt. Passport 30455 (Egypt); alt. Passport 1046403 (Egypt) (individual) [SDT]

ABDALLA, Fazul (a.k.a. ADBALLAH, Fazul; a.k.a. AISHA, Abu; a.k.a. AL SUDANI, Abu Seif; a.k.a. ALI, Fadel Abdallah Mohammed; a.k.a. FAZUL, Abdalla; a.k.a. FAZUL, Abdallah; a.k.a. FAZUL, Abdallah Mohammed; a.k.a. FAZUL, Haroon; a.k.a. FAZUL, Harun; a.k.a. HAROON; a.k.a. HAROUN, Fadhil; a.k.a. HARUN; a.k.a. LUGMAN, Abu; a.k.a. MOHAMMED, Fazul;

LAWYERS' COMMITTEE FOR CIVIL RIGHTS
131 STEUART STREET, SUITE 400
SAN FRANCISCO, CA 94105
(415) 543-9444 (TEL)
(415) 543-0296 (FAX)
WWW.LCCR.COM

Lawyers' Committee for
CIVIL RIGHTS
of the San Francisco Bay Area