THOMAS R. BURKE (State Bar No. 141930)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111-6533
Telephone: (415) 276-6500
Facsimile: (415) 276-6599

ROBERT RUBIN (State Bar No. 85084)
PHILIP HWANG (State Bar No. 185070)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
  OF THE SAN FRANCISCO BAY AREA
131 Steuart Street, Suite 400
San Francisco, CA 94105
Telephone: (415) 543-9444
Facsimile: (415) 543-0296

Attorneys for Plaintiff Lawyers' Committee
for Civil Rights of the San Francisco Bay Area

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY,<br><br>Defendant. | No. C07-2590 PJH<br><br>**OPPOSITION TO DEPARTMENT OF TREASURY'S MOTION TO DISMISS COMPLAINT**<br><br>Hearing Date: October 24, 2007<br>Time: 9:00 a.m.<br>Hon. Phyllis J. Hamilton |

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities ............................................................................................................................. ii

I.   Introduction ............................................................................................................................ 1

II.  Argument ................................................................................................................................ 2

   A.  LCCR's Complaint Is Not Moot Because Treasury Has Not Satisfied The Legal Standards For Construing LCCR's FOIA Requests Or For Searching For The Documents LCCR Requested Years Ago. ................................................................. 2

   B.  Treasury's Claims Regarding Its Search Are Untenable And Its Responses To the FOIA Requests Are Legally Inadequate. ............................................................... 5

      1.  Treasury Needs to Produce the Documents That It Admits to Having That Are Responsive to LCCR's Requests 1 Through 6. ........................................ 5

      2.  Treasury's Search for Documents Responsive to LCCR's Requests 7 through 10 Was Insufficient. ........................................................................................... 7

      3.  Other Publicly-Available Documents Belie Treasury's Assertion that All Documents Responsive to LCCR's FOIA Requests Have Been Produced, and the Implications of Its Assertion that No Documents Exist Other than the Nine Pages of Already-Publicly-Available Ones Released to LCCR Are Too Incredible to be Believed ........... 10

   C.  In Light of the Obvious Inadequacy of Treasury's Search and Production and Countervailing Evidence Routing Treasury's Assertion that All Responsive Documents Have Been Produced, This Court Should Permit Limited Discovery. ................................ 13

III. Conclusion ............................................................................................................................ 14

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Burgert v. Lokelani Bernice Pauahi Bishop Trust,*
   200 F.3d 661 (9th Cir. 2000) .................................................................................................2

*Coastal States Gas Corp. v. Dep't of Energy,*
   617 F.2d 854 (D.C. Cir. 1980) ...............................................................................................7

*Dep't of the Air Force v. Rose,*
   425 U.S. 352 (1976) ...............................................................................................................3

*Forsham v. Califano,*
   587 F.2d 1128 (D.C. Cir. 1978) .............................................................................................7

*Founding Church of Scientology v. Nat'l Security Agency,*
   610 F.2d 824 (D.C. Cir. 1979) .......................................................................................passim

*Friends of Blackwater v. United States Dep't of the Interior,*
   391 F. Supp.2d 115 (D.D.C. 2005) ........................................................................................4

*Ground Saucer Watch, Inc. v. CIA,*
   692 F. 2d 770 (D.C. Cir. 1981) ..............................................................................................2

*Hishon v. King and Spalding,*
   467 U.S. 69, 73 (1984) ...........................................................................................................2

*John Doe Agency v. John Doe Corp.,*
   493 U.S. 146 (1989) ...............................................................................................................3

*LaCedra v. Executive Office for U.S. Att'ys,*
   317 F.3d 345 (D.C. Cir. 2003) ...............................................................................................3

*Lion Raisins Inc., v. United States Dep't of Agriculture,*
   354 F.3d 1072 (9th Cir. 2004)............................................................................................3, 6

*Maricopa Audubon Soc. v. U.S. Forest Serv.,*
   108 F.3d 1082 (9th Cir. 1997)................................................................................................3

*Nation Magazine, Washington Bureau v. United States Customs Serv.,*
   71 F.3d 885 (D.C. Cir. 1995) ........................................................................................passim

*Oglesby v. United States Dep't of Army,*
   920 F.2d 57 (D.C. Cir. 1990) .................................................................................................8

