# ALAN R. KABAT

# EXHIBIT A

## A-73 through A-97

**Exhibits to August 4, 2004 letter**

1.   M. Al-Kadi, Letter of Resignation (effective Feb. 22, 2003).

2.   A. Al-Aqeel, Letter of Resignation (effective Mar. 27, 2003).

3.   Defendant Al Haramain Islamic Foundation, Inc.'s Motion to Dismiss the Third Amended Complaint (Feb. 7, 2003).

4.   Defendant Al Haramain Islamic Foundation, Inc.'s Reply Brief in Support of Its Motion to Dismiss the Third Amended Complaint (Apr. 25, 2003).

5.   Defendant Al Haramain Islamic Foundation, Inc.'s Notice of Status (June 23, 2003).

6.   United States v. Sami Al-Hussayen, No. 03-CR-0048 (D. Idaho), Second Superseding Indictment (Mar. 4, 2004).

7.   United States v. Sami Al-Hussayen, No. 03-CR-0048 (D. Idaho), Jury Verdict (June 10, 2004).

8.   United States v. Sami Al-Hussayen, No. 03-CR-0048 (D. Idaho), Order of Dismissal (July 2, 2004).

9.   State Registration Office of the Russian Federation's Ministry of Justice, certificate for "Saudi Red Crescent," registered in the Consolidated State Register of Foreign Companies Accredited to Operate Within the Territories of the Russian Federation (Oct. 30, 2000).

KABAT Exhibit A-73

LAW OFFICES
# BERNABEI & KATZ, PLLC
1773 T STREET, N.W.
WASHINGTON, D.C.  20009-7139

| | | |
|---|---|---|
| LYNNE BERNABEI | (202) 745-1942 | OF COUNSEL: |
| DEBRA S. KATZ○ | TELECOPIER (202) 745-2627 | DAVID J. MARSHALL |
| LISA J. BANKS | E-Mail: BERKATZLAW@AOL.COM | |
| ARI M. WILKENFELD + | Website: www.bernabeiandkatz.com | |
| ALAN R. KABAT + | | +ADMITTED IN MD ALSO |
| AVI L. KUMIN○ | | ○ADMITTED IN NY ALSO |
| RASHIDA A. ADAMS○ | | ○ADMITTED IN CA ALSO |
| RENEE SERVANCE♦ | By Hand Delivery | ♦ADMITTED IN WI ONLY |
| LEMA R. BASHIR * | February 14, 2005 | * ADMITTED IN MD ONLY |

Mr. Robert W. Werner
Office of Foreign Assets Control
U.S. Department of Treasury
Licensing Division
1500 Pennsylvania Avenue, N.W., Annex
Washington, D.C. 20220

     Re:   Al Haramain Islamic Foundation, Inc., License No. SDGT-343.

Dear Mr. Werner:

     On behalf of the Al Haramain Islamic Foundation, Inc. (U.S.A.) ("AHIF"), I am writing pursuant to 31 C.F.R. § 501.807 to supplement the Administrative Record, and to request administrative reconsideration of the decisions by the Office of Foreign Assets Control ("OFAC") to block AHIF's assets, on or around February 18, 2004, and to designate AHIF as a SDGT on or around September 16, 2004.

## AHIF's Supplementation of the Administrative Record

     AHIF requests the opportunity to supplement the Administrative Record by submitting the following documents, which are enclosed and incorporated herein by reference.  These documents were previously submitted after the close of OFAC's arbitrary deadline, and are hereby re-submitted to supplement the Administrative Record, and to serve as part of the basis for the administrative reconsideration of OFAC's designation of AHIF:

     (1)    Letter from L. Bernabei to R. Newcomb (Aug. 31, 2004), and attachment ("Supplemental Report of the 9/11 National Commission on Terror Attacks Upon the United States");

     (2)    Letter from L. Bernabei to R. Newcomb (Aug. 31, 2004), and attachment (Declaration of Vladimir Matusevitch); and

KABAT Exhibit A-74

Mr. Robert W. Werner
Office of Foreign Assets Control
U.S. Department of Treasury
February 14, 2005
Page 2

     (3)    Letter from L. Bernabei to R. Newcomb (Sept. 7, 2004), and attachment
            (Declaration of Vladimir Matusevitch).

     AHIF further requests that the Administrative Record be supplemented to include the following information relating to several transactions that were referenced in my prior correspondence to OFAC. See Letter from L. Bernabei to R. Newcomb (May 14, 2004); Letter from L. Bernabei to R. Newcomb (May 27, 2004). In my prior correspondence, I explained, as supported by documentary evidence, that in December 1999, the government of the Kingdom of Saudi Arabia entered into an agreement with the government of Russia to provide support to the refugees from the ongoing conflicts in Chechnya. This project was overseen by the Saudi Joint Relief Committee and the Saudi Arabian Red Crescent Society, an affiliate of the International Red Cross and Red Crescent, and was approved by the highest levels in the Saudi government.

     As part of this humanitarian aid project, AHIF agreed to support the Chechenya relief efforts. In February 2000, a donor gave $150,000 to AHIF to support relief efforts in Chechnya, and several other donors gave smaller amounts. These funds were transferred to the al-Haramain Foundation (SA) ("al-Haramain (SA)"), to be transferred to the bank account of the Saudi Joint Relief Committee. AHIF had no further involvement with the expenditures of these donations, and no control over the downstream use of these funds, whether by the Saudi Joint Relief Committee, the Russian government, or any refugee. Nor did AHIF ever have any knowledge that the funds would be used for anything other than humanitarian relief efforts. Nor did AHIF or its two active directors, Soliman H.S. Al-Buthe or Perouz Sedaghaty, ever travel to Chechyna.

     I am hereby providing you with additional documents and information that supplement my previous correspondence. Mr. Al-Buthe was responsible for transferring the Chechen donations from AHIF to Saudi Arabia in March 2000. He and Mr. Seda signed an agreement under which Mr. Al-Buthe accepted the responsibility for transferring these funds. See Agreement (Mar. 10, 2000) (attached hereto as Exhibit 1). Messrs. Seda and Al-Buthe went to the local branch of the Bank of America, where AHIF maintained its bank accounts, to obtain the requisite travelers' checks. Although the Bank of America recommended that they take a cashier's check, they opted to take travelers' checks, believing that travelers' checks could be cleared faster by overseas banks. As it happened, the bank did not have sufficient travelers' checks, so they took $130,000 in American Express travelers' checks, and $21,000 in a cashier's check. Upon Mr. Al-Buthe's arrival in Riyadh, Saudi Arabia, he deposited the cashier's check and travelers' checks in the Al Rajhi Banking and Investment Corporation, in order to have the funds converted into Saudi Rials. See Al Rajhi receipt for cashier's check (attached hereto as Exhibit 2); Al Rajhi receipt for travelers' checks (attached hereto as Exhibit 3). Then, after the checks had cleared, Mr. Al-Buthe made two payments to al-Haramain (SA): on March 12, 2000,

KABAT Exhibit A-75

Mr. Robert W. Werner
Office of Foreign Assets Control
U.S. Department of Treasury
February 14, 2005
Page 3

for 224,000 Saudi Rials, and on March 28, 2000, for 479,514 Saudi Rials, for the balance, and covering several other miscellaneous donations. See Receipt (March 12, 2000) (attached hereto as Exhibit 4); Receipt (March 28, 2000) (attached hereto as Exhibit 5). These transactions are confirmed by a declaration from the Financial and Administrative Manager of al-Haramain (SA). See Declaration of Khalid bin Obaid Azzahri (May 5, 2004) (attached hereto as Exhibit 6).

