# THOMAS R. BURKE

# EXHIBIT A

## A-1 through A-38

**MELAMED, DAILEY & AKEEL, P.C.**
ATTORNEYS AND COUNSELORS
26511 WOODWARD AVENUE
HUNTINGTON WOODS, MI 48070-1332

FREDERICK W. MELAMED
MARK L. DAILEY
SHEREEF H. AKEEL
JOSEPH L. MILANOWSKI

(248)591-5000
FAX: (248)541-9458
e-mail: meldailey@voyager.net

November 12, 2004

Via Fax (w/o enclosures) to 202-622-1657 and FedEx

Robert W. Werner, Director
Office of Foreign Assets Control
U.S. Department of Treasury
1500 Pennsylvania Avenue NW
Washington, DC 20220

RE:  FAC NOFDG-234338
     Blocking Notice:  Islamic African Relief Agency
     Our Client:  Islamic American Relief Agency (IARA-USA)

Dear Mr. Werner:

As you should know from my prior letters, we represent Islamic American Relief Agency (IARA-USA) based in Columbia, Missouri, as its attorneys.  A Blocking Notice was directed to another entity, the Islamic African Relief Agency which is based in Sudan (Exhibit A).  It is our understanding that the Sudanese organization has been designated as a terrorist organization by the Department of Treasury.  However, as a consequence, IARA-USA's property was blocked.  This is to inform you that my client is a completely separate organization and independent from the Sudanese organization whatsoever.  My client never received notice of any charges or allegations pending against it or any evidence purportedly supporting the charge or allegation before my client's

BURKE Exhibit A-1

IARA-1876

property was blocked. The designation of another unrelated entity as a terrorist, and then bootstrapping IARA-USA as part of that organization, is arbitrary and a clear violation of due process.

<u>REQUEST FOR UNBLOCKING OF PROPERTY</u>

This is a request to have the property belonging to IARA-USA unblocked.

<u>BACKGROUND</u>

IARA-USA was established in 1985 as a non-profit organization, located at 201 E. Cherry Street, Suite D, Columbia, Missouri. IARA-USA does not operate under any other name and is not affiliated with any other organization. IARA-USA has no parent entities or subsidiaries.[1] IARA-USA is an independent Non-Governmental Organization (NGO) run by United States citizens[2]. For nearly 20 years, IARA-USA dedicated its resources and efforts to provide immediate humanitarian relief to the poor without regard to race, religion, creed, color, disability, gender or nationality, while striving for long-term commitments to combat poverty and famine (see Exhibit B, By-Laws). For example, Exhibit C is a letter from a Christian aide worker, Anne Owltl, Director of a non-profit organization in Kenya, Kibera Community Self-Help Program Kenya (KICOSHEP), dated February 21, 2003, stating, in relevant

_____

[1] IARA-USA was about to celebrate its 20th year of successfully providing humanitarian relief before it was closed down.

[2] One board member has been a permanent resident alien for over 20 years.

2

BURKE Exhibit A-2

IARA-1877

part:

> IARA is an Islamic organization that has really come out
> to help humanity without any discrimination. The school
> has a Christian majority but that did not deter IARA from
> feeding these vulnerable children, they appreciate their
> situation and view them as children in need and not
> Christians.    This is really commendable and a good
> example of religious tolerance.    From our experience
> working with IARA, we have found them to be very sincere
> in their efforts to alleviate the suffering of mankind.

IARA-USA's activities included setting up orphan sponsorship

programs, elderly health care clinics, feeding centers, and schools

in impoverished countries around the world, including Mali, Chad,

Yemen, Somali, Bangladesh, Jordan, Kenya, Bosnia and Ethiopia.

IARA-USA was also instrumental in setting up health and feeding

centers in Africa, for orphans of Aids victims in Nairobi, Kenya,

and providing humanitarian relief for victims of earthquakes

(Exhibit D).    IARA-USA has dedicated its efforts to sponsoring

Christian and Muslim orphans.    IARA-USA had also been involved in

providing disaster relief funds and relief to victims of terrorist

attacks, including the Kenya bombing.

From 1985 to May of 2000, the organization was known as the

Islamic African Relief Agency, the same name as another

organization based in Sudan.[3]    Both organizations had a similar

---

[3]The Department of Treasury designated the Islamic African Relief Agency based
in Sudan and five of its officials were designated as terrorists (Exhibit T).
That organization and the members are all based abroad, and none of those
members listed by the Department of Treasury as alleged terrorists are members
of IARA-USA based in Columbia, Missouri.

3

IARA-1878

acronym: IARA.[4] However, because the organization based in the United States expanded and began providing humanitarian relief in other continents besides Africa, the organization chose to change its name to Islamic American Relief Agency by amending its charter through the Secretary of State of Missouri (Exhibit F). Throughout its years of operation, IARA-USA has been completely independent from any other organization, including the Islamic African Relief Agency in Africa. IARA-USA has its own independent board, officers, directors and employees. The board members periodically met and documented their activities with Minutes, like the ones attached as Exhibit G. The Minutes reflect the members who have been in attendance and the type of decisions rendered by the organization.

An understanding of how IARA-USA operated is essential for the purposes of how it provided humanitarian relief. IARA-USA used a partnership model to implement its projects around the globe. The partnership model is well known in the relief and humanitarian arena. A partner is an organization with whom IARA-USA has entered into a contractual cooperative agreement for the implementation of one or more specific and clearly defined humanitarian projects. Such a contract will clearly spell out the responsibilities of each

---

[4] It is important to note that the acronym IARA is a very common name used by many organizations around the world, i.e., Italian Amateur Radio Astronomy, International Automotive Remarketers Alliance, Israel Academy for Regional Anesthesia.

4

BURKE Exhibit A-4

IARA-1879

participating agency, including procedures for monitoring and financial accountability on a project by project basis. Funds allocated to such projects are transferred and accounted for only on a project by project basis. There is no similarity between IARA-USA and its partners in the administrative structure, board of directors, decision making process, financial accounts, legal and financial accountability.

IARA-USA had and did work with many partners. Some of these partners include United Nations agencies, such as UNRWA. Other partners have included Action Nord-Sud, MCDI, KICOFHIP, USAID, etc.

