# THOMAS R. BURKE

# EXHIBIT B

## B-1 through B-41

U.S. DEPARTMENT OF THE TREASURY

OFFICE OF FOREIGN ASSETS CONTROL

APPLICATION FOR THE RELEASE OF BLOCKED FUNDS

(WHEN APPROVED, THIS DOCUMENT BECOMES A
SPECIFIC LICENSE AUTHORIZING THE UNBLOCKING
OF THE SUBJECT FUNDS AND THEIR RELEASE
ACCORDING TO THE TERMS HEREOF)

DO NOT WRITE IN THIS BOX – LICENSE APPROVAL ONLY VALID WITH OFAC SEAL

THIS APPLICATION IS HEREBY:                    FACLICENSE NO._____

☐ APPROVED, AND FUNDS MAY BE UNBLOCKED AND RELEASED, WITH VALUE:
   ☐ TO ORIGINATOR OR ORIGINATING BANK
   ☐ IN ACCORDANCE WITH ORIGINAL PAYMENT INSTRUCTIONS

☐ DENIED (SEE ATTACHED EXPLANATION)

☐ RETURNED WITHOUT ACTION (SEE ATTACHED CHECKLIST)

TYPE OF REQUEST (CHECK APPROPRIATE BOX)
☒ LICENSE APPLICATION
☐ REQUEST FOR RECONSIDERATION (PROVIDE
FAC NO. OF PREVIOUS AGENCY ACTION (IF KNOWN): _____

APPLICANT INFORMATION

| APPLICANT | ADDRESS LINE 1 | ADDRESS LINE 2 |
|---|---|---|
| Global Services International | c/o Fredrikson & Byron, P.A. | 900 Second Avenue South |

| CITY | STATE | CONTACT PERSON | TELEPHONE | FAX NUMBER |
|---|---|---|---|---|
| Minneapolis | Minnesota | John Lundquist  Rick Petry | 612-347-7181  612-347-7107 | 612-347-7077 |

| POSTAL CODE | COUNTRY | SOCIAL SECURITY/TAXPAYER I.D. NO. (Required for US Persons) | E-MAIL ADDRESS |
|---|---|---|---|
| 55402 | U.S.A. | | jlundquist@fredlaw.com  rpetry@fredlaw.com |

CORPORATIONS AND OTHER ENTITIES

| PRINCIPAL PLACE OF BUSINESS | STATE OF INCORPORATION OR ORGANIZATION | EMPLOYER IDENTIFICATION NUMBER |
|---|---|---|
| 1929 Fifth Street, #204  Minneapolis, MN 55454 | Minnesota | 410971937 |

THE FOLLOWING INFORMATION, IF KNOWN, SHOULD BE PROVIDED CONCERNING THE BLOCKED FUNDS (USE PAGE 2 AS NEEDED)

| NAME & ADDRESS OF FINANCIAL INSTITUTION WHICH BLOCKED FUNDS | AMOUNT BLOCKED | DATE OF THE BLOCKING |
|---|---|---|
| U.S. Bank, Account No. 1 047 5584 7175  P.O. Box 64799  Saint Paul, MN 55164 | Approximately $36,000 | November 7, 2001 |

| REMITTER NAME & ADDRESS | REMITTING FINANCIAL INSTITUTION NAME & ADDRESS |
|---|---|
| Various | |

| INTERMEDIARY FINANCIAL INSTITUTION(S) NAME & ADDRESS | BENEFICIARY FINANCIAL INSTITUTION NAME & ADDRESS |
|---|---|
| | |

| BENEFICIARY NAME & ADDRESS | DESCRIPTION OF UNDERLYING TRANSACTION (ATTACH SEPARATE SHEET AS NEEDED) |
|---|---|
| Global and various customers | money transfers |

APPLICATION CERTIFICATION: I, THE UNDERSIGNED, HEREBY DECLARE THAT, TO THE BEST OF MY KNOWLEDGE, THE INFORMATION
PROVIDED ON THIS APPLICATION AND ANY ACCOMPANYING DOCUMENTATION IS TRUTHFUL AND COMPLETE.

| SIGNATURE | NAME OF SIGNER | TITLE OF SIGNER | DATE PREPARED |
|---|---|---|---|
| *Abdullahi Farah* | Abdullahi Farah | President/Owner | December 5, 2001 |

ADDITIONAL COPIES OF THIS FORM MAY BE OBTAINED FROM OFAC'S WEBSITE AT NO CHARGE: <http://www.treas.gov/ofac>

*See attached Petition for Additional Detail*

BURKE Exhibit B-1

**EXH. F**

U.S. DEPARTMENT OF THE TREASURY

OFFICE OF FOREIGN ASSETS CONTROL

APPLICATION FOR THE RELEASE OF BLOCKED FUNDS

(WHEN APPROVED, THIS DOCUMENT BECOMES A
SPECIFIC LICENSE AUTHORIZING THE UNBLOCKING
OF THE SUBJECT FUNDS AND THEIR RELEASE
ACCORDING TO THE TERMS HEREOF)

DO NOT WRITE IN THIS BOX – LICENSE APPROVAL ONLY VALID WITH OFAC SEAL

THIS APPLICATION IS HEREBY:          FAC/LICENSE NO._____

G     APPROVED, AND FUNDS MAY BE UNBLOCKED AND RELEASED, WITH VALUE:
      G     TO ORIGINATOR OR ORIGINATING BANK
      G     IN ACCORDANCE WITH ORIGINAL PAYMENT INSTRUCTIONS

G     DENIED (SEE ATTACHED EXPLANATION)

G     RETURNED WITHOUT ACTION (SEE ATTACHED CHECKLIST)

TYPE OF REQUEST [CHECK APPROPRIATE BOX]
[x]   LICENSE APPLICATION
[ ]   REQUEST FOR RECONSIDERATION [PROVIDE
      FAC NO. OF PREVIOUS AGENCY ACTION (IF KNOWN)]: _____

**APPLICANT INFORMATION**

| APPLICANT | ADDRESS LINE 1 | ADDRESS LINE 2 |
|---|---|---|
| Global Services International | c/o Fredrikson & Byron, P.A. | 900 Second Avenue South |

| CITY | STATE | CONTACT PERSON | TELEPHONE | FAX NUMBER |
|---|---|---|---|---|
| Minneapolis | Minnesota | John Lundquist<br>Rick Petry | 612-347-7181<br>612-347-7107 | 612-347-7077 |

| POSTAL CODE | COUNTRY | SOCIAL SECURITY/TAXPAYER I.D. NO.<br>(Require for US Persons) | E-MAIL ADDRESS |
|---|---|---|---|
| 55402 | U.S.A. | | jlundquist@fredlaw.com<br>rpetry@fredlaw.com |

CORPORATIONS AND OTHER ENTITIES

| PRINCIPAL PLACE OF BUSINESS | STATE OF INCORPORATION OR ORGANIZATION | EMPLOYER IDENTIFICATION NUMBER |
|---|---|---|
| 1929 Fifth Street, #204<br>Minneapolis, MN 55454 | Minnesota | 410971937 |

THE FOLLOWING INFORMATION, IF KNOWN, SHOULD BE PROVIDED CONCERNING THE BLOCKED FUNDS (USE PAGE 2 AS NEEDED)

| NAME & ADDRESS OF FINANCIAL INSTITUTION WHICH BLOCKED FUNDS | AMOUNT BLOCKED | DATE OF THE BLOCKING |
|---|---|---|
| Wells Fargo Bank Minnesota, N.A.<br>Account No. 048-4771837<br>Nicollet & Lake Office, P.O. Box B514<br>Minneapolis, MN 55479 | Approximately<br>$87,000 | November 7, 2001 |

| REMITTER NAME & ADDRESS | REMITTING FINANCIAL INSTITUTION NAME & ADDRESS |
|---|---|
| Various | |

| INTERMEDIARY FINANCIAL INSTITUTION(S) NAME & ADDRESS | BENEFICIARY FINANCIAL INSTITUTION NAME & ADDRESS |
|---|---|
| | |

| BENEFICIARY NAME & ADDRESS | DESCRIPTION OF UNDERLYING TRANSACTION (ATTACH SEPARATE SHEET AS NEEDED) |
|---|---|
| Global and various customers | money transfers |

APPLICATION CERTIFICATION: I, THE UNDERSIGNED, HEREBY DECLARE THAT, TO THE BEST OF MY KNOWLEDGE, THE INFORMATION
PROVIDED ON THIS APPLICATION AND ANY ACCOMPANYING DOCUMENTATION IS TRUTHFUL AND COMPLETE.

| SIGNATURE | NAME OF SIGNER | TITLE OF SIGNER | DATE PREPARED |
|---|---|---|---|
| *(signature)* | Abdullahi Farah | President/Owner | December 5, 2001 |

ADDITIONAL COPIES OF THIS FORM MAY BE OBTAINED FROM OFAC'S WEBSITE AT NO CHARGE: <http://www.treas.gov/ofac>

*See attached Petition for Additional Detail*

BURKE Exhibit B-2

U.S. DEPARTMENT OF THE TREASURY

OFFICE OF FOREIGN ASSETS CONTROL

APPLICATION FOR THE RELEASE OF BLOCKED FUNDS

(WHEN APPROVED, THIS DOCUMENT BECOMES A
SPECIFIC LICENSE AUTHORIZING THE UNBLOCKING
OF THE SUBJECT FUNDS AND THEIR RELEASE
ACCORDING TO THE TERMS HEREOF)

DO NOT WRITE IN THIS BOX – LICENSE APPROVAL ONLY VALID WITH OFAC SEAL

THIS APPLICATION IS HEREBY:                    FAC/LICENSE NO._____

G      APPROVED, AND FUNDS MAY BE UNBLOCKED AND RELEASED, WITH VALUE:
         G      TO ORIGINATOR OR ORIGINATING BANK
         G      IN ACCORDANCE WITH ORIGINAL PAYMENT INSTRUCTIONS

