# THOMAS R. BURKE

# EXHIBIT B

## B-42 through B-66

UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF FOREIGN ASSET CONTROL

PETITION IN SUPPORT OF THE APPLICATIONS OF AARON MONEY WIRE
SERVICE, INC. AND GARAD NOR FOR THE RELEASE OF BLOCKED FUNDS

Applicants, Aaron Money Wire Service, Inc. ("Aaron") and Garad Nor ("Nor") a.k.a.
Garad Jama (collectively referred to herein as "Applicants"), respectfully represent to and
petition the United States Department of the Treasury, Office of Foreign Asset Control
("OFAC") as follows:

## INTRODUCTION

Pursuant to 31 C.F.R. §§ 501.801, 501.806 and 501.807, Applicants submit this
memorandum in support of their Applications and requests for the following: (1) the unblocking
of funds believed to have been blocked due to a mistake of fact or mistaken identity; and (2) the
removal of Aaron's and Nor's names from Appendix A to Title 31 CFR Chapter V, all versions
of OFAC's Specially Designated Nationals and Blocked Persons ("SDN") list and OFAC's
brochure on terrorism.

## FACTS

"To many Somali immigrants in Minnesota, Garad [Nor] is known as a savior of sorts
who began a service that enables them to quickly wire cash to impoverished relatives in Somalia,
where there is no banking system." *See* Joy Powell, *To many Somalis, Garad Jama has helped
thousands*, Minneapolis Star Tribune, Nov. 8, 2001 at http://www.startribune.com/stories/484/
813952.html.

Mr. Nor immigrated to the United States in March 1992 at the age of 17. He became a
naturalized American citizen in 1997. Mr. Nor is married to Fartune Ahmed Wasrsame and they

have two children, Ayan Yusuf Jama, age 7 and Yonis Garad Yusuf, age 5. Yonis was born five months premature. As a result of his premature birth, Yonis suffers from lung damage and other health related problems. Yonis has spent a substantial portion of his young life either hospitalized or under the care of doctors and nurses. Mr. Nor and his wife, accordingly, have increased demands placed on them as parents as a result of their son's special needs.

Prior to immigrating to the U.S., Mr. Nor lived with his family in Somalia where he completed the 6th grade in school. After moving to the U.S., Mr. Nor resided in San Diego, California from 1992 until 1995. In 1995, Mr. Nor moved to Marshall, Minnesota where he took a job working for Heartland Food Company as an assembly line worker. He also attended school at Grand Falls Technical College studying accounting. Like other Somalis in the Marshall area, Mr. Nor was a first generation immigrant to the U.S. who felt an obligation to provide financial assistance to family members living in poverty in the war-torn country of Somalia. Thus, Mr. Nor began searching for a way that he could send a portion of his earnings back to his family.

At first, Mr. Nor purchased money orders and sent them by mail to his family through Canada and into Kenya. This process was very slow and often times the money would not reach Mr. Nor's family until several weeks after it was sent. Because Somalia has no effective government or banking system, this method did not work well. Eventually, however, Mr. Nor was put in contact with a person in Kenya that could help Mr. Nor send money back to his family.

Other Somali immigrants in the Marshall area were interested in sending money back to their families, as well. Mr. Nor began assisting such people out of his home. A recent newspaper article described the process as follows: "[a]t the time, he had about $3.000 in his

2

personal bank account. Working with scribbled notes in his two-bedroom apartment, [Mr. Nor] began collecting money from other Somalis and arranged for Norwest Bank to wire it overseas." *See* Minneapolis Star Tribune, Nov. 8, 2001 at http://www.startribune.com/stories/484/ 813952.html. Mr. Nor did not receive any compensation for his services.

In approximately 1996, Mr. Nor formed the Somali International Relief Organization ("SIRO"), a non-profit organization established to help other Somali immigrants send money back to Africa. Mr. Nor operated SIRO for approximately one year. While operating SIRO, Mr. Nor did not receive any compensation for the services he provided.

The number of people Mr. Nor helped eventually grew to between 40 and 50. As the number of people grew, so did the administrative burdens associated with the task. Thus, rather than continuing as a non-profit organization, Mr. Nor decided to restructure as a for-profit company. In 1996, Mr. Nor closed SIRO and formed Aaron.

Prior to the Blocking Notice, Aaron, like SIRO, was engaged in the money transfer business. Aaron's business operations consisted of Aaron receiving money from its customers, most of whom are immigrants from Somalia, Kenya and Ethiopia, and then transferring the money to another company in Dubai, United Arab Emirates, called Amal Express ("Amal"). A Minneapolis newspaper article reports that "[i]n United Arab Emirates, Amal . . . workers pick up the money at the Bank of Dubai and take it in heavily guarded cars into Somalia or refugee camps in Kenya." *See* Minneapolis Star Tribune, Nov. 19, 2000 at http://www.startribune.com/stories/484/53003.html. "In the most remote areas, money-transfer companies hire couriers who ride donkeys and camels." *Id.* The people receiving the money are primarily refugees and impoverished individuals living in refugee camps throughout Eastern Africa.

