# THOMAS R. BURKE
# EXHIBIT F

Case 3:07-cv-02590 Document 50 Filed 07/02/2008    Page 2 of 4

# The New York Times
nytimes.com



PRINTER-FRIENDLY FORMAT
SPONSORED BY

March 4, 2008

SIDEBAR

# A Wave of the Watch List, and Speech Disappears

By ADAM LIPTAK

Steve Marshall is an English travel agent. He lives in Spain, and he sells trips to Europeans who want to go to sunny places, including Cuba. In October, about 80 of his Web sites stopped working, thanks to the United States government.

The sites, in English, French and Spanish, had been online since 1998. Some, like www.cuba-hemingway.com, were literary. Others, like www.cuba-havanacity.com, discussed Cuban history and culture. Still others — www.ciaocuba.com and www.bonjourcuba.com — were purely commercial sites aimed at Italian and French tourists.

"I came to work in the morning, and we had no reservations at all," Mr. Marshall said on the phone from the Canary Islands. "We thought it was a technical problem."

It turned out, though, that Mr. Marshall's Web sites had been put on a Treasury Department blacklist and, as a consequence, his American domain name registrar, eNom Inc., had disabled them. Mr. Marshall said eNom told him it did so after a call from the Treasury Department; the company, based in Bellevue, Wash., says it learned that the sites were on the blacklist through a blog.

Either way, there is no dispute that eNom shut down Mr. Marshall's sites without notifying him and has refused to release the domain names to him. In effect, Mr. Marshall said, eNom has taken his property and interfered with his business. He has slowly rebuilt his Web business over the last several months, and now many of the same sites operate with the suffix .net rather than .com, through a European registrar. His servers, he said, have been in the Bahamas all along.

Mr. Marshall said he did not understand "how Web sites owned by a British national operating via a Spanish travel agency can be affected by U.S. law." Worse, he said, "these days not even a judge is required for the U.S. government to censor online materials."

A Treasury spokesman, John Rankin, referred a caller to a press release issued in December

BURKE Exhibit F-1

2004, almost three years before eNom acted. It said Mr. Marshall's company had helped Americans evade restrictions on travel to Cuba and was "a generator of resources that the Cuban regime uses to oppress its people." It added that American companies must not only stop doing business with the company but also freeze its assets, meaning that eNom did exactly what it was legally required to do.

Mr. Marshall said he was uninterested in American tourists. "They can't go anyway," he said.

Peter L. Fitzgerald, a law professor at Stetson University in Florida who has studied the blacklist — which the Treasury calls a list of "specially designated nationals" — said its operation was quite mysterious. "There really is no explanation or standard," he said, "for why someone gets on the list."

Susan Crawford, a visiting law professor at Yale and a leading authority on Internet law, said the fact that many large domain name registrars are based in the United States gives the Treasury's Office of Foreign Assets Control, or OFAC, control "over a great deal of speech — none of which may be actually hosted in the U.S., about the U.S. or conflicting with any U.S. rights."

"OFAC apparently has the power to order that this speech disappear," Professor Crawford said.

The law under which the Treasury Department is acting has an exemption, known as the Berman Amendment, which seeks to protect "information or informational materials." Mr. Marshall's Web sites, though ultimately commercial, would seem to qualify, and it is not clear why they appear on the list. Unlike Americans, who face significant restrictions on travel to Cuba, Europeans are free to go there, and many do. Charles S. Sims, a lawyer with Proskauer Rose in New York, said the Treasury Department might have gone too far in Mr. Marshall's case.

"The U.S can certainly criminalize the expenditure of money by U.S. citizens in Cuba," Mr. Sims said, "but it doesn't properly have any jurisdiction over foreign sites that are not targeted at the U.S. and which are lawful under foreign law."

Mr. Rankin, the Treasury spokesman, said Mr. Marshall was free to ask for a review of his case. "If they want to be taken off the list," Mr. Rankin said, "they should contact us to make their case."

That is a problematic system, Professor Fitzgerald said. "The way to get off the list," he said, "is to go back to the same bureaucrat who put you on."

BURKE Exhibit F-2

Last March, the Lawyers' Committee for Civil Rights issued a disturbing report on the OFAC list. Its subtitle: "How a Treasury Department Terrorist Watch List Ensnares Everyday Consumers."

The report, by Shirin Sinnar, said that there were 6,400 names on the list and that, like no-fly lists at airports, it gave rise to endless and serious problems of mistaken identity.

"Financial institutions, credit bureaus, charities, car dealerships, health insurers, landlords and employers," the report said, "are now checking names against the list before they open an account, close a sale, rent an apartment or offer a job."

But Mr. Marshall's case does not appear to be one of mistaken identity. The government quite specifically intended to interfere with his business.

That, Professor Crawford said, is a scandal. "The way we communicate these days is through domain names, and the Treasury Department should not be interfering with domain names just as it does not interfere with telecommunications lines."

Curiously, the Treasury Department has not shut down all of Mr. Marshall's .com sites. You can still find, for now, www.cuba-guantanamo.com.

*Online: Documents and an archive of Adam Liptak's articles: nytimes.com/adamliptak.*

Copyright 2008 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

BURKE Exhibit F-3