# THOMAS R. BURKE

# EXHIBIT G

# NOTES

## Justice for the "Designated": The Process That Is Due to Alleged U.S. Financiers of Terrorism

Nicole Nice-Petersen*

### Introduction

Within two weeks after the attacks of September 11, 2001, President George W. Bush invoked his powers under the International Emergency Economic Powers Act (IEEPA)[1] by signing an executive order declaring a national emergency and freezing the assets of twenty-seven entities his Administration determined to be "terrorists" or "persons that support or otherwise associate with" terrorists.[2] In making this announcement, the President assured the American people that his Administration was acting based on "clear evidence," but that this evidence would not be disclosed because it was classified.[3] In fact, the Bush Administration froze the assets of these entities *without* providing the entities with sufficient notice of the specific charges against them—even after the freeze—and *without* affording them a hearing at which they could present evidence in their defense. The "clear evidence" that President Bush declared was in the hands of his Administration was not only kept secret from the American people and the media—it was not even revealed to the entities that had millions of dollars in assets frozen indefinitely and, as a result, had no meaningful opportunity to defend themselves.

In the years since the September 11 attacks, President Bush has continued to use IEEPA to freeze the assets of hundreds of designated terrorist individuals and organizations.[4] The increased use of this emergency powers statute to combat terrorism reflects the government's need to act swiftly to block the assets of individuals who it believes are supporting terrorist activities and

---

* J.D., Georgetown University Law Center, 2005. The author wishes to thank Professor David Cole of Georgetown University Law Center for his guidance, suggestions, and encouragement throughout the writing of this Note. The author is also grateful for the inspiration provided by Congressman David E. Bonior—one of the few Members of Congress willing to fight for the rights of persons who are deprived of their liberty on the basis of secret evidence.

1. 50 U.S.C. §§ 1701–1707 (2000 & Supp. I 2001).

2. *See* Exec. Order No. 13,224, 3 C.F.R. 785 (2001) ("Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"); Press Release, The White House, President Freezes Terrorists' Assets (Sept. 24, 2001), *available at* http://www.whitehouse.gov/news/releases/2001/09/20010924-4.html.

3. Press Release, The White House, *supra* note 2.

4. Press Release, The White House, Three Years of Progress in the War on Terror (Sept. 11, 2004), *available at* www.whitehouse.gov/news/releases/2004/09/20040911.html. As of September 2004, the United States had designated 387 persons and entities as terrorists or supporters of designated terrorists and frozen approximately $142 million in terrorist-related assets. *Id.*

1387

BURKE Exhibit G-1

organizations, and thereby prevent devastating attacks against the United States. Since September 11, there has been a worldwide consensus that freezing terrorist assets is an effective and important tool in the war against terrorism,[5] and IEEPA has become the executive's primary means of taking such action. However, the Bush Administration has increasingly used IEEPA, which was originally used as a means for freezing the assets of foreign nations for political and diplomatic reasons, to freeze the assets of U.S. citizens and corporations present in the United States.[6] As a result, this statute, which raised few constitutional problems when used against foreign states and individuals, now presents serious constitutional problems when used against U.S. entities entitled to constitutional rights.[7] Determining what process is due to alleged financiers of terrorism requires striking a delicate balance between our nation's legitimate need to thwart terrorism and the due process rights of U.S. entities.

The current procedures provided to U.S. entities under IEEPA fall far short of meeting basic due process requirements. The lack of sufficient notice of the charges against them and the lack of a meaningful opportunity to be heard before a neutral arbiter make it virtually impossible for U.S. entities to mount a defense against IEEPA blocking orders. The use of classified evidence to justify blocking orders further increases the risk that blocked U.S. entities will suffer serious and erroneous deprivations of their property. While exigent circumstances, deference to the executive on matters of national security, and the notion that IEEPA freezes are only temporary have been offered by courts as reasons for providing only minimal procedural safeguards to blocked U.S. entities,[8] a close examination of these justifications reveals that they are insufficient to warrant the lack of procedural safeguards provided in the terrorist designation process. Blocked U.S. entities have a constitutional right to sufficient notice, an adversarial hearing before an impartial arbiter, and access to the information being used to justify their deprivation.

Part I of this Note will discuss the current use of IEEPA to freeze the assets of suspected terrorist organizations and the process by which the Treasury Department designates entities as "terrorists" and blocks their assets. Part II will examine three unsuccessful due process challenges brought by U.S. Muslim charities whose assets were frozen under IEEPA. Part III will highlight the due process concerns raised by each of these cases, examine the private and

---

5. *See* S.C. Res. 1390, U.N. SCOR, 54th Sess., 4452th mtg., U.N. Doc. S/RES/1390 (2002) (requiring members of the United Nations to freeze assets of Usama bin Laden, al Qaeda members, and the Taliban); S.C. Res. 1373, U.N. SCOR, 57th Sess., 4385th mtg., U.N. Doc. S/RES/1373 (2001) (requiring members of the United Nations to freeze assets of persons who commit, or attempt to commit, terrorist acts, and of those who facilitate such acts).

6. DAVID COLE, ENEMY ALIENS 77 (2003); R. Colgate Selden, *The Executive Protection: Freezing the Financial Assets of Alleged Terrorists, the Constitution, and Foreign Participation in U.S. Financial Markets*, 8 FORDHAM J. CORP. & FIN. L. 491, 494 (2003).

7. COLE, *supra* note 6, at 77.

8. *See, e.g.*, Holy Land Found. for Relief & Dev. v. Ashcroft, 219 F. Supp. 2d 57, 76 (D.D.C. 2002); Global Relief Found., Inc. v. O'Neill, 207 F. Supp. 2d 779, 808 (N.D. Ill. 2002).

BURKE Exhibit G-2

governmental interests at stake in the determination of due process safeguards under IEEPA, and outline what procedures, at a minimum, are constitutionally required to allow U.S. entities accused of terrorist connections a meaningful opportunity to defend themselves.

## I. IEEPA AND THE TERRORIST DESIGNATION PROCESS

### A. THE PRESIDENT'S POWERS UNDER IEEPA

The President's powers under IEEPA are very broad and have been expanded even further in recent years. IEEPA was enacted in 1977 to establish a procedure whereby the President could, during peacetime, employ a wide range of economic sanctions to deal with a declared national emergency.[9] Under IEEPA, the President must first establish that there exists "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."[10] Once this threat is established, and the President declares a national emergency pursuant to the National Emergencies Act,[11] IEEPA then authorizes the President to take certain actions to deal with the established threat.[12] Specifically, IEEPA authorizes the President to

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . .[13]

The President typically freezes assets under IEEPA using an executive order.[14]

The language allowing the President to block assets "during the pendency of an investigation" was added as part of the USA PATRIOT Act of 2001,[15] which expanded the President's powers under IEEPA even further by giving the

---

9. Pub. L. No. 95-223, tit. 2, 91 Stat. 1625, 1626–29 (1977) (codified as amended at 50 U.S.C. §§ 1701–1707 (2000 & Supp. 1 2001)); see also James J. Savage, Executive Use of the International Emergency Economic Powers Act—Evolution Through the Terrorist and Taliban Sanctions, 10 CURRENTS: INT'L TRADE L.J. 28, 28 (2001).

10. 50 U.S.C. § 1701(a) (2000).

11. Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601–1651 (2000)).

12. 50 U.S.C. § 1701.

13. 50 U.S.C. § 1702(a)(1)(B) (Supp. 1 2001).

14. See 50 U.S.C. § 1631 (2000).

15. Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), Pub. L. No. 107-56, § 106, 115 Stat. 272, 277–78 (amending 50 U.S.C. § 1702 (2000)). One violates an executive order issued under IEEPA by conducting economic transactions with an entity whose assets are blocked pursuant to the order. See 50 U.S.C. §§ 1702(a)(1)(B), 1705 (2000 & Supp. 1 2001).

BURKE Exhibit G-3

President the authority to freeze assets *before* he has made even an initial determination that the owner has violated IEEPA.[16] The PATRIOT Act amendments to IEEPA also added § 1702(c), which provides that, for the purposes of judicial review of any determination made under IEEPA, the government may submit classified information to a reviewing court *ex parte* and *in camera*. This means that the government's attorney can present classified evidence against a blocked entity to the court without the blocked entity's attorney present and without ever disclosing this evidence to the party whose assets are frozen.[17] Therefore, not only can an entity have its assets frozen before it has been proven that it committed any wrongdoing, but once that happens, it may have no opportunity to review and rebut the secret evidence used to designate it a "terrorist" and block its assets.[18]

At the time IEEPA was passed, it was intended to impose additional *limits* on the President's authority to freeze assets unilaterally during peacetime.[19] IEEPA's predecessor statute, the Trading with the Enemy Act (TWEA), conferred on the President broad regulatory powers to freeze assets and vest them in the control of the United States during both peacetime and wartime, with little congressional oversight.[20] In passing IEEPA, Congress reserved application of TWEA to wartime emergencies only and established new procedures and powers to be used during peacetime.[21] IEEPA was intended to limit the powers previously conferred under TWEA and to impose additional modes of congressional review to prevent the executive from abusing its authority under the Act.[22]

The only real congressional "check" on the President's sweeping powers under IEEPA, however, is the requirement that he submit to Congress periodic reports about the use of his powers under the Act.[23] The President must renew the national

---

16. *See* 50 U.S.C. § 1702(a)(1)(B) (Supp. I 2001).

17. 50 U.S.C. § 1702(c) (Supp. I. 2001). The statute, however, makes it explicit that there is no guaranteed right of judicial review. *Id.*

18. Both of the PATRIOT Act amendments to IEEPA were passed with little discussion or controversy. Hearings on the Act were focused on other provisions, and the House Report makes no specific mention of the IEEPA amendments, except to say that the amendments make "a number of clarifying and technical changes to section 203 of the International Emergency Economic Powers Act, most of which will not change the way that provision currently is implemented." H.R. REP. No. 107–236, at 62 (2001).

19. H.R. REP. No. 95-459, at 7–11 (1977); S. REP. No. 95-466, at 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541.

20. 50 U.S.C. app. § 1 (2000); *see also* Savage, *supra* note 9, at 29–30.

21. Rudolph Lehrer, Comment, *Unbalancing the Terrorists' Checkbook: Analysis of U.S. Policy in Its Economic War on International Terrorism*, 10 TUL. J. INT'L & COMP. L. 333, 340 (2002).

22. H.R. REP. No. 95-459, at 7–11 (1977); *see also id.* at 341; Savage, *supra* note 9, at 29–30.

23. 50 U.S.C. § 1703 (2000). Section 1706 of the Act does provide that Congress may terminate a national emergency, which gives rise to the President's powers under IEEPA, by concurrent resolution. 50 U.S.C. § 1706(b) (2000). However, this provision was effectively invalidated by the Supreme Court's decision in *INS v. Chadha*, 462 U.S. 919 (1983), which struck down the use of legislative vetoes. The National Emergencies Act, pursuant to which the President must declare a national emergency, also requires that Congress meet every six months to vote on whether to terminate the emergency. 50 U.S.C. § 1622(b) (2000). Yet Congress has not utilized this power, despite the continuation of many emergencies for years.

BURKE Exhibit G-4

emergency giving rise to his powers under IEEPA every year, or it will terminate automatically.[24] But because Presidents may repeatedly renew their declared national emergencies, there is no limit on the amount of time for which assets may remain frozen under the statute. Assets can be frozen for years, even decades.[25] Furthermore, the Act does not provide any principles that could serve to guide the President in determining which of his powers to use in different situations or how these powers should be specifically implemented.[26] And the judicial branch has provided little substantive oversight, given the high degree of deference that it shows the President on matters of foreign policy and national security.[27] In sum, IEEPA delegates to the President enormous powers to impose economic sanctions in virtually any way he sees fit.

Initially, presidents used their powers under IEEPA to freeze the assets of foreign nations, and those doing business with them, for political and diplomatic reasons.[28] President Carter first invoked the statute in 1979 to freeze the assets of Iran during the Iran Hostage Crisis.[29] This action was taken primarily to secure leverage for the United States in future negotiations with Iran.[30] President Reagan similarly invoked IEEPA to freeze the assets of Nicaragua in 1985 for the purpose of issuing sanctions against its Sandinista-controlled government.[31] In subsequent years, Presidents Reagan, Bush, and Clinton used IEEPA to block the U.S. assets of many nations, including Libya,[32] Panama,[33] Haiti,[34] the former Yugoslavia,[35] and Sudan,[36] and to impose trade sanctions against others, including South Africa[37] and Angola.[38] This was the primary type of application that Congress intended when it crafted IEEPA

---

24. 50 U.S.C. § 1622(d).