*Oregon Natural Desert Ass'n v. Bibles,*
   83 F.3d 1168 (9th Cir. 1996), *rev'd on other grounds,* 519 U.S. 355 (1997) .........................3

DAVIS WRIGHT TREMAINE LLP

*Steinberg v. United States Dep't of Justice,*
  23 F.3d 548 (D.C. Cir. 1994) .................................................................................. 8

*Truitt v. Dep't of State,*
  897 F.2d 540, 544-45 (D.C. Cir. 1990) ................................................................... 4

*United Transp. Union-Illinois Legis. Bd. v. Surface Transp. Bd.,*
  132 F.3d 71 (D.C. Cir. 1998) .................................................................................. 6

*Weisberg v. United States Dep't of Justice,*
  627 F.2d 365 (D.C. Cir. 1980) ................................................................................ 2

*Weisberg v. United States Dep't of Justice,*
  705 F.2d 1344 (D.C. Cir. 1983) .................................................................... 2, 8, 13

*Wilderness Society v. United States Dep't of the Interior,*
  344 F. Supp. 2d 1 (D.D.C. 2004) ............................................................................ 1

**FEDERAL STATUTES**

5 U.S.C. § 552 ................................................................................................... *passim*

5 U.S.C. § 552(a)(3)(A) .......................................................................................... 6, 7

5 U.S.C. § 552(b) ....................................................................................................... 3

**REGULATIONS**

31 C.F.R. § 501.807 .................................................................................................. 9

## I. INTRODUCTION

The Lawyers' Committee for Civil Rights ("LCCR") respectfully requests that this Court deny the United States Department of the Treasury's ("Treasury") Motion to Dismiss LCCR's complaint relating to its requests to the Office of Foreign Assets Control ("OFAC") made in 2005 pursuant to the Freedom of Information Act, 5 U.S.C. § 552, ("FOIA"). Treasury's long-overdue response is patently inadequate and fails to satisfy both the letter and the spirit of FOIA, which require the agency handling FOIA requests to construe them liberally. Nor has Treasury shown that it made a good-faith effort to conduct the necessary search for the records. Moreover, not only does Treasury's response *confirm* that responsive documents exist which the agency has not released and for which it has asserted no exemptions, but third-party documents that LCCR has discovered also establish that Treasury's assertions that some of the requested documents do not exist simply cannot be true.

This Court should keep two fundamental points in mind as it considers Treasury's motion. First, it is black-letter law under FOIA that Treasury had a duty to interpret LCCR's FOIA requests liberally, a standard that Treasury's response to LCCR's requests manifestly does not satisfy. *See, e.g., Nation Magazine, Washington Bureau v. United States Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995). Second, Treasury had a duty to perform an adequate search as adjudged by objective standards of reasonableness, meaning that it needed to show that it made a good-faith effort to conduct a search reasonably calculated to uncover all relevant documents. *See, e.g., Wilderness Society v. United States Dep't of the Interior*, 344 F. Supp. 2d 1, 20 (D.D.C. 2004) (citing *Weisberg v. United States Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). Treasury fails to satisfy either of these standards.

Given the nature of the documents sought by LCCR, many of which involved basic policies and procedures regarding the hotline that OFAC operates, Treasury cannot plausibly assert that none of these documents exist and its showing is well below the legal standard for granting dismissal. Because Treasury's response is facially suspect and called into question by evidence LCCR itself has uncovered, this Court should deny the motion and should instead order

limited discovery to permit LCCR to inquire into what kind of training, policies and procedures Treasury's OFAC follows and whether and when any of the documents requested were destroyed.

## II. ARGUMENT

### A. LCCR's Complaint Is Not Moot Because Treasury Has Not Satisfied The Legal Standards For Construing LCCR's FOIA Requests Or For Searching For The Documents LCCR Requested Years Ago.

As an initial matter, although Treasury has styled its motion as one for dismissal, its arguments are actually more in line with those for a motion for summary judgment because it is essentially claiming that it has discharged its obligations and therefore that LCCR's complaint is now moot. Mot. at 3. But Treasury cannot meet its burden under either standard.

In reviewing a motion to dismiss, a court must accept all well-pleaded allegations of the complaint as true and construe them in a light most favorable to the plaintiff. *See Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000). A court may dismiss the complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King and Spalding*, 467 U.S. 69, 73 (1984). With regard to summary judgment, an agency in a FOIA case is entitled to summary judgment only if it proves that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester. *See Weisberg*, 705 F.2d at 1350.