Taken together, these documents show that AHIF's transfer of the Chechen donations to Riyadh, Saudi Arabia, was properly executed by the relevant financial institutions at each step, and the donations were recorded by the recipient in Saudi Arabia. Thereafter, AHIF had no further knowledge of, let alone control over, how the Saudi and Russian governments, through the Saudi Joint Relief Committee, used the money as part of the government-authorized humanitarian relief efforts in the Chechnya region.

### AHIF's Request for Administrative Reconsideration of OFAC's Designation

Reconsideration is warranted under 31 C.F.R. § 501.807(a) (2004) since an insufficient basis exists for the designation of AHIF. The Administrative Record that was provided to us consists almost entirely of information about al-Haramain (SA) and several of its overseas affiliates, and not AHIF. Even the relatively little information that OFAC produced about AHIF itself consists largely of newspaper articles and other inadmissible hearsay.[1]

However, this information does not show that AHIF (1) intentionally provided assistance to al-Haramain (SA) or to any al Qaeda entity, knowing that the recipient engaged in terrorist activities; or (2) had authority or control over the activities of al-Haramain (SA) or any al Qaeda entity, knowing it engaged in terrorist activities; or (3) knew that the recipients of AHIF assistance would engage in terrorism, as required to support a finding that AHIF supported terrorism or engaged in terrorist activities.

As the U.S. Court of Appeals for the Seventh Circuit recognized, making donations to an alleged terrorist group, without "knowledge of and intent to further the payee's violent criminal acts," would *not* sustain a tort claim under the Anti-Terrorism Act, 18 U.S.C. § 2331, et seq. Boim v. Quranic Literacy Inst., 291 F.3d 1000, 1012 (7th Cir. 2002); accord Ungar v. Islamic Republic of Iran, 211 F. Supp. 2d 91, 99 (D.D.C. 2002) (even though "plaintiffs have established that Iran provided extensive support to Hamas, . . . their proof does not link that support to the

---

[1] In my letter of May 14, 2004, I cited legal authority for the proposition that OFAC's reliance on classified evidence violated AHIF's due process rights, and that OFAC improperly relied on newspaper articles which are inadmissible hearsay evidence.

KABAT Exhibit A-76

Mr. Robert W. Werner
Office of Foreign Assets Control
U.S. Department of Treasury
February 14, 2005
Page 4

Ungar murders specifically"); see also Restatement (Second) of Torts, § 9 cmt. b (1965) ("In order that a particular act or omission may be the legal cause of an invasion of another's interest, the act or omission must be a substantial factor in bringing about the harm."). Here, OFAC is designating AHIF without having made the requisite showing that AHIF had the knowledge and intent to further any violent or terrorist acts on the part of any person or entity.

In essence, OFAC's designation of AHIF seems to be based on the acts of al-Haramain (SA) and/or several of its affiliates. In order to do so, OFAC must satisfy the requirements of the "reverse" veil-piercing test, which allows the imposition of liability on a subsidiary for the acts of a parent corporation, or the subsidiary's sole shareholder. JSC Foreign Economic Ass'n v. Intl. Dev. & Trade Servs., Inc., 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004). Aside from the fact that al-Haramain (SA) is not even the parent corporation of AHIF, given that AHIF was not incorporated as a subsidiary of the Saudi charity, see AHIF's Articles of Incorporation (Feb. 11, 1999) (attached hereto as Exhibit 7), a veil piercing analysis requires a showing that the parent corporation not only "exercised domination and control" over the subsidiary, but also that the "corporate domination caused" the alleged wrongful acts. Bedford Affiliates v. Sills, 156 F.3d 416, 431-32 (2d Cir. 1998). There is nothing in the Administrative Record that shows that al-Haramain (SA) exercised the requisite "domination and control" over AHIF, let alone that this domination caused violent or terrorist conduct.

Therefore, pursuant to 31 C.F.R. § 501.807(a) (2004), I respectfully request that OFAC supplement its Administrative Record with the information and documentation referenced in this letter, and that OFAC reconsider and revoke its designation of AHIF.

If you need any additional information, please contact me.

Sincerely,

Lynne Bernabei

Enc.

cc:  Cari Stinebower, Esquire
     Mary M. Rowland, Esquire

KABAT Exhibit A-77

LAW OFFICES

## BERNABEI & WACHTEL, PLLC
1775 T STREET, N.W.
WASHINGTON, D.C. 20009-7124

LYNNE BERNABEI
DAVID WACHTEL +
ALAN R. KABAT +
EMILY READ
SASHA SAJOVIC○
TARA JENSEN ✦

(202) 745-1942
TELECOPIER (202) 745-2627
WWW.BERNABEIPLLC.COM

+ADMITTED IN MD ALSO
○ADMITTED IN MD ONLY
✦ADMITTED IN NY ONLY

<u>By Hand Delivery</u>
January 4, 2008

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
1500 Pennsylvania Avenue, N.W., Annex
Washington, D.C. 20220

     Re:   <u>Al Haramain Islamic Foundation, Inc. (USA) and Soliman Al-Buthe.</u>

Dear Mr. Szubin:

     I am writing in response to your letter dated November 14, 2007, in which the Office of Foreign Assets Control ("OFAC") stated that it "has provisionally determined to proceed with a redesignation of Al Haramain Islamic Foundation Inc. of Oregon (AHIF) and Soliman al-Buthi," your letter dated November 30, 2007, in which you provided additional documents "that are being considered by the agency in this process," and the letter from Brad Brooks-Rubin, dated December 28, 2007, which provided additional newspaper and Internet articles "that are being considered by [OFAC]."[1]

     As set forth below, OFAC's proposed "redesignation" of AHIF and Mr. Al-Buthe as Specially Designated Global Terrorists ("SDGT") is both procedurally and substantively improper, because (1) there is no statutory or regulatory procedure for a "redesignation," particularly once a designated entity has initiated a court challenge to the initial designation, and there are no statutory or regulatory standards for a "redesignation," and, therefore, the process is by definition standardless and arbitrary, and appears to be an impermissible attempt to buttress OFAC's case in response to intervening litigation challenging AHIF's initial designation; (2) the "redesignation" violates due process because it offers no statement of charges or reasons and therefore fails to provide adequate notice; relies on hearsay and secret evidence not disclosed to AHIF or Mr. Al-Buthe, and still provides no response to AHIF's previous submissions; and (3) the new documents that OFAC submitted as part of the proposed redesignation do not demonstrate any connection whatsoever between AHIF and Mr. Al-Buthe, on the one hand, and

---

[1] As an initial matter, we object to OFAC providing additional articles on December 28, only one week before our response is due, particularly when the articles date from 2000 to 2004, and OFAC provides no reason why these articles could not have been produced much earlier in the process, indeed, during the initial designation process. We nonetheless respond to those articles, along with the rest of OFAC's submission, herein.

KABAT Exhibit A-78

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 2

terrorists, terrorist organizations or terrorism, on the other hand. Accordingly, the proposed redesignation, as was the initial designation, is unfounded, and OFAC should de-list both AHIF and Mr. Al-Buthe.

**I.  OFAC's Proposed "Redesignation" Is Procedurally Improper.**

There is no provision in either Executive Order 13224 (Sept. 23, 2001), or the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et seq.* (as amended), or the applicable regulations, that authorizes OFAC to "redesignate" an individual or entity that has been previously designated, and remains designated. It appears that OFAC is pursuing this unprecedented course not for any legitimate purpose, but in a belated attempt to respond to constitutional deficiencies in its original designation, now that AHIF has challenged that designation in the U.S. District Court for the District of Oregon.