<u>INTERNAL CONTROLS</u>

Internally, IARA-USA had exercised impeccable internal control. Routinely, IARA-USA filed its 990 tax returns with the Internal Revenue Service and had its annual statements audited annually. Exhibit H contains the 990 tax returns for 1999, 2000, 2001 and 2003, and Exhibit E contains the audited statements for 2000 through 2002. It is believed the 990 for 2002 and the audited statements for 1999 and 2003 were seized when IARA-USA's office was raided by the government.[5]

In 1999, IARA-USA had undergone a specialized audit for non-profit organizations where the auditor made the substantive finding that IARA-USA met all Government Auditing Standards issued by the

_____

[5]IARA-USA employed Christian and Muslim employees. A Michael Hainsworth was the project director for two of the largest IARA-USA projects and was the highest-paid IARA-USA employee.

5

BURKE Exhibit A-5

IARA-1880

Comptroller General of the United States (Exhibit I).

IARA-USA also underwent a recent vigorous audit by the Better

Business Bureau, which found that IARA-USA met 22 of the 23 listed

criteria for operating a successful non-profit entity (Exhibit J).

To appreciate this success, important information needs to be shed

regarding the nature of this audit. In relevance:

> The BBB Wise Giving Alliance Standards for Charitable
> Accountability were developed to assist donors in making sound
> decisions and to foster public confidence in charitable
> organizations. The standards seek to encourage fair and
> honest solicitation practices, to promote ethical conduct by
> charitable organizations, and to advance support of
> philanthropy. ...organizations that comply with these
> accountability standards have provided documentation that they
> meet basic standards: 1) in how they govern their
> organization; 2) in the way they spend their money; 3) in the
> truthfulness of their representation; and 4) in their
> willingness to disclose basic information to the public.

* * *

Finances

> This section of the standards seeks to ensure that the charity
> spends its funds honestly, prudently, and in accordance with
> statements made in fund raising appeals...

See Exhibit J for further information regarding BBB Wise Giving

Alliance Standards for Charitable Accountability.

IARA-USA also had formerly adopted internal accounting control

policies to ensure proper internal controls (Exhibit O). IARA-USA

also had built-in controls with respect to its contractual

agreements with other non-government organizations overseas. For

example, Exhibit K is a sample contract that was entered into

6

IARA-1881

between IARA-USA and an organization in Bosnia which states, in pertinent part:

> Whereas, the Main Partner (IARA-USA) has agreed to provide financial support for the first phase of the construction, the other Partners have offered, on the basis of their experience and expertise, to provide supervision and assurance of adherence to standards - U.S. Department of the Treasury Anti-Terrorist Financing Guidelines: Voluntary Best Practices for U.S. Based Charities and the Better Business Bureau Standards.

In the sample contract, there is also a termination clause allowing IARA to terminate the contract, should its partner breach it.[6]

### EXTERNAL DEALINGS WITH OTHER ENTITIES

Externally, IARA-USA worked regularly with United Nations Relief and Work Agency (UNRWA) which systematically provided reports for the funds contributed by IARA-USA, how much was applied to the given project, and detailed reports indicating how the funds have been exactly allocated. Exhibit L is an example of a report to IARA-USA from UNRWA, detailing its activities and how the funds were allocated. Exhibit M is another progress report to IARA-USA detailing the progress and activities to support the Afghan refugees. Exhibit N is another report detailing the progress in Mali.

---

[6]All the contracts similar to Exhibit K were seized or confiscated during the raid on October 13, 2004.

BURKE Exhibit A-7

IARA-1882

## FINANCING

Financing for IARA-USA has been recently obtained from private contributions. At one point in time, IARA-USA was obtaining funding from private and public contributions. There were two cooperative agreements awarded by United States for International Development (USAID) to IARA-USA in 1998 supporting specific agency-approved human needs activities (water, community income, and child survival) in poor and remote areas of Mali.[7] Unfortunately, both agreements were unilaterally terminated based on instructions received from the State Department (Exhibit P). The termination of those agreements was completely at odds with the Agency's actions prior to the intervention of the State Department. At that time, the Regional Agreement Officer for USAID, Annette E. Tuebner, having reviewed IARA-USA's detailed November 1999 submission addressing certain USAID concerns, determined that USAID had "no basis" for unilateral termination of the CEWIGAP award.[8] After this determination, Ms. Tuebner decided to continue funding the CEWIGAP program (Exhibit Q). Nevertheless, no further funds have been distributed by USAID and to date, IARA-USA was never advised

---

[7] The two awards received by IARA-USA from USAID in 1998 are: (1) cooperative agreement #688-A-98-00131-00, June 18, 1998, which supports the community education water income generating activities program in Mali; and (2) Cooperative Agreement #FAO-A-00-98-00045-00, September 30, 1998, which supports the Timbuktu Child Survival Project in Mali.

[8] CEWIGAP = Community Education Water Income Generating Activities Program in Mali.

BURKE Exhibit A-8

IARA-1883

of any concern that the State Department may have had. To date, IARA-USA has no knowledge or information as to why its funding with USAID was terminated.

<u>EVENTS IN 2004 LEADING TO BLOCKING NOTICE</u>

In 2004, the Board of Directors met and formed a plan of action, specifically to help disadvantaged people by raising at least two million dollars from donors for local and international projects to engage in outreach programs between Muslims and non-Muslims. See Exhibit R, plan of action. Part of the plan was to increase the number of orphan sponsorships by 1,000 and to continue sponsoring orphan projects in Afghanistan, Kenya, China and Iraq.

On October 13, 2004, the United States Department of Treasury, designated another entity called "Islamic African Relief Agency (IARA)" (Exhibit T), along with five of its senior officials, as Special Designated Global Terrorists (SDGT) pursuant to Executive Order No. 13224 issued by President Bush on September 23, 2001, and under the authority granted by the International Emergency Economic Power Act (IEEPA), 50 USC 1701-06. Those individuals include Dr. Mohammed Ibrahim Sulaiman, Jaffar Ahmad Abdullah Makki, Abdul Aziz Abba Karmuhamad, Khalid Ahmed Jumah Al-Sudani, and Abrahim Buisir. None of those individuals were ever officers, directors or employees of IARA-USA.

On that same day, October 13, 2004, another entity, my client, IARA-USA's office in Columbia, Missouri, was raided and shut down,

9

and its assets were blocked. Prior to that, IARA-USA never received any notice of alleged wrongdoing. To date, IARA-USA has no knowledge whatsoever of why its assets were blocked. IARA-USA and its officers vehemently deny any involvement in supporting terrorism. IARA-USA has publicly condemned any such acts and dedicated all of its efforts to providing humanitarian relief. Exhibit S contains affidavits of officers of IARA-USA attesting to such a position.