G      DENIED (SEE ATTACHED EXPLANATION)

G      RETURNED WITHOUT ACTION (SEE ATTACHED CHECKLIST)

TYPE OF REQUEST [CHECK APPROPRIATE BOX]
[X]     LICENSE APPLICATION
[ ]     REQUEST FOR RECONSIDERATION [PROVIDE
          FAC NO. OF PREVIOUS AGENCY ACTION (IF KNOWN)]: _____

**APPLICANT INFORMATION**

| APPLICANT | | ADDRESS LINE 1 | | ADDRESS LINE 2 | |
|---|---|---|---|---|---|
| Global Services International | | c/o Fredrikson & Byron, P.A. | | 900 Second Avenue South | |

| CITY | STATE | CONTACT PERSON | | TELEPHONE | FAX NUMBER |
|---|---|---|---|---|---|
| Minneapolis | Minnesota | John Lundquist<br>Rick Petry | | 612-347-7181<br>612-34707107 | 612-347-7077 |

| POSTAL CODE | COUNTRY | SOCIAL SECURITY/TAXPAYER I.D. NO.<br>(Required for US Persons) | E-MAIL ADDRESS |
|---|---|---|---|
| 55402 | U.S.A. | | jlundquist@fredlaw.com<br>rpetry@fredlaw.com |

**CORPORATIONS AND OTHER ENTITIES**

| PRINCIPAL PLACE OF BUSINESS | STATE OF INCORPORATION OR ORGANIZATION | EMPLOYER IDENTIFICATION NUMBER |
|---|---|---|
| 1929 Fifth Street, #204<br>Minneapolis, MN 55454 | Minnesota | 410971937 |

THE FOLLOWING INFORMATION, IF KNOWN, SHOULD BE PROVIDED CONCERNING THE BLOCKED FUNDS (USE PAGE 2 AS NEEDED)

| NAME & ADDRESS OF FINANCIAL INSTITUTION WHICH BLOCKED FUNDS | AMOUNT BLOCKED | DATE OF THE BLOCKING |
|---|---|---|
| Associated Bank, Account No. 22B3010136<br>1801 Riverside Avenue<br>Minneapolis, MN 55458 | Approximately<br>$176,729 | November 7, 2001 |

| REMITTER NAME & ADDRESS | REMITTING FINANCIAL INSTITUTION NAME & ADDRESS |
|---|---|
| Various | |

| INTERMEDIARY FINANCIAL INSTITUTION(S) NAME & ADDRESS | BENEFICIARY FINANCIAL INSTITUTION NAME & ADDRESS |
|---|---|
| | |

| BENEFICIARY NAME & ADDRESS | DESCRIPTION OF UNDERLYING TRANSACTION (ATTACH SEPARATE SHEET AS NEEDED) |
|---|---|
| Global and various customers | money transfers |

APPLICATION CERTIFICATION: I, THE UNDERSIGNED, HEREBY DECLARE THAT, TO THE BEST OF MY KNOWLEDGE, THE INFORMATION PROVIDED ON THIS APPLICATION AND ANY ACCOMPANYING DOCUMENTATION IS TRUTHFUL AND COMPLETE.

| SIGNATURE | NAME OF SIGNER | TITLE OF SIGNER | DATE PREPARED |
|---|---|---|---|
| *Abdullahi Farah* | Abdullahi Farah | President/Owner | December 5, 2001 |

ADDITIONAL COPIES OF THIS FORM MAY BE OBTAINED FROM OFAC'S WEBSITE AT NO CHARGE: <http://www.treas.gov/ofac>

*See attached Petition for Additional Detail*

BURKE Exhibit B-3

UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF FOREIGN ASSETS CONTROL

## PETITION IN SUPPORT OF THE APPLICATION OF GLOBAL SERVICES INTERNATIONAL, INC., FOR THE RELEASE OF BLOCKED FUNDS

Applicant, Global Services International, Inc. ("Global"), respectfully represents to and petitions the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC") as follows:

### INTRODUCTION

Pursuant to 31 C.F.R. §§ 501.801, 501.806 and 501.807, Global submits this Memorandum in support of its Application and request for the following: (1) the unblocking of funds believed to have been blocked due to a mistake of fact or mistaken identity; and (2) the removal of Global's name from Appendix A to Title 31 C.F.R. Chapter V, all versions of OFAC's Specially Designated Nationals and Blocked Persons ("SDN") list and OFAC's brochure on terrorism.

### FACTS

Global is a small Minnesota corporation owned and operated by Abdullahi Farah. Mr. Farah was born in Somalia, where he helped operate his family's retail business, and immigrated to the United States in 1993. He became a naturalized U.S. citizen in 1999. In order to establish his good faith and to demonstrate the lack of any connection to terrorists organizations, he voluntarily agreed to an in-depth interview with the Department of Justice and agents of the FBI, IRS and the U.S. Customs Service. The interview took place at the U.S. Attorney's Office in Minneapolis on November 21, 2001. AUSA John Marti can be reached at (612) 664-5600 to verify.

Since its inception, Global has remained in good standing with the Minnesota Secretary of State and all other state and local agencies. Global has paid all of its tax obligations as they have become due and otherwise conducted itself as a responsible and law-abiding corporate citizen.

On November 7, 2001, Global had its funds blocked and all of its property seized pursuant to a Blocking Notice (FAC No. SDT-196715). The Notice is attached hereto as Exhibit A. Mr. Farah has been locked out of his rented office space. As a direct result of the blocking and seizures, Global was forced to cease all operations.

Prior to ceasing its operations, Global was lawfully involved in the money transfer business. In addition to Mr. Farah, the company had one employee, Abu Bakur Jabril.

Global's business activities consisted of Global accepting money from its customers, most of whom were Somali, Ethiopian or Kenyan immigrants to the United States and then wire-transferring funds to the Al-Barakaat network, which would then forward the money to its agents in Africa, who would in-turn deliver the money to the intended recipients (primarily family members of Global's customers). The recipients of the money were generally impoverished individuals residing Somalia, Ethiopia and Kenya, often in refugee camps.

Global charged its customers a commission of up to five percent (which would be reduced for larger transactions). Global itself received 30 percent of the total commission charged, with the remainder forwarded to the Al-Barakaat network. The commission Global received was used by Global to pay its operating expenses including rent, utilities, salaries, taxes, bank charges, etc. The average gross monthly income for Global was approximately $7,000. Mr. Farah and his employee each received a gross monthly salary of $1,200.

2

Global provided a valuable and much needed service to its customers who immigrated to this country with hopes of making better lives for themselves and their families back in Africa. Indeed, one of Global's customers was recently quoted in a newspaper article as follows: "We came here to establish our lives, not to bring terror." See, *Somalis rally to voice concerns about wire-service closures*, Minneapolis Star Tribune, p. A22, Nov. 9, 2001.

## DISCUSSION

A.    **GLOBAL'S FUNDS AND PROPERTY SHOULD BE UNBLOCKED.**

The "Blocking Notice" left on November 7, 2001 at Global's office states that, pursuant to Executive Order No. 13224 (the "Order") and under the authority of 50 U.S.C. §1701-06, OFAC has "determined" that Global has provided "financial support or other services to persons who commit, threaten to commit or support terrorism."

Global vigorously and categorically denies this claim.

Under the International Emergency Economic Powers Act ("IEEPA"), the President of the United States is authorized to deal with "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." *See 50 U.S.C. § 1701(a); Behring Int'l, Inc. v. Miller*, 504 F. Supp. 552, 556 (D. N.J. 1980). The President's authority under IEEPA is enumerated and therefore limited to those specific powers granted under the act. The enumerated powers granted to the President by IEEPA are the powers to investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any such property in which any foreign country or a

3

national thereof has any interest; by any person, or with respect to any property, subject to the

jurisdiction of the United States. *See 50 U.S.C. §1702(a)(1)(B).*

The President's power under IEEPA does not include the authority to regulate or prohibit,

directly or indirectly:

(1)    any postal, telegraphic, or other personal communication, which does not involve the transfer of anything of value;

(2)    donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under [50 U.S.C. § 1701-06], (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are I a situation where imminent involvement in hostilities is clearly indicated by the circumstances.

*See 50 U.S.C. §§ 1702(3)(b)(1)-(2).*

In this case, the President's Order provides, in relevant part, as follows:

all property and interests in property of the following persons that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons are blocked:

(d)    persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General;

(i)    to assist in, sponsor, or provide financial, material, or technical support for, or financial or other services to or in support of, such act of terrorism or those persons listed in the Annex to this order or determined to be subject to this order;

(ii)    to be otherwise associated with those persons listed in the Annex to this order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order.

*See Executive Order 13224 at Section 1(d).* The Order further states that the President has made

the following determinations:

the making of donations of the type specified in section 203(b)(2) of the IEEPA (50 U.S.C. 1702(b)(2)) by United States persons to persons determined to be subject to this order would seriously impair my ability to deal with the national emergency declared in this order, and would endanger Armed Forces of the United States that are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances and hereby prohibit such donations as provided by section 1 of this order.

4

*Id. at Section 4.*   The Order also contains the following delegation of authority to the Secretary

of the Treasury:

> With respect to those persons designated pursuant to subsection 1(d) of this order, the
> Secretary of the Treasury, in the exercise of his discretion and in consultation with the
> Secretary of State and the Attorney General, may take such other actions than the
> complete blocking of property or interests in property as the President is authorized to
> take under the IEEPA and UNPA if the Secretary of the Treasury, in consultation with
> the Secretary of State and the Attorney General, deems such other actions to be consistent
> with the national interests of the United States, considering such factors as he deems
> appropriate.