3

As compensation for its services, Aaron charged its costumers up to a five-percent commission. The five percent commission was added to the amount of money Aaron's customers wished to have transferred. For example, if a customer wanted to transfer $100, Aaron would collect $100, plus an additional five dollars for the commission. Of the five percent commission collected by Aaron, 33% was retained and the remaining 67% was sent to Amal. The funds earned by Aaron through its share of the commissions were used by Aaron to pay rent, utilities, salaries, bank fees, etc. Mr. Nor's average salary for operating Aaron was approximately $1,500 per month.

Mr. Nor operated Aaron until November 7, 2001. On that date, Aaron's assets were frozen and all of its property and records were seized pursuant to a Blocking Notice (SDT-196711). Mr. Nor's personal assets were also frozen pursuant to a Blocking Notice (SDT-196720). The Notices are attached hereto as Exhibits A and B. Mr. Nor and Aaron have also been locked out of their rented office space. Notwithstanding the lock out, Aaron continues to incur rent expenses pursuant to its rental agreement with its landlord. As a direct result of the blockings and seizure, Aaron was forced to cease its business operations. Also as a result of the blockings, Mr. Nor has been left with no income and no money with which to support himself and his family.

Amal is owned by Somali businessmen that formerly operated small money transfer companies and eventually joined together, for economic and competitive reasons, to form Amal. Mr. Nor is a member of the board of directors for Amal. Amal was not named in the Order as a SDGT. Rather, Amal is known internationally as a medium for providing financial assistance to those in need in the Puntland region of Central Somalia. Indeed, the U.N., Red Cross and other

4

humanitarian relief organizations have relied upon Amal to assist them in getting funds to impoverished people in Somalia.

With the closure of its business, Aaron's customers have been left searching for ways to send money back to their families that are in desperate need of assistance back home.

## I. DISCUSSION

A.    AARON'S AND MR. NOR'S FUNDS AND PROPERTY SHOULD BE UNBLOCKED.

The "Blocking Notices" received by counsel for Aaron on November 21, 2001 and by Mr. Nor on November 30, 2001 state that, pursuant to Executive Order No. 13224 (the "Order") and under the authority of 50 U.S.C. §1701-06, OFAC has "determined" that Aaron and Mr. Nor have provided "financial support or other services to persons who commit, threaten to commit or support terrorism."

Aaron and Mr. Nor vigorously and categorically deny these claims.

Under the International Emergency Economic Powers Act ("IEEPA"), the President of the United States is authorized to deal with "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." *See 50 U.S.C. § 1701(a); Behring Int'l, Inc. v. Miller*, 504 F. Supp. 552, 556 (D. N.J. 1980). The President's authority under IEEPA is enumerated and therefore limited to those specific powers granted under the act. The enumerated powers granted to the President by IEEPA are the powers to investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any such property in which any foreign country or a

BURKE Exhibit B-46

national thereof has any interest; by any person, or with respect to any property, subject to the

jurisdiction of the United States. *See 50 U.S.C. §1702(a)(1)(B).*

The President's power under IEEPA does not include the authority to regulate or prohibit,

directly or indirectly:

(1)     any postal, telegraphic, or other personal communication, which does not involve
the transfer of anything of value;
(2)     donations, by persons subject to the jurisdiction of the United States, of articles,
such as food, clothing, and medicine, intended to be used to relieve human suffering,
except to the extent that the President determines that such donations (A) would seriously
impair his ability to deal with any national emergency declared under [50 U.S.C. § 1701-
06], (B) are in response to coercion against the proposed recipient or donor, or (C) would
endanger Armed Forces of the United States which are engaged in hostilities or are in a
situation where imminent involvement in hostilities is clearly indicated by the
circumstances.

*See 50 U.S.C. §§ 1702(3)(b)(1)-(2).*

In this case, the President's Order provides, in relevant part, as follows:

all property and interests in property of the following persons that are in the United States
or that hereafter come within the United States, or that hereafter come within the
possession or control of United States persons are blocked:

(d)     persons determined by the Secretary of the Treasury, in consultation with the
Secretary of State and the Attorney General;

(i)     to assist in, sponsor, or provide financial, material, or technical support
for, or financial or other services to or in support of, such act of terrorism or those
persons listed in the Annex to this order or determined to be subject to this order;
(ii)     to be otherwise associated with those persons listed in the Annex to this
order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i)
of this order.

*See Executive* Order *13224 at Section 1(d).* The Order further states that the President has made

the following determinations:

the making of donations of the type specified in section 203(b)(2) of the IEEPA (50
U.S.C. 1702(b)(2)) by United States persons to persons determined to be subject to this
order would seriously impair my ability to deal with the national emergency declared in
this order, and would endanger Armed Forces of the United States that are in a situation
where imminent involvement in hostilities is clearly indicated by the circumstances and
hereby prohibit such donations as provided by section 1 of this order.