25. *See* Selden, *supra* note 6, at 546; John D. Cline, *The President's Power to Seize Property in the Post-September 11 World: The International Emergency Economic Powers Act*, CHAMPION, Sept./Oct. 2003, at 18. For example, the national emergency declared in 1950 in response to the Korean conflict remained in effect for almost twenty-five years, and the national emergency declared in 1979 with respect to Iran remains in effect today. *See* Jules Lobel, Comment, *Emergency Power and the Decline of Liberalism*, 98 YALE L.J. 1385, 1401 (1989); Cline, *supra*, at 18.

26. Savage, *supra* note 9, at 31.

27. *See* Regan v. Wald, 468 U.S. 222, 242 (1984) ("Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'") (quoting Harisiades v. Shaughnessy, 342 U.S. 580, 589 (1952)); *see also* Note, *The International Emergency Economic Powers Act: A Congressional Attempt to Control Presidential Emergency Power*, 96 HARV. L. REV. 1102, 1113 (1983) ("[T]he courts have displayed remarkable reluctance to enforce limits on presidential emergency powers, especially when such powers involve foreign relations.").

28. *See* Selden, *supra* note 6, at 494.

29. BARRY E. CARTER & PHILLIP R. TRIMBLE, INTERNATIONAL LAW 250 (3d ed. 1999).

30. *Id.*

31. *Id.* at 251.

32. Exec. Order No. 12,543, 3 C.F.R. 181 (1986); Exec. Order No. 12,544, 3 C.F.R. 183 (1986).

33. Exec. Order No. 12,635, 53 Fed. Reg. 12,134 (Apr. 8, 1988).

34. Exec. Order No. 12,775, 3 C.F.R. 367 (1991).

35. Exec. Order No. 12,808, 3 C.F.R. 305 (1992).

36. Exec. Order No. 13,067, 3 C.F.R. 230 (1997).

37. Exec. Order No. 12,532, 3 C.F.R. 387 (1985).

38. Exec. Order No. 12,865, 3 C.F.R. 636 (1993).

BURKE Exhibit G-5

with the requirement that there be a foreign national interest in assets frozen under the Act.[39]

Beginning during the Clinton Administration, however, the executive branch began invoking its powers under IEEPA to deal with very different kinds of threats—those stemming from "stateless" entities. President Clinton invoked IEEPA to freeze the assets of individuals engaged in narcotics trafficking.[40] In addition, Clinton used IEEPA to freeze the assets of terrorists in an attempt to punish and thwart those he believed were interfering with the Middle East peace process.[41] President George W. Bush followed suit in 2001 with an executive order freezing the assets of those "who commit, threaten to commit, or support terrorism," including both foreign and domestic entities.[42] By using IEEPA in these ways, Presidents Clinton and Bush were not seeking to use blocked assets as leverage in future diplomatic negotiations, nor were these assets frozen for purposes relating to nation-to-nation diplomacy.[43] Instead, IEEPA is now being used for the purpose of preventing certain individuals from acting in ways the executive deems contrary to the national interest.[44] Furthermore, by beginning to use IEEPA to freeze the assets of U.S. citizens and organizations, the executive has interpreted the meaning of the "foreign interest" requirement in § 1702(a)(1)(B) of IEEPA to include assets used to conduct operations outside the United States or applied for the benefit of noncitizens, even if those assets are legally owned by a U.S. corporation.[45] As a result of all these factors, the use of IEEPA by the executive branch has increasingly expanded since the time of IEEPA's enactment.

### B. THE FREEZING OF TERRORIST ASSETS BY PRESIDENTIAL EXECUTIVE ORDER

On January 23, 1995, President Clinton started the practice of freezing terrorist assets under IEEPA by signing Executive Order 12,947: "Prohibiting Transactions With Terrorists Who Threaten to Disrupt the Middle East Peace Process."[46] On August 22, 1998, additional names were added to the list of terrorist organizations by President Clinton's Executive Order 13,099, bringing the total to sixteen blocked terrorist entities.[47] These executive orders blocked

---

39. 50 U.S.C. § 1702(a)(1)(B) (2000 & Supp. II 2003); *see* H.R. REP. No. 95-459, at 7–11 (1977) ("[The President's power to freeze assets] has been used generally for purposes related to the national security and the conduct of the foreign relations of the United States.")

40. Exec. Order No. 12,978, 60 Fed. Reg. 54579 (Oct. 21, 1995) ("Blocking Assets and Prohibiting Transactions with Significant Narcotics Traffickers").

41. Exec. Order No. 12,947, 3 C.F.R. 319 (1995).

42. Exec. Order No. 13,224, 3 C.F.R. 785, 786 (2001).

43. *See* Selden, *supra* note 6, at 534.

44. *Id.*

45. The Courts of Appeals have upheld this broad interpretation of the meaning of "foreign interest" under IEEPA. *See* Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 163 (D.C. Cir. 2003); Global Relief Found., Inc. v. O'Neill, 315 F.3d 748, 753 (7th Cir. 2002).

46. Exec. Order. No. 12,947, 3 C.F.R. 319 (1995) (annexing a list of "Terrorist Organizations Which Threaten To Disrupt the Middle East Peace Process").

47. Exec. Order. No. 13,099, 3 C.F.R. 208 (1998).

BURKE Exhibit G-6

all assets of the listed terrorist individuals and organizations, including assets of those who provided material support to them, and prohibited all financial transactions with the listed entities.[48]

After declaring a national emergency with respect to the attacks of September 11, 2001, President Bush signed Executive Order 13,224, which extended the previous Clinton executive orders beyond Middle Eastern terrorism to "global terrorism."[49] Attached to the executive order was a list of twenty-seven entities, including both individuals and organizations, whose assets were immediately frozen.[50] In addition, the order delegated to the Secretary of the Treasury and the Secretary of State the authority to add names of persons to the list who (1) "have committed, or . . . pose a significant risk of committing, acts of terrorism"; (2) are "owned or controlled by, or . . . act for or on behalf of those persons listed in the . . . order or [other] persons determined to be subject to [the order]"; (3) "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in . . . [the] order or determined to be subject to [the] order"; or (4) are "otherwise associated with those persons" listed in the order or otherwise subject to the order.[51] Financial transactions with persons subject to the order are also prohibited.[52]

Despite the serious consequences that result from designation as a terrorist or terrorist-related entity, however, nowhere in IEEPA, the Executive Order, or the U.S. Department of Treasury regulations is there a definition of exactly what types of behaviors or activities are proscribed, or what types of associations will cause an entity to be added to the list.[53] And nowhere is it indicated if or how an entity should be treated differently if it is a United States entity.

By expanding the class of targeted groups to include those who "associate with" designated terrorist groups, Executive Order 13,224 cast a much wider net than did previous executive orders dealing with terrorism.[54] As a result, far more entities have been designated terrorists under Executive Order 13,224 than had been designated under the Clinton executive orders.[55] As of September 2004, 387 names had been added to the list, and over $37 million in terrorist-

---

48. *Id.*; Exec. Order No. 12,947, 3 C.F.R. 319 (1995).

49. Joseph M. Myers, *Disrupting Terrorist Networks: The New U.S. and International Regime for Halting Terrorist Funding*, 34 LAW & POL'Y INT'L BUS. 17, 18 (2002).

50. Exec. Order 13,224, 3 C.F.R. 785, 790 (2001).

51. *Id.* § 1, 3 C.F.R. at 787.

52. *Id.* The Order also sought to freeze assets of designated terrorists held in foreign banks by giving the Treasury Department the authority to block the assets of foreign banks who refuse to cooperate with U.S. authorities in freezing terrorist assets and deny access to the U.S. market by those banks. *See id.* §§ 1, 3(a), 3 C.F.R. at 787, 788; Press Release, The White House, *supra* note 2; *see also* Angela D. Hardister, *Can We Buy Peace on Earth?: The Price of Freezing Terrorist Assets in a Post-September 11 World*, 28 N.C. J. INT'L L. & COM. REG. 605, 606–07 (2003).

53. *See infra* Part III.D (discussing the doctrine of unconstitutional vagueness).

54. *See* Myers, *supra* note 49, at 18.

55. Lehrer, *supra* note 21, at 346–47.

BURKE Exhibit G-7

related assets had been blocked in the United States.[56] Each of these blocked entities has been identified as a "Specially Designated Global Terrorist" or "SDGT."[57] This list is enforced and updated by the Office of Foreign Assets Control (OFAC) within the U.S. Department of Treasury.[58]

### C. THE OFAC DESIGNATION PROCESS

The process by which OFAC designates entities as SDGTs is primarily one-sided and conducted almost exclusively behind closed doors. According to the Administration, "a number of U.S. agencies, including the Treasury, State, Justice, the FBI and the intelligence community, review open source and confidential information, including tips and leads, about persons and entities who commit, threaten to commit or support terrorism."[59] A "subset of the agencies" is then responsible for developing a file on the entity, which is then reviewed by a "larger group" before it is forwarded to the National Security Council.[60] The Security Council "convenes a meeting of deputy Agency heads" who make a recommendation to the Secretary of the Treasury, who, in cooperation with the Secretary of State and Attorney General, issues a final designation and blocking order.[61] This blocking order is implemented by OFAC.[62] OFAC, pursuant to the President's mandate in Executive Order 13,224, gives the entity no prior notice that its assets will be frozen.[63] Upon issuance of the blocking order, the entity is told that its assets have been frozen, its name is published in the Federal Register, and this information is disseminated to financial institutions.[64]

Should a blocked entity wish to challenge its designation as an SDGT and request removal from the list on the grounds of mistaken identity or error, the

---

56. Press Release, The White House, *supra* note 4.

57. Global Terrorism Sanctions Regulations, 31 C.F.R. § 594.310 (2004).

58. 31 C.F.R. § 594.201(a) (2004). The identification of a "Specially Designated Global Terrorist" (SDGT) by OFAC under Executive Order 13,224 should not be confused with the identification of a "Specially Designated Terrorist" (SDT) by OFAC under Executive Order 12,947. 31 C.F.R. § 595.311. The Secretary of State also maintains a list of designated terrorists labeled "Foreign Terrorist Organizations" (FTOs), pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996). 31 C.F.R. § 597.309.

59. Int'l Information Programs, U.S. Dep't of State, Background on Terror Assets Designation Process (Feb. 28, 2002) [hereinafter U.S. Dep't of State, Background on Terror Assets Designation Process], *available at* http://usinfo.state.gov/is/Archive_Index/Background_On_Terror_Assets_Designation_Process.html.

60. *Id.* Although this process is the official interagency practice, the staff of the National Commission on Terrorist Attacks Upon the United States (9/11 Commission) reported in its Staff Monograph on Terrorist Financing that there have been instances when "[o]nly a single piece of paper, signed by the director of OFAC, was required [to freeze assets]." NAT'L COMM'N ON TERRORIST ATTACKS UPON THE U.S., MONOGRAPH ON TERRORIST FINANCING 99 (2004), *available at* http://www.9-11commission.gov/staff_statements/911_TerrFin_Monograph.pdf.

61. U.S. Dep't of State, Background on Terror Assets Designation Process, *supra* note 59.

62. *Id.*

63. *See* Exec. Order. No. 13,224, § 10, 3 C.F.R. 785, 789 (2001).

64. Selden, *supra* note 6, at 497–98.

BURKE Exhibit G-8

entity must submit its request in writing to OFAC, including a statement of the reasons why the entity believes its funds were blocked in error.[65] The information submitted will then be reviewed by OFAC, which may request additional clarifying or corroborating information.[66] The entity may request a meeting with OFAC to review its designation, but such meetings are not required, and OFAC may decline to meet with entity representatives in person before completing its review and issuing a decision.[67] At no point does the designated entity have an opportunity to review any classified evidence that the "subset of agencies" has compiled against it.[68] At no point is the entity afforded a hearing before an Administrative Law Judge at which it can present evidence in its defense and challenge the evidence contained in the administrative record.[69] This record, compiled by the agency to justify its blocking order, may contain hearsay, including newspaper articles, statements by anonymous FBI informants, and intelligence reports from other countries.[70]

Not surprisingly, these one-sided, closed-door procedures have been criticized by those entities seeking a meaningful opportunity to defend themselves against a potentially devastating blocking order. Members of the United Nations have also registered their disagreement with the process and have argued that the United States should disclose more of the evidence it uses to designate an entity as a "terrorist."[71] An examination of recent cases in which SDGT designations were challenged provides a better understanding of just how lopsided and secretive this process can be.