Furthermore, the agency bears the burden of showing **beyond a material doubt** that it has conducted a search reasonably calculated to uncover all relevant documents. *See id.* at 1351. While it is true that agency affidavits are accorded a presumption of good faith, which cannot be rebutted by "purely speculative claims about the existence and discoverability of other documents," *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981), **"[c]onclusory statements that the agency has reviewed relevant files are insufficient to support summary judgment,"** and logically, a motion to dismiss. *See Nation Magazine,* 71 F.3d at 890 (emphasis added) (citing *Weisberg v. United States Dep't of Justice*, 627 F.2d 365, 371 (D.C. Cir. 1980) (affidavit asserting that agency official "ha[s] conducted a review of [agency] files which would contain [responsive] information," without describing approach to search or identifying

files searched, was insufficiently detailed to permit summary judgment). Unlike the conclusory and cursory affidavit of Virginia R. Canter offered here, "[t]he affidavits must be 'reasonably detailed . . ., setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'" *Nation Magazine,* 71 F.3d at 890 (internal citation omitted). Moreover, even if supporting affidavits are "relatively detailed and nonconclusory and . . . submitted in good faith," if countervailing evidence exists and "if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue," then a ruling for the agency is not in order. *See Founding Church of Scientology v. Nat'l Security Agency,* 610 F.2d 824, 836 (D.C. Cir. 1979).

FOIA "mandates a policy of broad disclosure of government documents." *See, e.g., Maricopa Audubon Soc. v. U.S. Forest Serv.,* 108 F.3d 1082, 1085 (9th Cir. 1997). *See also Lion Raisins Inc., v. United States Dep't of Agriculture,* 354 F.3d 1072, 1079 (9th Cir. 2004) ("The Supreme Court has interpreted the disclosure provisions of FOIA broadly, noting that the act was animated by a 'philosophy of full agency disclosure.'") (quoting *John Doe Agency v. John Doe Corp.,* 493 U.S. 146, 152 (1989), and citing *Dep't of the Air Force v. Rose,* 425 U.S. 352, 361 (1976) ("disclosure, not secrecy, is the dominant objective of the Act")). Consequently, unless one of the nine statutory exemptions set forth in 5 U.S.C. § 552(b) applies (which themselves are to be construed narrowly), the FOIA request must be granted and all relevant public records must be disclosed. *See, e.g., Oregon Natural Desert Ass'n v. Bibles,* 83 F.3d 1168, 1170 (9th Cir. 1996), *rev'd on other grounds,* 519 U.S. 355 (1997).

Since Treasury has not objected to LCCR's requests on grounds that an exemption applies or that the documents sought are subject to privilege,[1] any records relating to those requests are presumptively required to be disclosed.

Consistent with this principle favoring disclosure, Treasury needed to have construed LCCR's FOIA requests liberally. *See, e.g., LaCedra v. Executive Office for U.S. Att'ys,* 317 F.3d

---

[1] OFAC personnel did represent to LCCR at one point that the number of blocked transactions by year was protected for national security reasons but has never formally asserted the same in responding to LCCR's requests. *See* Declaration of Shirin Sinnar ¶ 4.

345, 348 (D.C. Cir. 2003).[2]  Neither the letter from Treasury purporting to respond to LCCR's FOIA requests nor the affidavit submitted by Virginia R. Canter in support of Treasury's motion to dismiss indicates that this was done.  In fact, to the contrary, early on in the process, OFAC employees expressly stated that they believed LCCR's FOIA request should be read narrowly. When the LCCR attorney who drafted the requests called in August 2006 to check on the status of a response from Treasury, she was told by two persons working in OFAC's compliance division, one of whom was a senior officer, that with respect to request numbers 7 through 10, OFAC would not be providing policies or procedures since they had been told that such records were not covered by FOIA.  *See* Declaration of Shirin Sinnar, ¶ 7.  The resulting production from Treasury indicates that the agency adhered to this impermissibly narrow reading of the requests.