OFAC's regulations do permit it to de-list a designated individual or entity pursuant to 31 C.F.R. § 501.801, as it recently did on November 15, 2007, for Ahmed Nasreddin and his businesses. But it has not done so here. In addition, 31 C.F.R. § 500.801 and § 501.803 authorize OFAC to engage in "amendment, modification, or revocation" of its administrative actions. But the proposed redesignation of AHIF and Mr. Al-Buthe does not fall into any of these three specifically enumerated categories, as OFAC has not stated that it intends to amend, modify, or revoke its original designations. Since OFAC's proposed redesignation is an unauthorized agency action, it is arbitrary and capricious.[2]

Because the applicable statute (IEEPA), OFAC regulations, and Executive Orders do not authorize "redesignations," they do not provide any standards for the process or any definition of what constitutes a "redesignation." In the absence of clear standards, AHIF and Mr. Al-Buthe have no notice of what the redesignation process consists of, and as a result the process fails to provide the notice required by due process and is void for vagueness. Without any law to guide them, they are necessarily responding in the dark. The Supreme Court has explained that:

> . . . the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

---

[2] While AHIF, in 2005, moved for reconsideration of the original designation, that motion also provides no basis for a redesignation. OFAC's letters offer no evidence that it has reconsidered its initial decision in light of AHIF's arguments and evidence. Instead, it has created out of whole cloth a "redesignation" in order to belatedly buttress its own case now that it faces federal litigation. In fact, OFAC did not respond to AHIF's February 2005 motion for reconsideration for over thirty months, until after AHIF filed its lawsuit in August 2007, challenging that designation.

KABAT Exhibit A-79

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 3


Kolender v. Lawson, 461 U.S. 352, 357 (1983) (holding statute to be unconstitutionally vague).
The vagueness doctrine also applies to civil statutes. See, e.g., Jordan v. De George, 341 U.S.
223, 231 (1951) (applying vagueness doctrine to civil deportation statute); Bullfrog Films, Inc. v.
Wick, 847 F.2d 502, 512-14 (9th Cir. 1988) (applying vagueness doctrine to invalidate USIA
regulations governing customs exemptions for documentary films); Big Mama Rag, Inc. v.
United States, 631 F.2d 1030, 1035-40 (D.C. Cir. 1980) (applying vagueness doctrine to
invalidate IRS regulations governing tax exemptions for educational and charitable
organizations). In essence, redesignation is whatever OFAC says it is. Such standardless action
invites impermissible "arbitrary and discriminatory enforcement." In the absence of clear
standards and definitions, it is not possible for AHIF and Mr. Al-Buthe to provide a meaningful
response to OFAC's proposed redesignation.

        Congress knows how to authorize redesignation when it chooses to. The absence of any
provision for redesignation in IEEPA or the OFAC regulations is in direct contrast to the former
statutory requirement for redesignation in the separate Department of State process for handling
Foreign Terrorist Organizations ("FTO"). Before 2004, 8 U.S.C. § 1189(a)(4) required
redesignation of FTO's every two years. Section 7119(a) of Pub. L. 108-458 (Dec. 17, 2004),
removed the two-year time limit to those designations. Since Congress expressly included a
redesignation process in the original statute governing FTO's, but neither Congress nor the
President ever included such a procedure with respect to SDGT's under IEEPA and E.O. 13224,
OFAC has no authority to pursue a "redesignation" process it has made up out of whole cloth
and applied to AHIF and Mr. Al-Buthe.

        Indeed, it appears that the only reason OFAC is pursuing an unprecedented, unfounded,
and unconstitutional redesignation is that AHIF has filed a lawsuit challenging OFAC's
designation. See Al Haramain Islamic Foundation, et al. v. U.S. Department of the Treasury, et
al., No. 3:07-CV-1155-KI (D. Or.). OFAC appears to be using the "redesignation" to get
another bite at the apple and correct the manifest errors in its original designation decision, now
that that decision has been challenged in court. OFAC cannot use the proposed redesignation as
a way to short-circuit the pending litigation, or to absolve itself of its failure to respond to any of
the legal arguments raised in AHIF's prior submissions to OFAC.

## II.    OFAC's Proposed Redesignation Violates Due Process.

        In its redesignation notice, as in its initial designation, OFAC has utterly failed to respond
to any of the legal arguments raised in my prior submissions to your office. Specifically, the
following issues were raised in those submissions, which are incorporated herein by reference:

        (1)    Absence of legal standards utilized by OFAC in making designation decisions.

KABAT Exhibit A-80

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 4

See L. Bernabei to R. Newcomb (May 14, 2004), at 2; L. Bernabei to R. Newcomb (May 28, 2004), at 2.

(2)    OFAC's improper reliance on classified documents, and the use of secret evidence. See L. Bernabei to R. Newcomb (May 14, 2004), at 2-3.

(3)    OFAC's improper reliance on hearsay evidence, including news reports and other unidentified sources. Id. at 3-4.

(4)    OFAC's failure to acknowledge that AHIF's conduct in distributing publications is protected First Amendment activity. See L. Bernabei to R. Newcomb (May 28, 2004), at 3.

(5)    OFAC's improper reliance on documents that make no mention of AHIF, and that refer to the activities of other entities without any involvement by AHIF. See L. Bernabei to R. Newcomb (Aug. 4, 2004), at 1-3 & Ex. 1-5; L. Bernabei to R. Werner (Feb. 14, 2005), at 3-4 & Ex. 7.

(6)    OFAC's improper reliance on documents from the indictment and prosecution of Sami Al-Hussayen, No. 03-CR-0048 (D. Idaho), where the indictment made no mention of AHIF, and Mr. Al-Hussayen was acquitted of all material support charges. See L. Bernabei to R. Newcomb (Aug. 4, 2004), at 3-4 & Ex. 6-8; L. Bernabei to R. Newcomb (Aug. 20, 2004), at 1.

Nor has OFAC ever responded to the factual submissions I made on behalf of AHIF in connection with its designation, all of which are also incorporated again herein. In particular, I previously provided a full explanation of AHIF's involvement with the Saudi Joint Relief Committee ("SJRC") fundraising efforts to support refugees in Chechnya, including that the SJRC project was approved at the highest levels of the Saudi government (by then-Crown Prince Abdullah, who is now King Abdullah) and the Russian government in Chechnya, and that the transfer of approximately $150,000 in charitable donations from AHIF to the SJRC, through the Al-Haramain Foundation (Saudi Arabia) was properly documented at every step in which the funds were in the custody of AHIF and Mr. Al-Buthe. See L. Bernabei to R. Newcomb (May 14, 2004), at 4-7 & Ex. 1-9; L. Bernabei to R. Newcomb (May 27, 2004), at 1-2 & Ex. 1-3 (translations of three Arabic-language documents cited in May 14, 2004 letter); L. Bernabei to R. Newcomb (Aug. 4, 2004), at 5 & Ex. 9; L. Bernabei to R. Newcomb (Aug. 31, 2004) (translations of two Russian-language documents cited in May 14, 2004 and August 4, 2004 letters); L. Bernabei to R. Werner (Feb. 14, 2005), at 2-3 & Ex. 1-6; L. Bernabei to R. Werner (Sept. 21, 2005), at 1-2 & Ex. 1-3 (SJRC briefs filed with the U.S. District Court for the Southern District of New York).

KABAT Exhibit A-81

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 5

    I also noted that the 9/11 Commission issued a supplement to its official report in late August 2004, which described the pending investigation of AHIF as being one of "alleged money laundering and income tax and currency reporting violations," but made no mention of terrorist ties or support for terrorism. See L. Bernabei to R. Newcomb (Aug. 31, 2004) (quoting National Commission on Terror Attacks Upon the United States, supplemental report, at 127).