As stated, IARA-USA is a completely separate entity from the Africa based charity. This was further attested to by the Africa based charity in a recent press release (Exhibit U).

It is important to point out that various NGO may work together on a project. For example, Stephanie Bunker, a spokesperson for the UN Office for the Coordination of Humanitarian Affairs, indicated that they were working with an organization called IARA and the United Nations World Food Program in Sudan, as recently as October of this year (Exhibit V). This does not mean that the UN is supporting terrorism. Likewise, if OFAC has any evidence that IARA-USA was working with the African charity on certain projects (i.e., orphanage programs), both organizations were entirely independent of one another, and run by totally different decision makers.[9]

---

[9] At this time, IARA-USA can only guess what concerns OFAC may have to lead to the blocking of the property. IARA-USA has always maintained an open door policy with all governmental agencies to address any concerns and will continue to do so in the future, if given the opportunity.

10

BURKE Exhibit A-10

IARA-1885

## REQUEST FOR UNBLOCKING FUNDS

This serves as a request to unblock the funds owned by IARA-USA. The blocking of its property without any notice, indefinite in duration and unlimited in scope, with no reference to any possibility of remedy, removal or improvement of status, is unprecedented, unjust and manifestly improper. Further, to designate another completely separate entity in Sudan, namely Islamic African Relief Agency, as a Special Designated Global Terrorist, and to freeze the funds owned by another separate entity, my client, IARA-USA, has no rational basis, is arbitrary and capricious. For the reasons discussed below, IARA-USA requests that its funds be immediately unblocked.

1.  <u>Violation of due process</u>.

The Fifth Amendment of the Constitution states, in pertinent part:

> ...nor shall any person...be deprived of life, liberty or property without due process of law; nor shall private property be taken for public use without just compensation.

Nevertheless, in this context, due process mandates that "the Secretary must afford to the entities under consideration notice that the designation (for Special Designated Global Terrorist) is pending". Further:

> The Secretary must provide notice of those unclassified items upon which he proposes to rely to the entity to be designated. There must then be some compliance with the hearing requirement of due process juris prudence - that is, the opportunity to be heard at a meaningful time and

11

BURKE Exhibit A-11

IARA-1886

in a meaningful manner recognizing <u>Matthews</u>, <u>Armstrong</u>, and a plethora of other cases. We do not suggest "that a hearing closely approximating a judicial trial is necessary". <u>Matthews</u>, 424 US at 333, 96 S.Ct. 893. We do, however, require that the Secretary afford to entities considered for eminent designation the opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations. <u>National Council of Resistance of Iran v Department of State</u>, 251 F3d 192 (2001).

In this case, IARA-USA was never given any notice of any kind that it is under investigation or that its properties would be blocked. IARA-USA was never given any evidence that would support blocking its property. IARA-USA was also never given any consideration or an opportunity to present, at least in written form, any evidence to rebut any proposition that the Secretary may have that it in any way supports terrorism.

There is no question that the Secretary's actions in this case were egregious, arbitrary and in clear violation of due process.

a.   <u>Mistake of Fact</u>:

As noted above, IARA-USA is an independent U.S. non-profit corporation that is separate and distinct from any other organization outside the United States that may use IARA or any portion of this name in its title. As such, IARA-USA maintains that any action by the State Department with respect to IARA does not relate to IARA-USA. There is no legal or factual basis under which the Government could or should penalize IARA-USA for any perceived fault of another entity named IARA. If the Government's

12

IARA-1887

actions are premised on identification of the Islamic African

Relief Agency with IARA-USA, such premise is erroneous, since IARA-

USA is a completely separate entity.

In fact, when the Secretary issued a press release from the

Office of Public Affairs, it stated:

> The U.S. Department of the Treasury today designated the worldwide
> network of Islamic African Relief Agency (IARA), along with five
> senior officials, pursuant to E.O. 13224.
>
> ...IARA is headquartered in Khartoum, Sudan, and maintains over 40
> offices throughout the world, including the United States.

The five senior officials that were listed were:

> Dr. Mohammed Ibrahim Sulaiman
> Position:  Secretary General, IARA Headquarters,
> Khartoum, Sudan.
>
> Jaffar Ahmad Abdullah Makki
> Position:  IARA South Asia Region Director
>
> Abdul Aziz Abba Karmuhamad
> Position:  IARA Peshwar, Pakistan Director
>
> Khalid Ahmed Jumah Al-Sudani
> Position:  IARA Middle East Regional Director.
>
> Abrahim Buisir
> Position:  IARA representative in Ireland.

None of the officials of the Islamic African Relief Agency

listed above, have any administrative or financial role with IARA-

USA based in Columbia, Missouri.  They are completely separate

entities.

There seems to be a misunderstanding regarding the

identification of one official, namely Jaffar Ahmad Abdullah Makki,

with Ahmed O. Makki, who served as president of IARA-USA in 2002.

It is important to point out that these are two different

13

BURKE Exhibit A-13

IARA-1888

individuals.  In fact, Ahmed O. Makki passed away at his residence in Chicago, Illinois, two years ago from a heart condition (Exhibit S).  If this is the reason the Government froze IARA-USA's property, we are hopeful that this clears up any misunderstanding.[10]

    3.    Limitation on Authority to Block Funds.

    IARA-USA maintains that the Department of State exceeded its authority to block the property.  The International Emergency Economic Powers Act (IEEPA), provides that the President may:

> investigate blocks during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit any acquisition, holding, withholding, use, transfer, withdraw, transportation, or exportation of or dealing in or exercising any right involving...any property in which any foreign country or national thereof has any interest by any person, or with any respect to any property subject to the jurisdiction of the United States.  15 USC 1702(a)(1)(B).

15 USC 1701(a) states:

> Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its sources in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

Executive actions that go beyond statutory authority are invalid.[11]

    In this instance, there is no evidence whatsoever that IARA-

---

[10]Since we do not know what evidence the Government has to block the funds of IARA-USA, we can only guess, in efforts to hopefully facilitate the unblocking of the property.

[11]Little v Barreme, 6 US 170 (1804).