*Id. at Section 5.*

Acting under the authority delegated to it by the Order, OFAC has determined that

Global is a SDGT and therefore subject to the blocking and other sanctions authorized by the

Order.  To withstand judicial scrutiny, determinations by OFAC may not be unreasonable,

arbitrary, capricious or an abuse of discretion.  *See Behring* 504 F. Supp at 556 (citing *Sardino v.*

*Federal Reserve Bank of New York,* 361 F.2d 106 (2d Cir. 1965), *cert denied,* 385 U.S. 898

(1966); *Veterans & Reservists for Peace in Viet-Nam v. Regional Comm'r of Customs,* 459 F.2d

676 (3d Cir. 1972), *cert denied* 409 U.S. 933 (1972)).

When funds are blocked at a financial institution pursuant to a blocking notice and a

party believes the funds have been blocked due to mistaken identity, that party may seek to have

such funds unblocked.  *See 31 C.F.R. § 501.806.*  Global seeks to have its funds unblocked based

upon its belief that it has been mistakenly identified as a party associated with terrorist activities.

A request to have funds unblocked must contain the following information:

(1)     the name of the financial institution in which the funds are blocked;
(2)     the amount blocked;
(3)     the date of the blocking;
(4)     the identity of the original remitter of the funds and any intermediately
         financial institutions;

5

(5)     the intended beneficiary of the blocked transfer;

(6)     a description of the underlying transaction including copies or related documents;

(7)     the nature of the applicant's interest; and

(8)     a statement of the reasons why the applicant believes the funds were blocked due to mistaken identity.

*See 31 C.F.R. 501.806(d).*

### 1 - 2 .  Financial Institutions and Amounts

Funds in Global's accounts have been blocked at the following financial institutions: (1) approximately $176,729 at Associated Bank, Account Number 2283010136, 1801 Riverside Avenue, Minneapolis, Minnesota 55458; (2) approximately $87,000 at Wells Fargo Bank Minnesota, N.A., Account Number 048-4771837, Nicollet & Lake Office, P.O. Box B 514, Minneapolis, Minnesota 55479; and (3) approximately $34,199 at U.S. Bank, Account Number 1 047 5584 7175, P.O. Box 64799 Saint Paul, Minnesota 55164. Global cannot determine the exact amount of money that has been blocked because all of its financial records were seized by the government.

### 3.     Date of Blockings

Global's accounts were blocked on November 7, 2001.

### 4.     Identity of the Original Remitter of the Funds and Intermediary Financial Institution.

Numerous customers remitted funds that were deposited by Global into the blocked accounts. The names of the customers cannot be provided without access to Global's records.

### 5.     The Intended Beneficiaries.

The intended beneficiaries of the blocked funds are primarily Northeast African refugees that are related to those sending money from Minnesota via Global. These people rely on the money for their very existence, and there is no indication that they supply or direct money to

6

terrorists.  Instead, a recent newspaper article described one of the "beneficiaries" and the

journey she endures to pick-up and utilize the money sent by her daughter in America as follows:

> [A] 68-year old mother walks more than an hour through bombed-out dusty roads, past
> waiting thieves, flying bullets, beggars and murderous gangs to the office in Mogadishu's
> Medina district.
>
> At Al-Barakaat, she collects her money in U.S. currency.  To be sure she wont be
> harassed, she asks for small bills to give people who beg or bother her.
>
> A line of people awaits her back home.  She doesn't tell them she has money, but
> everyone knows why she left so early.  Each of them will leave her yard with a dollar or
> two.
>
> She will buy $7 worth of water, enough to fill the tank for a week.  She will spend the
> rest on a small bit of goat meat and beef, flour, sugar and other staples she can stretch for
> her large family.

See, *Somalis in the U.S. worry about closed wire-transfer offices*, Minneapolis Star Tribune,

pp.A1, 12, Nov. 10, 2001.

The funds should be returned to their lawful owners.  It is unconscionable to withhold

money from poor U.S. immigrants and their families.  A number of customers are becoming very

angry and have threatened to call the police or take other action, which concerns Mr. Farah.

The United National representative to Somalia, Randolph Kent, has said that "The Al-

Barakaat closure is having a very, very serious effect.  ***We are at a point where we have to

start anticipating a crisis that could be unique in the modern state system – the collapse of an

entire national economy."  Minneapolis Star Tribune, p.A1, December 1, 2001.

A portion of the money belongs to Global.  Without its records, it cannot ascertain what

the correct amount is.  Global is in arrears on rent, utilities and salary.  Mr. Farah has no income

with which to support his wife and five small children, one of whom is autistic and has special

needs.  It is, thus, urgent that the funds be returned to Global and its customers so that the

7

customers can make alternative arrangements for their relatives and Mr. Farah can support his

family.

### 6.    The Underlying Transactions

The underlying transactions at issue here consist of transactions akin to a Western Union

money wire transfer in that they involve customers bringing sums of money (usually $100 -

$500, although occasionally $5,000 or more) to a business location for the purpose of having the

money transferred to someone else.  As described above, Global accepts money from its

customers and deposits the funds into its banks accounts.  At least once a day, Global, via fax or

email, sends a list of names of recipients and other related information to Al-Barakaat in the

United Arab Emirates.  When Al-Barakaat receives the lists, it advances the specified amount of

money to the designated recipient.

Periodically (normally at the end of each month), Global settles-up with Al-Barakaat

based upon computer generated financial statements that reflected Global's business activities of

the preceding month.[1]  Based upon the information contained in the financial documents, the

companies determine the amount of commission Global had earned.  Of the money received by

Global for commissions, Global paid its operating expenses and employee salaries.  None of the

money earned by Global was provided to terrorists or terrorist organizations, and it is aware of

none of the amounts transferred being used for such purposes.

Although Global operates in a fashion similar to Western Union, it is interesting to note

that no action has been taken against it despite clear evidence that Western Union has been

directly linked to terrorist activity.  News reports state that it has been determined that "[i]n the

three days preceding September 11, four separate payments were sent to the United Arab

---

[1] Global is unable to provide copies of the financial statements because those documents were seized OFAC.

Emirates by the alleged highjackers. All four were made through Western Union Financial

Services, Inc. agents in the U.S. . . . ." See, Heather Timmons, *Western Union: Where the*

*Money Is – in Small Bills*, BusinessWeek Online, Nov. 15, 2001at http:/biz.yahoo.com/bizwk/

011115/ewybxk5dqr6jt4mf_pdstq_1.html. Western Union remains open and unaffected by any

blockings. Unlike Western Union, there is no direct or indirect connection between Global and

the events of September 11th or any other terrorist activities. Notwithstanding the lack of such a

connection, Global's accounts have been frozen and its operations closed. Such actions can only

be viewed as unreasonable, arbitrary, capricious, and an abuse of discretion.

      **7.**     **The Nature of the Applicant's Interest.**

     Global has both direct and indirect interests in the blocked funds. First, Global has a

direct interest in the frozen funds because the funds are frozen in accounts maintained by Global

and, in part, belonging to it. Global also has an interest in the funds belonging to its customers,

as it holds those amounts as agent for the benefit of its customers. Thus, Global has an interest

in all of the frozen funds which belong either to Global's customers, who bestowed their trust in

Global to make sure that the money was delivered to the designated recipients in Africa, or to

Global itself.

      **8.**     **Reasons Global Believes the Funds Were Blocked Based Upon Mistaken**
             **Identity.**

     The Blocking Notice indicates that Global has been identified as an entity that "provided

financial support or other services to persons who commit, threaten to commit or support

terrorism (Specially Designated Global Terrorist ("SDGT")). The term SDGT is not defined in

either the Order or the Blocking Notice. Global is thus left to assume that the term refers to "an

entity that provides financial support or other services to persons who commit, threaten to

9

commit or support terrorism." *See Blocking Notice* at ¶ 1. The Order defines terrorism as

follows: "an activity that –

> (i) involves a violent act or an act dangerous to human life, property, or infrastructure; and
> (ii) appears to be intended –
>> (A)     to intimidate or coerce a civilian population;
>> (B)     to influence the policy of a government by intimidation or coercion; or
>> (C)     to affect the conduct of a government by mass destruction, assassination, kidnapping, or hostage taking.

*See Order at Section 3(d).*

Global, however, vehemently denies that it has any connections whatsoever to persons

who commit, threaten to commit or support terrorism. Global further denies that it is in any way

involved in or associated with anyone or any organization that commits violent acts or acts

dangerous to human life, property or infrastructure that appear to be intended to intimidate or

coerce a civilization population, influence the policy of a government by intimidation or coercion

or affect the conduct of a government by mass destruction, assassination, kidnapping or hostage

taking. To the contrary, Global supplied humanitarian relief by providing a service that enabled

U.S. immigrants to supply money to their impoverished family members back in Africa. Support

for the claim that the Global provided humanitarian services is found in statements recently made

by its customers. For example, when learning that Global had been closed by the government, a

25-year old student that relied upon Global to help her send money to her family commented

"[w]hat are my young sisters and brothers going to do? What are they going to live on?" *See,*

*Somalis rally to voice concerns about wire-service closures*, Minneapolis Star Tribune, p. A1,

Nov. 9, 2001. A Somali man employed by the Somali Justice Center commented that "[t]his is a

matter of life and death to the Somali community." *Id.* The man continued stating "what

happened to us [on November 7, 2001] is beyond comprehension." *Id.* Another Somali woman

BURKE Exhibit B-13

commented: "[w]e are the foundation of our people, the spinal cord. Without us, our families will die. But I wonder, does America care?" See, *Somalis in the U.S. worry about closed wire-transfer offices*, Minneapolis Star Tribune, p. A12, Nov. 10, 2001. Yet another Somali immigrant questioned "[w]hat does life mean to you, when you have money but your mother is dying of starvation because you can't get that money to her?" See, *Government to look into other wire-transfer firms*, Minneapolis Star Tribune, p. A1, Nov. 9, 2001.