6

*Id. at Section 4.* The Order also contains the following delegation of authority to the Secretary of

the Treasury:

> With respect to those persons designated pursuant to subsection 1(d) of this order, the Secretary of the Treasury, in the exercise of his discretion and in consultation with the Secretary of State and the Attorney General, may take such other actions than the complete blocking of property or interests in property as the President is authorized to take under the IEEPA and UNPA if the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, deems such other actions to be consistent with the national interests of the United States, considering such factors as he deems appropriate.

*Id. at Section 5.*

Acting under the authority delegated to it by the Order, OFAC has determined that Aaron

and Mr. Nor are SDGTs and therefore subject to the blocking and other sanctions authorized by

the Order. To withstand judicial scrutiny, determinations by OFAC may not be unreasonable,

arbitrary, capricious or an abuse of discretion. *See Behring* 504 F. Supp at 556 (citing *Sardino v.*

*Federal Reserve Bank of New York,* 361 F.2d 106 (2d Cir. 1965), *cert denied,* 385 U.S. 898

(1966); *Veterans & Reservists for Peace in Viet-Nam v. Regional Comm'r of Customs,* 459 F.2d

676 (3d Cir. 1972), *cert denied* 409 U.S. 933 (1972)).

When funds are blocked at a financial institution pursuant to a blocking notice and a

party believes the funds have been blocked due to mistaken identity, that party may seek to have

such funds unblocked. *See 31 C.F.R. § 501.806.* Aaron and Mr. Nor seek to have their funds

unblocked based upon its belief that they have been mistakenly identified as a parties associated

with terrorist activities.

A request to have funds unblocked must contain the following information:

(1)    the name of the financial institution in which the funds are blocked;

(2)    the amount blocked;

(3)    the date of the blocking;

7

(4)     the identity of the original remitter of the funds and any intermediately financial institutions;

(5)     the intended beneficiary of the blocked transfer;

(6)     a description of the underlying transaction including copies or related documents;

(7)     the nature of the applicant's interest; and

(8)     a statement of the reasons why the applicant believes the funds were blocked due to mistaken identity.

*See 31 C.F.R. 501.806(d).*

## 1-2. Financial Institutions and Amounts

Funds in Aaron's account have been blocked at the following financial institution: approximately $166,111.86 at Associated Bank, Account Number 2283000699, 1801 Riverside Avenue, Minneapolis, Minnesota 55458. The following funds in Mr. Nor's account have been blocked: approximately $41,225.35 at Wells Fargo Bank Minnesota, N.A., Account Number 397-2664550, Nicollet & Lake Office, P.O. Box B 514, Minneapolis, Minnesota 55479. Mr. Nor's personal account was used by Aaron to hold funds deposited for transfer by smaller Amal agents around the western U.S. Since the other Amal agents were smaller than Aaron in terms of volume of business and not able to effectively and efficiently make money transfers, they relied on Aaron to collect and transfer funds that the smaller agents received from their customers. Because Aaron's bank account was maintained at Associated Bank, a Midwest regional bank, Amal agents operating outside the Midwest could not easily deposit money into Aaron's account. Thus, instead of using Aaron's account the agents deposited money into Mr. Nor's account at Wells Fargo, a bank with branches located throughout the western half of the U.S.

Neither Aaron nor Mr. Nor can determine the exact amount of money that has been blocked because all of their financial records were seized by the government.

8

3.    Date of Blockings

Aaron's and Mr. Nor's accounts were blocked on November 7, 2001.

4.    Identity of the Original Remitter of the Funds and Intermediary Financial Institution.

Numerous customers and other Amal agents remitted funds that were deposited by Aaron and Mr. Nor into the blocked accounts.  The names of the customers and other Amal agents cannot be provided without access to Aaron's and Mr. Nor's records.

5.    The Intended Beneficiaries.

The intended beneficiaries of the blocked funds are primarily East African refugees that are related to those sending money from Minnesota via Aaron.  These people rely on the money for their very existence, and there is no indication that they supply or direct money to terrorists. Instead, a recent newspaper article described one of the "beneficiaries" and the journey she endures to pick-up and utilize the money sent by her daughter in America as follows:

> [A] 68-year old mother walks more than an hour through bombed-out dusty roads, past waiting thieves, flying bullets, beggars and murderous gangs to the office in Mogadishu's Medina district.
>
> At Al-Barakaat, she collects her money in U.S. currency.  To be sure she won't be harassed, she asks for small bills to give people who beg or bother her.
>
> A line of people awaits her back home.  She doesn't tell them she has money, but everyone knows why she left so early.  Each of them will leave her yard with a dollar or two.
>
> She will buy $7 worth of water, enough to fill the tank for a week.  She will spend the rest on a small bit of goat meat and beef, flour, sugar and other staples she can stretch for her large family.

See, *Somalis in the U.S.* worry *about closed wire-transfer offices*, Minneapolis Star Tribune, pp. A1, 12, Nov. 10, 2001.

The funds should be returned to their lawful owners.  It is unconscionable to withhold money from poor U.S. immigrants and their families.  Moreover, a number of Aaron's customers

9

have expressed anger and frustration toward Mr. Nor because their money has not been received by their family members in Africa or returned to the customers. Some of Aaron's customers have even threatened violence against Mr. Nor and/or his family. Mr. Nor is concerned for his and his family's safety because of the threats.