---

65. 31 C.F.R. §§ 501.806–807 (2004).

66. *Id.*

67. 31 C.F.R. § 501.807.

68. Prior to 1999, OFAC regulations permitted entities seeking administrative reconsideration to request disclosure of the factual basis for their designation and review such unclassified materials the agency had compiled, *see* 31 C.F.R. § 501.807(a)–(c) (1998), but "OFAC withdrew the ability to obtain this material without explanation or fanfare." Peter L. Fitzgerald, *"If Property Rights Were Treated Like Human Rights, They Could Never Get Away With This": Blacklisting and Due Process in U.S. Economic Sanctions Programs*, 51 HASTINGS L.J. 73, 134 (1999). Since that time, the D.C. Circuit has held that a designated terrorist entity has a right to review the *unclassified* portions of the administrative record used to justify its designation. *See* Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 164 (D.C. Cir. 2003); Nat'l Council of Resistance of Iran v. Dep't of State, 251 F.3d 192, 208–09 (D.C. Cir. 2001). However, this record may not be provided to a blocked entity until months after the blocking order is issued and, in many cases, not until a civil suit has been filed challenging the designation. Meanwhile, OFAC often requires that blocked entities wishing to challenge their designations respond in writing shortly after receiving the blocking order, at a time when they are unlikely to have seen even the unclassified evidence the agency has compiled against them.

69. Fitzgerald, *supra* note 68, at 133.

70. *See* Cline, *supra* note 25, at 19.

71. Colum Lynch, *U.S. Plan to Stop Terrorists Creates Unease at U.N.*, WASH. POST, Feb. 2, 2002, at A19. Both France and Sweden have publicly criticized the United States for its terrorist designation procedures. *Id.* Two Somali-born Swedish citizens were eventually removed from the SDGT list by OFAC after continued "resistance from allies." John B. Reynolds, III et al., *Export Controls and Economic Sanctions*, 37 INT'L LAW. 263, 264 (2003).

BURKE Exhibit G-9

II. JUDICIAL CHALLENGES TO THE SDGT DESIGNATIONS OF U.S.-BASED MUSLIM CHARITIES[72]

Primary targets in the Bush Administration's "war on terrorism" are international and domestic charities, based on the belief that terrorists "oftentimes use nice-sounding, non-governmental organizations as fronts for their activities."[73] The first SDGT list attached to Executive Order 13,224 included several charities that the Bush Administration believed were funneling charitable donations to terrorist organizations around the world.[74] In December 2001, the Administration took the step of blocking the assets of three of the largest Muslim charities in the United States—all of which are U.S. corporations.[75] Each of these charities, in turn, challenged the freezing of their assets in federal court.

### A. HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT

The Holy Land Foundation for Relief and Development (HLF) was the first of these charities to be designated an SDGT by the Bush Administration.[76] HLF is a Texas-based 501(c)(3) nonprofit charitable organization founded in 1989.[77] It provided charitable and humanitarian aid to refugees, orphans, victims of natural disasters, and other needy individuals around the world, from the United

---

72. This part highlights the executive's use of IEEPA to freeze the assets of U.S.-based corporations. However, the executive branch has also frozen the assets of individual U.S. citizens under IEEPA, raising the same, if not more serious, constitutional concerns. *See, e.g.,* Exec. Order 13,224, 3 C.F.R. 785, 790 (2001). One such citizen, Mohammad Salah, had his assets frozen in 1995. List of Specially Designated Terrorists Who Threaten to Disrupt the Middle East Peace Process; Additional Name, 60 Fed. Reg. 41,152 (Aug. 11, 1995). Criminal charges against Salah were not brought until 2004, and he was never afforded a hearing with respect to the frozen assets. *Cf.* Mike Robinson, *Appeals Court Next Stop as Jury Awards $156 Million in Terrorism Case,* ASSOCIATED PRESS, Dec. 9, 2004, *available at* http://www.cairchicago.org/inthenews.php?file=ap12092004 (reporting that Salah is currently under criminal indictment "on charges stemming from his alleged support of Hamas"). The effect on Salah has no doubt been severe, given that his status as a Specially Designated Terrorist (and, as of September 24, 2001, an SDGT) makes it a crime for anyone in the United States to have any economic transactions with him. *See* 50 U.S.C. § 1705 (2000); Exec. Order 13,224, 3 C.F.R. 785 (2001); COLE, *supra* note 6, at 78.

73. Press Release, The White House, *supra* note 2; *see also* Press Release, U.S. Dep't of the Treasury, Progress in the War on Terrorist Financing 5 (Sept. 11, 2003), *available at* http://www.treas.gov/press/releases/js721.htm. The Bush Administration has sought to freeze assets of entities that are terrorist organizations fronting as charities, as well as those entities that allegedly engage in both terrorist and charitable activities. The charities that have challenged their designations as SDGTs adamantly maintain that they have not engaged in or supported any terrorist activities. *See* Press Release, The White House, *supra* note 2; *see also* Press Release, U.S. Dep't of the Treasury, *supra,* at 5.

74. *See* Exec. Order 13,224, 3 C.F.R. 785, 790 (2001).

75. *See* Gregory L. Vistica, *Frozen Assets Going to Legal Bills: U.S. Has Linked Confiscated Funds to Financing Terror,* WASH. POST, Nov. 1, 2003, at A6.

76. *See* Additional Designations of Terrorism-Related Blocked Persons, 67 Fed. Reg. 12,644 (Mar. 19, 2002).

77. Complaint of the Holy Land Foundation for Relief and Development for Declaratory and Injunctive Relief at 2–3, Holy Land Found. for Relief & Dev. v. Ashcroft, 219 F. Supp. 2d 57 (D.D.C. 2002) (No. 02-CV-00442).

BURKE Exhibit G-10

States, to Turkey, India, Mozambique, Bosnia, and others.[78] On December 4, 2001, the Bush Administration designated HLF as an SDGT and issued a blocking order for HLF's assets pursuant to Executive Order 13,224.[79] That same day, government agents entered HLF's offices in Texas, New Jersey, Illinois, and California, and seized and removed the contents.[80] Millions of dollars in charitable contributions were frozen in HLF's bank accounts.[81] The blocking notice HLF received said nothing about how HLF had specifically violated IEEPA.[82] Neither before nor after its assets were frozen did HLF ever have an adversarial hearing where it could challenge the legal and factual basis for the designation.[83]

HLF moved for a preliminary injunction in the United States District Court for the District of Columbia challenging its SDGT designation and the freezing of its assets.[84] HLF argued that OFAC's action was arbitrary and capricious in violation of the Administrative Procedure Act (APA) and was also in violation of the Due Process Clause of the U.S. Constitution because of the lack of sufficient notice or a meaningful opportunity to be heard.[85] The government moved for summary judgment on the APA claim, arguing that it had substantial evidence that millions of HLF dollars each year were eventually used by HAMAS—a Palestinian organization that was designated an SDGT on October 31, 2001—and that HLF masqueraded as a charity in order to raise money to promote terrorism.[86] The government also moved to dismiss the due process claims, arguing that pre-deprivation notice and a hearing are unreasonable in exigent circumstances, and that HLF had ample opportunity to contest its designation after the freeze through OFAC's written review procedures—which,

---

78. *Holy Land*, 219 F. Supp. 2d at 64.

79. Press Release, U.S. Dep't of Treasury Office of Public Affairs, Shutting Down the Terrorist Financial Network December 4, 2001 (Dec. 4, 2001), *available at* http://www.treas.gov/press/releases/po841.htm.

80. Cline, *supra* note 25, at 18.

81. Michelle Mittelstadt, *Sheik Key Figure in Government Case Against Holy Land*, DALLAS MORNING NEWS, July 31, 2002, at 6A.

82. Letter from U.S. Department of the Treasury to Holy Land Foundation for Relief and Development, Blocking Notice (Dec. 4, 2001) (on file with the author).

83. *See* First Amended Complaint of the Holy Land Foundation for Relief and Development for Declaratory and Injunctive Relief at 9–10, *Holy Land* (No. 02-CV-00442).

84. *Holy Land*, 219 F. Supp. 2d at 62.

85. *See id.* at 64. HLF also argued that OFAC's actions were in violation of the First and Fourth Amendments of the U.S. Constitution. *See id.*; Opposition of the Holy Land Foundation for Relief and Development to Defendants' Motion to Dismiss and for Summary Judgment and Reply in Support of Holy Land's Motion for a Preliminary Injunction at 69–75, *Holy Land* (No. 02-CV-00442). Indeed, there is a good argument that the "blacklisting" of U.S. entities accused of associating with suspected terrorist organizations violates their First Amendment freedom of association. *See* COLE, *supra* note 6, at 77. That issue, however, is beyond the scope of this note.

86. *See Holy Land*, 219 F. Supp. 2d at 63–64, 69; Press Release, U.S. Dep't of the Treasury Office of Public Affairs, Statement of Secretary Paul O'Neill on the Blocking of Hamas Financiers' Assets (Dec. 4, 2001), *available at* http://www.treas.gov/press/releases/po837.htm; Memorandum in Support of Defendants' Motion to Dismiss and for Summary Judgment and Opposition to Plaintiff's Motion for Preliminary Injunction at 14, *Holy Land* (No. 02-CV-00442).

BURKE Exhibit G-11

it argued, is the only hearing constitutionally required.[87]

HLF also petitioned the court for permission to submit numerous supporting exhibits in its defense, including sworn affidavits from its CEO and other HLF officials denying that HLF provided any support to HAMAS, court testimony contradicting the government's assertions, and evidence that the U.S. government provided aid to the same allegedly HAMAS-affiliated hospitals to which HLF contributed.[88] These exhibits were not already part of the record because OFAC gave HLF only a few weeks to gather evidence to refute OFAC's allegations before it planned to redesignate HLF as an SDGT in May 2002—not enough time for HLF to research the government's claims and gather evidence, particularly when much of the information that needed to be gathered was overseas.[89] The court rejected these exhibits, however, on the grounds that review under the APA ordinarily permits a court to consider only the evidence contained in the administrative record at the time of the agency's decision.[90] The court also "refused HLF's request for an evidentiary hearing to determine whether the administrative record was complete."[91] In HLF's D.C. District Court case, the record on which the judge ruled contained only that evidence that the government had included in the administrative record before HLF had a sufficient opportunity to submit evidence to OFAC in its defense.[92] In addition, the administrative record included numerous hearsay materials which would not ordinarily be considered in a summary judgment proceeding, including vague statements from government informers and classified material that HLF was not

---

87. *See* Memorandum in Support of Defendants' Motion to Dismiss and for Summary Judgment and Opposition to Plaintiff's Motion for Preliminary Injunction at 48–56, *Holy Land* (No. 02-CV-00442). The government also argued that because the government "re-designated" (for no discernible reason) HLF as an SDGT on May 31, 2002, the notice it gave HLF before the redesignation was sufficient to satisfy due process. *See* Corrected Reply Memorandum in Support of Defendants' Motion to Dismiss and for Summary Judgment at 33, *Holy Land* (No. 02-CV-00442). Indeed, prior to the redesignation, the government provided HLF with the unclassified information it was using to support the redesignation, but HLF had already been designated an SDGT at that time, and its assets were already blocked. *See* Cline, *supra* note 25, at 19.

88. *See* Cline, *supra* note 25, at 19. Other evidence has also surfaced that seems to poke holes in the government's case. In July 2002, it was reported that an alleged terrorist with whom HLF was accused of associating was invited by the U.S. government to travel to the U.S. on a three-week, all-expenses-paid tour of U.S. cities in 1999—"four years after the United States declared Hamas a terrorist organization." Mittelstadt, *supra* note 81.

89. Opposition of Plaintiff Holy Land to Government's Motion in Limine and Motion to Strike at 9–11, *Holy Land* (No. 02-CV-00442).

90. 219 F. Supp. 2d at 65. An administrative record must include the entire evidentiary basis of the agency's decision, including a statement of all factual and legal findings and conclusions made by the agency. 5 U.S.C. § 557(c) (2000). The agency is required to include those documents upon which the officer relied in arriving at his or her decision, and review is limited to only that information that was before the agency at the time of the decision. *See, e.g.*, IMS, P.C. v. Alvarez, 129 F.3d 618, 623–24 (D.C. Cir. 1997); Thompson v. Dep't of Labor, 885 F.2d 551, 555 (9th Cir. 1989); *Holy Land*, 219 F. Supp. at 65.

91. *See* Cline, *supra* note 25, at 19.