Moreover, Treasury has offered no description whatever of any search conducted for policies and procedures that would fall within the auspice of LCCR's FOIA request.  The representations by the OFAC personnel who spoke with LCCR's attorney regarding such documents strongly suggest such documents do exist, although the agency mistakenly treats these as falling outside of FOIA.  Indeed, Treasury's own responses themselves provide countervailing evidence that belie its assertion that no documents exist.  *See* Declaration of Thomas R. Burke, Ex. 1 (Letter dated July 20, 2007 from Virginia R. Canter to Thomas R. Burke) (describing documents found relevant to requests 1 through 6).

Nor has Treasury explained whether the documents requested never existed, or have been destroyed.  To the extent that OFAC later explains that responsive documents may have been destroyed, it should not be permitted to circumvent its obligations under FOIA by simply delaying searches until its own internal document retention policies provide that the documents requested be purged.  The U.S. Treasury is notorious for not responding to FOIA requests in a timely manner, so much so that in 2006 it submitted a "FOIA Improvement Plan" detailing how it was going to improve its response time to FOIA requests.  *See* Complaint, Ex. F (Department of

---

[2] A FOIA requester must reasonably describe the records sought, but "an agency also has a duty to construe a FOIA request liberally." *Nation Magazine,* 71 F.3d at 890 (*citing Truitt v. Dep't of State,* 897 F.2d 540, 544-45 (D.C. Cir. 1990) (*citing* Senate Report accompanying relevant provision of FOIA); *Founding Church of Scientology v. Nat'l Sec. Agency,* 610 F.2d 824, 836-37 (D.C. Cir. 1979) (same).  *See also Friends of Blackwater v. United States Dep't of the Interior,* 391 F. Supp. 2d 115, 122 (D.D.C. 2005).

4

Treasury FOIA Improvement Plan, dated June 14, 2006). In the plan, Treasury noted that it ended FY2005 with a backlog of 4,883 cases, *see id.* at 1, one of which was LCCR's own. If the records requested no longer exist because of Treasury's lag in responding, dismissing this action would impermissibly condone this agency's systematic delays, serving only to encourage this and other agencies from ever addressing FOIA requests in a timely manner.

### B. Treasury's Claims Regarding Its Search Are Untenable And Its Responses To the FOIA Requests Are Legally Inadequate.

Not only do Treasury's response and affidavit fail to satisfy the established standards for prevailing on the motion to dismiss, even as to the individual requests its response rings hollow.

#### 1. Treasury Needs to Produce the Documents That It Admits to Having That Are Responsive to LCCR's Requests 1 Through 6.

LCCR's FOIA request letter specifically asks for "disclosure of agency records regarding the following [requests], from all time periods from 2000 to the present," and in a footnote broadly defines "records" to include but not be limited to, among other things, all telephone logs, reports, correspondence, faxes, emails, notes, and specifically "records kept in electronic form." *See* Sinnar Decl., Ex. A n.1.

Requests 1 through 6 sought documents regarding the number and nature of inquiries to the hotline regarding and establishing possible name matches and/or related credit reports, the distribution of those calls across industries, complaints and inquiries from individuals about having their name flagged as similar to a name on OFAC's specially designated nationals ("SDN") list or having their credit reports contain an alert regarding possible name matches, and any OFAC responses thereto. *Id.*, pp. 1-2.

In the letter Treasury sent after the initiation of this lawsuit that purports to respond to LCCR's FOIA requests, Treasury *expressly admits* that it has records that fall within Requests 1 through 6 because it describes how it looked at those documents in preparing the narrative answers. Specifically, the letter states that OFAC "maintains an electronic database" containing information regarding telephone calls to the OFAC hotline; "maintains data in electronic form regarding the number of emails received through its website" and that those entries are searchable for terms relevant to the FOIA requests; that is has data maintained in electronic form "that

contains some information regarding telephone calls made to OFAC's congressional liaison"; and that it maintains a Foreign Assets Control Database that "contains some information regarding the volume of correspondence received by OFAC" and includes terms relevant to LCCR's FOIA requests. *See* Burke Decl., Ex. 1, p. 2. The letter then goes on to describe the information OFAC found in these databases. *Id.*

Without question, all of these documents referenced in the letter Treasury sent to LCCR are responsive to LCCR's requests – by Treasury's own admission. Treasury has not claimed that it has disposed of or destroyed these records or that they are exempted from FOIA.[3] Having conceded that there are such documents, Treasury is obligated to produce them, in redacted form if necessary. The fact that it did not and instead merely claims to have counted the number of calls, correspondence, and emails – when LCCR's requests expressly sought the documents themselves – renders Treasury's response wholly inadequate. Given that Treasury fully admits relevant documents exist and that it has not produced them, Treasury cannot credibly claim that it has "released all records responsive to the FOIA request." *See* Mot. to Dismiss at 2.