    I further explained that OFAC's selective reliance on Russian press coverage of Chechen issues was misplaced, given the biased nature of the official press in Russia, and the suppression of any criticism of Russian operations in Chechnya, based on the affidavit submitted by Vladimir Matusevitch, a professional expert on Russian journalism. See L. Bernabei to R. Newcomb (Sept. 7, 2004). (This issue is discussed more fully in Part III.C, infra).

    OFAC has provided no response to any of these legal and factual arguments. Indeed, OFAC never even issued an administrative decision in support of the initial designation, that would explain and take into account all the evidence in the record, including that submitted by AHIF's counsel.[3] The formal designation was bereft of any explanation for OFAC's decision. See R. Newcomb to L. Bernabei (Sept. 16, 2004). It is settled law that an agency decision must be vacated as arbitrary and capricious if the agency failed to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). Thus, an agency decision is arbitrary and capricious where, as here, the agency "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id. (invalidating agency decision on grounds that agency acted arbitrarily and capriciously).

    The U.S. Court of Appeals for the District of Columbia Circuit, the federal appellate court with the greatest experience in addressing administrative agency decisions, has consistently applied these standards in holding that an agency decision must be vacated on arbitrary and capricious grounds where, as has OFAC, the agency failed to consider all the evidence before it, and the agency's order or rule does not provide a reasoned basis for its decision. In Bluewater Network v. EPA, 370 F.3d 1, 21 (D.C. Cir. 2004), the Court found that since there was "nothing

---

[3] The only indication OFAC has ever provided of the basis for its designation is a press release on Sept. 9, 2004, which hardly substitutes for a formal administrative decision. The press release merely makes general allegations, cites no evidence, and discusses none of the evidence that AHIF submitted in any way. Thus, there is no evidence that OFAC even considered the full administrative record or addressed any of AHIF's arguments.

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 6

in the record before us explaining the analysis and evidence underlying EPA's conclusions," the agency's decision could not stand, absent a "rational connection between the facts found and the choice made." Id. (quoting Motor Vehicle Mfrs. Ass'n, 443 U.S. at 43). Similarly, in Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin., 429 F.3d 1136, 1147 (D.C. Cir. 2005), the agency's decision was held to be arbitrary and capricious where the agency "failed to consider important aspects of the [record]," "largely ignored the evidence [in the record]," and "simply disregarded the volumes of evidence," much as has OFAC in this proceeding. See also Wedgewood Village Pharmacy v. Drug Enforcement Agency, __ F.3d ___, 2007 WL 4302107, at *6 (D.C. Cir. Dec. 11, 2007) (vacating agency decision under arbitrary and capricious standard because "we cannot help but conclude that the [agency's] decision entirely failed to consider an important aspect of the problem before her"); El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Human Serv., 396 F.3d 1265, 1277 (D.C. Cir. 2005) ("there was relevant evidence before HHS that it does not appear to have examined") (upholding summary judgment in favor of plaintiffs); Morall v. Drug Enforcement Admin., 412 F.3d 165, 178 (D.C. Cir. 2005) ("To be clear, DEA's decision does not withstand review because the agency decisionmaker *entirely ignored* relevant evidence."); id. at 180 ("Indeed, the record contains evidence – evidence entirely omitted in the Deputy Administrator's decision [that exculpated plaintiff]").

Hence, OFAC's designation must be supported by a reasoned analysis in its decision. However, that order contains no analysis of any of the evidence in the administrative record, either that originally compiled by OFAC, or that subsequently submitted by AHIF. See R. Newcomb to L. Bernabei (Sept. 16, 2004). This failure of OFAC to provide any explanation for its decision is fatal. See, e.g., Williams Gas Processing-Gulf Coast Co., L.P. v. Federal Energy Regulatory Comm'n, 475 F.3d 319, 328 (D.C. Cir. 2006) ("The problem with FERC's ... rationale is that it is not supported by any reasoned analysis *in the orders themselves*.") (vacating FERC's orders as arbitrary and capricious).

Further, OFAC was required, by its own regulations, to "conduct[] a review of the request for reconsideration" and "provide a written decision to the blocked person." See 31 C.F.R. 501.807(d). Here, OFAC failed to provide any response to AHIF's February 2005 request for reconsideration, despite having nearly three years to do so.

Now, OFAC has exacerbated these errors by producing further evidence, without any statement whatsoever as to how any of it is relevant to any legal considerations, on what basis the agency considers any of it reliable or credible, or even what the agency believes the new evidence demonstrates. OFAC has thus failed the most basic of due process requirements – to explain the basis for its action so that AHIF and Mr. Al-Buthe have a meaningful opportunity to respond, and to consider and address the evidence and arguments presented in their defense. Accordingly, the redesignation, which is presumably predicated on the record created for

KABAT Exhibit A-83

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 7

designation, plus the new materials provided in the November 14 and 30, 2007 and December 28, 2007 letters, violates due process for all the reasons that the original designation did, and because the agency has exacerbated the problem by now proposing to redesignate without addressing any of the arguments and evidence presented by AHIF in the course of the initial designation.

**III.     OFAC's Additional Documents Do Not Support the Proposed Redesignation.**

In its November and December 2007 letters, OFAC has provided additional "unclassified and non-privileged documents" in support of the proposed redesignation. As noted above, OFAC has failed to offer any notice whatsoever as to why these documents were included, what relevance they might have, on what basis they have been deemed credible or reliable or accurate, or what infractions or conduct they are said to prove. Our response is therefore necessarily handicapped, as we can do little but conjecture as to why the documents were offered, and we do not even know what allegations within the documents warrant any response. Nonetheless, these documents do not support the redesignation of AHIF and Mr. Al-Buthe. As set forth below, the documents do not establish that either AHIF or Mr. Al-Buthe themselves have engaged in terrorism or supported terrorism or terrorist organizations. In addition, OFAC's administrative record improperly relies on classified evidence, and is grossly incomplete and one-sided, despite the fact that OFAC had access to fuller information that would provide a more complete and accurate picture of the facts.

**A.     OFAC's Reliance on Classified Evidence, Without Taking Any Steps to Mitigate the Unfairness of Such Consideration, Violates Due Process and Renders Its Decisionmaking Arbitrary and Capricious.**

OFAC has stated that, as in its original designation, it is relying on classified documents or evidence in support of the proposed redesignation. Yet it has undertaken no declassification review to determine whether any of this information could be declassified and disclosed. Without such a review, it is not even established that there is any need to keep the evidence under wraps. Clearly, if any of the evidence need not be classified, there is no justification whatsoever for refusing to disclose it to AHIF and Mr. Al-Buthe.

In addition, OFAC has offered no unclassified summary of the evidence that might offer AHIF and Mr. Al-Buthe some opportunity to respond, nor has it stated that no such summary can be provided. Again, if such a summary could be provided, it is arbitrary and wholly unnecessary to rely on such evidence without providing a summary, as by definition it would not undermine any interest of the government to provide an unclassified summary.

OFAC also has made no provision for counsel to receive a security clearance to permit

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 8

them to review the classified documents. Such a process is used in many other settings in which classified information is involved, including the ongoing litigation concerning Guantanamo detainees, and criminal cases involving classified information. Here, too, such a procedure would increase the fairness of the process without any cost to the government in terms of disclosure of classified information to unauthorized persons.

As a result, AHIF and Mr. Al-Buthe have been given *no notice whatsoever* of what may well be the critical evidence in the process, given that the unclassified evidence that has been disclosed to date offers no evidence that would support any engagement in or support of terrorism. AHIF and Mr. Al-Buthe cannot respond to what they cannot see, and therefore OFAC's reliance on secret evidence, particularly in the absence of any steps taken to seek to mitigate the obvious due process deficiencies, is both arbitrary and capricious and unconstitutional. See L. Bernabei to R. Newcomb (May 14, 2004), at 2-3.