14

BURKE Exhibit A-14

IARA-1889

USA engaged in any act which could possibly be deemed as an "unusual and extraordinary threat" to the United States. No evidence has been presented to IARA-USA to support such a drastic action. There is no question that the State Department has exceeded its authority by blocking IARA-USA's funds when it is not in any manner a threat to the United States.[12] In fact, since its inception in 1985, IARA-USA has been a partner with the United States to combat famine in impoverished nations. IARA-USA, as an American organization, was consistently demonstrating America's generosity to combat famine and provide humanitarian relief to the impoverished. This drastic step is against public policy and national security and interests, as it stifles IARA-USA's ability to combat a horrific problem in Africa and Asia, famine.

    4.   <u>First Amendment Violation</u>.

IARA-USA contends, on information and belief, that the Department of Treasury violated the First Amendment to the Constitution by blocking IARA-USA's property, as punishment for activities in association protected by IARA-USA's First Amendment right to freedom of conscience, freedom of speech, freedom of association, and freedom of religion.

    5.   <u>Denial of Equal Protection</u>.

Upon information and belief, the Department of Treasury

---

[12]Executive Order 13224 executed by the President essentially delegated his authority under the International Emergency Economic Powers Act, allowing the Department of Treasury to block funds on the President's behalf.

BURKE Exhibit A-15

IARA-1890

deprived IARA-USA, an Islamic organization, the equal protection of the laws guaranteed by the Fifth Amendment to the United States Constitution, by unilaterally blocking its funds in comparison to other non-Islamic organizations who share the same activities and/or associations in Africa and elsewhere which have not had their property blocked.  This denial of equal protection has also affected the organizations' donors and employees.

### RELIEF REQUESTED

In view of the foregoing, IARA-USA respectfully requests that the Department of Treasury, Office of Foreign Assets Control, take the following steps to provide relief:

1.    immediately unblock all property belonging to IARA-USA;

2.    remove any reference in public documents that IARA-USA is in any way related to Islamic African Relief Agency;

3.    issue a separate statement clearly indicating that Islamic American Relief Agency, IARA-USA, has not been deemed a Special Designated Global Terrorist.

Designating another unrelated entity as a terrorist organization and then bootstrapping IARA-USA as part of that organization was arbitrary and in clear violation of its due process rights.

The blocking of IARA-USA's assets was done without notice of any allegation or charge against it; without any evidence to support the purported allegation or charge; without any opportunity to be heard, even in a written format, to rebut the purported evidence; and without any hearing before a neutral trier of fact to

16

BURKE Exhibit A-16

IARA-1891

contest the evidence, if any; in violation of IARA-USA's due process rights. OFAC should be aware that IARA-USA is being severely and irrevocably harmed each day in which the property is blocked. It is suffering severe economic hardship. Its reputation as an honest and loyal United States organization has already been severely damaged. It has also suffered damage by the violation of its rights under the First and Fifth Amendments to the United States Constitution, as described above. Accordingly, IARA-USA strongly urges OFAC to take corrective action as soon as possible.

Please let us know if you need additional information concerning this matter. We look forward to hearing from you.

Very truly yours,

MELAMED, DAILEY & AKEEL, P.C.

Shereef H. Akeel

SHA/le

17

BURKE Exhibit A-17

IARA-1892

FILED by ___EG___ D.C.
ELECTRONIC

Mar 3 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO. 04-21917-CIV-ALTONAGA-BANDSTRA

MAKRO CAPITAL OF AMERICA, INC.,

     Plaintiff,

vs.

UBS AG; a/k/a UNION BANK OF SWITZERLAND;
a/k/a UBS (USA) INC.; a/k/a UBS PAINE WEBBER;
successors in interests to assets of I.G. FARBEN AG of
Germany in Switzerland, the assets of I.G. CHEMIE AG
a shell, cloaked or alter-ego company and/or a subsidiary,
daughter, managed, controlled by I.G. FARBEN AG;
successors in interest to assets of INTERNATIONALE
INDUSTRIE-und HANDELSBETEILIGUNGEN AG,
a/k/a INTERHANDEL, Basel a/k/a INTERNATIONAL
HOLDINGS in INDUSTRY and COMMERCE, and
UNITED STATES OF AMERICA,

     Defendants.

_____/

**DEFENDANT UBS AG'S OPPOSITION TO PLAINTIFF'S MOTION FOR
30-DAY ENLARGEMENT OF TIME TO RESPOND TO MOTION TO DISMISS
AND OPPOSITION TO REQUEST FOR CASE MANAGEMENT CONFERENCE**

     Plaintiff has moved for a 30-day enlargement of the time in which to file an

opposition to UBS AG's Motion to Dismiss, which was hand-delivered to Plaintiff's

counsel on February 17, 2005. Also, plaintiff now asks that the Court conduct a Rule

16(a) case management conference on April 7, 2005, the date already set by the Court for

oral argument of the Motion to Dismiss. As a matter of professional courtesy, UBS AG's

counsel ordinarily agree to reasonable requests for enlargements of time where

NYB 1494526.1

CASE NO. 04-21917-CIV-ALTONAGA-BANDSTRA

warranted.    Indeed, UBS AG's counsel *has* consented to a 10-day enlargement for

plaintiff to respond (which plaintiff failed to inform the Court).    Here, however, an

objection to a 30-day extension is more than justified.    Moreover, a case management

conference before resolution of the pending dispositive Motion to Dismiss would waste,

rather than conserve, time and resources of the Court and parties.

UBS AG believes that, if the Court even briefly reviews UBS AG's memorandum

in support of its Motion to Dismiss, the Court will see why its opposition to a 30-day

enlargement is fully justified.    As appears from that memorandum, the core issue in this

case has been the subject of litigation and relitigation for *decades*.    (See Def. Mem. in

Supp. at 1-2.)    This case actually is the *third* one brought in the United States by the two

directors of Makro Capital of America.    (*Id.* at 9-10.)    Their second case, brought in the

Eastern District of New York and making allegations virtually identical to those here,

was dismissed on November 1, 2004.    *Arndt v. UBS AG*, 342 F.Supp.2d 132 (E.D.N.Y.

2004).    As District Judge Glasser then observed in the context of UBS AG's motion filed

in *Arndt* to preclude further prosecution of the *Makro* case before this Court:

> The Court recognizes that if Defendant is correct about the nature of the
> *Makro* suit (Plaintiffs have not opposed Defendant's motion), allowing it
> to proceed would unfairly expose Defendant USB [sic] (and defendant
> United States of America) to further expense and other courts to the
> wasteful dissipation of their already scarce judicial resources at the
> expense of parties to other lawsuits.