Consideration of the above facts indicates that the funds should be unblocked. The beneficiaries of the funds are innocent, starving people who rely very heavily on the funds for their survival. There is no connection between the beneficiaries and terrorism. The underlying transactions are legal, proper and needed by the Somali-American community that relies on the transactions to assist their needy families back in Africa. There is no evidence to support a claim that Global was appropriately determined to be supporting terrorists. Therefore, the funds should be unblocked so that Global and its customers can use the funds that unquestionably belong to them.

**B.    ALTERNATIVELY, GLOBAL SHOULD RECEIVE A LICENSE TO ALLOW IT TO SATISFY ITS LEGAL OBLIGATIONS.**

For the reasons set forth above, Global alternatively requests a license that will allow it to pay its salaries, rent, utility bills and other operating expenses, as well as to restore the funds belonging to its customers. Global requests access to its records and computer so that it can provide a list of specific debts, customers and the amounts thereof.

**C.    GLOBAL'S NAME SHOULD BE REMOVED FROM APPENDIX A.**

**a.    There is no basis for the determination.**

According to the Blocking Notice, the Department of Treasury has identified Global as an entity that "provide[d] financial support or other services to persons who commit, threaten to

11

commit or support terrorism (Specially Designated Global Terrorist ("SDGT")). The Blocking

Notice, however, provides no evidence in support of such allegations. Thus, Global seeks to

have its name removed from all versions of OFAC's Specially Designated Nationals And

Blocked Persons ("SDN") list as well as OFAC's brochure on terrorism.

Global has no known connections to terrorism, those committing terrorist acts, those

threatening to commit terrorist acts, nor those supporting terrorism. To the contrary, Global is a

company dedicated to providing a much needed and very valuable service to the Somali

immigrant community in Minneapolis, Minnesota. Rather than providing financial support to

terrorists, Global provides financial services to honest working people that live in Minneapolis,

yet have family members back in Africa. For a very modest fee, Global provides a medium that

allows these immigrants to send a portion of their earnings back to family members in Africa.

Ninety-five percent of the money transferred by Global and its customers goes directly to

those designated by the senders as recipients. The remaining five percent is divided between

Global and Al-Barakaat, 30% and 70%, respectively. Global has no knowledge that Al-Barakaat

is providing funding for terrorists. In the unlikely event that turns out to be the case, Global will

readily sever all business relationships it has with Al-Barakaat. Likewise, Global is not aware of

any connections between those designated to receive the money sent by Global's customers and

any terrorists, political organizations, warlords or others with terrorist affiliations. Indeed,

according to Mr. Farah, the company cannot have any such affiliations for reasons related solely

to its business objectives. For example, if a company that does business in Somalia is connected

to a certain terrorist organization or warring tribe, those not having connections to the same

group or tribe will refuse to do business with the company. Thus, instead of having ties to such

organizations, the company's business relationships are based upon customer service and

geographic locations. That is why the company is dedicated to providing its customers with high quality and reliable services, not providing funding for terrorist organizations.

In the Somali community, trust is at a premium when it comes to establishing business relationships. Global's customers do business with the company because of the reputation of trust that Global has earned with its customers. Global, like any other business, earned such a reputation by delivering the services that it promised its customers. That service is simply getting the money to the starving, impoverished and dying people in Africa that rely on the money for their very survival as they promised they would.

In addition, although the Order prohibits United States persons from making humanitarian donations to persons determined to be subject to the Order, it does not prohibit United States persons from providing humanitarian relief to others, particularly those in desperate need of the assistance in Somalia. As discussed above, the nature of the transactions underlying the funds that have been blocked in Global's accounts concerns money provided by immigrants to the U.S. that are giving/donating money to others, including family members in Somalia, Ethiopia and Kenya. Money sent by Global's customers is used to meet basic needs for food, clothing and shelter. Global has provided services to the local Lutheran Church, which raised money for Somalis. Providing such financial assistance to the people of Somalia is not only proper and legal, but also consistent with the financial support being provided to the people of Somalia by the international community and urgently needed by the recipients. The United Nations Consolidated Inter-Agency Appeal for Somalia 2002 provides, in part, as follows:

> As the world faces the prospect of fundamental global political and economic change, the future of marginalized societies like Somalia is increasingly important. Beset by hunger, disease and disarray, Somalia is slowly reconstructing its place within the international community.
>
> ***

BURKE Exhibit B-16

> Facing some of the most appalling living conditions in the world -- where 45 women die every day in labor and one in four children do not reach the age of five -- Somalia is still reliant on international assistance to provide basic life saving support and protection of livelihoods.

*See United Nations Consolidated Inter-Agency Appeal for Somalia 2002*, U.N. Office for the Coordination of Humanitarian Affairs, at 1. In light of the U.N.'s findings, it is committed to raising $83,683,971 in U.S. funds during 2002 to focus primarily on humanitarian actions to address the pending crisis in Somalia. *Id.* The funds blocked in Global's accounts are also targeted to address the needs of the families in Somalia. Since the funds blocked in Global's account are akin to the funds being provided to the people of Somalia by the U.N. and the international community, there is no basis for determining that Global is involved in providing financial support to terrorist.

     **b.**     **Global is willing to reorganize.**

     Since it is clear that the services Global provided are much needed by the Somali immigrant community located in Minneapolis, Global wishes to continue providing such services to its customers. Global, however, is mindful that it may need to reorganize its company to accomplish that goal and it is willing to conduct such a reorganization. A blocked person may propose remedial steps on the person's part, such as corporate reorganization, which the person believes would negate the basis for the designation. *See 31 C.F.R 501.807(a)*. Since Global has no connections to terrorists and the government has not provided any information to show why it has placed such designations Global, they are left to speculate why the government has made the determinations. President Bush has been quoted accusing such services of "skim[ming] from every transaction to benefit terrorists. *See* David Stout, *U.S. Acts to Freeze Assets of Terror Groups*, The New York Times, November 7, 2001, at http://www.newyourtimes.com/2001/

14

11//07/national/07CND-PREX.html?. Notwithstanding the President's accusations, however, United States Treasury Department Secretary Paul O'Neill has acknowledged that "[w]e have 100,000 Somali's in the United States and it is not an unusual practice of foreign born people residing in the United States . . . to send money back to their families who are living in very impoverished circumstances to help them out." See, *Fed Raids Expose Somali Wire Transfer*, Minneapolis Star Tribune, Nov. 7, 2001, at http://www.startribune.com/stories/709/812997.html. Moreover, O'Niell has said that unless such services are listed as a terrorist organization, "people should assume that they're OK." See, *Government to look into other money transfer firms*, Minneapolis Star Tribune, Nov. 9, 2001, at http://www.startribune.com/stories/484/816799.html.

O'Niell has also suggested that alternatives be developed to help immigrants find a way to repatriate money "that doesn't involve someone skimming off some of their money to help fund terrorists." *Id.* Such alternative *could* include Western Union, but Western Union has suspended its operations in Somali. In addition, "Western Union charges about three times as much as the 5-percent fee the Somalia-run services typically charge to wire $100 from Minnesota to Africa", according to Western Union territory sales manager Rob McDonough. Thus, Global proposes reorganizing its company so that it can still provided the valuable services to its customers, yet avoid any accusations that third parities that it may deal with are diverting funds to support terrorist operations.

**D.    OTHER LEGAL ISSUES PRESERVED**

If this matter ends up in court, Global reserves all other legal issues including, with limitation:

1.    That the Blocking Notice and seizures violate Global's due process rights;

2.    That the seizures violate the Fourth Amendment;

3.    That the seizures were broader than necessary and were not authorized by law;

4.    That Mr. Farah's equal protection rights have been violated; and

5.    That the seizure of personal property, computers and records; the closure of

Global's business; and the exclusion of Global from its leased premises are unauthorized by law.

## CONCLUSION

Global respectfully requests that OFAC first provide access to Global's records (both

paper and electronic), so that Global can provide an accounting of the specific uses for the funds

in the blocked accounts. Global then requests OFAC to release such specifically identified funds

to Global and its customers.

Respectfully submitted,

Dated: December 5, 2001

John W. Lundquist (#65286)
Rick L. Petry (#292503)
FREDRIKSON & BYRON, P.A.
1100 International Centre
900 Second Avenue South
Minneapolis, MN  55402-3397
Phone: (612) 347-7107
Fax:    (612) 347-7077
Attorneys for Global Services International,
Inc.

::ODMA\PCDOCS\FBDOCS1\2587044\1

16

BURKE Exhibit B-19

U.S. DEPARTMENT OF THE TREASURY

OFFICE OF FOREIGN ASSETS CONTROL

APPLICATION FOR THE RELEASE OF BLOCKED FUNDS

(WHEN APPROVED, THIS DOCUMENT BECOMES A
SPECIFIC LICENSE AUTHORIZING THE UNBLOCKING
OF THE SUBJECT FUNDS AND THEIR RELEASE
ACCORDING TO THE TERMS HEREOF)

DO NOT WRITE IN THIS BOX – LICENSE APPROVAL ONLY VALID WITH OFAC SEAL

THIS APPLICATION IS HEREBY:                          FAC/LICENSE NO._____

G      APPROVED, AND FUNDS MAY BE UNBLOCKED AND RELEASED, WITH VALUE:
       G      TO ORIGINATOR OR ORIGINATING BANK
       G      IN ACCORDANCE WITH ORIGINAL PAYMENT INSTRUCTIONS

G      DENIED (SEE ATTACHED EXPLANATION)

G      RETURNED WITHOUT ACTION (SEE ATTACHED CHECKLIST)

TYPE OF REQUEST (CHECK APPROPRIATE BOX)

[X]    LICENSE APPLICATION
[ ]    REQUEST FOR RECONSIDERATION (PROVIDE
       FAC NO. OF PREVIOUS AGENCY ACTION (IF KNOWN)): _____