The United Nations representative to Somalia, Randolph Kent, has said "[t]he [money transfer business] closure is having a very, very serious effect. *** We are at a point where we have to start anticipating a crisis that could be unique in the modern state system – the collapse of an entire national economy." *See* Minneapolis Star Tribune, p. A1, December 1, 2001.

A portion of the money belongs to Aaron. Without its records, it cannot ascertain what the correct amount is. Aaron is in arrears on rent, utilities and salary. Mr. Nor has no income with which to support his wife and two small children. It is, thus, urgent that the funds be returned to Aaron, Mr. Nor and Aaron's customers so that the customers can make alternative arrangements to get the money to their relatives and Mr. Nor can support his family. Another portion of the money belongs to Amal. Without access to their records, Aaron and Mr. Nor are unable to determine what portions of the money belong to Aaron, Amal and Aaron's customers.

6.    **The Underlying Transactions**

The underlying transactions at issue here consist of transactions akin to a Western Union money wire transfer in that they involve customers bringing sums of money (usually $100 - $500, although occasionally $5,000 or more) to a business location for the purpose of having the money transferred to someone else. As described above, Aaron accepts money from its customers and deposits the funds into its banks accounts. At least once a day, Aaron, via fax or email, sends a list of names of recipients and other related information to Amal in the United

10

Arab Emirates.  When Amal receives the lists, it advances the specified amount of money to the designated recipient.

Periodically (normally at the end of each month), Aaron and Mr. Nor settle up with Amal based upon computer generated financial statements that reflect Aaron's business activities of the preceding month.[1]  Based upon the information contained in the financial documents, the companies determine the amount of commission Aaron earned.  Of the money received by Aaron for commissions, Aaron paid its operating expenses and employee salaries.  None of the money earned by Aaron was provided to terrorists or terrorist organizations, and it is aware of <u>none</u> of the amounts transferred being used for such purposes.

Although Aaron operates in a fashion similar to Western Union, it is interesting to note that no action has been taken against it despite clear evidence that Western Union has been directly linked to terrorist activity.  News reports state that it has been determined that "[i]n the three days preceding September 11, four separate payments were sent to the United Arab Emirates by the alleged highjackers.  All four were made through Western Union Financial Services, Inc. agents in the U.S. . . . ."  *See* Heather Timmons, *Western Union: Where the Money Is – in Small Bills*, BusinessWeek Online, Nov. 15, 2001 at http:/biz.yahoo.com/bizwk/ 011115/ewybxk5dqr6jt4mf_pdstq_1.html.  Western Union remains open and unaffected by any blockings.  Unlike Western Union, there is no direct or indirect connection between Aaron or Mr. Nor and the events of September 11th or any other terrorist activities.  Notwithstanding the lack of such a connection, Aaron's and Mr. Nor's accounts have been frozen and Aaron's operations closed.  Such actions can only be viewed as unreasonable, arbitrary, capricious, and an abuse of discretion.

---

[1] Aaron is unable to provide copies of the financial statements because those documents were seized by OFAC.

BURKE Exhibit B-52

7.    **The Nature of the Applicant's Interest.**

Aaron and Mr. Nor have both direct and indirect interests in the blocked funds. First, Aaron and Mr. Nor have direct interests in the frozen funds because the funds are frozen in accounts maintained by Aaron and Mr. Nor and, in part, belonging to them. Aaron and Mr. Nor also have an interest in the funds belonging to Aaron's customers and Amal, as Aaron holds those amounts as agent for the benefit of its customers and/or Amal. Thus, Aaron and Mr. Nor have an interest in all of the frozen funds which belong either to Aaron's customers and/or Amal, who bestowed their trust in Aaron to make sure that the money was delivered to the designated recipients in Africa.

8.    **Reasons Aaron and Mr. Nor Believe the Funds Were Blocked Based Upon Mistaken Identity.**

The Blocking Notices indicate that Aaron and Mr. Nor have been identified as an entity or individual that "provided financial support or other services to persons who commit, threaten to commit or support terrorism (Specially Designated Global Terrorist ("SDGT")). The term SDGT is not defined in either the Order or the Blocking Notices. Aaron and Mr. Nor are thus left to assume that the term refers to "an entity that provides financial support or other services to persons who commit, threaten to commit or support terrorism." *See Blocking Notice* at ¶ 1. The Order defines terrorism as follows: "an activity that –

> (i) involves a violent act or an act dangerous to human life, property, or infrastructure; and
> (ii) appears to be intended –
>> (A)    to intimidate or coerce a civilian population;
>> (B)    to influence the policy of a government by intimidation or coercion; or
>> (C)    to affect the conduct of a government by mass destruction, assassination, kidnapping, or hostage taking.