92. *See id.*

BURKE Exhibit G-12

allowed to review or refute.[93]

The district court granted the government's motions on the injunction, APA claim, and due process claim.[94] Reviewing OFAC's designation of HLF as an SDGT under the arbitrary and capricious standard, the court held that OFAC's decision met "certain minimal standards of rationality" in that the administrative record contained "ample evidence" that HLF was connected to HAMAS.[95] The court also determined that HLF's due process rights were not violated because a pre-deprivation notice and hearing were not required where deprivation of HLF's property was necessary to secure an important government interest, there was a special need for very prompt action, and the party initiating the deprivation was a government official responsible for determining that it was necessary and justified in this particular instance.[96] However, the court did not specifically address HLF's lack of a meaningful opportunity to be heard post-deprivation, despite the court's reliance on case law that upheld only the *postponement* of an adversarial, oral hearing, not the elimination of a hearing altogether.[97] Nor did the court address the fact that much of the evidence used against HLF was classified and not disclosed to HLF.

On appeal, the D.C. Circuit affirmed the lower court's decision and upheld OFAC's designation of HLF as an SDGT.[98] The court also upheld the government's reliance on hearsay in making its designations, as well as its consideration of classified evidence, pointing to the executive's "compelling interest" in withholding national security information.[99] In addition, the court determined that HLF's due process rights were not violated because (1) a pre-seizure notice of the blocking order was not required upon a showing that "notification would impinge upon the security or other foreign policy goals of the United States"; and (2) HLF was provided a written opportunity to be heard post-deprivation when it submitted materials to OFAC for its consideration, and that is all that is required to satisfy due process requirements.[100] HLF filed a petition for certio-

---

93. *Id.* at 19–20.

94. *Holy Land,* 219 F. Supp. 2d at 85. In granting the government's motion to dismiss the due process claim, the court considered government evidence outside the pleadings and, in effect, converted the motion to dismiss into one for summary judgment. Because the court did not allow HLF to submit additional evidence that it typically would be allowed to submit under a motion for summary judgment, HLF argued on appeal that the judge abused her discretion in granting summary judgment for the government. The D.C. Circuit agreed but held the abuse of discretion to be harmless error. Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 165 (D.C. Cir. 2003).

95. 219 F. Supp. 2d at 69, 74.

96. *See id.* at 76 (citing Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 678 (1974)).

97. *See id.* at 76–77 (citing *Calero-Toledo,* 416 U.S. at 679–80); *see also infra* Part III.D (discussing civil forfeiture).

98. 333 F.3d at 167.

99. *Id.* at 162, 164.

100. *Id.* at 163–64. In *National Council of Resistance of Iran v. Department of State,* 251 F.3d 192 (D.C. Cir. 2001), the D.C. Circuit held that, when designating entities as Foreign Terrorist Organizations under the Antiterrorism and Effective Death Penalty Act (AEDPA), the Secretary of State must "afford to the entities under consideration notice that the designation is impending." Upon an adequate showing, this notice may be provided after the designation "where earlier notification would impinge

BURKE Exhibit G-13

1400          THE GEORGETOWN LAW JOURNAL          [Vol. 93:1387

rari with the U.S. Supreme Court, but its petition was denied.[101] More than two and a half years after HLF's assets were frozen, the government finally charged HLF and seven of its officials with terrorism-related charges.[102]

### B. GLOBAL RELIEF FOUNDATION

On December 14, 2001, the Bush Administration blocked the assets and seized the property of the Global Relief Foundation (GRF), another large Muslim charity.[103] GRF is an Illinois-based charitable nonprofit corporation that has supported clinics, trade schools, and hospitals around the world.[104] It provided aid to victims of earthquakes in Turkey and Afghanistan, to those suffering from droughts in Africa and Asia, and to distressed refugees in Chechnya, Afghanistan, Bosnia, and Kosovo.[105] GRF's assets were blocked *pending investigation*, under the USA PATRIOT Act amendment to IEEPA,[106] presumably because the government at that time did not have enough evidence to designate the charity as an SDGT. The government alleged that GRF had sent funds to regions in the world where al Qaeda operates.[107] Because the government lacked hard evidence that GRF had committed any wrongdoing, GRF was provided even less information about the evidence against it than HLF was provided. In the government's blocking notice, it stated only that it "had reason to believe [GRF] may be engaged in activities that violate [IEEPA]."[108] Even after the freeze, the government failed to notify GRF of the specific grounds for

---

on the security or other foreign policy goals of the United States." Furthermore, the court held, notice must be followed by "the opportunity to be heard in a meaningful time in a meaningful manner," which must allow the entities, at a minimum, to present in written form evidence to rebut the administrative record. *Id.* at 208–09. In *Holy Land*, the D.C. Circuit held that OFAC had complied with the requirements outlined in *National Council of Resistance of Iran.* 333 F.3d at 163.

101. Holy Land Found. for Relief & Dev. v. Ashcroft, 540 U.S. 1218 (2004).

102. *See* Grand Jury Indictment, United States v. Holy Land Found. for Relief & Dev., No. 304-CR-240G (N.D. Tex. July 26, 2004), *available at* http://news.findlaw.com/cnn/docs/hlf/ushlf72604ind.pdf. The indictment charges HLF with various terrorism and non-terrorism offenses, including money laundering, the filing of false tax returns, and the provision of material support to a Foreign Terrorist Organization (FTO). The government alleges that HLF provided funds and resources to HAMAS, an organization designated in 1997. *See id.*

103. Global Relief Found., Inc. v. O'Neill, 207 F. Supp. 2d 779, 785 (N.D. Ill. 2002).

104. Declaration of Mohamed Chehade at 3, Global Relief Found., Inc. v. O'Neill, 207 F. Supp. 2d 779 (N.D. Ill. 2002) (No. 02-C-0674).

105. *Id.*

106. U.S. DEP'T OF THE TREASURY, PERIODIC REPORT TO CONGRESS ON THE NAT'L EMERGENCY WITH RESPECT TO PERSONS WHO COMMIT, THREATEN TO COMMIT, OR SUPPORT TERRORISM 4 (Sept. 17, 2003), *available at* http://www.treas.gov/offices/enforcement/ofac/presdocs/91703sdgtrept.pdf.

107. Brief for the Appellees at 9, Global Relief Found., Inc. v. O'Neill, 315 F.3d 748 (7th Cir. 2002) (No. 02-2536).

108. Letter from U.S. Department of the Treasury to Global Relief Foundation, Inc., Blocking Notice and Requirement to Furnish Information (Dec. 14, 2001) [hereinafter Blocking Notice and Requirement to Furnish Information] (on file with author); *see also* Global Relief Found., Inc. v. O'Neill, 207 F. Supp. 2d 779, 792 (N.D. Ill. 2002). The government did not specify which provision of IEEPA it believed GRF to have violated. *See* Blocking Notice and Requirement to Furnish Information, *supra.*

BURKE Exhibit G-14

blocking GRF's assets.[109] Consequently, although GRF maintains that it has never acted in support of terrorist organizations, GRF has had no meaningful opportunity to submit evidence in its defense because it has no idea what evidence would sufficiently contradict the evidence OFAC is using to justify freezing the charity's assets.[110] And like HLF, GRF has received no pre- or post-deprivation hearing at which it could hear the evidence against it or respond in a meaningful way.[111]

On May 24, 2002, OFAC notified GRF that it intended to designate it as an SDGT pursuant to Executive Order 13,224.[112] After its assets were frozen and before October 18, 2002, the date of its ultimate designation as an SDGT, GRF moved for a preliminary injunction in the U.S. District Court for the Northern District of Illinois challenging the designation on constitutional grounds similar to those that HLF asserted.[113] The government argued that the broad language of IEEPA and Executive Order 13,224 provided GRF with sufficient notice of the charges against it, that OFAC's written review process was the only hearing required, and that the use of classified evidence to justify the designation was constitutionally valid.[114] In holding for the government, the court upheld the use of *in camera*, *ex parte* evidence against GRF where Congress and the President had determined a need for the secrecy of government information.[115] The court also denied GRF's due process challenge, stating that (1) notice received the day assets were blocked, stating only that GRF may be engaged in activities that violate IEEPA, is sufficient due to the exigent circumstances surrounding matters of national security; and (2) the OFAC written review process provides GRF with an adequate opportunity to be heard.[116]

On appeal from the denial of the motion for a preliminary injunction, the Seventh Circuit affirmed the decision of the district court.[117] In a brief opinion, the court upheld the use of classified evidence to justify the freezing of GRF's assets, and rejected the notion that GRF was entitled to a pre-seizure hearing on the grounds that "postponement is acceptable in emergencies."[118] The court did not, however, address why it was proper that GRF *never* be afforded even a post-deprivation hearing under current OFAC regulations, nor did the court specifically address the lack of *sufficient* notice provided to GRF detailing the

---

109. Memorandum of Points and Authorities in Support of Petitioner's Motion for Injunctive Relief at 27–28, Global Relief Found., Inc. v. O'Neill, 207 F. Supp. 2d 779 (N.D. Ill. 2002) (No. 02-C-0674).

110. *See id.* at 28; Declaration of Mohamed Chehade at 8, Global Relief Found., Inc. v. O'Neill, 207 F. Supp. 2d 779 (N.D. Ill. 2002) (No. 02-C-0674).

111. Memorandum of Points and Authorities in Support of Petitioner's Motion for Injunctive Relief at 28, Global Relief Found., Inc. v. O'Neill, 207 F. Supp. 2d 779 (N.D. Ill. 2002) (No. 02-C-0674).

112. U.S. DEP'T OF THE TREASURY, *supra* note 106, at 4.

113. Global Relief Found., Inc. v. O'Neill, 207 F. Supp. 2d 779, 787 (N.D. Ill. 2002).

114. *See* Brief for the Appellees at 43–45, 57–58, Global Relief Found., Inc. v. O'Neill, 315 F.3d 748 (7th Cir. 2002) (No. 02-2536).

115. 207 F. Supp. 2d at 785, 805.

116. *Id.* at 803–05.

117. Global Relief Found., Inc. v. O'Neill, 315 F.3d 748, 755 (7th Cir. 2002).

118. *Id.* at 754.

BURKE Exhibit G-15

charges against it. GRF petitioned for certiorari to the U.S. Supreme Court, but its petition was denied.[119] As of September 2004, no original charges had been brought against GRF.

### C. BENEVOLENCE INTERNATIONAL FOUNDATION

The case of the Benevolence International Foundation (BIF) has followed much the same course. BIF is an Illinois-based charitable nonprofit corporation that administered humanitarian aid including food, clothing, and medical services to the needy in many countries throughout the world, including Afghanistan, Azerbaijan, Bosnia, China, Dagestan, Tajikistan, and others.[120] The government suspected that BIF had ties to al Qaeda, and on December 14, 2001, BIF received notice that its assets were being blocked by OFAC "pending investigation" because the government had "reason to believe" that BIF had violated IEEPA.[121] That same day, federal officials seized all of BIF's financial records and other documents located in its offices in Illinois and New Jersey.[122] On June 14, 2002, OFAC notified BIF that it intended to designate the charity as an SDGT pursuant to Executive Order 13,224.[123] BIF was never told of the specific basis for the government's blocking order or provided a hearing at which BIF would have the opportunity to hear and rebut the evidence against it.[124] Prior to its designation as an SDGT on November 19, 2002, BIF filed suit in the U.S. District Court for the Northern District of Illinois, challenging the blocking order on the grounds that it violated its statutory and constitutional due process rights, among others.[125] The district court stayed civil proceedings in the case pending criminal proceedings for racketeering conspiracy charges brought against BIF's CEO for misleading donors about the charity's use of

119. Global Relief Found., Inc. v. Snow, 540 U.S. 1003 (2003). The government argued in its opposition to certiorari that the Court's review of the Seventh Circuit's decision denying GRF a preliminary injunction would be inappropriate at that time, given that the case had reached the Court on an interlocutory appeal. Brief for the Respondent in Opposition, Argument, Pt. I, Global Relief Found., Inc. v. Snow, 540 U.S. 1003 (2003) (No. 03–775). The Court may have found this part of the government's argument particularly persuasive.

120. Memorandum in Support of Plaintiff Benevolence International Foundation's Motion for Preliminary Injunction at 1, 4, Benevolence Int'l Found., Inc. v. Ashcroft, 200 F. Supp. 2d 935 (N.D. Ill. 2002) (No. 02-C-0763).

121. Benevolence Int'l, 200 F. Supp. 2d at 936; NAT'L COMM'N ON TERRORIST ATTACKS UPON THE U.S., supra note 60, at 97.

122. Memorandum in Support of Plaintiff Benevolence International Foundation's Motion for Preliminary Injunction at 2, Benevolence Int'l (No. 02-C-0763).