Nor does the fact that the documents or information are stored electronically excuse Treasury's lack of production. LCCR's FOIA request letter broadly defined "record" to include all "records kept in electronic form." *See* Sinnar Decl., Ex. A n.1. Consequently, Treasury needed to have produced the records it has in whatever format possible. Importantly, Treasury has not asserted that it *cannot* produce these records in electronic format. *Cf. United Transp. Union-Illinois Legis. Bd. v. Surface Transp. Bd.*, 132 F.3d 71, 75 (D.C. Cir. 1998) ("The E-FOIA amended the definition of "record" in the FOIA to include a record maintained in 'an electronic format,'… and added a requirement that the agency make a record available to the public 'in any form or format requested by the person if the record is readily reproducible by the agency in that form or format….'").

Furthermore, the text of FOIA itself expressly states that an agency, "upon any request for records" to which exemptions or objections do not apply, "shall make the records promptly

---

[3] And if Treasury were to claim that any of these documents were exempted, such exemptions must be narrowly construed. *See Lion Raisins Inc., v. United States Dep't of Agriculture*, 354 F.3d at 1079.

available to any person." 5 U.S.C. § 552(a)(3)(A). The statute says nothing about permitting the substitution of mere descriptions of the records in lieu of the documents themselves.

Treasury's failure to produce these relevant documents is fatal to its assertion that all responsive records have been produced, and as a result this Court should deny the instant motion to dismiss.

Moreover, if, as Treasury claims, it truly does not have any records regarding complaints by individuals whose names or credit reports are flagged for cross-checking on the OFAC SDN list, then Treasury is essentially saying that it has no mechanism for tracking, let alone accounting for, even the barest citizen input and grievances related to the list it operates. Such an assertion is at odds with the practices of other agencies that administer similar terrorist watch lists and that spend considerable time and resources implementing mechanisms to deal with complaints. For example, the director of the Terrorist Screening Center run by the Federal Bureau of Investigation ("F.B.I.") has stated that it has "a dedicated staff who do nothing but work to redress matters" involving erroneous matches to the terrorist lists used. *See* Declaration of Thomas R. Burke, Exs. 2 (CNN.com article) & 3 (New York Times online article noting that the center had established an office to deal with complaints from people who contend they are erroneously on the list). This lack of any documentation regarding complaints is also suspect given Treasury's infamously poor record for responding to FOIA requests.

### 2. Treasury's Search for Documents Responsive to LCCR's Requests 7 through 10 Was Insufficient.

LCCR's requests 7 through 10 generally sought polices and procedures used by OFAC to determine whether the individual being queried about is really on the OFAC SDN watch list and what procedures OFAC takes when it does make a match to an individual on the SDN list.

As described above, OFAC compliance division personnel asserted in response to LCCR's requests that it considered its policies and procedures to be outside the purview of FOIA. *See* Sinnar Decl. at ¶ 6. But government policies and procedures are at the very heart of FOIA, whose "strong policy . . . is that the public is entitled to know what its government is doing and why." *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980); *see also Forsham v. Califano*, 587 F.2d 1128, 1141 (D.C. Cir. 1978) ("the fundamental premise of the Act

7

is that 'the public as a whole has a right to know what its Government is doing'") (citing S.Rep. No. 813, 89th Cong., 1st Sess. 5 (1965)). It is difficult to imagine what could be more integral to what "the government is doing" than the policies and procedures its agencies follow.