### B.    The Oregon Detention Hearing Documents are Incomplete and One-Sided.

The documents submitted by OFAC on November 14, 2007 consist of the U.S. Government's submission in support of pre-trial detention of Perouz Sedaghaty (Pete Seda), a former AHIF officer. Here, again, OFAC provides no notice of how any of these documents are relevant, on what basis they are considered accurate, credible, or reliable, or what the documents are offered to prove. In addition, they are fatally incomplete, offering only the government's evidence when OFAC had available to it the full record of the detention hearing. Indeed, OFAC fails even to acknowledge that U.S. Magistrate Judge Thomas M. Coffin and U.S. District Judge Michael R. Hogan *rejected* the government's arguments that Mr. Seda should be held in pretrial detention. Magistrate Judge Coffin ordered that Mr. Seda be released on September 10, 2007, two months before OFAC's letter. On November 30, 2007, the day OFAC faxed its second letter to us, and a month before OFAC sent its third letter, Judge Hogan denied the government's appeal of that release order, and ordered Mr. Seda released subject to certain conditions. He was released that afternoon. The government argued that Mr. Seda should be detained in significant part because of his connection to AHIF and what it said were AHIF's connections to and support of terrorism. Undoubtedly if the government had offered any credible evidence that Mr. Seda was a supporter of terrorism, he would not have been released. Thus, both judges necessarily rejected the government's contentions. Yet OFAC never even admits that relevant fact.

The full record of Mr. Seda's detention proceedings undermines any contention that Mr. Seda, or by extension AHIF or Mr. Al-Buthe, were involved in terrorist activities of any kind. OFAC inexplicably omitted the complete record, relying instead solely on the government's *unsuccessful* submission. Therefore, I request that OFAC include within the administrative record and consider and address the following documents, which complete the record as to Mr. Seda's detention and release, and demonstrate that the documents submitted by OFAC do not

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 9

support the "redesignation" of AHIF and Mr. Al-Buthe:

>    (1)  Defendant's Memorandum in Support of Pretrial Release, No. 6:05-cr-60008 (Doc.
>    No. 31) (Aug. 21, 2007) (with Exhibits A-K);
>
>    (2)  Transcript of Proceedings for Aug. 22, 2007, No. 6:05-cr-60008 (Doc. No. 46);
>
>    (3)  Minute Entry: Order granting release of P. Seda, No. 6:05-cr-60008 (Doc. No. 38)
>    (Sept. 10, 2007) (Coffin, M.J.);
>
>    (4)  Minute Entry: Order setting methods and conditions of release of P. Seda, No. 6:05-
>    cr-60008 (Doc. No. 39) (Sept. 10, 2007) (Coffin, M.J.);
>
>    (5)  Transcript of Proceedings for Sept. 10, 2007, No. 6:05-cr-60008 (Doc. Nos. 41, 43,
>    and 45);
>
>    (6)  Transcript of Proceedings for Sept. 11, 2007, No. 6:05-cr-60008 (Doc. No. 51);
>
>    (7)  Defendant's Memorandum in Support of Pretrial Release, No. 6:05-cr-60008 (Doc.
>    No. 44) (Sept. 17, 2007) (with Exhibits A-M);
>
>    (8)  Partial Transcript of Proceedings for Sept. 18, 2007, No. 6:05-cr-60008 (Doc. No.
>    52); and
>
>    (9)  Order setting conditions of release as to Defendant Pirouz Sedaghaty, No. 6:05-cr-
>    60008 (Doc. No. 66) (Nov. 30, 2007) (Hogan, J.).

These documents are attached hereto (as Exhibits 1-11), although the Department of
Justice and OFAC already have access to all of these documents.  They demonstrate the
following:

(A) That the government's submission in support of pre-trial detention (which OFAC
relies upon) was filed on August 21, 2007, nearly two weeks after the government was served
with AHIF's complaint (August 6, 2007) in its challenge to OFAC's designation, yet the
government made no mention of AHIF's explanation in its complaint for the transfer of the
approximately $150,000 in charitable donations from AHIF to the Al-Haramain Foundation
(Saudi Arabia) ("AHF-SA"), for use in the SJRC humanitarian relief project in Chechnya, and
that the custody of these funds were fully documented during the entire time that they were in the
control of AHIF and Mr. Al-Buthe.

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 10

(B) Mr. Seda fully informed the U.S. District Court of these factual issues, _see_ Exhibit 1, at 5 & Ex. J thereto; Exhibit 7, at 2 n.3 & Ex. B thereto.

(C) While the government briefly mentioned the issue of the $150,000 donation at Mr. Seda's hearing, _see_ Ex. 2 (Transcript for Aug. 22, 2007), at 40-41, it presented no evidence in support of those allegations, or to rebut Mr. Seda's (and AHIF's) explanation of the transfer of the donations to the SJRC through the Al-Haramain Foundation (Saudi Arabia).

(D) The government's own submission for Mr. Seda's detention hearing admitted that the Al-Haramain Foundation (Saudi Arabia) "performed many legitimate humanitarian projects throughout the world, including the construction of water projects and hospitals, and the distribution of food to those in need," _see_ U.S. Mem., at 2, and that AHF-SA was never designated by OFAC or the State Department, _id._ at 3-4 & Ex. D (listing other entities that were designated, but not AHF-SA). While the government's submission asserts that "certain branches of [AHF-SA] were involved in financing and supporting acts of terrorism throughout the world," _id._ at 3, it offered no credible evidence to show that AHIF or Mr. Al-Buthe did so.

(E) The government relied, unsuccessfully, on information that a prisoner sent $10.00 to AHIF on his own initiative, _id._ at 7, and that the prisoner asked that it be given to "mujahedeen." But the government made no showing that this meager donation actually went to support the "mujahedeen," that AHIF ever solicited money for that purpose, or that AHIF ever donated funds to any "mujahedeen" anywhere.

(F) The government attempted to show that the mere fact that Mr. Seda had articles about the Chechen civil war on his computer was evidence that he was personally supporting the Chechen mujahedeen, _id._ at 8-9, again, without showing credible proof that Mr. Seda or AHIF ever solicited or sent any funds to the mujahedeen.

(G) The government alleged that AHIF made a $2,000 donation to the AHF-SA affiliate in Albania in 1999. _Id._ at 9-10. But even if true, the mere fact of such a transfer, five years _before_ that Albanian affiliate was designated in 2004, does not provide any evidence that Mr. Seda or AHIF supported terrorism. The government did not show that Mr. Seda or anyone at AHIF knew, five years before the government's designation of the Albanian group, that the latter entity was supporting terrorism. Nor did they show that the donation was intended for terrorism, or ever used for any unlawful purpose.

(H) The government also relied upon an email that it claimed was sent by Osama Bin Laden himself, _id._ at 11-12, but testimony at the detention hearing established that this email was a hoax, as it was written in garbled Arabic (_i.e._, by someone who was not even a native Arabic speaker). _See_ Ex. 2 (Transcript for Aug. 22, 2007), at 124-29.

KABAT Exhibit A-87

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 11

     A fair and unbiased review of all the transcripts for the detention hearings confirms, as both judges found, that there was nothing to the government's allegations about Mr. Seda's ties to terrorism. If these allegations failed to justify the continued detention of Mr. Seda, an indicted criminal defendant, they certainly do not justify closing down AHIF, which is not even charged with any violation of law.

     In short, the government, during the detention hearings, failed to provide any rebuttal to Mr. Seda's (and AHIF's) explanation for his activities, including the transfer of the $150,000 in charitable donations (despite having had repeated opportunities to do so), and the courts' decisions and questions and comments during the hearing demonstrate that they found the government's allegations unpersuasive. Hence, OFAC's reliance on the government's submission fails to support the redesignation of AHIF and Mr. Al-Buthe.