*Id.* at 142.[1]

---

[1]    The *Arndt* court ultimately was constrained to deny UBS AG's motion to preclude
further prosecution because the court lacked subject matter jurisdiction.

2

NYB 1494526.1

IARA-1894

CASE NO. 04-21917-CIV-ALTONAGA-BANDSTRA

While the circumstances here involve six decades of various proceedings, it is all

a matter of well known, historical fact. The more recent procedures in Germany and the

United States are particularly well known to Messrs. Beutenmueller and Petrowsky, the

sole directors of Makro, as they have been involved in all of them. (*See* Def. Memo. in

Supp. at 9-11 and n.24.) Further, the legal issues raised by UBS AG's Motion to Dismiss

are straightforward and equally well-known, since they were also involved in the prior

litigation.

Plaintiff attempts to distract the Court from the above considerations with an

exaggerated discussion of the propriety, and amount, of the material submitted with UBS

AG's Motion to Dismiss.[2] But this material serves only to emphasize, using the public

record, how timeworn and empty the Complaint really is. More importantly, plaintiff's

directors have been in possession of this same material ever since it was served in June of

last year with UBS AG's successful motion to dismiss in the *Arndt* action—over *eight*

*months* ago. Plaintiff's present counsel, who claim they were retained six weeks ago,

have no basis to plead surprise or ignorance at an almost identical submission now.

Finally, setting a Rule 16(a) case management conference before hearing

argument on the Motion to Dismiss would actually waste the time and resources of the

---

[2]     Plaintiff's suggestion that the exhibits to UBS AG's Motion are somehow
improper is both wrong and misleading. These exhibits are entirely proper: it is
well-established that the Court may take judicial notice of material generally
known or "capable of accurate and ready determination by resort to sources
whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b); *see also,
e.g., Bryant v. Avado Brands*, 187 F.3d 1271, 1280 (11th Cir. 1999) (permitting
public records to be considered at the motion to dismiss stage without conversion
to summary judgment).

3

NYB 1494526.1

BURKE Exhibit A-20

IARA-1895

CASE NO. 04-21917-CIV-ALTONAGA-BANDSTRA

Court and parties, and will not expedite matters. Plaintiff seeks a conference to discuss exactly those topics—the factual and procedural history of this case—which are the subject of UBS AG's Motion to Dismiss. (Pl. Mem. In Supp. at 6.) A conference for the purposes stated by plaintiff would interrupt and delay the hearing and resolution of UBS AG's pending motion to dismiss, thus hindering appropriate steps for the expeditious disposition of cases contemplated by Rule 16(a). Fed.R.Civ.P. 16(a). It would duplicate explanation and argument to be made in the context of that motion, constituting just the sort of "wasteful pretrial activity" the rule was designed to preclude. *Id.* Accordingly this request should be denied.

UBS AG has been forced to take the time and unnecessary expense of defending against repetitive, vexatious lawsuits over the issue here and, accordingly, seeks as expeditious a resolution as is reasonably possible. *See* Fed.R.Civ.P. 1 ("[The Federal Rules of Civil Procedure] shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."). Therefore, UBS AG opposes any enlargement of more than 10 days for plaintiff to respond to the Motion to Dismiss, and respectfully asks that the Court deny plaintiff's request for a Rule 16(a) conference.

Respectfully submitted:

CLIFFORD CHANCE US LLP
James B. Weidner, Esq. (pro hac vice)
Thomas Teige Carroll, Esq. (pro hac vice)
Amber Wessels, Esq. (pro hac vice)
31 West 52nd Street
New York, NY 10019-6131
(212) 878-8000
(212) 878-8375 fax

*Attorneys for Defendant UBS AG*

HOMER BONNER, P.A.

By: _____
    Peter W. Homer
    Florida Bar No. 291250
    Gregory J. Trask
    Florida Bar No. 0055883
1441 Brickell Avenue, Suite 1200
Miami, Florida 33131
(305) 350-5100
(305) 372-2738 fax

4

NYB 1494526.1

BURKE Exhibit A-21

IARA-1896

CASE NO. 04-21917-CIV-ALTONAGA-BANDSTRA

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was sent this

3rd day of March 2005 by facsimile and postage prepaid first class U.S. mail to the

following persons:

Steve I. Silverman, Esq.
Kluger, Peretz, Kaplan & Berlin
The Miami Center, Suite 1700
201 South Biscayne Blvd.
Miami, Florida 33131
(305) 379-3428 fax

Norman Hemming, Esq.
Assistant United States Attorney
United States Attorney's Office
Southern District of Florida
99 N.E. 4th Street
Miami, Florida 33132
(305) 530-7679 fax

Gregory J. Trask

5

NYB 1494526.1

BURKE Exhibit A-22

IARA-1897

# Exhibit A




ARTMENT OF THE TREASUR
WASHINGTON, D.C. 20220

## BLOCKING NOTICE

FAC No. SDG- 234338

Islamic African Relief Agency
201 East Cherry St., Suite D
Columbia, MO 65203

Gentlemen:

You are hereby notified that pursuant to Executive Order No. 13224 (66FR49079), issued by
President Bush on September 23, 2001 (the "Order"), and under the authorities granted by the
International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06 ("IEEPA"), the Office of
Foreign Assets Control ("OFAC"), U.S. Department of the Treasury, has reason to believe that
Islamic African Relief Agency ("IARA") is an entity that provides financial support or other
services to persons who commit, threaten to commit or support terrorism. Accordingly, effective
October 13, 2004, IARA has been designated as a Specially Designated Global Terrorist
("SDGT") pursuant to the Order.

This notice is also to inform you that pursuant to the Order, all real and personal property of
IARA, including but not limited to all offices, furnishings, equipment and vehicles, as well as all
funds and accounts in which IARA has any interest, that are owned or controlled by IARA and
that are in, or come within, the United States or that are in, or come within, the possession or
control of any U.S. person, are blocked. All assets of IARA, including but not limited to bank,
charge and investment accounts, securities, and safe deposit boxes at any financial institution
located in the United States or organized under the laws of the United States, including their
overseas branches, are blocked. Blocked property may not be transferred, withdrawn, exported,
paid, or otherwise dealt in without prior authorization from OFAC. OFAC has notified the
financial community of the blocked status of IARA's funds and accounts.