APPLICANT INFORMATION

| APPLICANT | ADDRESS LINE 1 | ADDRESS LINE 2 |
|---|---|---|
| Aaron Money Wire Service, Inc. | c/o Fredrikson & Byron, P.A. | 900 2nd Avenue South |

| CITY | STATE | CONTACT PERSON | TELEPHONE | FAX NUMBER |
|---|---|---|---|---|
| Minneapolis | MN | John W. Lundquist<br>Rick L. Petry | 612-347-7181<br>612-347-7107 | 612-347-7077 |

| POSTAL CODE | COUNTRY | SOCIAL SECURITY/TAXPAYER I.D. NO.<br>(Required for US Persons) | E-MAIL ADDRESS |
|---|---|---|---|
| 55402 | USA | | rpetry@fredlaw.com<br>jlundquist@fredlaw.com |

CORPORATIONS AND OTHER ENTITIES

| PRINCIPAL PLACE OF BUSINESS | STATE OF INCORPORATION OR ORGANIZATION | EMPLOYER IDENTIFICATION NUMBER |
|---|---|---|
| 1806 Riverside Avenue, 2nd floor<br>Minneapolis, MN 55454 | Minnesota | 41-1907209 |

THE FOLLOWING INFORMATION, IF KNOWN, SHOULD BE PROVIDED CONCERNING THE BLOCKED FUNDS (USE PAGE 2 AS NEEDED)

| NAME & ADDRESS OF FINANCIAL INSTITUTION WHICH BLOCKED FUNDS | AMOUNT BLOCKED | DATE OF THE BLOCKING |
|---|---|---|
| Associated Bank – Acct. No. 2283000699<br>1801 Riverside Avenue,<br>Minneapolis, MN 55454 | Approximately<br>$166,111.86 | November 7, 2001 |

| REMITTER NAME & ADDRESS | REMITTING FINANCIAL INSTITUTION NAME & ADDRESS |
|---|---|
| Various | |

| INTERMEDIARY FINANCIAL INSTITUTION(S) NAME & ADDRESS | BENEFICIARY FINANCIAL INSTITUTION NAME & ADDRESS |
|---|---|
| | |

| BENEFICIARY NAME & ADDRESS | DESCRIPTION OF UNDERLYING TRANSACTION (ATTACH SEPARATE SHEET AS NEEDED) |
|---|---|
| Aaron, Amal Express and various customers | money transfers |

APPLICATION CERTIFICATION: I, THE UNDERSIGNED, HEREBY DECLARE THAT, TO THE BEST OF MY KNOWLEDGE, THE INFORMATION
PROVIDED ON THIS APPLICATION AND ANY ACCOMPANYING DOCUMENTATION IS TRUTHFUL AND COMPLETE.

| SIGNATURE | NAME OF SIGNER | TITLE OF SIGNER | DATE PREPARED |
|---|---|---|---|
| | Garad Nor | President/Owner | 12/13/01 |

ADDITIONAL COPIES OF THIS FORM MAY BE OBTAINED FROM OFAC'S WEBSITE AT NO CHARGE: <http://www.treas.gov/ofac>

*See attached memorandum for additional details.

BURKE Exhibit B-20

**EXH. G**

UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF FOREIGN ASSET CONTROL

PETITION IN SUPPORT OF THE APPLICATIONS OF AARON MONEY WIRE
SERVICE, INC. AND GARAD NOR FOR THE RELEASE OF BLOCKED FUNDS

Applicants, Aaron Money Wire Service, Inc. ("Aaron") and Garad Nor ("Nor") a.k.a.
Garad Jama (collectively referred to herein as "Applicants"), respectfully represent to and
petition the United States Department of the Treasury, Office of Foreign Asset Control
("OFAC") as follows:

INTRODUCTION

Pursuant to 31 C.F.R. §§ 501.801, 501.806 and 501.807, Applicants submit this
memorandum in support of their Applications and requests for the following: (1) the unblocking
of funds believed to have been blocked due to a mistake of fact or mistaken identity; and (2) the
removal of Aaron's and Nor's names from Appendix A to Title 31 CFR Chapter V, all versions
of OFAC's Specially Designated Nationals and Blocked Persons ("SDN") list and OFAC's
brochure on terrorism.

FACTS

"To many Somali immigrants in Minnesota, Garad [Nor] is known as a savior of sorts
who began a service that enables them to quickly wire cash to impoverished relatives in Somalia,
where there is no banking system." *See* Joy Powell, *To many Somalis, Garad Jama has helped
thousands*, Minneapolis Star Tribune, Nov. 8, 2001 at http://www.startribune.com/stories/484/
813952.html.

Mr. Nor immigrated to the United States in March 1992 at the age of 17. He became a
naturalized American citizen in 1997. Mr. Nor is married to Fartune Ahmed Wasrsame and they

have two children, Ayan Yusuf Jama, age 7 and Yonis Garad Yusuf, age 5. Yonis was born five months premature. As a result of his premature birth, Yonis suffers from lung damage and other health related problems. Yonis has spent a substantial portion of his young life either hospitalized or under the care of doctors and nurses. Mr. Nor and his wife, accordingly, have increased demands placed on them as parents as a result of their son's special needs.

Prior to immigrating to the U.S., Mr. Nor lived with his family in Somalia where he completed the 6th grade in school. After moving to the U.S., Mr. Nor resided in San Diego, California from 1992 until 1995. In 1995, Mr. Nor moved to Marshall, Minnesota where he took a job working for Heartland Food Company as an assembly line worker. He also attended school at Grand Falls Technical College studying accounting. Like other Somalis in the Marshall area, Mr. Nor was a first generation immigrant to the U.S. who felt an obligation to provide financial assistance to family members living in poverty in the war-torn country of Somalia. Thus, Mr. Nor began searching for a way that he could send a portion of his earnings back to his family.

At first, Mr. Nor purchased money orders and sent them by mail to his family through Canada and into Kenya. This process was very slow and often times the money would not reach Mr. Nor's family until several weeks after it was sent. Because Somalia has no effective government or banking system, this method did not work well. Eventually, however, Mr. Nor was put in contact with a person in Kenya that could help Mr. Nor send money back to his family.

Other Somali immigrants in the Marshall area were interested in sending money back to their families, as well. Mr. Nor began assisting such people out of his home. A recent newspaper article described the process as follows: "[a]t the time, he had about $3,000 in his

2

personal bank account. Working with scribbled notes in his two-bedroom apartment, [Mr. Nor] began collecting money from other Somalis and arranged for Norwest Bank to wire it overseas." *See* Minneapolis Star Tribune, Nov. 8, 2001 at http://www.startribune.com/stories/484/ 813952.html. Mr. Nor did not receive any compensation for his services.

In approximately 1996, Mr. Nor formed the Somali International Relief Organization ("SIRO"), a non-profit organization established to help other Somali immigrants send money back to Africa. Mr. Nor operated SIRO for approximately one year. While operating SIRO, Mr. Nor did not receive any compensation for the services he provided.

The number of people Mr. Nor helped eventually grew to between 40 and 50. As the number of people grew, so did the administrative burdens associated with the task. Thus, rather than continuing as a non-profit organization, Mr. Nor decided to restructure as a for-profit company. In 1996, Mr. Nor closed SIRO and formed Aaron.

Prior to the Blocking Notice, Aaron, like SIRO, was engaged in the money transfer business. Aaron's business operations consisted of Aaron receiving money from its customers, most of whom are immigrants from Somalia, Kenya and Ethiopia, and then transferring the money to another company in Dubai, United Arab Emirates, called Amal Express ("Amal"). A Minneapolis newspaper article reports that "[i]n United Arab Emirates, Amal . . . workers pick up the money at the Bank of Dubai and take it in heavily guarded cars into Somalia or refugee camps in Kenya." *See* Minneapolis Star Tribune, Nov. 19, 2000 at http://www.startribune.com/stories/484/53003.html. "In the most remote areas, money-transfer companies hire couriers who ride donkeys and camels." *Id.* The people receiving the money are primarily refugees and impoverished individuals living in refugee camps throughout Eastern Africa.

3

As compensation for its services, Aaron charged its costumers up to a five-percent commission. The five percent commission was added to the amount of money Aaron's customers wished to have transferred. For example, if a customer wanted to transfer $100, Aaron would collect $100, plus an additional five dollars for the commission. Of the five percent commission collected by Aaron, 33% was retained and the remaining 67% was sent to Amal. The funds earned by Aaron through its share of the commissions were used by Aaron to pay rent, utilities, salaries, bank fees, etc. Mr. Nor's average salary for operating Aaron was approximately $1,500 per month.

Mr. Nor operated Aaron until November 7, 2001. On that date, Aaron's assets were frozen and all of its property and records were seized pursuant to a Blocking Notice (SDT-196711). Mr. Nor's personal assets were also frozen pursuant to a Blocking Notice (SDT-196720). The Notices are attached hereto as Exhibits A and B. Mr. Nor and Aaron have also been locked out of their rented office space. Notwithstanding the lock out, Aaron continues to incur rent expenses pursuant to its rental agreement with its landlord. As a direct result of the blockings and seizure, Aaron was forced to cease its business operations. Also as a result of the blockings, Mr. Nor has been left with no income and no money with which to support himself and his family.

Amal is owned by Somali businessmen that formerly operated small money transfer companies and eventually joined together, for economic and competitive reasons, to form Amal. Mr. Nor is a member of the board of directors for Amal. Amal was not named in the Order as a SDGT. Rather, Amal is known internationally as a medium for providing financial assistance to those in need in the Puntland region of Central Somalia. Indeed, the U.N., Red Cross and other

4

BURKE Exhibit B-24

humanitarian relief organizations have relied upon Amal to assist them in getting funds to impoverished people in Somalia.

With the closure of its business, Aaron's customers have been left searching for ways to send money back to their families that are in desperate need of assistance back home.