*See Order at Section 3(d).*

BURKE Exhibit B-53

Aaron and Mr. Nor, however, vehemently deny that they have any connections whatsoever to persons who commit, threaten to commit or support terrorism. Aaron and Mr. Nor further deny that they are in any way involved in or associated with anyone or any organization that commits violent acts or acts dangerous to human life, property or infrastructure that appear to be intended to intimidate or coerce a civilization, influence the policy of a government by intimidation or coercion or affect the conduct of a government by mass destruction, assassination, kidnapping or hostage taking. To the contrary, Aaron and Mr. Nor supplied humanitarian relief by providing a service that enabled U.S. immigrants to supply money to their impoverished family members back in Africa. Support for the claim that Aaron and Mr. Nor provided humanitarian services and not support for terrorists is found in statements recently made by other Somali immigrants. For example, Mohamed Wardere, a Twin Cities Somali leader has instructed local Somalis to contact federal authorities if they know of anyone collecting money for terrorists or planning terrorist activities. *See*, Minneapolis Star Tribune, October 14, 2001 at http://www.startribune.com/stories/1576/813722.html. Mr. Wardere continued stating "[i]t's bad for our community. If we find that somebody is doing that in our community, we won't hide them." *Id.* Notwithstanding Mr. Wardere's comments, he supports Aaron's and Mr. Nor's requests for the unblocking of the frozen funds.

A Somali man employed by the Somali Justice Center also commented that "[t]his is a matter of life and death to the Somali community." *Id.* The man continued stating "what happened to us [on November 7, 2001] is beyond comprehension." *Id.* Another Somali woman commented: "[w]e are the foundation of our people, the spinal cord. Without us, our families will die. But I wonder, does America care?" See, *Somalis in the U.S. worry about closed wire-transfer offices*, Minneapolis Star Tribune, p. A12, Nov. 10, 2001. Yet another Somali

BURKE Exhibit B-54

immigrant questioned "[w]hat does life mean to you, when you have money but your mother is dying of starvation because you can't get that money to her?"  See, *Government to look into other wire-transfer firms*, Minneapolis Star Tribune, p. A1, Nov. 9, 2001.

Shortly after commencing operations in 1998, Aaron and Mr. Nor were approached by agents for the IRS who were suspicious that money being transferred by Aaron was related to drug trafficking.  Aaron and Mr. Nor cooperated with the IRS agents by disclosing their business records to confirm that they were in no way connected to any type of illegal activities.  After Aaron and Mr. Nor cooperated and shared such information with the IRS, they never heard from the agents again.  Mr. Nor has offered again to cooperate with the government in its current investigation. His willingness to submit to an interview was communicated to AUSA John Marti who may be reached at (612) 664-5600.

Consideration of the above facts indicates that the funds should be unblocked.  The primary beneficiaries of the funds are innocent, starving people who rely very heavily on the funds for their survival.  There is no connection between Aaron, Mr. Nor or the beneficiaries and terrorism.  The underlying transactions are legal, proper and needed by the Somali-American community that relies on the transactions to assist their needy families back in Africa.  There is no evidence to support a claim that Aaron and Mr. Nor were appropriately determined to be supporting terrorists.  Therefore, the funds should be unblocked so that Aaron, Mr. Nor, Amal and Aaron's customers can use the funds that unquestionably belong to them.

**B.    ALTERNATIVELY, AARON AND MR. NOR SHOULD RECEIVE LICENSES TO ALLOW THEM TO SATISFY THEIR LEGAL OBLIGATIONS.**

For the reasons set forth above, Aaron and Mr. Nor alternatively request licenses that will allow them to pay their salaries, rent, utility bills and other operating expenses, as well as to restore funds belonging to Aaron's customers and Amal.  Aaron and Mr. Nor request access to

BURKE Exhibit B-55

their records and computer so that they can provide a list of specific debts, customers and the amounts thereof.

C.    **AARON'S AND MR. NOR'S NAMES SHOULD BE REMOVED FROM APPENDIX A, ALL VERSIONS OF OFAC'S SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS ("SDN") LIST AND OFAC'S BROCHURE ON TERRORISM.**

a.    There is no basis for the determination.

According to the Blocking Notices, the Department of Treasury has identified Aaron and Mr. Nor as entities or individuals that "provide[d] financial support or other services to persons who commit, threaten to commit or support terrorism (Specially Designated Aaron Terrorist ("SDGT")). The Order lists SIRO as a SDGT. The Blocking Notices, however, provide no evidence in support of such allegations. Thus, Aaron, SIRO and Mr. Nor seek to have their names removed from Appendix A to Title 31 CFR Chapter V, all versions of OFAC's Specially Designated Nationals and Blocked Persons ("SDN") list and OFAC's brochure on terrorism.

Neither Aaron nor Mr. Nor have any known connections to terrorism, those committing terrorist acts, those threatening to commit terrorist acts, nor those supporting terrorism. To the contrary, Aaron is a company dedicated to providing a much needed and very valuable service to the Somali immigrant community in Minneapolis, Minnesota. Rather than providing financial support to terrorists, Aaron provides financial services to honest working people that live in Minnesota, yet have family members back in Africa. Some of these people work two or three jobs so that they can earn enough money to support themselves and their families here in the U.S., plus send money back to family members in Africa. For a very modest fee, Aaron provides a medium that allows these immigrants to send a portion of their earnings back to family members in Africa.