123. THE PRESIDENT OF THE U.S., PERIODIC REPORT TO CONGRESS ON THE NAT'L EMERGENCY WITH RESPECT TO PERSONS WHO COMMIT, THREATEN TO COMMIT, OR SUPPORT TERRORISM 4 (Sept. 24, 2002), available at http://www.treas.gov/offices/eotffc/ofac/presdocs/sdgt902report.pdf.

124. Memorandum in Support of Plaintiff Benevolence International Foundation's Motion for Preliminary Injunction at 21, Benevolence Int'l (No. 02-C-0763). Several months after its assets were initially frozen, BIF received a copy of the unclassified portions of the administrative record from OFAC. Because all the evidence against BIF was deemed classified, however, the portion of the record BIF received contained primarily newspaper articles and copies of the court documents from its civil suit—no information that would allow it to defend itself against the charges.

125. See id.

HeinOnline -- 93 Geo. L.J. 1402 2004-2005

BURKE Exhibit G-16

funds to support rebel fighters in Chechnya and Bosnia.[126] Eventually, the civil case was voluntarily dismissed, as BIF no longer had the financial resources to continue the case.

### D. THE 9/11 COMMISSION'S ANALYSIS OF THE GRF AND BIF CASES

In its July 2004 report on Terrorist Financing, the staff of the National Commission on Terrorist Attacks Upon the United States (9/11 Commission) expressed its opinion that the "aggressive approach" taken by the Administration against U.S. charities, particularly GRF and BIF, raises civil liberties concerns.[127] The Commission staff reported that investigators had "no direct evidence of criminal activity" in either the BIF or GRF case at the time of the freeze, and emphasized that "there is a difference between troubling 'links' to terrorists and compelling evidence of supporting terrorists."[128] Particularly in cases of blocking assets "pending investigation," the Commission staff cautioned that the President's use of IEEPA

> is a powerful weapon with potentially dangerous applications when applied to domestic institutions. This provision lets the government shut down an organization without any formal determination of wrongdoing. It requires a single piece of paper, signed by a midlevel government official. Although in practice a number of agencies typically review and agree to the action, there is no formal administrative process, let alone any adjudication of guilt.[129]

Regarding the cases of BIF and GRF, the Commission concluded:

> [T]he investigation of BIF and GRF revealed little compelling evidence that either of these charities actually provided financial support to al Qaeda . . . after al Qaeda was designated a foreign terrorist organization . . . . Indeed, despite unprecedented access to the U.S. and foreign records of these organizations, one of the world's most experienced and best terrorist prosecutors has not been able to make any criminal case against GRF and resolved the investigation of BIF without a conviction for support of terrorism.[130]

---

126. *Benevolence Int'l*, 200 F. Supp. 2d at 937, 941; Plea Agreement, United States v. Arnaout, 282 F. Supp. 2d 838, 843 (N.D. Ill. 2003) (No. 02-CR-892), *available at* http://news.findlaw.com/hdocs/docs/bif/usarnaout203plea.pdf. BIF's CEO, Enaam Arnaout, was also criminally charged with conspiracy to provide material support to terrorism, money laundering, and mail and wire fraud—but all terrorism-related charges were dropped when Arnaout agreed to plead guilty to racketeering conspiracy. *See id.* In response to the government's attempt to apply the sentencing enhancement for crimes of terrorism, the court said plainly, "Arnaout does not stand convicted of a terrorism offense. Nor does the record reflect that he attempted, participated in, or conspired to commit any act of terrorism." *Arnaout*, 282 F. Supp. 2d at 843.

127. NAT'L COMM'N ON TERRORIST ATTACKS UPON THE U.S., *supra* note 60, at 88.

128. *Id.* at 93, 97.

129. *Id.* at 112.

130. *Id.* at 111.

The 9/11 Commission had reason to be concerned about the OFAC blocking process, particularly given the effect that freezes have on blocked entities. Because their assets are blocked, these charities have effectively been shut down and are no longer able to provide the humanitarian aid they once did.[131] And because they were denied basic procedural protections normally afforded to U.S. entities—including sufficient notice of the charges against them and a meaningful opportunity to be heard—they may never know exactly why.

There is no doubt that according blocked U.S. entities due process protections would shed much-needed light on the designation process. Yet the government increasingly uses the OFAC designation process precisely because this process allows it to act against an alleged terrorist entity without having to make any of the showings that would be necessary in a criminal proceeding. Leveling criminal charges against one of these charities requires that the government disclose the evidence it is using to justify designation, subject that evidence to cross-examination, and provide the blocked entity the opportunity to conduct discovery. The fact that the government can freeze the assets of blocked entities long before enough evidence has been gathered to justify criminal charges suggests that due process protections are all the more crucial in these cases. Without providing blocked U.S. entities sufficient notice or a hearing, the government is allowed to deprive them of all that they have with little explanation or adversarial testing.

### III. THE CONSTITUTIONAL REQUIREMENTS OF PROCEDURAL DUE PROCESS

The Due Process Clause of the Fifth Amendment[132] affords U.S. citizens and all persons within the United States basic procedural protections to ensure they are not arbitrarily deprived of their life, liberty, or property by the federal government. "The prohibition against the deprivation of property without due process of law reflects the high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free from governmental interference."[133] In addition, it seeks to "minimize substantively unfair or mistaken deprivations of property."[134] Accordingly, it is well-settled that the Due Process Clause requires that a person deprived of his property be given timely, adequate notice of the charges against him and a meaningful opportunity to be heard.[135]

---

131. Declaration of Mohamed Chehade at 5, Global Relief Found., Inc. v. O'Neill, 207 F. Supp. 2d 779 (N.D. Ill. 2002) (No. 02-C-0674); Memorandum in Support of Plaintiff Benevolence International Foundation's Motion for Preliminary Injunction at 3, 16, *Benevolence Int'l* (No. 02-C-0763).

132. U.S. CONST. amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law . . . .").

133. Fuentes v. Shevin, 407 U.S. 67, 81 (1972).

134. United States v. James Daniel Good Real Prop., 510 U.S. 43, 53 (1993).

135. *See, e.g., id.* at 48; *Fuentes*, 407 U.S. at 81; Goldberg v. Kelly, 397 U.S. 254, 267–68 (1970); *In re* Ruffalo, 390 U.S. 544, 550 (1968); Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950).

BURKE Exhibit G-18

U.S. entities whose assets may be frozen indefinitely under IEEPA are entitled to due process protections to ensure their property is not frozen in error.[136] Under *Matthews v. Eldridge*, the determination of what due process protections are due designated U.S. entities requires a consideration of three factors: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that interest through the current procedures used, including the probable value of additional safeguards; and (3) the government's interest, including the additional administrative burden that additional procedural safeguards would entail.[137]

Balancing these factors, U.S. entities are due much greater protections than those currently provided. Blocked U.S. entities suffer extreme deprivation when their assets are frozen. Yet under current law, these entities may suffer erroneous deprivations of their property because the terms used in the governing statute and executive order are so vague that blocked entities cannot ensure that their actions are in compliance with the law. These entities are also unable to mount an effective defense when their assets are frozen because blocking orders do not provide adequate notice of the charges against blocked entities, and the evidence used to justify blocking orders is often not disclosed to them. Furthermore, entities are denied a meaningful opportunity to be heard because they are denied a hearing before a neutral arbiter, even after their assets are frozen. A due process analysis of the OFAC blocking process reveals that any interest the government has in maintaining current blocking procedures is outweighed by the need for U.S. entities to have greater procedural protections to ensure they are not erroneously deprived of their property.

### A. THE LIBERTY AND PROPERTY INTERESTS OF BLOCKED U.S. ENTITIES

Entities that have their assets frozen have a significant private interest at stake.[138] The U.S. Muslim charities whose assets were blocked indefinitely effectively had to close their doors and cease their charitable operations.[139] The amount of assets frozen totaled several million dollars—amounting to essentially all financial holdings and property owned by these charities in the United

---

136. *See, e.g.*, Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 163–64 (D.C. Cir. 2002).

137. 424 U.S. 319, 335 (1976).

138. *See* Nat'l Council of Resistance of Iran v. Dep't of State, 251 F.3d 192, 196 (D.C. Cir. 2001) (recognizing that entities whose assets are blocked as a result of terrorist designations suffer "dire" consequences).

139. NAT'L COMM'N ON TERRORIST ATTACKS UPON THE U.S., *supra* note 60, at 87; Declaration of Mohamed Chehade at 5, Global Relief Found., Inc. v. O'Neill, 207 F. Supp. 2d 779 (N.D. Ill. 2002) (No. 02-C-0674); Memorandum in Support of Plaintiff Benevolence International Foundation's Motion for Preliminary Injunction at 3, 16, Benevolence Int'l Found., Inc. v. Ashcroft, 200 F. Supp. 2d 935 (N.D. Ill. 2002) (No. 02-C-0763).

BURKE Exhibit G-19

States.[140] No longer were they at liberty to continue their charitable missions. Without access to their funds, business records, and other documents seized during the investigation of their offices, the charities were left without any means of functioning.[141] Not surprisingly, donations to the charities also dramatically decreased, given that under IEEPA, any contributors would risk criminal prosecution.[142] Their reputations have suffered irreparable injury as a result of their designations as terrorist-related organizations.[143] Indeed, after the seizure of their properties and the blocking of their assets, these charities had virtually nothing left.

### B. THE RISK OF ERRONEOUS DEPRIVATION THROUGH CURRENT OFAC PROCEDURES

The risk of erroneous deprivation of the property interests of blocked U.S. entities is significant where insufficient notice is given and no hearing is provided. Particularly where assets are blocked "pending investigation," the freeze lacks appropriate accompanying procedural safeguards and poses a significant risk of erroneous deprivation of property. This is because blocking orders "pending investigation" occur at a time when the government does not have—and may never have—enough evidence against an entity to designate it as an SDGT. However, even in cases where the government has sufficient evidence to designate, significant risks of error are inherent in the procedures currently provided.

First, nowhere, in either IEEPA or Executive Order 13,224, is "Specially Designated Global Terrorist" defined, nor is it anywhere indicated what specific kinds of behaviors or activities render one an SDGT.[144] One might infer from OFAC's actions that these terms are interpreted quite broadly by the Administration, but without a definition of the kinds of activities proscribed, U.S. entities are unable to discern what they may have done to violate the law, or, for that matter, to take preemptive, proactive steps to ensure their compliance with the

---

140. *See* Mittelstadt, *supra* note 81; First Amended Complaint of the Holy Land Foundation for Relief and Development for Declaratory and Injunctive Relief at 22, Holy Land Found. for Relief & Dev. v. Ashcroft, 219 F. Supp. 2d 57 (D.D.C. 2002) (No. 02-CV-00442).

141. Memorandum in Support of Plaintiff Benevolence International Foundation's Motion for Preliminary Injunction at 13, 16, *Benevolence Int'l* (No. 02-C-0763); Motion for Preliminary Injunction and Request for Briefing Schedule, Expansion of Pages and Accelerated Hearing at 6, *Global Relief* (No. 02-C-0674).

142. *See* 50 U.S.C. § 1705 (2000); First Amended Complaint of the Holy Land Foundation for Relief and Development for Declaratory and Injunctive Relief at 22, *Holy Land* (No. 02-CV-00442); Memorandum in Support of Plaintiff Benevolence International Foundation's Motion for Preliminary Injunction at 15, *Benevolence Int'l* (No. 02-C-0763); Motion for Preliminary Injunction and Request for Briefing Schedule, Expansion of Pages and Accelerated Hearing at 5, *Global Relief* (No. 02-C-0674). SDGTs may apply to OFAC for licenses to pay legal fees and settle previous debts, but they may not access any of their funds to continue their operations. *See* 31 C.F.R. §§ 501.801–802 (2004).

143. First Amended Complaint of the Holy Land Foundation for Relief and Development for Declaratory and Injunctive Relief at 22, *Holy Land* (No. 02-CV-00442); Memorandum in Support of Plaintiff Benevolence International Foundation's Motion for Preliminary Injunction at 22, *Benevolence Int'l* (No. 02-C-0763).

144. *See* COLE, *supra* note 6, at 77.

BURKE Exhibit G-20

law.[145] This prevents U.S. entities from being able to mount an effective defense and protect their property from being blocked in error.