Moreover, Treasury has not offered *any* description of the type of search undertaken to locate documents responsive to these requests. Instead of a "relatively detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched," *Oglesby v. United States Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990), the affidavit by Virginia Canter merely asserts in conclusory fashion that "By letter dated July 20, 2007 OFAC responded to plaintiff's FOIA request, releasing all responsive records to plaintiff." *See* Canter Decl. ¶ 6. But "[c]onclusory statements that the agency has reviewed relevant files are insufficient to support summary judgment," and should not support a motion to dismiss. *See Nation Magazine,* 71 F.3d at 890 (emphasis added). Moreover, the Canter declaration is patently insufficient to meet the requisite objective "standard of reasonableness" and falls far below showing "beyond material doubt" that it has conducted a search reasonably calculated to uncover all relevant documents. *See Weisberg*, 705 F.2d at 1351. *See also Founding Church of Scientology v. Nat'l Security Agency*, 610 F.2d 824, 837 (D.C. Cir. 1979) ("an agency is not required to reorganize its [files] in response to a demand for information, but it does have a firm statutory duty to make reasonable efforts to satisfy it") (internal quotation marks and footnote omitted).

For one, Treasury did not even bother to assert that it had reviewed *any* relevant files for requests 7 through 10, and the documents it did provide do not satisfy the requests posed. In *Steinberg v. United States Dep't of Justice*, 23 F.3d 548, 551-52 (D.C. Cir. 1994), for example, the court reversed a grant of summary judgment to the government and instructed the district court on remand specifically to take into account that the declaration offered by the government as the basis for its summary judgment motion "is so general as to raise a serious doubt whether the [agency] conducted a reasonably thorough search of its records. While the document describes in general how the [agency] processed appellant's FOIA request, it fails to describe in any detail what

records were searched, by whom, and through what process." The same "serious doubts" exist here in light of OFAC's cursory affidavit that does not even describe the agency's alleged search.

Nor do the documents provide evidence of the nature or extent of any search, let alone a "reasonable" one. The first document Treasury provided is a "Frequently Asked Questions and Answers" that walks a user of the OFAC hotline through the steps the caller should take *prior to even calling the hotline.* See Burke Decl., Ex. 1, p. 4-6. The second document is a "Foreign Assets Control Regulations for the Credit Reporting Industry" that asserts it "will be useful" to credit bureaus, credit reporting agencies, and requesters of credit information, and explains how those entities should use OFAC's SDN list. *See id.*, pp. 7-8. Nothing in the document discusses the policies and procedures OFAC itself is following in operating the hotline; rather, it predominantly explains what actions lending-type companies need to take to comply with the prohibition against doing business with persons listed on OFAC's SDN list.

The third document Treasury provided is one that LCCR *had already attached as an exhibit to its complaint* and is a publication aimed at consumers entitled an "OFAC Update for Consumers: What is this Information on My Credit Report?" *See id.*, pp. 9-10; Complaint, Ex. B. The publication speaks briefly about what OFAC is and why some people have OFAC alerts on their credit reports, and states that "if the person checking your credit believes you are the person on the SDN list, then he or she should call the OFAC Hotline to verify and report it." Burke Decl., Ex. 1, p. 10.

The fourth and last document provided is a copy of Title 31, Volume 3, Chapter V, section 501.807 of the Code of Federal Regulations, that sets forth how someone may go about having their name removed from the lists that are at "appendices A, B, and C to this chapter." *Id.* pp. 11-12. The only part of the C.F.R. that is arguably responsive to an OFAC policy or procedure is paragraph (d), stating that "After [OFAC] has conducted a review of the request for consideration, it will provide a written decision to the blocked person . . . ." *Id.* p. 12.

Requests 7 and 8 asked for, respectively, "Policies or measures taken to protect the civil rights and privacy interests of individuals whose names are flagged as similar to a name on the SDN list or other watch list," and "Procedures for individuals to remove their names from the

9

SDN list or other watch list or to establish that they are not actually on the watch list." Sinnar Decl., Ex A. The only documents produced that are even somewhat arguably responsive are the OFAC Update article, which LCCR had already provided, and the C.F.R. The implication is that Treasury has absolutely no OFAC policies or procedures to work with people who contend they are erroneously on the list, or to suss out when people who actually are on the list attempt to have their names removed improperly. By contrast, F.B.I.'s Terrorist Screening Center has established an entire office to deal with such complaints. *See* Burke Decl., Exs. 2 & 3.

Even more egregiously lacking is any sort of response to requests 9 and 10, which asked for "Policies and procedures used by OFAC to determine whether an individual about whom the agency has received an inquiry is actually the same person identified on a government watch list" and "Policies and procedures used by OFAC once it has determined that an individual is actually on a government watch list," respectively. *See* Sinnar Decl., Ex. A. None of the four documents Treasury allegedly "released" (and all of which are publicly available) contain any information regarding OFAC's policies or procedures or indicate that a legally adequate search for the documents requested was undertaken. Rather, they describe actions that should be taken by other parties in interacting with OFAC.