     OFAC's decision to disregard the complete record from the detention hearings confirms the lack of due process in OFAC's redesignation process, and calls into question OFAC's ability or willingness to reach a fair and unbiased decision in this matter. It is settled law that an agency "may not skew the record in its favor by excluding pertinent but unfavorable information." Fund for Animals v. Williams, 245 F. Supp. 2d 49, 55 (D.D.C. 2003). The U.S. Court of Appeals for the D.C. Circuit has recognized that an agency cannot "exclude[] from the record evidence adverse to its position," which warrants supplementing the administrative record with such documents. Kent County, Delaware Levy Court v. EPA, 963 F.2d 391, 396 (D.C. Cir. 1992); see also Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989) (supplementation of the administrative record proper when "the agency failed to consider factors which are relevant to its final decision").

     Where, as here, additional documents about the detention hearing of Mr. Seda were "publicly available" at the time OFAC compiled its Administrative Record, and "were official records from court proceedings, they should have been considered by the agency." Carlton v. Babbitt, 26 F. Supp. 2d 102, 107 (D.D.C. 1998) (ordering agency to include relevant public documents and court records that undermine the agency's administrative record); see also Public Citizen v. Heckler, 653 F. Supp. 1229, 1237 (D.D.C. 1986) (documents improperly excluded from administrative record "are indicative of a lack of rationality on the part of HHS in the decisionmaking process" and "indicates that the Secretary's stated reason may very well be pretextual"). Thus, even if we had not submitted the omitted parts of the detention hearing record, OFAC was under an obligation to supplement the administrative record with the aforementioned "pertinent but unfavorable information," readily available to OFAC at the time. The full record confirms that OFAC has no basis designating AHIF and Mr. Al-Buthe based on government allegations made in Mr. Seda's detention hearings, and rejected by two judges.

KABAT Exhibit A-88

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 12


C.      **The Russian Newspaper Articles are Incomplete and One-Sided.**

        The articles about Chechen issues submitted by OFAC on November 30, 2007 and
December 28, 2007, are also incomplete and one-sided, and fail to justify the redesignation of
AHIF and Mr. Al-Buthe. Here again, OFAC provides no indication of why the newspaper
articles, most of which do not even mention AHIF or Mr. Al-Buthe, are relevant, on what basis it
has deemed them reliable, accurate, and credible (particularly given their hearsay character), or
even what they are said to prove. Much like the classified evidence, these documents leave
AHIF and Mr. Al-Buthe entirely in the dark, and deprive them of the notice required by due
process and a non-arbitrary consideration.

        As a threshold matter, OFAC still has not responded to my letter dated September 7,
2004, and the attached affidavit of Vladimir Matusevitch, which documented that OFAC's
extensive reliance on Russian newspaper and Internet articles was misplaced, given the high
degree of bias and inaccuracy in the Russian media, particularly with respect to Chechen issues.
OFAC also failed to respond in any way to AHIF's motion for reconsideration and motion to
supplement the administrative record, dated February 14, 2005, which expressly requested that
the Matusevitch affidavit be considered by OFAC as part of its challenge to the designation.
OFAC has provided <u>no</u> competent evidence that the Russian articles it previously submitted or
those it is relying on now, all based on multiple levels of hearsay, are unbiased, accurate, or
otherwise constitute reliable evidence.

        The new articles submitted by OFAC in support of its proposed "redesignation" are
equally biased and self-selected. For those that were not originally published in English, OFAC
has not provided the original Russian-language or Arabic-language versions. Nor has it provided
full Internet citations for all but one of the Internet articles. AHIF and Mr. Al-Buthe specifically
request that OFAC provide us with the original versions of these articles, and the Internet
sources, so that the accuracy of the translations, and the veracity of the sources, may be analyzed.

        Based on the translations provided, however, the five articles initially submitted with the
November 30 letter on their face do not support redesignation. The articles all describe activities
and events in Chechnya in 2006-07, years after AHIF had been shut down. Moreover, none of
the five articles even mentions AHIF or Mr. Al-Buthe, or any other "Al Haramain" entity.

        On their face, the five documents have nothing to do with AHIF or Mr. Al-Buthe:

(1)     "Terrorist Abu Hafs Slain in Dagestan Shootout," *Vremya Novostey* (Nov. 27, 2006).
        This article, about Abu Hafs, the alleged Al Qaida representative in Chechnya, does not
        mention AHIF, Mr. Al-Buthe, or any "Al Haramain" entity. OFAC has never alleged
        that AHIF or Mr. Al-Buthe are in any way connected to Abu Hafs.

KABAT Exhibit A-89

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 13

(2) "Voice of Qoqaz Announces new Chechen Khattab Group Leader" (Dec. 12, 2006). This
translation is of a posting from an unspecified "jihadist website," about the alleged
successor to Abu Hafs. This article also makes no mention of AHIF, Mr. Al-Buthe, or
any "Al Haramain" entity. OFAC has never alleged that AHIF or Mr. Al-Buthe are in
any way connected to Abu Hafs or his successor.

(3) "Jihadist Website Posts Full English Translation of Latest Al-Zawahiri Video (Dec. 21,
2006). This translation is also from an unspecified "jihadist website," and the lengthy
speech is primarily about the Palestine-Israel conflict and the ongoing wars in
Afghanistan and Iraq, with only the briefest mention of Chechen issues. This speech
makes no mention of AHIF, Mr. Al-Buthe, or any "Al Haramain" entity. Nor has the
government alleged that AHIF or Mr. Al-Buthe had any connection to any of the
activities discussed in this article.

(4) "Russian Security Chief Outlines Counterterrorism Policy," *Vesti TV* (June 22, 2007).
This lengthy speech and question-answer session by a Russian government minister is
primarily about nation-wide policies and practices in dealing with terrorism issues, and
while several groups and individuals are identified by name, there is no mention of AHIF,
Mr. Al-Buthe, or any "Al Haramain" entity.

(5) "Russian Forces Destroy Al-Qa'idah Man in North Caucasus," *Moscow Center TV* (Sept.
18, 2007). This short broadcast is about the deaths of two Al Qaida leaders in Dagestan,
Rappani Khalilov and Nabi Nabiyev, natives of Buynaksk (Dagestan) and Azerbaijan,
respectively. There is no mention of any "Al Haramain" entity, or that either Mr.
Khalilov or Mr. Nabiyev had any connection with AHIF and Mr. Al-Buthe.

Accordingly, on their face these documents provide no basis for concluding that AHIF or Mr.
Al-Buthe are connected in any way to terrorism, terrorists, or terrorist organizations.

OFAC's December 28 letter included additional news articles. Tellingly, OFAC offered
no explanation for why these articles, all of which date from 2004 or earlier, were produced at
the eleventh hour, more than three years after the designation. And again, OFAC offers no
explanation as to the articles' relevance, basis for knowledge, credibility, or reliability. In any
event, these additional articles also do not provide any basis for the "redesignation" of AHIF and
Mr. Al-Buthe. Most of these articles are about the Al-Haramain Foundation (Saudi Arabia)
("AHF-SA") – an entity that has not been designated by OFAC, so that any allegations about
AHF-SA are irrelevant to the proposed redesignation of AHIF and Mr. Al-Buthe.

(1)    "How charity begins in Saudi Arabia," *Asia Times* (2004). This article, which

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 14

        includes an interview with Mr. Al-Buthe, discusses the history of AHF-SA in
        Saudi Arabia, but has no evidence about illegal activities of AHIF or Mr. Al-
        Buthe.

(2)    "Millions from Riyadh," *Milan Panorama* (Nov. 27, 2003). This article discusses
        alleged activities of AHF-SA in Chechnya, but does not discuss AHIF or Mr. Al-
        Buthe.