All transactions by United States persons or within the United States involving property in which
IARA has any interest, including any property of third parties in the possession or control of
IARA, are prohibited without specific authorization from OFAC. These prohibitions include,
but are not limited to, the making or receiving of any contribution of funds, goods, or services to
or for the benefit of IARA.

As a consequence of this action, activities in, use of, and occupation of IARA offices, including
this facility and any other IARA office subject to United States jurisdiction, are hereby
prohibited. All persons on these premises are directed to terminate all activities for or on behalf
of IARA and to leave the premises. No property may be removed from the premises other than
property that is clearly the personal property of the individual requesting to remove such
property from the premises. Persons who are unable to remove their personal belongings at this
time must contact OFAC in writing at the following address to make arrangements to secure
their belongings at a later date: U.S. Department of the Treasury, Office of Foreign Assets

Witnessed    10/13/04    Issued By
10/13/04                 Richard Hoffas
Ormith    C Cooke

2

Control, Attn: Chief of Enforcement, 1500 Pennsylvania Avenue, N.W. (Annex), Washington, D.C. 20220. Letters may be sent via facsimile to (202) 622-1657.

Willful violations of IEEPA and of licenses and orders issued thereunder, including this Blocking Notice, are punishable by criminal penalties ranging up to 10 years in prison and/or fines up to $500,000 for corporations and up to $250,000 for individuals. Civil penalties of up to $11,000 per count may be imposed by OFAC.

OFAC will consider requests for specific licenses to ameliorate the effects of this blocking action. Such license may allow for, among other activities, the payment from blocked funds or accounts of outstanding financial obligations owed by the organization, such as salary, rent, and utility payments, as well as the payment of attorneys' fees and expenses related to legal representation of the organization in this matter. Should IARA wish to seek a license to engage in any transaction involving blocked property, please refer to the licensing procedures set forth in §§ 501.801-802 of the Reporting, Procedures and Penalties Regulations, 31 C.F.R. Part 501 (the "RPPR"). License requests should be made in writing and mailed to OFAC, Attn: Chief of Licensing, at the following address: U.S. Department of the Treasury, Office of Foreign Assets Control, 1500 Pennsylvania Avenue, N.W. (Annex), Washington, D.C. 20220. Letters may also be sent via facsimile to (202) 622-1657, with the original document to follow by mail.

Pursuant to § 501.603 of the RPPR, IARA must provide a written report within 10 business days from the date of this Blocking Notice identifying all blocked IARA property within the United States or within the possession or control of U.S. persons anywhere in the world. This report must include a detailed description of the blocked property, including serial or other identifying numbers if applicable, the name and address of the person or entity in possession of the property, and the physical address(es) where the property is located. IARA's report must be mailed to OFAC, Attn: Compliance Programs Division, at the address noted above.

If it is believed that this designation as an SDGT is in error and IARA wishes to challenge it, a letter should be sent to the attention of the Director of OFAC at the address indicated above. For further information, please refer to § 501.807 of the RPPR.

If you have any questions concerning this notification, please contact OFAC Chief of Enforcement Hal Harmon at (202) 622-2430.

Sincerely,

*Robert W. Werner*     10/08/2004

Robert W. Werner
Director
Office of Foreign Assets Control

BURKE Exhibit A-25

IARA-1900

# Exhibit B

*The current Bylaws*

# BYLAWS OF
## ISLAMIC AMERICAN RELIEF AGENCY (IARA-USA)

### ARTICLE I
### Name

The name of this corporation shall be the Islamic American Relief Agency (hereinafter referred to as "IARA—USA" or "the Corporation")

### ARTICLE II
### Purposes and Goals

The primary purpose of IARA—USA shall be to establish, organize, and operate a humanitarian, social, educational, and similar purposes charitable service agency in the broadest possible sense of the term as is allowed a corporation organized under the General Not-for-profit Corporation Law of the State of Missouri, including and without limitation, the following goals:

A. To provide immediate and dignified relief to the poor, without regard to race, religion, creed, color, disability, gender, or nationality, while working for long-term solutions to the problems of poverty and development through:

    i- Providing care, shelter, and services to refugees, the homeless and the oppressed;

    ii- Providing supplies and social and medical services to persons victimized by natural catastrophes such as floods, earthquakes, and famine;

    iii- Providing educational resources to disadvantaged persons and communities where needed worldwide in order to enable them to achieve self-sufficiency and determination.

    iv- Developing economic and educational opportunities and programs for the needy through services that raise the level and quality of their lives

B. To scientifically study and report on issues dealing with the health, education, and welfare of the poor and needy people worldwide

C. To establish health, educational, welfare, and other institutions to achieve these purposes.

D. To raise funds in the United States and worldwide to be donated towards achieving the purpose and the goal of the Corporation.

BURKE Exhibit A-27

1

IARA-1902

or distribution of statements) any political campaign on behalf of any candidate for public office.

P.  The Corporation shall have no members. Its Board of Directors shall manage the affairs of the Corporation. The number of Directors and their terms shall be fixed from time to time by the by-laws of the Corporation, provided that there shall not be less than four (4) Directors. The Directors of the Corporation shall be selected in the manned described by the by-laws

Q.  The Corporation shall have all the powers permitted a corporation that is both a not-for-profit corporation under the General Not-for-Profit Corporation Law of the State of Missouri and an exempt organization described in Section 510©(3) of the Internal Revenue Code of 1954 (or the corresponding provision of any future laws of the State of Missouri and any future United States Internal Revenue Law).

R.  By-laws of the Corporation, consistent with these Articles, shall be adopted by the Board of Directors in office severally or collectively consent in writing to any action to be taken by the Directors, such consent shall have the same force and effected as a unanimous vote of the Directors at the meeting duly help and that such may be stated to have that effected in any certificate or document filed under the General Not-for-Profit Corporation Law of the Missouri.

S.  These Articles may be amended in the manner provided by the law.

T.  Upon dissolution of the Corporation, the Board of Directors, shall after paying or making provisions for the payment of all liabilities of the Corporation, distribute all the properties and assets and obligations of the Corporation to Umar ibn Al Khattab Islamic Foundation (Masjid Umur ibn Al Khattab) of Los Angeles, California, provided that the Foundation continues to be qualified as an exempt organization pursuant to Section 501© of the Internal Revenue Code of 1954(or the corresponding provision of any future United States Internal Revenue Law).