## I. DISCUSSION

### A.    AARON'S AND MR. NOR'S FUNDS AND PROPERTY SHOULD BE UNBLOCKED.

The "Blocking Notices" received by counsel for Aaron on November 21, 2001 and by Mr. Nor on November 30, 2001 state that, pursuant to Executive Order No. 13224 (the "Order") and under the authority of 50 U.S.C. §1701-06, OFAC has "determined" that Aaron and Mr. Nor have provided "financial support or other services to persons who commit, threaten to commit or support terrorism."

Aaron and Mr. Nor vigorously and categorically deny these claims.

Under the International Emergency Economic Powers Act ("IEEPA"), the President of the United States is authorized to deal with "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." *See 50 U.S.C. § 1701(a); Behring Int'l, Inc. v. Miller*, 504 F. Supp. 552, 556 (D. N.J. 1980). The President's authority under IEEPA is enumerated and therefore limited to those specific powers granted under the act. The enumerated powers granted to the President by IEEPA are the powers to investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any such property in which any foreign country or a

5

national thereof has any interest; by any person, or with respect to any property, subject to the

jurisdiction of the United States. *See 50 U.S.C. §1702(a)(1)(B)*.

The President's power under IEEPA does not include the authority to regulate or prohibit,

directly or indirectly:

(1)     any postal, telegraphic, or other personal communication, which does not involve
the transfer of anything of value;
(2)     donations, by persons subject to the jurisdiction of the United States, of articles,
such as food, clothing, and medicine, intended to be used to relieve human suffering,
except to the extent that the President determines that such donations (A) would seriously
impair his ability to deal with any national emergency declared under [50 U.S.C. § 1701-
06], (B) are in response to coercion against the proposed recipient or donor, or (C) would
endanger Armed Forces of the United States which are engaged in hostilities or are in a
situation where imminent involvement in hostilities is clearly indicated by the
circumstances.

*See 50 U.S.C. §§ 1702(3)(b)(1)-(2)*.

In this case, the President's Order provides, in relevant part, as follows:

all property and interests in property of the following persons that are in the United States
or that hereafter come within the United States, or that hereafter come within the
possession or control of United States persons are blocked:

(d)     persons determined by the Secretary of the Treasury, in consultation with the
Secretary of State and the Attorney General;

(i)     to assist in, sponsor, or provide financial, material, or technical support
for, or financial or other services to or in support of, such act of terrorism or those
persons listed in the Annex to this order or determined to be subject to this order;
(ii)     to be otherwise associated with those persons listed in the Annex to this
order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i)
of this order.

*See Executive* Order *13224 at Section 1(d)*. The Order further states that the President has made

the following determinations:

the making of donations of the type specified in section 203(b)(2) of the IEEPA (50
U.S.C. 1702(b)(2)) by United States persons to persons determined to be subject to this
order would seriously impair my ability to deal with the national emergency declared in
this order, and would endanger Armed Forces of the United States that are in a situation
where imminent involvement in hostilities is clearly indicated by the circumstances and
hereby prohibit such donations as provided by section 1 of this order.

5

*Id. at Section 4.* The Order also contains the following delegation of authority to the Secretary of the Treasury:

> With respect to those persons designated pursuant to subsection 1(d) of this order, the Secretary of the Treasury, in the exercise of his discretion and in consultation with the Secretary of State and the Attorney General, may take such other actions than the complete blocking of property or interests in property as the President is authorized to take under the IEEPA and UNPA if the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, deems such other actions to be consistent with the national interests of the United States, considering such factors as he deems appropriate.

*Id. at Section 5.*

Acting under the authority delegated to it by the Order, OFAC has determined that Aaron and Mr. Nor are SDGTs and therefore subject to the blocking and other sanctions authorized by the Order. To withstand judicial scrutiny, determinations by OFAC may not be unreasonable, arbitrary, capricious or an abuse of discretion. *See Behring* 504 F. Supp at 556 (citing *Sardino v. Federal Reserve Bank of New York*, 361 F.2d 106 (2d Cir. 1965), *cert. denied*, 385 U.S. 898 (1966); *Veterans & Reservists for Peace in Viet-Nam v. Regional Comm'r of Customs*, 459 F.2d 676 (3d Cir. 1972), *cert denied* 409 U.S. 933 (1972)).

When funds are blocked at a financial institution pursuant to a blocking notice and a party believes the funds have been blocked due to mistaken identity, that party may seek to have such funds unblocked. *See 31 C.F.R. § 501.806.* Aaron and Mr. Nor seek to have their funds unblocked based upon its belief that they have been mistakenly identified as a parties associated with terrorist activities.

A request to have funds unblocked must contain the following information:

(1)     the name of the financial institution in which the funds are blocked;

(2)     the amount blocked;

(3)     the date of the blocking;

(4)    the identity of the original remitter of the funds and any intermediately
       financial institutions;

(5)    the intended beneficiary of the blocked transfer;

(6)    a description of the underlying transaction including copies or related
       documents;

(7)    the nature of the applicant's interest; and

(8)    a statement of the reasons why the applicant believes the funds were
       blocked due to mistaken identity.

See 31 C.F.R. 501.806(d).

## 1 - 2 .  Financial Institutions and Amounts

Funds in Aaron's account have been blocked at the following financial institution:
approximately $166,111.86 at Associated Bank, Account Number 2283000699, 1801 Riverside
Avenue, Minneapolis, Minnesota 55458. The following funds in Mr. Nor's account have been
blocked: approximately $41,225.35 at Wells Fargo Bank Minnesota, N.A., Account Number
397-2664550, Nicollet & Lake Office, P.O. Box B 514, Minneapolis, Minnesota 55479. Mr.
Nor's personal account was used by Aaron to hold funds deposited for transfer by smaller Amal
agents around the western U.S. Since the other Amal agents were smaller than Aaron in terms of
volume of business and not able to effectively and efficiently make money transfers, they relied
on Aaron to collect and transfer funds that the smaller agents received from their customers.
Because Aaron's bank account was maintained at Associated Bank, a Midwest regional bank,
Amal agents operating outside the Midwest could not easily deposit money into Aaron's account.
Thus, instead of using Aaron's account the agents deposited money into Mr. Nor's account at
Wells Fargo, a bank with branches located throughout the western half of the U.S.

Neither Aaron nor Mr. Nor can determine the exact amount of money that has been
blocked because all of their financial records were seized by the government.

8

3.    Date of Blockings

Aaron's and Mr. Nor's accounts were blocked on November 7, 2001.

4.    Identity of the Original Remitter of the Funds and Intermediary Financial
      Institution.

Numerous customers and other Amal agents remitted funds that were deposited by Aaron

and Mr. Nor into the blocked accounts.  The names of the customers and other Amal agents

cannot be provided without access to Aaron's and Mr. Nor's records.

5.    The Intended Beneficiaries.

The intended beneficiaries of the blocked funds are primarily East African refugees that

are related to those sending money from Minnesota via Aaron.  These people rely on the money

for their very existence, and there is no indication that they supply or direct money to terrorists.

Instead, a recent newspaper article described one of the "beneficiaries" and the journey she

endures to pick-up and utilize the money sent by her daughter in America as follows:

> [A] 68-year old mother walks more than an hour through bombed-out dusty roads, past
> waiting thieves, flying bullets, beggars and murderous gangs to the office in Mogadishu's
> Medina district.
>
> At Al-Barakaat, she collects her money in U.S. currency.  To be sure she won't be
> harassed, she asks for small bills to give people who beg or bother her.
>
> A line of people awaits her back home.  She doesn't tell them she has money, but
> everyone knows why she left so early.  Each of them will leave her yard with a dollar or
> two.
>
> She will buy $7 worth of water, enough to fill the tank for a week.  She will spend the
> rest on a small bit of goat meat and beef, flour, sugar and other staples she can stretch for
> her large family.

See, *Somalis in the U.S. worry about closed wire-transfer offices*, Minneapolis Star

Tribune, pp. A1, 12, Nov. 10, 2001.

The funds should be returned to their lawful owners.  It is unconscionable to withhold

money from poor U.S. immigrants and their families.  Moreover, a number of Aaron's customers

9

have expressed anger and frustration toward Mr. Nor because their money has not been received by their family members in Africa or returned to the customers. Some of Aaron's customers have even threatened violence against Mr. Nor and/or his family. Mr. Nor is concerned for his and his family's safety because of the threats.

The United Nations representative to Somalia, Randolph Kent, has said "[t]he [money transfer business] closure is having a very, very serious effect. *** We are at a point where we have to start anticipating a crisis that could be unique in the modern state system – the collapse of an entire national economy." *See* Minneapolis Star Tribune, p. A1, December 1, 2001.

A portion of the money belongs to Aaron. Without its records, it cannot ascertain what the correct amount is. Aaron is in arrears on rent, utilities and salary. Mr. Nor has no income with which to support his wife and two small children. It is, thus, urgent that the funds be returned to Aaron, Mr. Nor and Aaron's customers so that the customers can make alternative arrangements to get the money to their relatives and Mr. Nor can support his family. Another portion of the money belongs to Amal. Without access to their records, Aaron and Mr. Nor are unable to determine what portions of the money belong to Aaron, Amal and Aaron's customers.

6.    **The Underlying Transactions**

The underlying transactions at issue here consist of transactions akin to a Western Union money wire transfer in that they involve customers bringing sums of money (usually $100 - $500, although occasionally $5,000 or more) to a business location for the purpose of having the money transferred to someone else. As described above, Aaron accepts money from its customers and deposits the funds into its banks accounts. At least once a day, Aaron, via fax or email, sends a list of names of recipients and other related information to Amal in the United

BURKE Exhibit B-30

Arab Emirates. When Amal receives the lists, it advances the specified amount of money to the designated recipient.