15

At least, ninety-five percent of the money transferred by Aaron and its customers goes directly to those designated by the senders as recipients. The remaining approximately five percent is divided between Aaron and Amal, 33% and 67%, respectively. Neither Mr. Nor or Aaron has any knowledge that Amal is providing funding for terrorists. In the unlikely event that turns out to be the case, Aaron will readily sever all business relationships it has with Amal. Likewise, Aaron and Mr. Nor are not aware of any connections between those designated to receive the money sent by Aaron's customers and any terrorists, political organizations, warlords or others with terrorist affiliations. Indeed, according to Mr. Nor, "[t]he whole idea is we help Somali people." *See* Minneapolis Star Tribune, *Money-transfer businesses answer a need, owners say,* Nov. 19, 2000, at http://www.startribune.com/stories/484/53003.html. Mr. Nor continued stating "[i]f we get the government [operating], then we have a solution and we won't need the wire services. The money goes to individuals. Not tribes. Not factions. Not warlords." *Id.*

In the Somali community, trust is at a premium when it comes to establishing business relationships. Aaron's customers do business with the company because of the reputation of trust that Aaron and Mr. Nor have earned with Aaron's customers. Aaron and Mr. Nor, like any other business or businessman, earned such a reputation by delivering the services that they promised their customers. That service is simply getting the money quickly, as they promised they would, to the starving, impoverished and dying people in Africa that rely on the money for their very survival.

Although the Order prohibits United States persons from making humanitarian donations to persons determined to be subject to the Order, it does not prohibit United States persons from providing humanitarian relief to others, particularly those in desperate need of the assistance in

16

Somalia. As discussed above, the nature of the transactions underlying the funds that have been

blocked in Aaron's and Mr. Nor's accounts concerns money provided by immigrants to the U.S.

that are giving/donating money to others, including family members in Somalia, Ethiopia and

Kenya. Money sent by Aaron's customers is used to meet basic needs for food, clothing and

shelter. Providing such financial assistance to the people of Somalia is not only proper and legal,

but also consistent with the financial support being provided to the people of Somalia by the

international community and urgently needed by the recipients.    The United Nations

Consolidated Inter-Agency Appeal for Somalia 2002 provides, in part, as follows:

> As the world faces the prospect of fundamental global political and economic change, the
> future of marginalized societies like Somalia is increasingly important. Beset by hunger,
> disease and disarray, Somalia is slowly reconstructing its place within the international
> community.
>
> ***
>
> Facing some of the most appalling living conditions in the world – where 45 women die
> every day in labor and one in four children do not reach the age of five – Somalia is still
> reliant on international assistance to provide basic life saving support and protection of
> livelihoods.

*See United Nations Consolidated Inter-Agency Appeal for Somalia 2002*, U.N. Office for the

Coordination of Humanitarian Affairs, at 1. In light of the U.N.'s findings, it is committed to

raising $83,683,971 in U.S. funds during 2002 to focus primarily on humanitarian actions to

address the pending crisis in Somalia. *Id.* The funds blocked in Aaron's and Mr. Nor's accounts

are also targeted to address the needs of the families in Somalia. Since the funds blocked in

Aaron's and Mr. Nor's accounts are akin to the funds being provided to the people of Somalia by

the U.N. and the international community, there is no basis for determining that Aaron or Mr.

Nor are involved in providing financial support to terrorist.

17

b.     **Aaron is willing to reorganize.**

Since it is clear that the services Aaron provided are much needed by the Somali immigrant community located in Minneapolis, Aaron wishes to continue providing such services to its customers.   Aaron, however, is mindful that it may need to reorganize its company to accomplish that goal and it is willing to conduct such a reorganization.   A blocked person may propose remedial steps on the person's part, such as corporate reorganization, which the person believes would negate the basis for the designation.  *See 31 C.F.R 501.807(a).*  Since Aaron and Mr. Nor have no connections to terrorists and the government has not provided any information to show why it has placed such designations on Aaron and Mr. Nor, they are left to speculate why the government has made the determinations.   President Bush has been quoted accusing such services of "skim[ming] from every transaction to benefit terrorists.  *See* David Stout, *U.S. Acts to Freeze Assets of Terror Groups*, The New York Times, November 7, 2001, at http://www.newyourtimes.com/2001/11//07/national/07CND-PREX.html?.  Notwithstanding the President's accusations, however, United States Treasury Department Secretary Paul O'Neill has acknowledged that "[w]e have 100,000 Somali's in the United States and it is not an unusual practice of foreign born people residing in the United States . . . to send money back to their families who are living in very impoverished circumstances to help them out."  See, *Fed Raids Expose Somali Wire Transfer*, Minneapolis Star Tribune, Nov. 7, 2001, at http://www. startribune.com/stories/709/812997.html.   Moreover, O'Neill has said that unless such services are listed as a terrorist organization, "people should assume that they're OK."  *See Government to look into other money transfer firms*, Minneapolis Star Tribune, Nov. 9, 2001, at http://www. startribune.com/stories/484/816799.html.