Second, this risk is increased by the fact that most of the U.S. entities designated as SDGTs pursuant to Executive Order 13,224 are not given adequate notice of the charges against them. Informing an entity in a blocking order that it has violated a multi-provision, several-page, exceedingly broad statute does not provide the entity with sufficient information of the charges against it to allow it to adequately defend itself.[146] When a blocked entity has been told little or nothing about the kind of evidence the government has accumulated against it, or what this evidence is specifically alleging, mounting a defense is akin to shooting in the dark.[147]

Third, the risk of erroneous deprivation is inherent in the use of classified evidence presented *ex parte* and *in camera*—where only the government's attorney is allowed to be present while the judge considers the government's classified evidence. When much of the evidence the government uses to justify the deprivation is kept secret from the blocked entity, the entity has no meaningful opportunity to test the veracity of the information being used against it.[148]

> It has long been recognized that fairness can rarely be obtained by secret, one-sided determination[s] of facts decisive of rights . . . [and n]o better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and an opportunity to meet it.[149]

There exists a danger in any *ex parte, in camera* proceeding that unreliable, untested evidence will provide the basis for a decision to uphold the deprivation of property, and that property will be frozen in error as a result.

Fourth, the opportunity to be heard provided by OFAC is also insufficient. While a blocked entity is allowed the opportunity to submit a written request for reconsideration outlining the reasons why it believes its assets were frozen in error, it is never provided an adversarial, evidentiary hearing at which it could present this evidence to a neutral arbiter.[150] Instead, an OFAC administrator "reviews" the written request before making a second determination that an

---

145. *See infra* Part III.D (discussing the doctrine of unconstitutional vagueness).

146. Even less notice is provided in cases where assets are frozen "pending investigation," and the blocking notice informs the blocked entity only that "there is reason to believe" it "may" have violated IEEPA. *See, e.g.*, Blocking Notice and Requirement to Furnish Information, *supra* note 108.

147. This risk is not alleviated by the eventual disclosure of the unclassified portions of the administrative record to the entity; this evidence is often not provided to the entity until several weeks or months after the initial freeze.

148. *See* United States v. James Daniel Good Real Prop., 510 U.S. 43, 55 (1993) (holding that *ex parte* state forfeiture procedure in which a magistrate judge acts solely on the evidence offered by the government "creates an unacceptable risk of error"); *see also* Selden, *supra* note 6, at 538.

149. Fuentes v. Shevin, 407 U.S. 67, 81 (1972) (quoting Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 170–72 (1951)).

150. *See* 31 C.F.R. §§ 501.806–807 (2004).

BURKE Exhibit G-21

entity is an SDGT.[151] This review process is conducted in secret, quite possibly by the same individual who recommended the designation in the first place, and there is no requirement that the decision-maker ever have a face-to-face meeting with the blocked entity before labeling it a "terrorist" and freezing its assets.[152] "The purpose of an adversary hearing is to ensure the requisite neutrality that must inform all governmental decision-making."[153] Given the lack of such a hearing in OFAC procedures governing SDGT designations, no such assurance of neutrality exists.

Finally, the lack of rigorous review of OFAC blocking orders on appeal contributes to the risk inherent in these procedures. The only evidence reviewed by a court once an OFAC designation or blocking order is appealed is the administrative record compiled by the agency.[154] The entity is not allowed to submit any additional evidence in its defense.[155] Furthermore, deferential judicial review of OFAC designations and blocking orders lends an entity little hope of securing due process protections lost in the OFAC designation process. Because IEEPA contains no provision for judicial review, review is conducted under the Administrative Procedure Act, using the "arbitrary and capricious" standard.[156] Under this standard, an agency action is held invalid only if it is deemed to be arbitrary, capricious, or an abuse of discretion.[157] Given the great degree of deference this standard gives to the agency, it should not be surprising that OFAC decisions are often affirmed.[158] In addition, decisions made by OFAC receive even greater deference because they involve matters of national security or foreign policy.[159] Limited judicial review combined with traditional court deference on matters of foreign policy work to produce an agency that "exercises tremendous discretion with unprecedented freedom from judicial or congressional oversight."[160] It should not be surprising that so few cases are brought challenging OFAC decisions when so few cases succeed.[161]

The probable value of additional safeguards cannot be contested. "[W]hen a person has an opportunity to speak up in his own defense, and when the State

---

151. *See id.*

152. *See* 31 C.F.R. § 501.807 (2004).

153. *James Daniel Good Real Prop.*, 510 U.S. at 55.

154. *See* Camp v. Pitts, 411 U.S. 138, 142 (1973).

155. *Id.*

156. *See* 5 U.S.C. § 706 (2000).

157. *Id.*; *see also* Fitzgerald, *supra* note 68, at 151.

158. Fitzgerald, *supra* note 68, at 140–41.

159. *See id.*; *see also, e.g.*, Paradissiotis v. Rubin, 171 F.3d 983, 988 (5th Cir. 1999) (upholding authority of OFAC to determine who is within the scope of sanctions); Veterans & Reservists for Peace in Vietnam v. Reg'l Comm'r of Customs, 459 F.2d 676 (3d Cir.) (upholding discretion of OFAC to impose restrictions on the import of Chinese informational materials from North Vietnam), *cert. denied*, 409 U.S. 933 (1972); Nielsen v. Sec'y of the Treasury, 424 F.2d 833, 839 (D.C. Cir. 1970) (upholding the blocking of the U.S. assets of a Cuban corporation, finding that Treasury officials acted within the "zone of their discretion").

160. Fitzgerald, *supra* note 68, at 136.

161. *See id.* at 136–37, 151.

must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented."[162] It is hard to argue that affording blocked entities an opportunity to hear the evidence against them, mount a defense, and present it at an adversarial hearing would not increase the likelihood that the truth will be discovered and errors avoided.

### C. THE GOVERNMENT'S INTEREST

The Government has a significant interest in maintaining its power under IEEPA to freeze terrorist assets. Freezing the assets of terrorists has been one of the primary weapons in the Bush Administration's war on terrorism because it can successfully cripple the ability of terrorists to continue their activities and plan future attacks.[163] It is widely accepted that the executive needs the ability to exercise broad powers during national emergencies in order to respond effectively to the dangers confronting the nation, and that it is well-suited to exercise these powers.[164] Because the executive branch is "unitary, always in session, [and] possessing confidential sources of information," it is the "best equipped of the three branches to act with the necessary decisiveness, dispatch, and knowledge" during times of crisis.[165] There is no doubt that the executive needs the ability to be flexible when responding to national emergencies.[166]

The government's need to freeze terrorist assets *quickly* is also justified. It is reasonable for the government to refrain from providing pre-deprivation notice to suspected terrorists whose assets it intends to freeze. If swift action is not taken, and notice is provided prior to the time at which the blocking order is to take effect, the danger exists that the designated entity will preemptively transfer its assets to other entities or locations—leaving terrorist financing unrestricted and a cold trail for government investigators to follow.[167] For this reason, courts have consistently recognized the need, in extraordinary circumstances, to postpone the safeguards of notice and a hearing until after the deprivation has occurred.[168]

---

162. Fuentes v. Shevin, 407 U.S. 67, 81 (1972).

163. *See* Press Release, U.S. Dep't of the Treasury, *supra* note 73, at 2; Savage, *supra* note 9, at 28.

164. Note, *supra* note 27, at 1103.

165. *See id.*

166. *See id.* at 1120.

167. Savage, *supra* note 9, at 37.

168. *See* Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 679 (1974) (holding that no pre-seizure notice or hearing is required when property seized is "of a sort that could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given"); *see also* Gilbert v. Homar, 520 U.S. 924, 930 (1997) ("This Court has recognized . . . that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause."); Conn. v. Doehr, 501 U.S. 1, 8 (1991) (holding that a prior hearing may be postponed "where exceptional circumstances justify such a delay, *and where* sufficient additional safeguards are present."). "Due to the exigencies of national security and foreign policy considerations, the Executive Branch historically has not provided pre-deprivation notice in sanctions programs under IEEPA." Global Relief Found., Inc. v. O'Neill, 207 F. Supp. 2d 779, 803 (N.D. Ill. 2002). President Bush did, in fact, include in Executive Order 13,224 a provision declaring

BURKE Exhibit G-23

Furthermore, the government has a legitimate need to maintain the secrecy of sensitive, classified information. Where disclosure of materials could compromise national security, ongoing investigations, or intelligence sources and methods, courts have upheld the government's interest in keeping classified material secret.[169] Blocking orders issued under IEEPA may be based on foreign intelligence, information from government informers, or evidence involving sensitive national security matters.[170] In these situations, it may not be feasible or responsible to disclose to blocked entities information that is unknown to them and that could harm the interests of the United States if released to the public.[171] As one court stated, "[t]he Constitution would indeed be a suicide pact if the only way to curtail enemies' access to assets were to reveal information that might cost lives."[172]

Calculating the government's interest also requires a consideration of any increased administrative burdens that would accompany additional procedural safeguards. However, it is unlikely that the government will face significant administrative burdens because many blocked entities are foreign individuals or organizations who may be less inclined to pursue the OFAC review process or challenge a blocking order in U.S. courts.[173] Many others choose not to pursue the review process because of the difficulty of persuading a court to overturn an OFAC action.[174]

Despite the existence of a legitimate government interest in using asset freezes for national security reasons, there are ways to protect the government's interest while also providing additional procedures to safeguard the due process rights of blocked U.S. entities.[175] Indeed, neither the government's interest in using asset freezes, nor the slight administrative burden that additional proce-

---

that "there need be no prior notice of a listing or determination made pursuant to this order" because of the ability of assets to be transferred instantaneously. Exec. Order. No. 13,224 § 10, 3 C.F.R. 785, 789 (2001).

169. *See, e.g.*, CIA v. Sims, 471 U.S. 159, 181 (1985); Nat'l Council of Resistance of Iran v. Dep't of State, 251 F.3d 192, 208–09 (D.C. Cir. 2001); United States v. Yunis, 867 F.2d 617, 623–24 (D.C. Cir. 1989).

170. *See, e.g.*, Holy Land Found. for Relief & Dev. v. Ashcroft, 219 F. Supp. 2d 57, 69–73 (D.D.C. 2002).

171. *See* Defendants' Reply Memorandum in Support of Their Motion for Leave to Submit Classified Evidence *In Camera* and *Ex Parte* at 13–14, Holy Land Found. for Relief & Dev. v. Ashcroft, 219 F. Supp. 2d 57 (D.D.C. 2002) (No. 02-CV-00442); *see also* Brief for Respondents in Opposition to Petition for Writ of Certiorari to the United States Court of Appeals for the District of Columbia Circuit at 23, Holy Land Found. for Relief & Dev. v. Ashcroft, 540 U.S. 1218 (2004) (No. 03-775). Even where the government's evidence is classified, however, procedures can be put in place to allow a blocked entity the opportunity to learn of the nature of the evidence against it. *See infra* Part III.D.

172. Global Relief Found., Inc. v. O'Neill, 315 F.3d 748, 754 (7th Cir. 2002) (internal citation omitted).

173. Fitzgerald, *supra* note 68, at 136–37. In fact, it is possible that a court would find that such a foreign entity does not have a claim upon which relief can be granted because the entity is not entitled to due process rights under the Constitution. *See infra* note 176.

174. *See* Fitzgerald, *supra* note 68, at 139–41.

175. *See infra* Part III.D.

BURKE Exhibit G-24

dures might impose, justify freezing the assets of U.S. entities without providing adequate procedural protections.

### D. THE PROCESS THAT IS DUE TO "DESIGNATED" U.S. ENTITIES[176]

There is a way to fashion procedural safeguards under IEEPA to ensure that the executive maintains flexibility to respond to emergencies quickly *and* that blocked U.S. entities have a meaningful opportunity to hear the evidence against them and respond to the charges. Because Congress "cannot adequately prescribe in advance the measures to be taken in response to particular emergencies,"[177] there are legitimate reasons for the President to have the authority under IEEPA to impose an array of economic sanctions against a wide variety of individuals and organizations.[178] To protect constitutional rights in the face of this broad discretionary power, however, there must be basic due process protections to ensure that this power is not exercised arbitrarily against U.S. entities. These protections should include a more precise definition of the terms used in IEEPA and Executive Order 13,224, sufficient notice of all charges, a hearing before a neutral arbiter, and a time limit on asset freezes.