### 3. Other Publicly-Available Documents Belie Treasury's Assertion that All Documents Responsive to LCCR's FOIA Requests Have Been Produced, and the Implications of Its Assertion that No Documents Exist Other than the Nine Pages of Already-Publicly-Available Ones Released to LCCR Are Too Incredible to be Believed.

Leaving aside that Treasury apparently did not even search for any responsive documents and verbally asserted that it did not believe it was required to produce policies and procedures, the practical implications of the alleged utter lack of OFAC policies and procedures are quite stunning. As evidenced in the documents Treasury did provide, banks, credit bureaus, employers, landlords, insurance agents, mortgage lenders, and other lenders and businesses are all directed to call the OFAC hotline. *See* Burke Decl., Ex. 1, p. 7.

If what Treasury has produced truly encompasses all documents relevant to LCCR's requests, then the OFAC employees responding to these inquiries have not been provided any training materials and are not following any written policies or procedures in doing so. That

would mean either (a) they have not received any formal training on how to respond, (b) such materials existed at the point in time they were trained and these have been destroyed (although the hotline is still in existence), or (c) they received all of their training orally.

The upshot of Treasury's assertion that there are no documents is that every time a company or individual calls to report that they think that they might be about to do a business transaction with an SDN, OFAC has no established protocol for how to cross-check or identify whether the individual whose name is similar to the person on the list or whose credit report has been flagged actually is the SDN in question or how to deal with that situation, *and* does not track either who the individual was or what the transaction was. Further, it suggests that if a company calling the hotline has the suspected individual literally in its offices, OFAC does not do anything or alert any other agencies about that possibility.

But such contentions are belied even by the documents OFAC did provide. For example, the "OFAC Update for Consumers: What is this Information on My Credit Report?" states that "if the person checking your credit believes you are the person on the SDN list, then he or she should call the OFAC Hotline *to verify and report it.*" See Burke Decl., Ex. 1, p. 10 (emphasis added). Similarly, the "Foreign Assets Control Regulations for the Credit Reporting Industry" states "if you have any reason to know or believe that allowing this person to do business in the U.S. would violate any of the Regulations, you should call the hotline and e-plain this knowledge or belief." *See id.* p. 8. In light of these mandates to report a possible encounter with someone on OFAC's SDN list, it is improbable that such reports are not retained in some form by the agency and that the OFAC operators answering these calls are not following any kind of protocol in processing this information.

Even supposing for a moment that Treasury's declaration was not facially inadequate, considerable countervailing evidence here rebuts the assertion in Canter's declaration that all responsive documents have been produced. *See, e.g., Founding Church*, 610 F.2d at 835-36. LCCR has found other publicly available documents that indicate that OFAC does indeed have more records responsive to LCCR's FOIA requests than those OFAC produced in regard to all the requests at issue here.

For starters, the Treasury's own Secretary testified to the Senate Appropriations Committee on March 28, 2007 that the OFAC hotline received approximately 90,000 calls over the last year. *See* Complaint, Ex. E, p. 8. Even the ability to give a ballpark number suggests that it is being tracked and documented, as does OFAC's letter that listed not only the number of calls made but how they were responded. *See* Burke Decl., Ex. 1, p. 2. During the same March 2007 Senate testimony, Secretary Paulson also agreed with Senator Durbin's statement that misidentifications "create pretty serious hardship on some . . . innocent people" and stating that "it's something we're concerned about." *See* Complaint, Ex. E, p. 8. It seems remarkable given this admission that Treasury has apparently not taken a single step similar to those enacted by the FBI's Terrorist Screening Center and has not documented any such hardships.