(3)    "Saudi Charity Head Denies Closure of Offices, Views Foundation's Activities,"
        *Al-Ansari* (May 3, 2002). This article discusses the activities of several of AHF-
        SA's affiliates in Bosnia and Somalia, and briefly mentions AHIF, but without
        any discussion of links between AHIF and terrorism.

(4)    "Russians Reportedly Kill Bin Ladin's Key Aide in Chechnya," *Al-Zaman* (Oct.
        24, 2001). This article, about the death of Al-Sayyaf, makes no mention of AHIF
        or Mr. Al-Buthe.

(5)    "Prince Nayif, Al-Haramayn Charity Organization Official on Freezing of
        Assets," *Al-Hayah* (Mar. 14, 2002). This article is solely about the blocking of
        assets in the Somalia and Bosnia affiliates of AHF-SA, and makes no mention of
        AHIF or Mr. Al-Buthe.

(6)    "Russia accuses Islamic organization of funding Chechen rebels," *Moscow ITAR-
        TASS* (Feb. 10, 2003). This article is about Russia's proposal to ban AHF-SA in
        Chechnya in 2003, several years after AHIF's transfer of donations to the SJRC,
        in a project approved by the Russian government in Chechnya, and at a time when
        AHIF had no further involvement with the SJRC's Chechen project.

(7)    "Chief of Al-Haramayn Foundation Denies Links to Terror, Notes Mistaken
        Identity," *Al-Sharq Al-Awsat* (Mar. 16, 2002). This interview is about the closure
        of the Bosnia and Somalia affiliates of AHF-SA, but makes no mention of AHIF
        or Mr. Al-Buthe.

(8)    "Saudi Charity Director Unaware of Decision to Freeze Organization's Assets,"
        *Al-Sharq Al-Awsat* (Mar. 13, 2002). This interview, as for the previous entry, is
        also about the closure of the Bosnia and Somalia affiliates of AHF-SA, but makes
        no mention of AHIF or Mr. Al-Buthe, other than to note that this closure had no
        effect on AHIF.

(9)    "Correction – Russia: Basayev Had Leg Amputated," *Moscow Interfax* (Feb. 1,

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 15

2000). This article, about the ongoing civil war in Chechnya, makes no mention of AHIF or Mr. Al-Buthe.

In short, these articles, like those submitted with the November 30 letter, fail to identify any involvement of AHIF or Mr. Al-Buthe that would constitute support of terrorism, terrorists, or designated entities. At most, these articles allege that some other affiliates of AHF-SA may have provided support to terrorist activities in Somalia, Bosnia, or Chechnya, years after AHIF and Mr. Al-Buthe participated in the SJRC's humanitarian relief efforts as part of a project that was supported at the highest levels of the Saudi government and the Russian government in Chechnya. Thus, these nine articles also fail to support the proposed redesignation of AHIF and Mr. Al-Buthe.

## IV.    The State Department's Reports on Russia Call Into Question OFAC's Reliance on Russian Media Sources.

Finally, I submit for inclusion in the administrative record and for OFAC's consideration the U.S. Department of State's annual reports on Human Rights in Russia for 1995 through 2006. These reports establish that the Russian Government has harshly censored the press coverage of Chechen issues, and has detained, or even imprisoned, reporters who attempted to report truthful statements concerning Russian hostilities towards Chechen refugees. In addition, they confirm that the numerous Chechen refugees were in genuine need of humanitarian aid at the time that AHIF was involved, through the Russian-government-approved SJRC project, in providing such aid. See U.S. Department of State, "Russia: Country Reports on Human Rights Practices – 2006" (Mar. 6, 2007), at: http://www.state.gov/g/drl/rls/hrrpt/2006/78835.htm (attached and incorporated herein as Exhibit 12).

The Department of State made two categories of observations with respect to Chechen issues: (1) suppression of civil rights in Chechnya, resulting in extensive human rights abuses; and (2) suppression of press coverage of the ongoing conflict in Chechnya. These observations cast significant doubt on the reliability of Russian press coverage of Chechen issues. These reports also confirm that the suppression of civil rights resulted in vast numbers of refugees from Chechnya, who had to rely on foreign humanitarian aid from the SJRC and other charities, since the Russian government was taking harsh actions against these refugees.

As the Department of State clearly recognized, the Russian government allows to be published only news that is favorable to the Russian government. Many of the refugees whom the Saudi Joint Relief Committee ("SJRC") and AHIF have assisted in previous years are among the civilian victims of Russian security forces in Chechnya.

KABAT Exhibit A-92

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 16

(1)     **Human rights abuses.**

- **"The government's human rights record in the continuing internal conflict in and around Chechnya remained poor.  Both federal and Chechen Republic security forces generally acted with legal impunity in Chechnya** . . . . Chechen security forces at times appeared to act independently of the Russian command structure, and there were no indications that federal authorities made any effort to rein in those forces' extensive human rights abuses." See Exhibit 12 ("Russia: Country Reports on Human Rights Practices – 2006"), at 1 (emphasis added).

- "Security forces were involved in additional significant human rights problems, including alleged government involvement in politically motivated abductions, disappearances, and unlawful killings in Chechnya and elsewhere in the North Caucasus . . . ." Id.

- "Arbitrary or unlawful deprivation of life: . . . there continued to be **credible reports that federal armed forces engaged in unlawful killings in Chechnya.**  The use of indiscriminate force in areas of Chechnya with significant civilian populations resulted in numerous deaths." Id. at 2 (emphasis added).

(2)     **Lack of freedom of press regarding Chechnya.**

- "During the year [2006], several journalists were killed for reasons that appeared to be related to their work, including Anna Politkovskaya, known for her reporting on human rights abuses and the Chechnya conflict." Id. at 3.

- "Federal authorities – both military and civilian – have limited journalists' and human rights observers' access to war zones since the beginning of the second war in Chechnya in 1999, in part due to security concerns.  **In addition coverage has been restricted in government-controlled media, and the government has sought to pressure independent journalists into engaging in self-censorship.**  These restrictions made independent observation of conditions and verification of reports difficult and limited the available sources of information about the conflict." Id. at 12 (emphasis added).

- "Freedom of Speech and Press. . . . government pressure on the news media persisted, resulting in numerous infringements of these rights. . . . The government used its controlling ownership in all national television and radio stations, as well as the majority of influential regional ones, to restrict access to information about issues deemed sensitive.  **It severely restricted coverage by all media of events in Chechnya.**  There were indications that government pressure frequently led reporters to engage in self-

KABAT Exhibit A-93

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 17

      censorship." Id. at 21 (emphasis added).

- "While the government generally respected citizens' rights to freedom of expression, it sometimes restricted this right with regard to issues such as the conduct of federal forces in Chechnya . . ." Id. at 21.

- "The federal Ministry of Internal Affairs continued to control media access to the area of the Chechen conflict," and detained reporters from United Kingdom, Austria, Germany, and Poland who tried to report on Chechen issues. Id. at 23.

- "At year's end the ABC television network was still unable to obtain accreditation necessary to reopen its bureau in Moscow. The Russian government withdrew the bureau's accreditation in July 2005 after ABC News broadcast an interview with Chechen terrorist Shamil Basayev." Id.

      The Department of State further noted that refugees from the Chechen conflict remained a significant problem, although not as severe as in the earlier part of this decade, at the time when AHIF was supporting the SJRC's provision of humanitarian aid to the Chechen refugees.