## ARTICLE III
### Board of Directors

A.  The Board of Directors shall manage and control the affairs of the Corporation, develop and enforce a set of rules governing the proper usage of the properties of IARA-USA.

B.  The Board of Directors shall consist of a President, Vice-President, Secretary, Assistant Secretary, Treasurer, and any additional members as determined by the Board of Directors.

C.  The term of directors shall be three years and may be renewed for more terms.

D.  The present Board of Directors shall elect four members for the new Board.

BURKE Exhibit A-28

3

IARA-1903

## ARTICLE IV
### Meetings

A. The Board of Directors shall meet at least once every 3 months.
B. Special meetings shall be called by the President or the majority of the Board of Directors.
C. The Secretary of the Board of Directors shall notify the members individually of the agenda, time, and place of the meetings at least two weeks in advance.
D. The act of the majority of the directors present at a meeting shall be the act of the Board of Directors.
E. The Board of Directors shall approve an annual budget written report concerning all activities and expenses and incomes of the Islamic American Relief Agency.
F. Attendance at the Board Meeting:
    i. A member has an excused absence if he informs the secretary before the meeting that he cannot attend.
    ii. If a member has three excused absences or one unexcused absence, the secretary shall notify him of his status.
    iii. If a member exceeds the number of absences prescribed in 2, he will be subject to dismissal from the Board of Directors.


## ARTICLE V
### Officers of IARA-USA

A. Number of positions:
    a. The officers of IARA-USA shall be a Chief Executive Officer (CEO), Secretary, Assistant Secretary, Treasurer, and Assistant Treasurer.
    b. These officers shall be appointed by the Board.
    c. Any officer elected or appointed by the Board of Directors may be removed by the Board of Directors.
B. Duties of the Officers:
    a. Chief Executive Officer (CEO)
        i. Supervises all business and affairs of the corporation as set forth in the constitution of the corporation
        ii. Signs with The Secretary or any other proper officer of the corporation any deed, contracts, or checks which the Board of Directors authorized.
    b. The Secretary shall handle and keep records of all financial correspondence and take the minutes of all meetings of the officers.
    c. The Assistant Secretary shall assist the Secretary and perform the duties of the Secretary in case of his absence and other duties assigned to him.
    d. The Treasurer shall be responsible for all financial transactions and submit the required financial report of IARA-USA to the Board of Directors.
    e. The Assistant Treasurer shall assist the Treasurer and perform the duties of the Treasurer in case of his absence.

BURKE Exhibit A-29

4

IARA-1904

## ARTICLE VI
### Financial Affairs

A. All funds of IARA—USA shall be deposited immediately to the credit of the Islamic American Relief Agency in designated local bank(s).

B. Funds shall be expended for the purposes they were donated, collected, and/or appropriated. Donations accepted for unspecified purposes shall be appropriated by the Board of Directors for the proper use.

C. All checks issued in the name of IARA—USA shall be signed by the President of the Board of Directors and the CEO as determined by the Board of Directors.

D. Islamic American Relief Agency shall maintain the following amounts in a local bank(s) and any additional accounts as may be determined by the Board of Directors:
    i.    General Fund
    ii.   Orphan's Fund Account
    iii.   Other accounts for different projects.

E. The fiscal year of IARA—USA shall begin on the first of January and shall end on the thirty-first of December of the same year.

F. The Executive Officers shall submit to the Board of Directors a budget for the ensuing fiscal year period setting forth in details, for all operating funds, the estimated revenue and the proposed expenditures. The proposed expenditures shall not exceed the estimated revenue.

G. The Board of Director by a two-third vote may disapprove any distinct item or items in the proposed budget. The items approved shall become the annual budget. No approved amount of money shall be a mandate to spend.

## ARTICLE VII
### Contributions and/or Grants to other Organizations

A. The making of grants and contributions and otherwise rendering financial assistance for the purposes expressed in the character of IARA-USA shall be within the exclusive power of the Board of Directors.

B. In furtherance of IARA—USA 's purposes, the Board of Directors shall have the power to make grants to any organization organized and operated exclusively for charitable, scientific, or educational purposes within the meaning of section 501©(3) of the code.

C. The Board of Directors shall review all requests for funds from other organizations, shall require that such requests specify the use to which the funds will be put, and if the Board of Directors approves the request, shall authorize payment of such funds to the approved grantees.

D. The Board of Directors shall require that the Grantees furnish a periodic accounting to show that the funds were expended for the purposes that were approved by the Board of Directors.

IARA-1905

E.  The Board of Directors may, in its absolute discretion, refuse to make any grants or contributions or otherwise render financial assistance to or for all the purposes of which funds were requested.

F.  After the Board of Directors has approved a grant to another organization for a specific project or purpose of the other organization. However, the Board of Directors shall at all times have the right to withdraw approval of the grant and use the funds for other charitable, scientific or educational purposes.


### ARTICLE VIII
### Amendments

A.  Amendments to the By-Laws shall be submitted in writing by to the Secretary of the Board of Directors not less than 15 days prior to its quarterly meeting.

B.  The Board of Directors shall approve the proposed amendment by simple majority of (51 %) of the attendants.

BURKE Exhibit A-31

IARA-1906

# Exhibit C

BURKE Exhibit A-32

IARA-1907

Fax sent by : 2542713425          IARA E A          21/01/14   00:32   rg . 2



# Kibera Community Self-Help Programme Kenya
## (KICOSHEP)

21ˢᵗ February 2003

To whom it may concern

Dear Sir/Madam

REF: IARA-USA'S SUPPORT FOR AIDS ORPHAN FEEDING PROGRAM

IARA-USA, IARA-E.A and KICOSHEP are engaged in a joint project to ensure that Aids orphans do not suffer from any nutrition related illnesses. KICOSHEP has a school for the Aids orphans in the slums of Kibera, Nairobi, Kenya.

The feeding program was begun in January 2001 with IARA-USA providing the funds for the food and IARA-E.A and KICOSHEP implementing the feeding at the KICOSHEP School. The plight of Aids orphans in this slum is magnified by the fact that the dead parents had very minimal income (they were living from hand to mouth) thus left nothing behind for the children to inherit. Most of the children in the school come form child headed households with the eldest child being less than eighteen years. These children suffer from starvation and malnutrition among other illnesses because they rarely used to eat a neither balanced diet, nor food on a daily basis. It is for this reason that IARA came up with the feeding intervention to support the efforts of KICOSHEP, which provides education and health care.