Periodically (normally at the end of each month), Aaron and Mr. Nor settle up with Amal based upon computer generated financial statements that reflect Aaron's business activities of the preceding month.[1]  Based upon the information contained in the financial documents, the companies determine the amount of commission Aaron earned. Of the money received by Aaron for commissions, Aaron paid its operating expenses and employee salaries. None of the money earned by Aaron was provided to terrorists or terrorist organizations, and it is aware of none of the amounts transferred being used for such purposes.

Although Aaron operates in a fashion similar to Western Union, it is interesting to note that no action has been taken against it despite clear evidence that Western Union has been directly linked to terrorist activity. News reports state that it has been determined that "[i]n the three days preceding September 11, four separate payments were sent to the United Arab Emirates by the alleged highjackers. All four were made through Western Union Financial Services, Inc. agents in the U.S. . . . ." *See* Heather Timmons, *Western Union: Where the Money Is – in Small Bills*, Business Week Online, Nov. 15, 2001 at http:/biz.yahoo.com/bizwk/ Q11115/ewybxk5dqr6jt4mf_pdstq_1.html. Western Union remains open and unaffected by any blockings. Unlike Western Union, there is no direct or indirect connection between Aaron or Mr. Nor and the events of September 11th or any other terrorist activities. Notwithstanding the lack of such a connection, Aaron's and Mr. Nor's accounts have been frozen and Aaron's operations closed. Such actions can only be viewed as unreasonable, arbitrary, capricious, and an abuse of discretion.

---

[1] Aaron is unable to provide copies of the financial statements because those documents were seized by OFAC.

11

7.     **The Nature of the Applicant's Interest.**

Aaron and Mr. Nor have both direct and indirect interests in the blocked funds. First, Aaron and Mr. Nor have direct interests in the frozen funds because the funds are frozen in accounts maintained by Aaron and Mr. Nor and, in part, belonging to them. Aaron and Mr. Nor also have an interest in the funds belonging to Aaron's customers and Amal, as Aaron holds those amounts as agent for the benefit of its customers and/or Amal. Thus, Aaron and Mr. Nor have an interest in all of the frozen funds which belong either to Aaron's customers and/or Amal, who bestowed their trust in Aaron to make sure that the money was delivered to the designated recipients in Africa.

8.     **Reasons Aaron and Mr. Nor Believe the Funds Were Blocked Based Upon Mistaken Identity.**

The Blocking Notices indicate that Aaron and Mr. Nor have been identified as an entity or individual that "provided financial support or other services to persons who commit, threaten to commit or support terrorism (Specially Designated Global Terrorist ("SDGT")). The term SDGT is not defined in either the Order or the Blocking Notices. Aaron and Mr. Nor are thus left to assume that the term refers to "an entity that provides financial support or other services to persons who commit, threaten to commit or support terrorism." *See Blocking Notice* at ¶ 1. The Order defines terrorism as follows: "an activity that –

(i) involves a violent act or an act dangerous to human life, property, or infrastructure; and
(ii) appears to be intended –
    (A)     to intimidate or coerce a civilian population;
    (B)     to influence the policy of a government by intimidation or coercion; or
    (C)     to affect the conduct of a government by mass destruction, assassination, kidnapping, or hostage taking.

*See Order at Section 3(d).*

BURKE Exhibit B-32

Aaron and Mr. Nor, however, vehemently deny that they have any connections whatsoever to persons who commit, threaten to commit or support terrorism. Aaron and Mr. Nor further deny that they are in any way involved in or associated with anyone or any organization that commits violent acts or acts dangerous to human life, property or infrastructure that appear to be intended to intimidate or coerce a civilization, influence the policy of a government by intimidation or coercion or affect the conduct of a government by mass destruction, assassination, kidnapping or hostage taking. To the contrary, Aaron and Mr. Nor supplied humanitarian relief by providing a service that enabled U.S. immigrants to supply money to their impoverished family members back in Africa. Support for the claim that Aaron and Mr. Nor provided humanitarian services and not support for terrorists is found in statements recently made by other Somali immigrants. For example, Mohamed Wardere, a Twin Cities Somali leader has instructed local Somalis to contact federal authorities if they know of anyone collecting money for terrorists or planning terrorist activities. *See*, Minneapolis Star Tribune, October 14, 2001 at http://www.startribune.com/stories/1576/813722.html. Mr. Wardere continued stating "[i]t's bad for our community. If we find that somebody is doing that in our community, we won't hide them." *Id.* Notwithstanding Mr. Wardere's comments, he supports Aaron's and Mr. Nor's requests for the unblocking of the frozen funds.

A Somali man employed by the Somali Justice Center also commented that "[t]his is a matter of life and death to the Somali community." *Id.* The man continued stating "what happened to us [on November 7, 2001] is beyond comprehension." *Id.* Another Somali woman commented: "[w]e are the foundation of our people, the spinal cord. Without us, our families will die. But I wonder, does America care?" See, *Somalis in the U.S. worry about closed wire-transfer offices*. Minneapolis Star Tribune, p. A12, Nov. 10, 2001. Yet another Somali

BURKE Exhibit B-33

immigrant questioned "[w]hat does life mean to you, when you have money but your mother is dying of starvation because you can't get that money to her?" See, *Government to look into other wire-transfer firms*, Minneapolis Star Tribune, p. A1, Nov. 9, 2001.

Shortly after commencing operations in 1998, Aaron and Mr. Nor were approached by agents for the IRS who were suspicious that money being transferred by Aaron was related to drug trafficking. Aaron and Mr. Nor cooperated with the IRS agents by disclosing their business records to confirm that they were in no way connected to any type of illegal activities. After Aaron and Mr. Nor cooperated and shared such information with the IRS, they never heard from the agents again. Mr. Nor has offered again to cooperate with the government in its current investigation. His willingness to submit to an interview was communicated to AUSA John Marti who may be reached at (612) 664-5600.

Consideration of the above facts indicates that the funds should be unblocked. The primary beneficiaries of the funds are innocent, starving people who rely very heavily on the funds for their survival. There is no connection between Aaron, Mr. Nor or the beneficiaries and terrorism. The underlying transactions are legal, proper and needed by the Somali-American community that relies on the transactions to assist their needy families back in Africa. There is no evidence to support a claim that Aaron and Mr. Nor were appropriately determined to be supporting terrorists. Therefore, the funds should be unblocked so that Aaron, Mr. Nor, Amal and Aaron's customers can use the funds that unquestionably belong to them.

**B.    ALTERNATIVELY, AARON AND MR. NOR SHOULD RECEIVE LICENSES TO ALLOW THEM TO SATISFY THEIR LEGAL OBLIGATIONS.**

For the reasons set forth above, Aaron and Mr. Nor alternatively request licenses that will allow them to pay their salaries, rent, utility bills and other operating expenses, as well as to restore funds belonging to Aaron's customers and Amal. Aaron and Mr. Nor request access to

14

their records and computer so that they can provide a list of specific debts, customers and the amounts thereof.

C.    AARON'S AND MR. NOR'S NAMES SHOULD BE REMOVED FROM APPENDIX A, ALL VERSIONS OF OFAC'S SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS ("SDN") LIST AND OFAC'S BROCHURE ON TERRORISM.

a.    There is no basis for the determination.

According to the Blocking Notices, the Department of Treasury has identified Aaron and Mr. Nor as entities or individuals that "provide[d] financial support or other services to persons who commit, threaten to commit or support terrorism (Specially Designated Aaron Terrorist ("SDGT")). The Order lists SIRO as a SDGT. The Blocking Notices, however, provide no evidence in support of such allegations. Thus, Aaron, SIRO and Mr. Nor seek to have their names removed from Appendix A to Title 31 CFR Chapter V, all versions of OFAC's Specially Designated Nationals and Blocked Persons ("SDN") list and OFAC's brochure on terrorism.

Neither Aaron nor Mr. Nor have any known connections to terrorism, those committing terrorist acts, those threatening to commit terrorist acts, nor those supporting terrorism. To the contrary, Aaron is a company dedicated to providing a much needed and very valuable service to the Somali immigrant community in Minneapolis, Minnesota. Rather than providing financial support to terrorists, Aaron provides financial services to honest working people that live in Minnesota, yet have family members back in Africa. Some of these people work two or three jobs so that they can earn enough money to support themselves and their families here in the U.S., plus send money back to family members in Africa. For a very modest fee, Aaron provides a medium that allows these immigrants to send a portion of their earnings back to family members in Africa.

15

At least, ninety-five percent of the money transferred by Aaron and its customers goes directly to those designated by the senders as recipients. The remaining approximately five percent is divided between Aaron and Amal, 33% and 67%, respectively. Neither Mr. Nor or Aaron has any knowledge that Amal is providing funding for terrorists. In the unlikely event that turns out to be the case, Aaron will readily sever all business relationships it has with Amal. Likewise, Aaron and Mr. Nor are not aware of any connections between those designated to receive the money sent by Aaron's customers and any terrorists, political organizations, warlords or others with terrorist affiliations. Indeed, according to Mr. Nor, "[t]he whole idea is we help Somali people." *See* Minneapolis Star Tribune, *Money-transfer businesses answer a need, owners say,* Nov. 19, 2000, at http://www.startribune.com/stories/484/53003.html. Mr. Nor continued stating "[i]f we get the government [operating], then we have a solution and we won't need the wire services. The money goes to individuals. Not tribes. Not factions. Not warlords." *Id.*

In the Somali community, trust is at a premium when it comes to establishing business relationships. Aaron's customers do business with the company because of the reputation of trust that Aaron and Mr. Nor have earned with Aaron's customers. Aaron and Mr. Nor, like any other business or businessman, earned such a reputation by delivering the services that they promised their customers. That service is simply getting the money quickly, as they promised they would, to the starving, impoverished and dying people in Africa that rely on the money for their very survival.