18

O'Neill has also suggested that alternatives be developed to help immigrants find a way to repatriate money "that doesn't involve someone skimming off some of their money to help fund terrorists." *Id.* Such alternative *could* include Western Union, but Western Union has suspended its operations in Somali. In addition, "Western Union charges about three times as much as the 5-percent fee the Somalia-run services typically charge to wire $100 from Minnesota to Africa", according to Western Union territory sales manager Rob McDonough. Thus, Aaron proposes reorganizing its company so that it can still provide valuable services to its customers, yet avoid any accusations that third parities that it may deal with are diverting funds to support terrorist operations.

**D.    OTHER LEGAL ISSUES PRESERVED**

In the event that this matter is litigated in a court of law, Aaron and Mr. Nor reserve all other legal issues including, but not limited to, the following:

1.    That the Blocking Notices and seizures violate Aaron's and Mr. Nor's due process rights;

2.    That the seizures violate the Fourth Amendment;

3.    That the seizures were broader than necessary and were not authorized by law;

4.    That Mr. Nor's equal protection rights have been violated; and

5.    That the seizure of personal property, computers and records; the closure of Aaron's business; and the exclusion of Aaron from its leased premises are unauthorized by law.

## II. <u>CONCLUSION</u>

Aaron and Mr. Nor respectfully request that OFAC first provide access to Aaron's and Mr. Nor's records (both paper and electronic), so that Aaron and Mr. Nor can provide an accounting of the specific uses for the funds in the blocked accounts. Aaron and Mr. Nor then

BURKE Exhibit B-60

request that OFAC release such specifically identified funds to Aaron, Mr. Nor and their customers.

Respectfully submitted,

Dated: December 14, 2001

John W. Lundquist (#65286)
Rick L. Petry (#292503)
FREDRIKSON & BYRON, P.A.
1100 International Centre
900 Second Avenue South
Minneapolis, MN 55402-3397
Phone: (612) 347-7107
Fax:   (612) 347-7077
Attorneys for Aaron Money Wire Service, Inc. and Garad Nor

2588232\1

20

Minneapolis
London
Washington, DC    1100 International Centre
*Affiliates:*    900 Second Avenue South
Mexico City    Minneapolis, MN 55402-3397
Warsaw    (612) 347-7000
Montreal    FAX (612) 347-7077
Toronto    www.fredlaw.com
Vancouver    JOHN W. LUNDQUIST
    Direct Dial No.
    (612) 347-7181
    jlundquist@fredlaw.com

# FREDRIKSON & BYRON, P.A.
*Attorneys and Advisors*

December 5, 2001

**VIA FEDERAL EXPRESS**

R. Richard Newcomb, Director
U.S. Department of Treasury
Office of Foreign Assets Control
1500 Pennsylvania Avenue NW (Annex)
Washington, DC 20220

Re:    License Request of Fredrikson & Byron, P.A.

Dear Mr. Newcomb:

As counsel for Global Services International, Inc., we have filed three Applications for Release of Blocked Funds with your office. Copies are attached hereto for your reference.

By this letter, Fredrikson & Byron, P.A. requests that your office grant a license so that we may be paid for our legal services, past and future, provided to Global Services International, Inc. These services will include representation of Global Services International, Inc. in all matters related to the Blocking Notice dated November 7, 2001, counseling regarding the requirements of relevant law, legal assistance in dealing with federal law enforcement agencies, defending our clients blocked property (including preparation of the enclosed Application), representation before OFAC and any litigation that may result therefrom. We believe that such a license is proper under 31 C.F.R. § 585.506 and may also be constitutionally required.

At this time we request a license for the payment of $25,000 for these services.

We base this request on the attached Applications which are incorporated by reference. Please let me know as soon as possible if you request any other information or believe that a separate form should be submitted.

Very truly yours,

John W. Lundquist

JWL/sd
Enclosures
cc:    Vicki Rosenthal, Office of OFAC Chief Counsel (w/Encl.)
    Abdullahi Farah (w/Encl.)

::ODMA\PCDOCS\FBDOCS1\2590985\1

BURKE Exhibit B-62                **EXH. I**

# FREDRIKSON & BYRON, P.A.
### *Attorneys and Advisors*

Minneapolis
London
Washington, DC
*Affiliates:*
Mexico City
Warsaw
Montreal
Toronto
Vancouver

1100 International Centre
900 Second Avenue South
Minneapolis, MN  55402-3397
(612) 347-7000
FAX (612) 347-7077
www.fredlaw.com
JOHN W. LUNDQUIST
Direct Dial No.
(612) 347-7181
jlundquist@fredlaw.com

December 14, 2001

**VIA FEDERAL EXPRESS**

R. Richard Newcomb, Director
U.S. Department of Treasury
Office of Foreign Assets Control
1500 Pennsylvania Avenue NW (Annex)
Washington, DC 20220

> **Re:    License Request of Fredrikson & Byron, P.A.**

Dear Mr. Newcomb:

As counsel for Aaron Money Wire Service, Inc. ("Aaron") and Garad Nor, we have filed two Applications for Release of Blocked Funds with your office.  Copies are attached hereto for your reference.