For U.S. entities to have adequate notice, they must first be able to ascertain from the language of IEEPA, as well as the presidential executive orders issued under the statute, just what types of conduct will result in sanctions. It is well-settled that "a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the

---

176. This section outlines the procedures required by the Due Process Clause when the U.S. assets of U.S. citizens are frozen pursuant to IEEPA. However, courts have not expressly rejected the idea that foreign nationals designated as terrorists by the U.S. are also entitled to due process rights when their U.S. assets are frozen. In *People's Mojahedin Organization of Iran v. Department of State*, 182 F.3d 17, 22 (D.C. Cir. 1999), the D.C. Circuit held that a foreign entity without property or presence in the U.S. has no due process rights when it is designated as a Foreign Terrorist Organization by the Department of State under the Antiterrorism and Effective Death Penalty Act (AEDPA). In that case, the foreign entity designated as an FTO had no assets frozen as it had no assets located in the U.S. However, the court made it clear that it was not addressing the question of what procedural rights would be due to a foreign entity that had assets blocked in the U.S. *Id.* In *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192 (D.C. Cir. 2001), the court held that a foreign entity whose U.S. assets are frozen after designation as an FTO has due process rights when the foreign entity has come within the territory of the United States and developed substantial connections with this country. *Id.* at 202–03 (citing United States v. Verdugo-Urquidez, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country.")). The court left open the questions of whether a foreign national present in the United States, but without substantial connections to the United States, would have due process rights and whether a foreign entity's placement of assets in U.S. banks is sufficient to establish U.S presence. 251 F.3d at 202. Therefore, an argument could be made that foreign nationals without substantial connections to this country, whose U.S. assets are frozen pursuant to a terrorist designation by the U.S. government, are entitled to due process rights. This issue, however, is beyond the focus of this Note.

177. Note, *supra* note 27, at 1103.

178. *See id.*

BURKE Exhibit G-25

conduct it prohibits."[179] The vagueness doctrine exists to ensure that the government does not punish people for behavior they could not have known was illegal, as well as to protect against subjective enforcement of the laws based on arbitrary or discriminatory interpretations by the government.[180] Without the certainty that fair notice provides, regulated parties are unable to "conform [their] conduct with the law."[181]

IEEPA fails to meet these standards because it does not specify those types of activities rendered unlawful under the statute. First, nowhere in the statute, or in Executive Order 13,224, are the terms "Specially Designated Global Terrorist," "associated with," or "assist, sponsor, or provide financial, material, or technological support for," defined.[182] Without definition, a literal interpretation of these terms could lead to an attorney being criminally charged for his legal representation of a designated entity, a utility company being criminally charged for heating the home of a designated individual, or a son or daughter being criminally charged for associating with his or her designated parent. Executive Order 13,224 does not specify that a person or organization charged with supporting or associating with a designated terrorist have any intent to support the terrorist activities of the designated entity or even any knowledge that the entity has been designated. The Order contains no exceptions or qualifiers that prevent sweeping interpretations of its terms.

The vague terms used in IEEPA stand in contrast to the more detailed definition of "material support" provided in the so-called material support statute.[183] The material support statute was passed as part of the Violent Crime Control and Law Enforcement Act of 1994, was amended by the Antiterrorism and Effective Death Penalty Act (AEDPA) and the USA PATRIOT Act, and has much the same purposes as Executive Order 13,224. The material support statute criminalizes certain types of activities that support terrorist activities and organizations, and defines "material support" as: "currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (one or more individuals who may be or include oneself), and transportation, except medicine or religious materials."[184] Even parts of this definition, a definition that is far more specific than any language in IEEPA or Executive Order 13,224, have been found unconstitutionally vague by the U.S. Court of

---

179. City of Chicago v. Morales, 527 U.S. 41, 56 (1999) (quoting Giaccio v. Pennsylvania, 382 U.S. 399, 402–03 (1966)).

180. United States v. Wunsch, 84 F.3d 1110, 1119 (9th Cir. 1996) (citing Grayned v. City of Rockford, 408 U.S. 104, 108–09 (1972)). The vagueness doctrine applies, although less strictly, where a regulation imposes civil penalties. Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498–99 (1982).

181. Morales, 527 U.S. at 58.

182. See Exec. Order. No. 13,224 § 1, 3 C.F.R. 785, 787 (2001).

183. 18 U.S.C.A. §§ 2339A, 2339B (West Supp. 2005).

184. 18 U.S.C.A. § 2339A(b)(1).

BURKE Exhibit G-26

Appeals for the Ninth Circuit.[185] There is no question that the Constitution requires that U.S. entities be given more precise notice of the activities IEEPA proscribes.

Second, a blocked entity must be served with sufficient notice of the charges against it to have a meaningful opportunity to defend itself. To satisfy constitutional requirements, notice must do more than simply alert interested parties to the existence of a charge, it must also be "reasonably calculated, under all the circumstances, to . . . afford them an opportunity to present their objections."[186] Blocking orders currently issued under IEEPA fall far short of meeting this standard; they provide only a vague assertion of the law which the entity is accused of violating and fail to inform the entity about what specific activities they have engaged in that IEEPA prohibits.[187] It is not necessary that this notice be provided to a blocked entity pre-deprivation, as there are legitimate reasons why the government should be concerned about entities transferring assets once warning of an impending freeze is given. Instead, it is reasonable for this notice to be provided upon deprivation, as is currently the practice.[188] But to be sufficient, this notice must provide adequate information to allow blocked entities a meaningful opportunity to answer the charges upon receipt of the blocking order. It is not sufficient to provide a blocked entity with the unclassified portions of the administrative record months after the blocking order issues and the opportunity to challenge the designation has ended. An entity should not have to wait months—or initiate a civil suit—in order to have even a portion of the information needed to adequately defend itself.

Third, procedures must be put into place whereby a blocked entity can learn of the nature of the *classified* evidence used against it. Where much of the evidence used to justify a designation is classified and an entity does not have even general knowledge of the nature of the evidence, a blocked entity is left without a meaningful opportunity to present evidence in its defense. Instead, where classified evidence will be used to justify a blocking order, the government should provide at the very least a summary of the classified information to be used. The procedures required in criminal cases under the Classified Informa-

185. *See* Humanitarian Law Project v. Dep't of Justice, 352 F.3d 382, 403 (9th Cir. 2003) (holding that "the terms 'personnel' and 'training' are void for vagueness under the First and Fifth Amendments because they bring within their ambit constitutionally protected speech and advocacy"), *reh'g en banc granted and opinion vacated by* 382 F.3d 1154 (9th Cir. 2004), *vacated and remanded by* 393 F.3d 902 (9th Cir. 2004) (remanding in light of amendments to 18 U.S.C. § 2339A(b) (2000), enacted as part of the National Intelligence Reform Act of 2004, Pub. L. No. 108-458, § 6603, 118 Stat. 3638, 3762–64, which provided more specific definitions of "training" and other terms in the material support statute); *see also* Humanitarian Law Project v. Ashcroft, 309 F. Supp. 2d 1185, 1200–01 (C.D. Cal. 2004) (holding that the term "expert advice and assistance" is impermissibly vague).

186. Mulane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).

187. Even where assets are blocked pending investigation, the government has information justifying the freeze that should reasonably be disclosed to the blocked entity.

188. Declaration of R. Richard Newcomb ¶ 12, Holy Land Found. for Relief & Dev. v. Ashcroft, 219 F. Supp. 2d 57 (D.D.C. 2002) (No. 02-CV-00442) (declaration of the Director of OFAC).

BURKE Exhibit G-27

tion Procedures Act (CIPA)[189] provide a useful model. Under CIPA, if a criminal case involves classified evidence that the government wishes not to disclose, the court may authorize the United States to

> delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove.[190]

These substitutes are allowed where the court determines that they will provide the defendant "with substantially the same ability to make his defense as would disclosure of the specific classified information."[191]

In enacting CIPA, Congress was mindful of a defendant's constitutional right to confront the evidence against him and attempted to strike an appropriate balance between a defendant's constitutional right to a fair trial and the government's need to protect classified information.[192] With the same constitutional and national security concerns in mind, similar procedures should be adopted under IEEPA to ensure adequate disclosure to entities whose assets are blocked.[193] Although the procedures outlined in CIPA have been applied only in criminal cases, an entity blocked pursuant to IEEPA has a similarly critical need to that of a criminal defendant to exercise its right to confront the evidence used against it through such procedures. Indeed, for a blocked entity, the consequences of being labeled a "terrorist" can be just as devastating as a criminal penalty, given both the economic ruin and social stigma associated with such a label. In the immigration context, where individuals facing detention and deportation have a similar liberty interest in due process safeguards, federal courts have held that the use of secret evidence, undisclosed to the detained alien, may not be employed where it undermines the alien's ability to mount a defense.[194] As in those cases, it is imperative that the balance between protecting classified evidence and disclosing adverse evidence to a blocked

---

189. Classified Information Procedures Act, Pub. L. No. 96-456, 94 Stat. 2025 (1980).

190. *Id.* § 4, 94 Stat. at 2025–26.

191. *Id.* § 6(c), 94 Stat. at 2026.

192. S. REP. No. 96-823, at 8–9 (1977), *reprinted in* 1980 U.S.C.C.A.N. 4294, 4302.

193. Congress has, in the past, drafted legislation to apply CIPA to certain kinds of non-criminal cases, including deportation proceedings for noncitizens. This legislation amassed significant support within the House of Representatives. *See* Secret Evidence Repeal Act of 2000, H.R. 2121, 106th Cong. § 3 (2000).

194. *See, e.g.,* Am.-Arab Anti-Discrimination Comm. v. Reno, 70 F.3d 1045, 1068–70 (9th Cir. 1995) (holding that INS use of secret evidence to oppose applications for legalization to permanent resident status violates aliens' due process rights); Al Najjar v. Reno, 97 F. Supp. 2d 1329, 1352–57 (S.D. Fla. 2000) (holding that INS use of secret evidence to detain alien violates alien's due process rights); Kiareldeen v. Reno, 71 F. Supp. 2d 402, 413–14 (D.N.J. 1999) (holding that INS use of secret evidence to detain alien pending deportation proceedings violates alien's due process rights).

BURKE Exhibit G-28

entity be struck in a way that takes into greater account the significant interest a blocked U.S. entity has in mounting a good defense.[195]

Finally, the Constitution requires that blocked U.S. entities be given a *meaningful* opportunity to be heard.[196] The national security concerns inherent in cases involving OFAC designations do not justify the lack of a post-deprivation, adversarial hearing. The Supreme Court has held that notice and a hearing may be postponed until after a deprivation has occurred in "extraordinary situations where some valid governmental interest is at stake."[197] It has not, however, suggested that exigent circumstances justify forgoing a hearing altogether.[198] Even where the deprivation is not permanent or is effected pending investigation, a hearing is required.[199] "A temporary, nonfinal deprivation of property is nonetheless a 'deprivation'" under the Due Process Clause.[200]

Furthermore, where agency decisions are made that have such serious consequences for a U.S. entity, that entity has a constitutional right to more than a one-sided review of its written submissions. A hearing need not include the right to cross-examine witnesses or resemble a jury trial to satisfy due process requirements.[201] But where the Supreme Court has upheld procedures involving less, the party suffering the deprivation often has had the opportunity to meet with the government investigator, argue its position orally, or participate in an evidentiary hearing.[202] Where the Court has deemed written submissions adequate to satisfy due process requirements, it specifically has noted that the individual had "full access to all information relied upon by the . . . agency" prior to submitting a written challenge to his deprivation, and that a hearing

---

195. Interestingly, the district court in *Global Relief Foundation, Inc. v. O'Neill*, 207 F. Supp. 2d 779, 808 (N.D. Ill. 2002), made a point to distinguish the "temporary" freezing of GRF's assets under IEEPA from a permanent forfeiture in justifying its decision that the submission of materials *ex parte* and *in camera* does not offend the Constitution. The court did not, however, explain how it believed the practical effects of an indefinite seizure under IEEPA could be distinguished from those of a civil forfeiture.

196. *See* Matthews v. Eldridge, 424 U.S. 319, 333 (1976).

197. Fuentes v. Shevin, 407 U.S. 67, 82 (1972) (quoting Boddie v. Connecticut, 401 U.S. 371, 379 (1971)).

198. *See, e.g.,* Barry v. Barchi, 443 U.S. 55, 66 (1979) (holding that, where government interest justifies forgoing pre-suspension hearing for suspended horse trainer, government must provide horse trainer with post-suspension hearing); Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 668, 678–79 (1974) (holding that government interest justifies postponing hearing until after deprivation, where hearing will later be provided in Superior Court); *see also* Holstein v. City of Chicago, 29 F.3d 1145, 1148 (7th Cir. 1994) ("In circumstances in which a pre-deprivation hearing is not required, due process requires that governmental unit afford postdeprivation procedures . . . ."); Chernin v. Welchans, 844 F.2d 322, 326 (6th Cir. 1988) ("Depending on the circumstances of the particular case, the hearing called for by the fourteenth amendment may be a pre-deprivation hearing, or a pre-deprivation abbreviated 'opportunity to respond' with a prompt post-deprivation hearing, or solely a prompt post-deprivation hearing." (internal citations omitted)).