Another example that OFAC maintains relevant records that have not been disclosed to LCCR can be found in the September 27, 2004 United States Report to the Nonproliferation Committee--Efforts Regarding United Nations Security Council Resolution 1540. *See* Burke Decl., Ex. 4. That report gives the number of calls and emails received weekly by the hotline and the e-Hotline and the dollar value and number of interdicted transactions:

> • The Department of Treasury's OFAC provides a unique service through its toll-free telephone Hotline, giving real-time guidance on in-process transactions. The hotline averages 1,000 calls every week with at least $1 million, and sometimes as much as $35 million, in appropriately interdicted items each week. The Hotline allows OFAC to stop illicit transactions before they are processed. In addition, in July 2003, Treasury created an e-Hotline that allows U.S. persons with in-process transactions to send an e-mail to OFAC containing the specifics of the transaction in question. OFAC has received more than 600 inquiries via the e-Hotline. Treasury's ability to stop in-process transactions before they are processed has become a benchmark, especially in the war on terrorist financing.

*Id.*, p. 40 of 43, as printed out (the entire report is available at <http://www.state.gov/t/isn/rls/37375.htm>, last visited September 26, 2007). Such precise numbers for numbers of calls and amounts intercepted clearly must be retained somewhere, and any inquiries sent to the e-Hotline would exist on servers. Treasury asserts no exemptions to withhold this information and the responses Treasury gave to LCCR's requests 1 through 6 confirm that these documents exist. It is therefore incumbent on Treasury to produce them.

Along the same lines, the 9/11 Commission Report describes OFAC's efforts to restrict bin Laden, al Qaeda, and Taliban-related funds transfers and gives several examples of transactions worth many millions of dollars being blocked, which again suggests that records were kept. *See* Burke Decl., Ex. 5, p. 185 (full report available at <http://www.yale.edu/lawweb/avalon/sept_11/911Report.pdf>, last visited September 26, 2007).

The fact that Treasury did not produce any policies or procedures with regard to how inquiries to its hotline– whether via telephone or email – are handled would imply that OFAC just makes up as it goes along how to respond to these inquiries. Given the obvious security significance of these transactions, as evidenced by their prominent placement in such publications as the 9/11 Report, such a suggestion defies plausibility. Again, it is useful to contrast OFAC's assertions and lack of documents with the procedures followed by the Terrorist Screening Center which detail the percentage of matches, and take into account that if there is a warrant against the person, then the individual will be taken into custody, whereas if no exigent circumstances exist then the individual is released but the intelligence files are updated. *See* Burke Decl., Ex. 2. That such extensive precautions would be taken with regard to the Terrorist Screening Center and yet no such measures exist for the OFAC list is simply not credible. *Cf. Weisberg v. United States Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983) ("there may be times when an agency's inability to retrieve documents known or thought to be in its files is inherently unbelievable").

### C. In Light of the Obvious Inadequacy of Treasury's Search and Production and Countervailing Evidence Routing Treasury's Assertion that All Responsive Documents Have Been Produced, This Court Should Permit Limited Discovery.

The preceding discussion demonstrates that Treasury's identification and retrieval process for the documents requested are "genuinely in issue." *See, e.g., Founding Church of Scientology*, 610 F.2d at 836. Consequently, this Court should order limited discovery. *See, e.g., Weisberg*, 705 F.2d at 1351 (court had remanded for further discovery in predecessor case in light of absence of evidence of adequate search by agency). Specifically, LCCR submits that it should be permitted to seek discovery in the form of documents and testimony from the person or persons most knowledgeable about the following categories:

1.   Training of the persons who answer calls to the OFAC hotline and respond to emails submitted to the e-hotline;

2.   Documentation retained by the hotline and e-hotline of calls and e-mails received regarding possible matches and responses thereto, such as but not limited to the amount of transactions stopped, which have been documented in other reports as described above;

3.   Procedures used to determine whether there is a true match to a person on the OFAC list;

4.   Procedures and policies for actions OFAC takes when there is a true match; and

5.   Documents and procedures regarding complaints from individuals regarding name mis-matches or credit report flags.

### III.   CONCLUSION

Treasury has failed to satisfy the requisite showing that it is entitled for dismissal. Plaintiff respectfully requests that this Court deny the motion to dismiss, order Treasury to promptly release the responsive documents it has located, and additionally order that Plaintiff be permitted to conduct limited discovery for the purpose of ascertaining what responsive documents Treasury has that have not been released.

DATED this 3rd day of October, 2007.

DAVIS WRIGHT TREMAINE LLP

By: /s/
Thomas R. Burke

Attorneys for Plaintiff
Lawyers' Committee for Civil Rights of the
San Francisco Bay Area