      The Department of State's reports for 1999 through 2005, which are incorporated herein, and are to be added to OFAC's administrative record, similarly document that Russia repeatedly suppressed the media with respect to Chechen and related issues, and took harsh actions against the sizable numbers of Chechen refugees and displaced persons, which approached or exceeded 280,000 individuals at any one time. See U.S. Department of State, "Russia: Country Reports on Human Rights Practices – 2005" (Mar. 8, 2006), at: http://www.state.gov/g/drl/rls/hrrpt/2005/61671.htm; U.S. Department of State, "Russia: Country Reports on Human Rights Practices – 2004" (Feb. 28, 2005), at: http://www.state.gov/g/drl/rls/hrrpt/2004/41704.htm; U.S. Department of State, "Russia: Country Reports on Human Rights Practices – 2003" (Feb. 25, 2004), at: http://www.state.gov/g/drl/rls/hrrpt/2003/27861.htm; U.S. Department of State, "Russia: Country Reports on Human Rights Practices – 2002" (Mar. 31, 2003), at http://www.state.gov/g/drl/rls/hrrpt/2002/18388.htm; U.S. Department of State, "Russia: Country Reports on Human Rights Practices – 2001" (Mar. 4, 2002), at: http://www.state.gov/g/drl/rls/hrrpt/2001/eur/8331.htm; U.S. Department of State, "Russia: Country Reports on Human Rights Practices – 2000" (Feb. 23, 2001), at: http://www.state.gov/g/drl/rls/hrrpt/2000/eur/877.htm; U.S. Department of State, "Russia: Country Reports on Human Rights Practices – 1999" (Feb. 23, 2000), at: http://www.state.gov/g/drl/rls/hrrpt/1999/356.htm (attached and incorporated herein as Exhibits 13-19, also to be included in OFAC's administrative record).

KABAT Exhibit A-94

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 18

Specifically, the Department of State found extensive suppression of human rights in Chechnya. See Ex. 13 at 1, 10-14, Ex. 14 at 1, 9-13; Ex. 15 at 1-2, 12-14, Ex. 16 at 1-2, 12-14, Ex. 17 at 1, 13-15, Ex. 18 at 1, 3, 15, and Ex. 19 at 1, 3-4, 21-23. The Department of State recognized the existence sizable numbers of refugees and displaced persons arising from the Chechen conflict, and the refusal of the Russian government to help those refugees, at a time when the SJRC and AHIF were seeking to do so. See Ex. 13 at 16, 27, Ex. 14 at 14 (approximately 77,600 in 2004), Ex. 15 at 15 (approximately 216,000 in 2003), Ex. 16 at 14 (approximately 250,000 in 2003); Ex. 17 at 15 (approximately 280,000 in 2001), Ex. 18 at 16 (approximately 280,000 in 2000); and Ex. 19 at 21 (approximately 170,000 to 240,000 in 1999). The Department of State also recognized extensive evidence as to the suppression of the press in Russia, both generally and specifically with respect to coverage of Chechen issues, and the resulting pervasive bias in what coverage was allowed to be published, which includes the Russian articles relied upon by OFAC. See Ex. 13 at 16, 17; Ex. 14 at 14, 15; Ex. 15 at 12, 16, 21; Ex. 16 at 20; Ex. 17 at 2, 20; Ex. 18 at 21; and Ex. 19 at 22-23, 25.

The Department of State also recognized that the United Nations passed a resolution in April 2000, calling upon the Russian government to provide humane treatment to the Chechen refugees and to allow international non-governmental organizations to provide humanitarian charitable relief in Chechnya. See Ex. 17 at 15; see also United Nations, Office of the High Commissioner for Human Rights, Commission on Human Rights Resolution 2000/58 (Apr. 25, 2000), "Situation in the Republic of Chechnya of the Russian Federation," at: http://ap.ohchr.org/documents/E/CHR/resolutions/E-CN_4-RES-2000-58.doc (attached and incorporated herein as Exhibit 20). The United Nations resolution, *inter alia*, called upon Russia "to allow international humanitarian organizations … free and secure access to areas of internally displaced and war affected populations in the Republic of Chechnya and neighbouring republics, in accordance with international humanitarian law, and to facilitate their activities and the delivery of humanitarian aid to the victims in the region." See Ex. 20 at 2, § 9. This resolution, adopted in April 2000, confirms the legality of AHIF's and Mr. Al-Buthe's conduct in transferring approximately $150,000 in charitable donations to AHF-SA for the SJRC's humanitarian relief efforts in Chechnya.

Critically, nearly all of the problems that the U.S. Department of State identified with the Russian government suppression of the media related specifically to Chechen issues. See Exhibits 12-19, *supra*. OFAC and the Department of Justice cannot claim any greater or better knowledge in this area than the Department of State, given that agency's expertise with respect to foreign relations and its in-depth analyses of the press situation in Russia.

The Department of State reports are buttressed by recent reliable news accounts regarding censorship in Russia. A Russian court ordered the release of Andrei Novikov, a journalist who

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 19

worked for an news service that reported on Chechen issues, whom the government arrested, sentenced to prison, and committed to a psychiatric hospital, all for allegedly engaging in sedition and inciting violence through sending two e-mails to newspapers. See "Russian Court Orders Release of a Journalist, Group Says," *N.Y. Times* (Dec. 7, 2007); Reporters Without Borders for Press Freedom, "Court Orders Online Journalist's Release from Psychiatric Hospital" (Dec. 7, 2007) (online at: http://www.rsf.org/article.php3?id_article=24655) (attached hereto as Exhibits 20-21). We submit this evidence for the administrative record as well. This recent development confirms the Russian government's practice of imprisoning and committing to psychiatric hospitals those reporters who attempted to report truthfully about the humanitarian needs or humanitarian projects in Chechnya. Hence, OFAC's reliance on pro-government articles about Chechnya, which largely deny the injuries of the civilian population, and focus solely on the Russian government's viewpoint, is inherently unreliable, given that any reporters who might report the opposing view could be incarcerated.

### IV.     Conclusion.

In conclusion, the proposed redesignation of AHIF and Mr. Al-Buthe is procedurally improper, since there is no statutory or regulatory authority for OFAC to proceed with any redesignation. The redesignation further violates their rights to due process and AHIF's First Amendment rights, as did OFAC's original designation. OFAC has failed to provide AHIF or Mr. Al-Buthe with any statement of charges or explanation of how the administrative record purports to support designation or redesignation, or any response to AHIF's prior submissions, and OFAC continues to rely on secret evidence without undertaking any of a number of available steps to mitigate the substantial due process problems presented by such reliance.

OFAC's supplementation to the administrative record is demonstrably one-sided, since it relies on the government's motion in support of pretrial detention of Mr. Seda, a motion that was decisively rejected by two federal judges, while OFAC improperly ignored the entire court record relating to Mr. Seda's detention. OFAC further improperly relies on articles or website postings that reflect biased press coverage and either do not mention AHIF or Mr. Al-Buthe, or only discuss their legitimate activities.

I look forward to your written response that specifically addresses each of the legal and factual issues raised in this letter. OFAC's prior and ongoing failures to consider these arguments, and those made in our prior submissions, including the motions for reconsideration and motions to supplement the administrative record, in violation of 31 C.F.R. § 501.807(d), confirms the fundamental lack of due process in the designation and redesignation process.

KABAT Exhibit A-96

Adam J. Szubin, Esquire
Director, Office of Foreign Assets Control
Department of the Treasury
January 4, 2008
Page 20

Sincerely,

Lynne Bernabei

Enc.

cc:    David D. Cole, Esquire
       Andrea Gacki, Esquire
       Thomas H. Nelson, Esquire[4]

---

[4] Note:  Mr. Cole represents AHIF with respect to its challenges to the designation and redesignation; Mr. Nelson represents Mr. Al-Buthe with respect to his challenges to the designation and redesignation.

KABAT Exhibit A-97