Since the inception of the feeding program, the children have shown a remarkable improvement in their health and academic performance. The children are now healthy and do not miss school because they have no energy to walk, nor do they have to scavenge the garbage pits for food. Concentration in class has also improved as they now do not have to worry whether they shall eat on that day or not, they are guaranteed of one meal per day. They are fed once a day (lunch) six days a week.

The food ration that is currently being provided is "forced" to be enough for all the children. The initial plan was to feed 100 children but the number has increased tremendously as word of the school's feeding program has spread very fast in the slum.

1

P.O. BOX 48551, TEL. 576075, 570387, 571061, Telefax: 571516, E-MAIL: kicoshep@kenbunet.com, HOTLINE: 0727-777361

BURKE Exhibit A-33                                          IARA-1908

: 2542713425              IARA E A              21/01/14    00:38    Pg: 1

More and more children want to be admitted to the school not for education's sake but just to be able to get that food. The school currently has 600 children some of whom are HIV positive.

There is need to increase the ration so as to satisfy all the 600 children.   Some children opt not to eat and secretly pack their share in their bags to take for their younger siblings at home.  For this reason dry ration for the child headed households and for families that have their mothers bedridden will boost the success of this program.

IARA is an Islamic organization that has really come out to help humanity without any discrimination.  The school has a Christian majority but that did not deter IARA from feeding these vulnerable children, their appreciate their situation and view them as children in need and not Christians.  This is really commendable and a good example of religious tolerance.   From our experience working with IARA we have found them to be very sincere in their efforts to alleviate the suffering of mankind.

We really appreciate the donations from IARA-USA and invite more donors to come abode to assist the efforts of IARA-USA so as to be able to fill the gap.

Yours faithfully

Mrs. Anne Owiti
Director -KICOSHEP

BURKE Exhibit A-34

IARA-1909

Dec 30 04 11:10a    MelamedDaileyAkeel        12485419456            p.2

Rehema A. Sheikh
P.O. Box 54975
NAIROBI – KENYA.

29th Dec., 2004

Sharif Oagel
U.S.A.


Dear Sir,

RE: IARA-USA SPONSORSHIP.

I am an orphan, aged 11 years. I live with my grandmother and two other brothers. I am the second born.

Since our both parents passed away, our Grandmother took us in. She is over 70 years old and sickly, cannot do heavy work or travel long distance. She spends her day outside our door selling groundnuts. The proceeds from the sale of groundnuts are not enough to provide for our food, house rent, school fees and hospital bills for our sickly grandmother.

The money I received from Lina Stoman through IARA – USA has subsidized. With this money we are able to pay school fees, buy books, school uniforms, food and others. Ever since we stopped receiving the money from IARA – USA in October, life has become difficult. These are days when my grandmother is too ill to seek the groundnuts for selling. We were all out of school due to non payment of school fees and the owner of the house is threatening demanding his house rent.

I am asking your to help us to be able to get this money again. Even now when we fall sick, we do not go to hospital. Please help us so we can be able to get the money from Lina Stoman.

Thank you,
REHEMA A. SHEIKH.

BURKE Exhibit A-35

IARA-1910

Dec 30 04 11:10a    MelamedDaileyAkeel    12485419456    p.3

Peter Mwangi Mbugua
P.O. Box 108
KIAMBU - KENYA

29th Dec, 2004

Sheriff Court
U.S.A

Dear Sir,

RE: IARA-USA SPONSORSHIP

I would like to appeal through you for IARA – USA to be reinstated. I am a Christian orphan aged 13 years. I live with my mother and two brothers who are still in school. I am the last born in the family.

My mother relay on well wishers and some times does door to door laundry, her income is US Dollars $ 27 per month. This is not enough to pay for our school fees, hospital bills, food and other. The support I have been receiving from Marie Kihm through IARA – USA has subsidized. From the money received we have managed to get education, which was like a dream. We have a roof over our heads, three square meals on our table and clothes on our backs.

Ever since we stopped receiving the money from IARA – USA in October, life has become really difficult. We have stopped smiling and our faces are full of tears. We the children are out of school due to non-payment of school fees and forced to go back to streets to scavenge in garbage's for food.

I am kindly requesting you to help us to be able to get this money again.

Thank you
PETER MWANGI MBUGUA

BURKE Exhibit A-36

IARA-1911

Dec 30 04 11:11a        MelamedDaileyAkeel              12485419456                    P.4

Adam Yusuf
P.O. Box 56234
NAIROBI - KENYA

29th Dec, 2004

Shariff Engel
U.S.A

Dear Sir,

RE: SPONSORSHIP FROM IARA-USA

I wish to appeal through you for IARA - USA to be reinstated. I am an orphan aged 15.

Since my father passed away, things have never been the same. I live with my mother and four of brothers and sisters. My mother who is now the breadwinner does domestic labor, her income is US Dollars $25 per month. This is not enough to pay for the rent, school fees, hospital bills and food. The support I have been receiving from Anajid Silmi through IARA – USA has helped a great deal towards our sustenance. From the money received, my mother has been able to send us all to school and put food on our table. Since the money failed to come from IARA - USA in October 2004, life is unbearable. We the children are forced to scavenge in garbage's for food. If IARA-USA remains closed I fear that we shall not get education and will end up on the streets.

Any assistance from your side towards re-opening IARA-USA will be highly appreciated and will be a blessing to many others who are in our situation.

God bless you,
ADAM YUSUF

BURKE Exhibit A-37

IARA-1912

Victor Stanley Muindi
P.O. Box 19632
NAIROBI - KENYA

29th Dec., 2004

Shariff Ouget
U.S.A.

Dear Sir,

RE: HELP,

I appeal to your law firm to please intervene for IARA – USA to be re-opened. I am 16 years old and an orphan.

I live with my mother and six brothers and sisters. We are all Christians. My mother is a small scale vegetable trader. From her business she cannot provide for all our needs. If she affords to pay the rent then she will not be able to send us to school. All was well with the support I have been receiving from Arif Ahmed through IARA – USA. My mother was able to pay for the rent, school fees, hospital bills and food.

At the moment we have been sent out of the house and are sheltering outside shops. This is because the money for July up to September, which we were supposed to receive in October we have not received. I am praying and requesting that you will be able to appeal on my behalf and those in the same situation as myself.

Thank you and God bless,
VICTOR STANLEY MUINDI

BURKE Exhibit A-38

IARA-1913