Although the Order prohibits United States persons from making humanitarian donations to persons determined to be subject to the Order, it does not prohibit United States persons from providing humanitarian relief to others, particularly those in desperate need of the assistance in

BURKE Exhibit B-36

Somalia. As discussed above, the nature of the transactions underlying the funds that have been blocked in Aaron's and Mr. Nor's accounts concerns money provided by immigrants to the U.S. that are giving/donating money to others, including family members in Somalia, Ethiopia and Kenya. Money sent by Aaron's customers is used to meet basic needs for food, clothing and shelter. Providing such financial assistance to the people of Somalia is not only proper and legal, but also consistent with the financial support being provided to the people of Somalia by the international community and urgently needed by the recipients. The United Nations Consolidated Inter-Agency Appeal for Somalia 2002 provides, in part, as follows:

> As the world faces the prospect of fundamental global political and economic change, the future of marginalized societies like Somalia is increasingly important. Beset by hunger, disease and disarray, Somalia is slowly reconstructing its place within the international community.
>
> ***
>
> Facing some of the most appalling living conditions in the world – where 45 women die every day in labor and one in four children do not reach the age of five – Somalia is still reliant on international assistance to provide basic life saving support and protection of livelihoods.

*See United Nations Consolidated Inter-Agency Appeal for Somalia 2002,* U.N. Office for the Coordination of Humanitarian Affairs, at 1. In light of the U.N.'s findings, it is committed to raising $83,683,971 in U.S. funds during 2002 to focus primarily on humanitarian actions to address the pending crisis in Somalia. *Id.* The funds blocked in Aaron's and Mr. Nor's accounts are also targeted to address the needs of the families in Somalia. Since the funds blocked in Aaron's and Mr. Nor's accounts are akin to the funds being provided to the people of Somalia by the U.N. and the international community, there is no basis for determining that Aaron or Mr. Nor are involved in providing financial support to terrorist.

17

BURKE Exhibit B-37

b.    Aaron is willing to reorganize.

Since it is clear that the services Aaron provided are much needed by the Somali immigrant community located in Minneapolis, Aaron wishes to continue providing such services to its customers. 'Aaron, however, is mindful that it may need to reorganize its company to accomplish that goal and it is willing to conduct such a reorganization. A blocked person may propose remedial steps on the person's part, such as corporate reorganization, which the person believes would negate the basis for the designation. *See 31 C.F.R 501.807(a)*. Since Aaron and Mr. Nor have no connections to terrorists and the government has not provided any information to show why it has placed such designations on Aaron and Mr. Nor, they are left to speculate why the government has made the determinations. President Bush has been quoted accusing such services of "skim[ming] from every transaction to benefit terrorists. *See* David Stout, *U.S. Acts to Freeze Assets of Terror Groups*, The New York Times, November 7, 2001, at http://www.newyourtimes.com/2001/11//07/national/07CND-PREX.html?. Notwithstanding the President's accusations, however, United States Treasury Department Secretary Paul O'Neill has acknowledged that "[w]e have 100,000 Somali's in the United States and it is not an unusual practice of foreign born people residing in the United States . . . to send money back to their families who are living in very impoverished circumstances to help them out." See, *Fed Raids Expose Somali Wire Transfer*, Minneapolis Star Tribune, Nov. 7, 2001, at http://www. startribune.com/stories/709/812997.html. Moreover, O'Neill has said that unless such services are listed as a terrorist organization, "people should assume that they're OK." *See Government to look into other money transfer firms*, Minneapolis Star Tribune, Nov. 9, 2001, at http://www. startribune.com/stories/484/816799.html.

18

O'Neill has also suggested that alternatives be developed to help immigrants find a way to repatriate money "that doesn't involve someone skimming off some of their money to help fund terrorists." *Id.* Such alternative *could* include Western Union, but Western Union has suspended its operations in Somali. In addition, "Western Union charges about three times as much as the 5-percent fee the Somalia-run services typically charge to wire $100 from Minnesota to Africa", according to Western Union territory sales manager Rob McDonough. Thus, Aaron proposes reorganizing its company so that it can still provide valuable services to its customers, yet avoid any accusations that third parities that it may deal with are diverting funds to support terrorist operations.

**D.    OTHER LEGAL ISSUES PRESERVED**

In the event that this matter is litigated in a court of law, Aaron and Mr. Nor reserve all other legal issues including, but not limited to, the following:

1.    That the Blocking Notices and seizures violate Aaron's and Mr. Nor's due process rights;

2.    That the seizures violate the Fourth Amendment;

3.    That the seizures were broader than necessary and were not authorized by law;

4.    That Mr. Nor's equal protection rights have been violated; and

5.    That the seizure of personal property, computers and records; the closure of Aaron's business; and the exclusion of Aaron from its leased premises are unauthorized by law.

## II. CONCLUSION

Aaron and Mr. Nor respectfully request that OFAC first provide access to Aaron's and Mr. Nor's records (both paper and electronic), so that Aaron and Mr. Nor can provide an accounting of the specific uses for the funds in the blocked accounts. Aaron and Mr. Nor then

BURKE Exhibit B-39

request that OFAC release such specifically identified funds to Aaron, Mr. Nor and their customers.

Respectfully submitted,

Dated: December 14, 2001

_____
John W. Lundquist (#65286)
Rick L. Petry (#292503)
FREDRIKSON & BYRON, P.A.
1100 International Centre
900 Second Avenue South
Minneapolis, MN 55402-3397
Phone: (612) 347-7107
Fax:    (612) 347-7077
Attorneys for Aaron Money Wire Service,
Inc. and Garad Nor

2588232\1

20

U.S. DEPARTMENT OF THE TREASURY

OFFICE OF FOREIGN ASSETS CONTROL

APPLICATION FOR THE RELEASE OF BLOCKED FUNDS

[WHEN APPROVED, THIS DOCUMENT BECOMES A
SPECIFIC LICENSE AUTHORIZING THE UNBLOCKING
OF THE SUBJECT FUNDS AND THEIR RELEASE
ACCORDING TO THE TERMS HEREOF]

DO NOT WRITE IN THIS BOX — LICENSE APPROVAL CH... ...D WITH OFAC SEAL

THIS APPLICATION IS HEREBY:                                        FAC/LICENSE NO.

☐ APPROVED, AND FUNDS MAY BE UNBLOCKED AND RELEASED, WITH VALUE:
    ☐ TO ORIGINATOR OR ORIGINATING BANK
    ☐ IN ACCORDANCE WITH ORIGINAL PAYMENT INSTRUCTIONS

☐ DENIED (SEE ATTACHED EXPLANATION)

☐ RETURNED WITHOUT ACTION (SEE ATTACHED CHECKLIST)

TYPE OF REQUEST [CHECK APPROPRIATE BOX]
☒ LICENSE APPLICATION
☐ REQUEST FOR RECONSIDERATION (PROVIDE
FAC NO. OF PREVIOUS AGENCY ACTION (IF KNOWN)]: _____

APPLICANT INFORMATION

| APPLICANT | ADDRESS LINE 1 | ADDRESS LINE 2 |
|---|---|---|
| Garad Nor aka Garad Jama | c/o Fredrikson & Byron, P.A. | 900 Second Avenue S. |

| CITY | STATE | CONTACT PERSON | TELEPHONE | FAX NUMBER |
|---|---|---|---|---|
| Minneapolis | MN | John Lundquist<br>Rick Petry | 612-347-7181<br>612-347-7107 | 612-347-7077 |

| POSTAL CODE | COUNTRY | SOCIAL SECURITY/TAXPAYER I.D. NO. (Required for US Persons) | E-MAIL ADDRESS |
|---|---|---|---|
| 55402 | USA | 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 | jlundquist@fredlaw.com<br>rpetry@fredlaw.com |

CORPORATIONS AND OTHER ENTITIES

| PRINCIPAL PLACE OF BUSINESS | STATE OF INCORPORATION OR ORGANIZATION | EMPLOYER IDENTIFICATION NUMBER |
|---|---|---|
| | | |

THE FOLLOWING INFORMATION, IF KNOWN, SHOULD BE PROVIDED CONCERNING THE BLOCKED FUNDS (USE PAGE 2 AS NEEDED)

| NAME & ADDRESS OF FINANCIAL INSTITUTION WHICH BLOCKED FUNDS | AMOUNT BLOCKED | DATE OF THE BLOCKING |
|---|---|---|
| Wells Fargo Bank, Account No. 397-2664550<br>Nicollet & Lake Office<br>PO Box 13514, Mpls, MN 55479 | approximately<br>$41,225.35 | November 7, 2001 |

| REMITTER NAME & ADDRESS | REMITTING FINANCIAL INSTITUTION NAME & ADDRESS |
|---|---|
| various | |

| INTERMEDIARY FINANCIAL INSTITUTION(S) NAME & ADDRESS | BENEFICIARY FINANCIAL INSTITUTION NAME & ADDRESS |
|---|---|
| | |

| BENEFICIARY NAME & ADDRESS | DESCRIPTION OF UNDERLYING TRANSACTION (ATTACH SEPARATE SHEET AS NEEDED) |
|---|---|
| Mr. Nor, Amal Express and various customers | money transfers |

APPLICATION CERTIFICATION: I, THE UNDERSIGNED, HEREBY DECLARE THAT, TO THE BEST OF MY KNOWLEDGE, THE INFORMATION PROVIDED ON THIS APPLICATION AND ANY ACCOMPANYING DOCUMENTATION IS TRUTHFUL AND COMPLETE.

| SIGNATURE | NAME OF SIGNER | TITLE OF SIGNER | DATE PREPARED |
|---|---|---|---|
| [signature] | Garad Nor | | 12/13/01 |

ADDITIONAL COPIES OF THIS FORM MAY BE OBTAINED FROM OFAC'S WEBSITE AT NO CHARGE: <http://www.treas.gov/ofac>

*see attached memorandum for additional details.

BURKE Exhibit B-41

**EXH. H**