By this letter, Fredrikson & Byron, P.A. requests that your office grant a license so that we may be paid for our legal services, past and future, provided to Aaron and Mr. Nor.  These services will include representation of Aaron and Mr. Nor in all matters related to the Blocking Notices dated November 7, 2001, counseling regarding the requirements of relevant law, legal assistance in dealing with federal law enforcement agencies, defending our clients blocked property (including preparation of the enclosed Application), representation before OFAC and any litigation that may result therefrom.  We believe that such a license is proper under 31 C.F.R. § 585.506 and may also be constitutionally required.

At this time we request a license for the payment of $25,000 for these services.

We base this request on the attached Applications that are incorporated by reference. Please let me know as soon as possible if you request any other information or believe that a separate form should be submitted.

Very truly yours,

John W. Lundquist

RLP
Enclosures
cc:    Vicki Rosenthal, Office of OFAC Chief Counsel (w/Encl.)
       Garad Nor (w/Encl.)

BURKE Exhibit B-63

**EXH. J**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

JAN 1 4 2002

JAN 0 8 2002

FAC No. SDGT-197686

John W. Lundquist, Esq.
Fredrikson & Byron, P.A.
1100 International Centre
900 Second Avenue South
Minneapolis, MN 55402-3397

Dear Mr. Lundquist:

This is with reference to your letter of December 5, 2001 to the Treasury Department's Office of Foreign Assets Control ("OFAC") on behalf of Fredrikson & Byron, P.A. (the "Firm").    In your letter you advised that the Firm represents Global Services International, Inc. (the "Client") in all matters relating to OFAC's blocking notice of November 7, 2001.

On January 7, 2002, OFAC requested additional information relating to the nature of the legal services rendered and to be rendered to the Client.  The additional information should include copies of engagement letters, fee/retainer agreements between the Firm and the Client, as well as information relating to outstanding amounts due to the Firm in connection with the above matters.

We have closed your request pending the receipt of the requested additional information.  As soon as that information is received, we will continue to process your request and will provide you with a prompt final licensing determination.

Sincerely,

(Acting) Chief of Licensing
Office of Foreign Assets Control

BURKE Exhibit B-64

**EXH. K**

Minneapolis
London
Washington, DC    1100 International Centre
*Affiliates:*         900 Second Avenue South
Mexico City        Minneapolis, MN 55402-3397
Warsaw            (612) 347-7000
Montreal           FAX (612) 347-7077
Toronto            www.fredlaw.com
Vancouver         JOHN W. LUNDQUIST
                  Direct Dial No.
                  (612) 347-7181
                  jlundquist@fredlaw.com

# FREDRIKSON & BYRON, P.A.
*Attorneys and Advisors*

January 8, 2002

<u>VIA FACSIMILE AND U.S. MAIL</u>

Paul Broderick, Esq.
U.S. Department of Treasury
Office of Foreign Assets Control
1500 Pennsylvania Avenue NW (Annex)
Washington, DC 20220

   **Re: Global Services International, Inc.**

Dear Mr. Broderick:

  I am writing to you in connection with our attorneys fees license application (FAC Numbers SDGT-197684 and 197686) and your request for further information concerning our fee agreement with Global Services International, Inc. and the status of our billings.

  Our client has been billed $17,657 for legal services and $318.81 for disbursements provided by us from November 7 to December 31, 2001. All services provided pertain to the Blocking Notices dated November 7, 2001. Our legal services include numerous meetings with our clients; legal research; preparation of petitions; communications with third parties regarding blocking notices; counseling regarding the requirements of relevant law and licensure; legal assistance in dealing with federal law enforcement agencies; representation at interview with federal agents; negotiations for return of property seized from home; representation before OFAC; and other related services.

  Our client has borrowed in order to pay our firm a $10,000 retainer. We propose to refund that retainer to our client once the license application has been approved and our statement is paid through a blocked account.

BURKE Exhibit B-65

**EXH. L**

**FREDRIKSON & BYRON, P.A.**
*Attorneys and Advisors*

Paul Broderick, Esq.
January 8, 2002
Page 2

     Our client has countersigned this letter and joins in the request for permission to pay up to $25,000 in legal fees from blocked funds upon presentation of an approved invoice to the appropriate bank.  Please do not hesitate to contact me if you have any questions or comments.

Very truly yours,

John W. Lundquist

**CERTIFICATION**

     Global Services International, Inc. hereby joins in the request set forth above and authorizes the payment of legal fees and disbursements to Fredrikson & Byron from the blocked accounts at Associated Bank, U.S. Bank and/or Wells Fargo Bank.

GLOBAL SERVICES INTERNATIONAL, INC.

Date: 1-8-2002      By Abdullahi Farah Afesend

JWL/sd

::ODMA\PCDOCS\FBDOCS1\2602556\1

BURKE Exhibit B-66