199. *See Barchi,* 443 U.S. at 66.

200. *Fuentes,* 407 U.S. at 85.

201. Brock v. Roadway Express, Inc, 481 U.S. 252, 266 (1987); *Eldridge,* 424 U.S. at 333.

202. *See, e.g., Brock,* 481 U.S. at 266; Arnett v. Kennedy, 416 U.S. 134, 142–46 (1974); Bell v. Burson, 402 U.S. 535, 540–42 (1971).

BURKE Exhibit G-29

following deprivation was provided.[203] OFAC's current procedures, which provide the blocked entity with only a written review process, without prior full access to the agency record and with no guaranteed opportunity for a hearing or meeting with an OFAC official, fall far short of meeting this standard.

U.S. entities must also be provided the opportunity to challenge their designations before an impartial decision-maker, as "an impartial decision maker is essential" to a meaningful opportunity to be heard.[204] A blocked entity should be provided a hearing before an Administrative Law Judge, not the individual or individuals initially responsible for determining that a blocking order was appropriate. During the hearing, the blocked entity must be allowed to present evidence in support of its position that the blocking order was issued in error, and the burden should rest on the government to prove that the entity is in fact a terrorist or supportive of terrorism.

Furthermore, once a freeze is enacted, and sufficient notice is given, the freeze must only be temporary—just long enough to allow the government time to provide the blocked U.S. entity with a hearing to determine if there is sufficient evidence to justify the blocking order. If the decision-maker determines that the evidence justifies a permanent freeze, he or she may order one. But a temporary freeze followed by a timely hearing ensures that, where the government's evidence is not deemed sufficient, an unjustified freeze is not allowed to continue indefinitely.

Where assets are frozen "pending investigation," there must still be a time limit on the duration of the freeze. If investigatory freezes are allowed to continue indefinitely, a blocked entity's assets may be frozen in error for decades without it ever being provided a genuine opportunity to confront and respond to the evidence. In these cases, a timely hearing and limited freeze provide the government with the incentive to perform a thorough investigation and make any necessary designation expediently. It is for just these reasons that the staff of the 9/11 Commission concluded in the Staff Monograph on Terrorist Financing that "serious consideration should be given to placing a strict and short limit on the duration of . . . a temporary blocking."[205]

A useful analogy of the procedures constitutionally required under IEEPA is

---

203. *See Eldridge*, 424 U.S. at 339, 345–46.

204. Goldberg v. Kelly, 397 U.S. 254, 271 (1970); Withrow v. Larkin, 421 U.S. 35, 46 (1975) ("[A] fair trial in a fair tribunal is a basic requirement of due process.").

205. NAT'L COMM'N ON TERRORIST ATTACKS UPON THE U.S., *supra* note 60, at 112. The Commission went on to state that "[a] 'temporary' designation lasting 10 or 11 months, as in the BIF and GRF cases, becomes hard to justify." *Id.*

The report also referred to the concerns of the Treasury Department's General Counsel about the length of temporary blocking orders. According to the Commission staff, the General Counsel wrote to other senior Treasury officials four months after the blocking orders against GRF and BIF were issued that "common fairness and principles of equity counsel that we impose a reasonable end date on the duration of such orders." *Id.* at 105.

BURKE Exhibit G-30

found in the procedures required for civil asset forfeiture.[206] While "temporary" freezes under IEEPA and permanent civil forfeiture may be legally distinct for takings purposes, they implicate the same concerns in the context of due process rights. For blocked U.S. entities, freezing of assets under IEEPA is the virtual equivalent of forfeiture, as assets can be frozen indefinitely. In addition, there are similar concerns about error inherent in both civil forfeiture and indefinite seizure under IEEPA. In both situations, it is in the best interest of both the government and private parties to ensure that an individual's property is not confiscated in error absent the protections of due process.

When the government seeks to seize an individual's property, the Supreme Court has held that the Due Process Clause requires that the government afford notice and an adversary hearing before seizing property subject to forfeiture.[207] In certain limited circumstances, immediate seizure may occur without the opportunity for a prior hearing where "the seizure has been directly necessary to secure an important governmental or general public interest, . . . there has been a special need for very prompt action, . . . [and] the person initiating the seizure has been a governmental official responsible for determining . . . that it was necessary and justified in the particular instance."[208] Even in those cases, however, a post-seizure hearing is still constitutionally required.[209]

Certainly, the blocking of assets under IEEPA qualifies as one of those limited circumstances in which a pre-seizure hearing is not required: the seizure is effected to serve the important governmental and public interest of keeping funds out of the hands of those who might attack us; there is a special need for prompt action given the fungibility of financial assets; and the frozen assets are seized by, and remain under the control of, the federal government. The existence of these factors, however, only justifies *postponing* the hearing until after the assets have been blocked. It does not justify withholding an opportunity for a hearing altogether.[210] In addition, the need for an adversarial hearing is arguably even greater under IEEPA than it is under civil forfeiture because an entity blocked under IEEPA is never given an opportunity to present its case before a neutral arbiter.

The Civil Asset Forfeiture Reform Act (CAFRA),[211] enacted in 2000, out-

---

206. Civil forfeiture provides the government means to seize and take ownership of property that was involved in a criminal offense. *See generally* Stefan D. Cassella, *The Civil Asset Forfeiture Reform Act of 2000: Expanded Government Forfeiture Authority and Strict Deadlines Imposed on All Parties*, 27 J. LEGIS. 97 (2001); Barclay Thomas Johnson, *Restoring Civility—the Civil Asset Forfeiture Reform Act of 2000: Baby Steps Towards a More Civilized Civil Forfeiture System*, 35 IND. L. REV. 1045 (2001).
207. United States v. James Daniel Good Real Prop., 510 U.S. 43, 62 (1993).
208. Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 678 (1974) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 90–91 (1972) (citing situations, including the need to protect the public from a bank failure, misbranded drugs, and contaminated food, in which postponement of a hearing is justified)).
209. *See* 416 U.S. at 679.
210. *See id.* at 668, 678–79.
211. 18 U.S.C. § 983 (2000 & Supp. II 2002).

BURKE Exhibit G-31

lines the procedures to be followed in federal asset forfeiture. Congress enacted CAFRA amid serious concerns that forfeiture procedures did not adequately protect the due process rights of property owners whose property was seized under the civil forfeiture laws.[212] Under the Act, notice of a seizure must generally be sent to a claimant within sixty days of the date of the seizure.[213] Once notice is received, a claimant has thirty days to file a claim for the seized property.[214] After a claim is filed, the U.S. Attorney has ninety days to file a civil complaint for forfeiture or include the property in a criminal indictment.[215] If this deadline passes without government action, forfeiture is barred.[216] This prevents the assets of those subject to forfeiture from being indefinitely seized without any showing by the government that the assets are *properly* seized. The most important principle in forfeiture law is that, shortly after the initial seizure, those subject to forfeiture are guaranteed their day in court to present their defense if they file a timely complaint.[217]

.Once in court, under CAFRA, if the government brings a civil forfeiture action, it must prove by a preponderance of the evidence that the assets are subject to forfeiture.[218] It may not rely on hearsay evidence to make its case.[219] If the government succeeds in meeting its burden, the burden then shifts to the owner, who must prove by a preponderance of the evidence that he is an "innocent owner"—that he either did not know of the unlawful conduct or, upon learning of it, "did all that reasonably could be expected under the circumstances to terminate such use of the property."[220]

Similar procedures should be adopted under IEEPA to safeguard the due process rights of those subject to IEEPA blocking orders. Because blocked U.S. entities are subject to a significant deprivation much like that of a civil forfeiture, they should be given as much due process protection, if not more, than

---

212. H.R. REP. No. 106-192, at 2, 6 (1999).
213. 18 U.S.C. § 983(a)(1)(A)(i) (2000).
214. 18 U.S.C. § 983(a)(2)(B).
215. 18 U.S.C. § 983(a)(3)(A).
216. 18 U.S.C. § 983(a)(3)(B).
217. 18 U.S.C. § 985(d)(1)(B)(i), (e) (2000).
218. 18 U.S.C. § 983(c) (2000).
219. Cassella, *supra* note 206, at 108–09.
220. 18 U.S.C. § 983(d). Interestingly, Congress, in the USA PATRIOT Act, amended CAFRA to provide for weaker civil forfeiture procedures in the seizure of terrorist assets. USA PATRIOT Act, Pub. L. No. 107-56, § 316, 115 Stat. 272, 309–10 (2001) (amending 18 U.S.C. § 983 (2000)). Specifically, it reduced the burden of proof for the government in terrorism cases to a showing of probable cause, and required that instead the claimant has the burden of proving, by a preponderance of the evidence, that it is *not* subject to forfeiture. *Id.* § 316(a), 115 Stat. at 309. In addition, it provided that hearsay evidence not admissible under the Federal Rules of Evidence may be admissible in a forfeiture proceeding if compliance with the federal rules "may jeopardize the national security interests of the United States." *Id.* § 316(b), 115 Stat. at 309. Notwithstanding this strengthening of civil forfeiture law as it pertains to terrorism cases, the Bush Administration has used civil forfeiture very rarely in the last few years, no doubt because the lack of due process safeguards under IEEPA makes it a much more attractive vehicle for the seizure of terrorist assets. Stefan D. Cassella, *Forfeiture of Terrorist Assets Under the USA PATRIOT Act of 2001*, 34 LAW & POL'Y INT'L BUS. 7, 10 (2002).

BURKE Exhibit G-32

those subject to forfeiture. Time limits on the length of a freeze "pending investigation" should be imposed to help ensure that innocent entities do not suffer serious and erroneous deprivations for years, and to provide the government an incentive to develop its case quickly or release the funds. At a minimum, a blocked entity should get a hearing before an Administrative Law Judge, at which the government must prove by a preponderance of the evidence, using only evidence admissible under the Federal Rules of Evidence, that the entity is connected to terrorism. At a minimum, the entity should be able to enter its own evidence into the record, confront the government's evidence, and be assured that the review process is fair and balanced.

## Conclusion

It is possible that all those designated as SDGTs are in fact terrorists or are actively supporting those who advocate and commit terrorism. Holy Land Foundation, Global Relief Foundation, and Benevolence International Foundation may in fact be associated with dangerous terrorist groups. It is also possible, however, that they are not. The Fifth Amendment exists to ensure that U.S. entities like these charities are given a meaningful opportunity to present evidence in their defense to prevent arbitrary deprivations of their property. Furthermore, procedural safeguards do more than ensure that a person is not erroneously deprived of his life, liberty, or property. They also assure the rest of us that we have found and punished those who are truly responsible for promoting terrorism and have genuinely made ourselves safer. By denying designated U.S. entities the due process rights to which they are entitled under the Constitution, the public is stripped of an important opportunity to know the truth.

In 2002, after sustaining criticism for the way in which it designates SDGTs, a U.S. official declared that critics "are just going to have to trust the United States to do the right thing."[221] Our democracy, however, was not built on trust. It was built on accountability and a deep-rooted belief that its citizens should be secure in their liberty and afforded the due process of law.

The executive branch now has at its disposal means by which it can freeze the assets of U.S. entities indefinitely, without notice or a hearing. Congress has failed to prescribe the "proper procedural and factual prerequisites" for designating an entity as an SDGT, adequate means of disclosing classified evidence to the blocked entity, or a meaningful way for a blocked entity to challenge its designation by presenting evidence in its defense.[222] And the courts, whose duty it is to safeguard the due process rights to which U.S. entities are entitled under the Constitution, have failed to reign in the executive's power and require the most basic due process protections—sufficient notice and a hearing—to the entities whose assets are frozen.

---

221. Lynch, *supra* note 71.
222. Fitzgerald, *supra* note 68, at 168.

BURKE Exhibit G-33

It is a mistake to assume that the fight against terrorism, an amorphous fight with an indefinite end, requires an executive with unprecedented powers. The need to maintain a balance between securing our nation and securing our liberties is ever-present. This balance is not only possible, it is constitutionally required. The courts should not hesitate to act solely because those stripped of their rights are accused terrorists. No crisis is so great as to justify stripping a citizen of his property based solely on the government's word. "It would indeed be ironic if, in the name of national defense, we would sanction the subversion of . . . those liberties . . . which [make] the defense of the Nation worthwhile."[223]

---

223. United States v. Robel, 389 U.S. 258, 264 (1967).

BURKE Exhibit G-34